1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                :
JOSE SANCHEZ and ANTONIO
MEJIA PALACIO,
                                        16-CV-2064

        Plaintiff,

            -against-          :

                                United States Courthouse
                                Central Islip, New York

FIRST CLASS HOME IMPROVEMENT,
LLC, FIRST CLASS ROOFING, INC.,
OCEANSIDE FIRST CLASS ROOFING,
INC., and ETHAN SAGE, a/k/a JESUS
MANUEL TORRES CANDELARIA, a/k/a
JESUS TORRES,
                                        November 27, 2016
        Defendants.        :        9:30 a.m.

- - - - - - - - - - - - - - - X

TRANSCRIPT OF BENCH TRIAL
BEFORE THE HONORABLE DENIS R. HURLEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:        NEIL H. GREENBERG & ASSOCIATES
                           4242 Merrick Road
                           Massapequa, NY  11758
                           BY:  JUSTIN M. REILLY, ESQ.


For the Defendants:        LEE R. PEARLMAN, ESQ.
                           54 Blydenburgh Road
                           Centereach, NY  11720



Court Reporter:        Mary Ann Steiger
                       100 Federal Plaza
                       Central Islip, New York 11722
                       (631) 712-6101


Proceedings recorded by mechanical stenography.
Transcript produced by computer.

2

1          THE CLERK:  All rise.

2          THE COURT:  Good morning, everyone, if you would

3     all be seated, please.

4          MR. PEARLMAN:  Good morning, your Honor.

5          THE CLERK:  Civil cause for bench trial, civil

6     16-2064, Sanchez, et al, against First Class Home

7     Improvements, et al.

8          Counsel, please state your appearances for the

9     record.

10         MR. REILLY:  Justin Reilly for the plaintiffs.

11    Good morning, Judge.

12         THE COURT:  Good morning, Mr. Reilly.

13         MR. REILLY:  I have next to me Keith Williams

14    from my office, and he will be sitting in, as well as the

15    two plaintiffs behind us.

16         THE COURT:  Good morning, Mr. Williams.

17         MR. WILLIAMS:  Good morning, your Honor.

18         MR. PEARLMAN:  Good morning, your Honor, Lee

19    Pearlman, 54 Blydenburgh Road, Centereach, New York, for

20    the defendants.  And that's Ethan Sage, one of the

21    defendants.

22         THE COURT:  Good morning, gentlemen.

23         There's just a few preliminary matters that we

24    should go over.

25         Firstly, we had a discussion I believe sometime

3

1    last week and there was a question of whether I should

2    recuse myself.  I indicated that I didn't feel it was

3    necessary.  I believe that counsel agreed with that

4    conclusion, but that should be placed on the record.

5              So, Mr. Reilly, I'll check with you first.

6              MR. REILLY:  Yes, Judge, we agree with that

7    conclusion that you don't need to recuse yourself.

8              MR. PEARLMAN:  And the defendants agree as well.

9              THE COURT:  Now, one other item we discussed at

10   some point -- at this point, we ought to swear in the

11   interpreter and I'll slow up a little bit.  I forgot we

12   needed an interpreter here.

13             Good morning, sir.

14             THE INTERPRETER:  Good morning, your Honor.

15             You don't have to slow down, it's fine with me.

16             (Interpreter sworn.)

17             THE CLERK:  Please state your name for the

18   record and the language you're interpreting.

19             MR. HONTORIA:  James Hontoria, and the language

20   is Spanish.

21             THE COURT:  The other preliminary matter is

22   there was some thought we would try to narrow the issues.

23   I don't know if any success has been achieved with respect

24   to that goal.  If the issues have been narrowed at all,

25   fine, let me know.  Otherwise, we will just proceed.

4

1           Mr. Reilly?  Mr. Pearlman?

2           MR. REILLY:  We haven't been able to narrow the

3    issue.

4           THE COURT:  That's obviously agreed to by Mr.

5    Pearlman?

6           MR. PEARLMAN:  Well, I don't necessarily agree

7    with that.

8           I think sub silentio we agree that the claim for

9    minimum wage which was in the complaint is not being

10   pursued, and what's being pursued is the overtime and the

11   other claims.

12          THE COURT:  Okay.

13          MR. PEARLMAN:  Am I correct?

14          MR. REILLY:  We never agreed to that, Judge.

15   Whatever the evidence bears out, the evidence bears out.

16          MR. PEARLMAN:  Okay.

17          THE COURT:  So both sides are ready to proceed?

18          MR. REILLY:  Yes, Judge.

19          MR. PEARLMAN:  Yes.

20          THE COURT:  Sir, speak to your lawyer.

21          (Pause in proceedings.)

22          THE COURT:  Yes, sir.

23          MR. PEARLMAN:  Your Honor, there's just one

24   thing my client asked me to note.

25          We consented to Mr. Sage's deposition I believe

5

1   it was of last week or the week before, a further

2   deposition, to go over his appointment books and we have

3   not be able to obtain the transcript even contacting the

4   reporters directly, so we just wanted to note that for the

5   record.  We feel there's a degree of prejudice involved

6   with that.

7           THE COURT:  What am I being asked to do, if

8   anything, at this point on this issue?

9           MR. PEARLMAN:  I'm not asking you to do

10  anything.

11          I'm noting for the record that we feel it's to

12  our disadvantage and prejudice that we haven't been able

13  to obtain a copy of those minutes even directly from the

14  reporter.  So, therefore, I have not been able to prepare

15  my client for questioning on that limited piece of the

16  case.

17          THE COURT:  Mr. Reilly, I'm a little confused.

18  Is there a copy of the transcript?

19          MR. REILLY:  Judge, I have a copy of the

20  transcript.  I got a copy last Monday, so I'm sure the

21  copy would have been available to defendants if they

22  requested it.

23          Judge, the reason why I took this subsequent

24  deposition is because after we put on the joint pretrial

25  order all of the exhibits that we were going to use, and

6

1   after we filed a joint pretrial order, all of a sudden I

2   got all these appointment books.

3           And your rule specifically says, if the exhibits

4   are not listed on the joint pretrial order, they don't go

5   into evidence.

6           Then we had a conference with you back in August

7   where you told us to try to work it out.

8           So I took his deposition and I agreed to admit

9   the daily planners into evidence along with a summary of

10  the days that were allegedly worked by the plaintiffs.

11          So I don't see how there could possibly be any

12  prejudice here.

13          THE COURT:  The prejudice that Mr. Pearlman is

14  citing to is he doesn't have a copy of the transcript and,

15  as a result, he hasn't had an opportunity to review it

16  with the defendant.

17          Now, what was the arrangement as far as who was

18  going to pay the Court Reporter for his or her services?

19          MR. REILLY:  The normal arrangements under the

20  federal rule.  They didn't request a read and sign copy,

21  and normally both sides pay their own costs for the

22  deposition.

23          MR. PEARLMAN:  We contacted the reporter last

24  week and they told us they weren't available.  That was

25  the problem that we had.

7

1    THE COURT:  You already paid your share?

2    MR. PEARLMAN:  Normally we pay when we get it or

3    right before.  We pay them simultaneously.

4    THE COURT:  I have no idea if this is going to

5    be a problem.  If it is, I'm not going to require the

6    individual defendant to be in a position where he's

7    cross-examined on the subsequent deposition when he hasn't

8    seen it.

9    So, one way or another, it's a non-jury trial,

10   if it has to be put over so we can get the transcript and

11   he can review it with counsel, that's what we will do.

12   MR. PEARLMAN:  Thank you, your Honor.

13   THE COURT:  Make every effort to get a copy of

14   it.

15   MR. REILLY:  Judge, it's my intention to use the

16   second transcript, which is from two weeks ago, November

17   13th, as part of my examination of the defendant and the

18   defendant is going to be the first witness here.

19   I'm the one who asked the questions and he

20   testified regarding the questions.  I don't know if his

21   attorney asked any questions at all.  He could have simply

22   just called me last week and said, by the way, I haven't

23   gotten a copy of the transcript, can you send it to me,

24   did you get it, and there was no communication at all.  I

25   would have said, certainly, here it is.

8

1           I have two more trials coming up, one on

2    December 12th before Judge Reyes, and one on December 18th

3    before Judge Wexler.  There's no way I can put this over

4    until sometime in December because of this.

5           THE COURT:  I'm not thinking about putting over

6    the trial.  What I am saying is I don't think it's fair

7    that the defendant is required to answer questions on

8    cross-examination concerning the second deposition when

9    he's never seen it, so I'm not going to permit that.

10          I do understand what you're saying, Mr. Reilly.

11   You're proceeding in good faith.  You have your copy, you

12   paid for it, you received no communication from

13   Mr. Pearlman saying I never got a copy.  So that's where

14   we are.

15          Out of curiosity, Mr. Pearlman, why didn't you

16   call up and say, hey, why don't you give me a copy of that

17   thing?

18          MR. PEARLMAN:  I didn't do that because I'm

19   aware of the rules that I was required to deal with the

20   reporter directly, which is what I attempted to do.

21          THE COURT:  How long is the deposition?  That's

22   pretty thick.  That's 70, 80 pages?

23          MR. REILLY:  It's 109 pages.  It's related to

24   his daily planners and documents that he created after his

25   first deposition as to the dates that he believed that the

9

1    plaintiffs worked.

2          THE COURT:  Firstly, I don't appreciate faces

3    from the parties.  So, the defendant is directed not to

4    make faces.  We try to do this in a civilized fashion with

5    appropriate respect for everybody.  You have an absolute

6    right to confer with your attorney at any point during the

7    proceedings, but simply reacting via an emotional response

8    doesn't further the goal of trying to get this matter

9    resolved; so I would ask you to please refrain from that

10   conduct.

11         Now, the question is your first witness is who?

12         MR. REILLY:  Ethan Sage.

13         THE COURT:  What are the subjects you want to go

14   into?  Obviously, one is the deposition.

15         MR. REILLY:  His daily planners and --

16         THE COURT:  Is there other subjects you can go

17   into?

18         MR. REILLY:  Certainly, Judge, but it's all kind

19   of mixed together though.  I can't separate it out.

20         THE COURT:  I'm open to suggestions.

21         One suggestion is that you try to separate it

22   out and go through, independent of the second deposition

23   subject, the daily planner, and over the luncheon recess

24   I'll arrange to get a copy of your deposition, if you give

25   me permission to do so, and that will be provided to the

10

1    defendant.  They will have the luncheon recess to review

2    the copy of the deposition and then you can resume your

3    examination after lunch.

4           MR. PEARLMAN:  That's exactly what I was going

5    to suggest, your Honor.

6           THE COURT:  Mr. Reilly, I know you're in a

7    difficult position and it's a position you didn't create

8    all right.

9           As I've said, he's going to have an opportunity

10   to read that because otherwise it's just not fair and I'm

11   not going to permit it.

12          You have two options.  If you want, I can put

13   the matter over for an hour-and-a-half, I'll make a copy

14   of the transcript, we will give it to him and start the

15   proceeding then.  That's one option.  Do you prefer that?

16          MR. REILLY:  Absolutely.

17          THE COURT:  Then we will do that.  Give me a

18   copy of the deposition and we will arrange to have a copy

19   made.

20          MR. REILLY:  You actually have a copy up there,

21   Judge.  It starts on page 218.

22          THE COURT:  We will make a copy of the one I

23   have for the defendant and then we will resume at 11:30

24   and we will get this to you in 15 minutes.

25          (Recess taken.)

11

1          THE COURT:  If you will all be seated, please.

2          Are we ready to proceed at this point.

3   Mr. Reilly?

4          MR. REILLY:  Yes, your Honor.

5          THE COURT:  Mr. Pearlman?

6          MR. PEARLMAN:  Yes, your Honor.

7          THE COURT:  All right, sir.

8          The question is whether we should have opening

9   statements.

10          I have read the briefs that were submitted.  I

11   think I understand the issues, but, Mr. Reilly, if you

12   would like to make an opening statement, fine, otherwise

13   we'll just proceed to the testimony.

14          MR. REILLY:  No opening, your Honor.

15          THE COURT:  No opening by the defense either?

16          MR. PEARLMAN:  No, your Honor.

17          THE COURT:  At this point I'll call on

18   Mr. Reilly, plaintiff's first witness.

19          MR. REILLY:  Ethan Sage, your Honor.

20          THE CLERK:  Please raise your right hand.

21   **ETHAN   SAGE**,

22          called as a witness, having been first

23          duly sworn, was examined and testified

24          as follows:

25          THE CLERK:  State your name for the record, and

Sage - Direct/Reilly

1   please spell it for the court reporter.

2                   THE WITNESS:  It's Ethan Sage.  S-A-G-E

3                   THE COURT:  Thank you, you may be seated.

4                   THE WITNESS:  Thank you, sir.

5                   MR. REILLY:  May I, your Honor.

6                   THE COURT:  Yes, sir.  Mr. Reilly, direct.

7   DIRECT EXAMINATION

8   BY MR. REILLY:

9   Q.   Good morning, Mr. Sage.

10  A.   Good morning.

11  Q.   Now, Mr. Sage, you gave sworn deposition testimony at

12  my office in May of 2017; is that correct.

13  A.   That's correct.

14  Q.   At that time you were represented by your counsel who

15  is representing you here today?

16  A.   That's correct.

17  Q.   At that time I asked you questions and you answered

18  those questions under oath; is that correct?

19  A.   That's correct.

20  Q.   At that time you answered all my questions as

21  truthfully and accurately as you could; is that correct.

22  A.   That's correct.

23  Q.   And then you appeared in November of 2017, this

24  month, to give further sworn deposition testimony; is that

25  correct.

Sage - Direct/Reilly

13

1   A.   That's correct.

2   Q.   At that time you were represented by your counsel who

3   is here today.

4   A.   That's correct.

5   Q.   And at that time I asked you questions under oath and

6   you gave your answers under oath; is that correct.

7   A.   That's correct.

8   Q.   And during that question and answer deposition

9   session, isn't it true that you answered all of my

10  questions as truthfully and accurately as possible.

11  A.   That's correct.

12  Q.   And you have both deposition transcripts and you have

13  reviewed the contents of both of those transcripts in

14  anticipation of testifying here today; is that correct.

15  A.   That's correct.

16  Q.   Now, you weren't always known as Ethan Sage; is that

17  correct.

18  A.   That's correct.

19  Q.   And were you known as Jesus Torres for three-quarters

20  of your life.

21  A.   That is correct.

22  Q.   And you have a nickname Jay.

23  A.   That's correct.

24  Q.   Is that spelled J-A-Y.

25  A.   Yes, sir.

Sage - Direct/Reilly

14

1    Q.    Are you known in your work circle as Jay, J-A-Y.

2    A.    Yes, sir.

3    Q.    And you have before you two binders of exhibits.  The

4    black binder are the Plaintiff's Exhibits 1 through 16

5    which are all in evidence, and the other binder, the blue

6    binder, which are exhibits DA through DI, which are all in

7    evidence except for DB.

8          I'll be asking you to take a look at these

9    exhibits from time to time, okay?

10   A.    Which ones, sir?

11   Q.    For now look at the plaintiff's binder.  Take a look

12   at Exhibit Number 1.

13         Turn to the first page of Exhibit 1.

14   A.    Okay.

15   Q.    Do you see the First Class Roofing logo on the first

16   page.

17   A.    You mean the business card?

18   Q.    Yes, a copy of the business card.  Do you see that?

19   A.    Yes.

20   Q.    Do you see the First Class Roofing logo there.

21   A.    Yes.

22   Q.    And First Class Roofing is your company; is that

23   correct.

24   A.    Yes.

25   Q.    And First Class Roofing has a principal place of

Sage - Direct/Reilly

15

1   business at 3072 Brower Avenue in Oceanside; is that

2   correct.

3   A.   That's correct.

4   Q.   Do you see on the copy of the business card, your

5   name, J-A-Y.

6   A.   Yes, sir.

7   Q.   And your cell phone number is there as well.

8   A.   That's correct.

9   Q.   Do the workers of First Class Roofing, do they refer

10  to you as Jay.

11  A.   Yes, sir.

12  Q.   You had a company called First Class Home Improvement

13  LLC; is that correct.

14  A.   Yes.

15  Q.   That is no longer active.

16  A.   Yes.

17  Q.   That company was last active in 2015; is that

18  correct.

19  A.   Yes.

20  Q.   That company changed names to Oceanside First Class

21  Roofing, Inc.; is that correct?

22  A.   It's an S Corp.

23  Q.   Okay.  But is the name of the company now Oceanside

24  First Class Roofing, Inc..

25  A.   Yes, sir.

Sage - Direct/Reilly

16

1   Q.    Okay.  And the LLC which is First Class Home

2   Improvement, LLC, you were a member of that LLC; is that

3   correct.

4   A.    That is correct.

5   Q.    And that LLC was a New York Limited Liability

6   Company; is that correct.

7   A.    That's correct.

8   Q.    And your LLC had a principal place of business at

9   3072 Brower Avenue in Oceanside; is that correct.

10  A.    That's correct.

11  Q.    And you were the only member of that LLC for

12  20 years; is that correct.

13  A.    That is correct.

14  Q.    And that LLC operated continuously from 1997 to the

15  year 2015; is that correct?

16  A.    That's correct.

17  Q.    And that LLC always had its principal place of

18  business at 3072 Brower Avenue; is that correct.

19  A.    That's correct.

20  Q.    And that's your home; is that correct?

21  A.    Yes.

22  Q.    And you run your businesses out of your home; is that

23  correct.

24  A.    Yes, sir.

25  Q.    Now you ran the day-to-day operations of the LLC for

17

1    20 years; is that correct.

2    A.    That's correct.

3    Q.    And the LLC provided roofing services to the public;

4    is that correct.

5    A.    That's correct.

6    Q.    And so the LLC removed roofs, repaired roofs and

7    installed roofs, right?

8    A.    That's correct.

9    Q.    And the LLC had one business checking account; is

10   that correct?

11   A.    That's correct.

12   Q.    And you were the sole signatory on that business

13   checking account.

14   A.    That's correct.

15   Q.    And the LLC filed tax returns; is that correct?

16   A.    Yes.

17   Q.    And the LLC last filed it's last tax return for the

18   year 2015.

19   A.    That's correct.

20   Q.    And am I correct you were the sole signatory to the

21   LLC tax returns that were filed each and every year.

22   A.    That's correct.

23   Q.    When the LLC changed its name to Oceanside First

24   Class Roofing Inc., you were the one that formed First

25   Class Roofing, Inc..

Sage - Direct/Reilly

1    A.    My accountant.

2    Q.    And you are the president of that corporation.

3    A.    That's correct.

4    Q.    And you are the sole shareholder.

5    A.    Yes, sir.

6    Q.    And from 2015 to the current date, you've been the

7    one who has run the day-to-day operations of Oceanside

8    First Class Roofing, Inc; is that correct?

9    A.    That's correct.

10   Q.    The company itself is known as First Class Roofing;

11   is that correct.

12   A.    That's correct.

13   Q.    And the corporation Oceanside First Class Roofing,

14   Inc. has a business checking account that you were the

15   sole signatory of; is that right.

16   A.    That's correct.

17   Q.    And when your LLC closed down, that is when the

18   corporation Oceanside First Class Roofing, Inc. started

19   operating; is that correct?

20   A.    Yes.

21   Q.    So there was no interruption in your roofing business

22   because one name was being changed, changed to the next.

23   A.    My accountant made sure of that.

24   Q.    And the Oceanside corporation operates out of your

25   home which is 3072 Brower Avenue.

Sage - Direct/Reilly

19

1    A.    That's correct.

2    Q.    And Oceanside, the corporation does the same type of

3    work as the LLP where it repairs, installs and performs

4    repairs to roofing; is that correct?

5    A.    Just roofing.

6    Q.    The Oceanside First Class Roofing, Inc., does not

7    install roofs and performs repairs to roofs.

8    A.    Incorrect.

9    Q.    Okay.  So you said just roof removing.  Does

10   Oceanside First Class Roofing, Inc. remove roofs of its

11   customers and then install the roofs.

12   A.    I did not testify it was just removal.  I said we do

13   just roofing, all sorts of roofing.

14   Q.    Which includes removing an old roof and installing a

15   new roof.

16   A.    That's correct.

17   Q.    And everything that comes along with that.

18   A.    That's correct.

19   Q.    Which could be repairs as well; is that correct.

20   A.    Yes, sir.

21   Q.    Now, your LLC, First Class Home Improvement LLC, made

22   $658,000 during the year 2013; is that correct.

23         MR. PEARLMAN:  Objection to form.

24   A.    Yes, sir.

25         THE COURT:  Overruled.

Sage - Direct/Reilly

20

1    No, I'll sustain the objection.  I'll change the

2    ruling.  The word made.  I don't know if that is gross

3    receipts or not.

4    Q.    The gross receipts of First Class Home Improvement,

5    LLC, for the year 2013 was $658,000; is that correct.

6    A.    I don't have anything in front of me, but it could

7    be.

8    Q.    Well, let's take a look at Exhibit 11, Plaintiff's

9    Exhibit 11, the black binder.

10   A.    The black binder.  That would be what, number 11?

11   Q.    Yes.

12   A.    There is just a picture here.

13   Q.    Plaintiff's Exhibit 11.

14   A.    Just a picture here.

15        MR. REILLY:  Judge, may I approach to see what

16   he's looking at?

17        THE COURT:  Yes.

18        THE WITNESS:  I got it.  Thank you very much.

19   Q.    Sir, you are now on Exhibit 11, Plaintiff's

20   Exhibit 11.

21   A.    Yes, sir.

22   Q.    Plaintiff's Exhibit 11 which is in evidence, is that

23   the individual tax return for you for the year 2013.

24   A.    Yes, sir.

25   Q.    And is there a Schedule C attached to this tax

Sage - Direct/Reilly

21

1   return.

2   A.    I'm not aware what Schedule C is, sir.

3   Q.    Okay.  Turn to page 4 of Exhibit 11 which is in

4   evidence.

5   A.    Okay.

6         I think I'm on the right page, I'm not sure.

7   Q.    Does it say Schedule C on the top of the page.

8   A.    I don't see it, but there's numbers here.

9   Q.    Well, you have your reading glasses on, is that

10  correct, sir?

11  A.    That's correct, sir.

12  Q.    So does page 4 of Exhibit 11 at the top say profit or

13  loss from business.

14  A.    Yes, sir.

15  Q.    Okay.  And do you see your name.

16        It says name of proprietor, it says Ethan Sage.

17  A.    Yes, sir.

18  Q.    Underneath that you see where it says home

19  improvements.

20  A.    Yes, sir.

21  Q.    Underneath that you see where it says First Class

22  Home Improvements, LLC.

23  A.    Yes, sir.

24  Q.    And do you see under income where it says gross

25  receipts or sales?  Do you see that.

Sage - Direct/Reilly

22

1   A.   Yes, sir.

2   Q.   Do you see the number 658,347.

3        Look to the right under income of number one.

4   Look to the right.

5   A.   Yes, sir.

6   Q.   Next to gross receipts of sales, does it say 658,347.

7   A.   Yes, sir.

8   Q.   Were those the gross receipts of First Class Home

9   Improvement, LLC, for the year 2013.

10  A.   That's what was generated by my accountant.

11  Q.   This is a tax return that you signed off on to be

12  filed with the IRS; is that correct.

13  A.   Yes.

14  Q.   And a the accountant used all of the income that the

15  LLC earned during the year 2013 to create the tax return;

16  is that correct.

17       MR. PEARLMAN:  Objection to form.

18  A.   That is correct.

19       THE COURT:  Yes, sustained as to form.  So

20  disregard the question and answer.

21       MR. REILLY:  Sure.

22  Q.   Does it say next to gross receipts or sales, the

23  number 658,347.

24  A.   I'm sorry.  Can you repeat that?

25  Q.   Sure.  Under income, you see number 1?

Sage - Direct/Reilly

23

1   A.   Yes, sir.

2   Q.   That says gross receipts or sales.  Do you see that.

3   A.   Yes, sir.

4   Q.   Okay.  And to the right of that does the number

5   658,347 appear?

6   A.   Yes, sir.

7   Q.   Okay.  Now, in order to install roofs am I correct

8   that a shingles need to be purchased.

9   A.   Yes, sir.

10  Q.   Undergarments need to be purchased.

11  A.   Yes.

12  Q.   And felt paper needs to be purchased.

13  A.   Yes.

14  Q.   And ridges need to be purchased as well.

15  A.   Yes.

16  Q.   Boots for plumbers pipes need to be purchased as

17  well.

18  A.   That's correct.

19  Q.   And your LLC, and now your corporation, purchases

20  these materials when you have roof installations; is that

21  correct?

22  A.   That's correct, but you missed a lot of materials

23  also used that brought up this price.

24  Q.   But we're talking about some materials, sir.

25          Now the shingles that the LLC and now the

Sage - Direct/Reilly

24

1   corporation uses has always been GAF roof shingles.

2   A.    That's correct.

3   Q.    And those are the shingles that your LLC and now your

4   corporation has installed on the roofs of its customers

5   for a period of many years.

6   A.    Yes.

7   Q.    And GAF is the company that manufactures shingles.

8   A.    Yes.

9   Q.    And GAF is located in New Jersey; is that correct.

10   A.    That's correct.

11   Q.    And the shingles that are installed on your

12   customers' roofs are manufactured in the state of New

13   Jersey; is that correct.

14   A.    That's correct.

15   Q.    And isn't GAF North Americas largest manufacturer of

16   residential and commercial roofing.

17   A.    I have no idea.

18   Q.    Isn't GAF headquartered in Parsippany, New Jersey.

19   A.    I'm not sure of the area it's located.

20   Q.    Does GAF have 29 manufacturing plants across the

21   United States.

22   A.    Yes.

23   Q.    The capping that is used, is part of the GAF

24   materials; is that correct.

25   A.    That's correct.

Sage - Direct/Reilly

25

1    Q.    And the capping is also manufactured in New Jersey;

2    is that correct?

3    A.    I assume so.

4    Q.    The ice and water shield that you use for the jobs of

5    the LLC and the corporation are also manufactured by GAF;

6    is that correct.

7    A.    That's correct.

8    Q.    And the Cobra ridge vents are also manufactured by

9    GAF.

10   A.    Yes, sir.

11   Q.    And during the year 2013, am I correct that both Jose

12   Sanchez and Antonio Palacio, the two plaintiffs worked for

13   your company First Class Home Improvement, LLC.

14   A.    Yes.

15   Q.    And Jose Sanchez participated in handling the

16   materials that were being used to install roofs; is that

17   correct?

18   A.    When you say handling, you mean what kind of

19   handling?

20   Q.    Bringing the shingles that are manufactured in New

21   Jersey from the ground up to the roof?

22   A.    That's correct.

23   Q.    And Anthony, Antonio Palacio did the same thing,

24   participated in handling the shingles manufactured from

25   New Jersey by bringing it up from the ground to be

26

1   installed on the roofs; is that correct.

2   A.    That's correct.

3   Q.    And you recognize when you see a GAF shingle on the

4   roof that you rip off, do you recognize the GAF shingles.

5   A.    At my job at the time, yes.

6   Q.    Part of your job duties and Jose Sanchez and Antonio

7   Palacio's, is to rip off GAF shingles from the roofs so

8   that new GAF shingles can be installed.

9   A.    That's correct.

10  Q.    Over the last six years from 2011 up until the

11  current date, or let's say from 2011 up until May of 2017,

12  there have been five to seven individuals who have worked

13  for the LLC and the corporation; is that correct.

14  A.    That is correct.

15  Q.    And Jose Sanchez and Antonio Palacio were two of the

16  five to seven individuals that performed services for your

17  roofing company; is that correct.

18  A.    That's correct.

19  Q.    And isn't it typical for the job that the LLC and now

20  the corporation does, to have five guys working on a roof.

21  A.    I'm sorry.  Repeat that?

22  Q.    Sure.  Isn't it typical for the jobs that your LLC

23  and now your corporation does, to have five guys working

24  on a roof installation?

25  A.    Yes, typically.  Yes.

Sage - Direct/Reilly

27

1   Q.   And you were the one that picks the individuals who

2   are going to actually work on the job; is that correct.

3   A.   Of course, yes, sir.

4   Q.   And when a customer hired your company to provide a

5   service, you provide employees to do the actual work; is

6   that correct.

7            MR. PEARLMAN:  Objection to form.

8   A.   That is correct.

9            THE COURT:  Overruled.

10  Q.   And when you are hired to remove a roof and install a

11  new roof there are particular employees of the LLC and now

12  the corporation that you assign to do the work; is that

13  correct.

14           MR. PEARLMAN:  Objection to form.

15           THE COURT:  Yes.

16           Mr. Pearlman, he has a problem with the word

17  "employees" which is a loaded word, so I'll sustain the

18  objection.

19           MR. REILLY:  Okay.  But Judge, I'm actually

20  quoting from his testimony in his deposition.  I may refer

21  to that?

22           THE COURT:  That would help.

23           MR. REILLY:  Okay.

24  Q.   Earlier we talked about your deposition, coming to my

25  office in May, correct?

Sage - Direct/Reilly

28

1    A.    Yes.

2    Q.    Where you answered questions over several hours; is

3    that correct.

4    A.    Yes, sir.

5    Q.    And you reviewed these transcripts; is that correct.

6    A.    Yes, sir.

7    Q.    And on page 32, beginning on line 13, do you recall

8    being asked or beginning on 15, do you recall being asked

9    the question, are there particular employees of either the

10   LLC or the corporation that you assigned to do that work,

11   and answering on line 18, yes, sir.

12          Do you recall being asked that question?

13   A.    With all due respect, where do I go because you

14   twisted my words.  So where do I go?

15   Q.    I'm asking you --

16          THE COURT:  He's asking you at the Examination

17   Before Trial back in May whether you were asked a

18   particular question and whether you gave that answer.  So

19   your answer is yes, no, I don't recall.

20   A.    Yes.

21   Q.    So you recall being asked that question and giving

22   that answer; is that correct.

23   A.    That's correct.

24   Q.    Now over the last six years, let's say 2011 to

25   current date, you've been on the roofs very often with the

Sage - Direct/Reilly

29

1    current workers; is that correct?

2    A.    That's correct.

3    Q.    On most jobs you go on the roof; is that correct.

4    A.    Yes, sir.

5    Q.    And on most jobs you go on the roofs to see how the

6    workers are doing; is that correct?

7    A.    Yes.

8    Q.    And on most jobs you actually do work on the roofs;

9    is that correct.

10   A.    Not so much now.

11   Q.    Okay.

12          Let's say during the years 2010 through the end

13   of 2015.  On most of the jobs did you actually do work on

14   the roofs?

15   A.    I do some, yes, sir.

16   Q.    Well, let's go to page 40 of your deposition

17   transcript, beginning at line 12 -- no, beginning at

18   line 10.

19          Do you recall being asked the question are you

20   actually doing work on the roofs when you are going on the

21   roofs?

22          Do you recall giving the answer at line 12,

23   uh-huh?

24   Do you recall being asked that question and giving that

25   answer?

Sage - Direct/Reilly

30

1   A.    Yes, sir.

2   Q.    And you consider yourself a working owner where you

3   get on the roof and rip off shingles and help them

4   install.

5         MR. PEARLMAN:  Objection as to what he

6   considers.

7         THE COURT:  Overruled.

8   Q.    Do you recall testifying in your deposition in May

9   you are a working owner and rip off the shingles and help

10  install shingles.

11  A.    Yes, sir.

12  Q.    If you are on a roof and notice one of your workers

13  is doing something -- not doing something properly, you

14  will tell him to do it the right way; is that correct.

15  A.    That's correct.

16  Q.    And more often than not, you are on the roof yourself

17  telling the workers what work you want to have done.

18        MR. PEARLMAN:  Objection to form.

19        THE COURT:  Sustained as to form.

20  A.    Yes, sir.

21        THE COURT:  If there is an objection and the

22  objection is sustained, just wait for the next question.

23        THE WITNESS:  Thank you, your Honor.

24        THE COURT:  Yes, sir.

25  Q.    Do you recall on page 40 of your deposition

Sage - Direct/Reilly

31

1   transcript, being on line 21, would you say more often

2   than not you are on the roof yourself telling the workers

3   what you want to have done and giving the answer, that is

4   correct.

5          Do you recall being asked that question and

6   giving that answer at your deposition?

7   A.    Yes, sir.

8   Q.    And am I correct that you actually go on the roofs

9   and actually direct the employees if they need to be

10  directed; is that correct.

11  A.    When the job begins, I do that.

12  Q.    Okay.  And you were the foreman of the jobs that are

13  done at your customers' houses; is that correct.

14  A.    When I'm on the job.

15  Q.    Well, on page 76, beginning on line 3, do you recall

16  being asked the question, was there a guy that was

17  considered the foreman of the jobs that were done at your

18  customers' houses and giving the answer no, sir.

19         Do you recall that question and answer?

20  A.    When I'm on the job I'm the foreman.

21  Q.    The next question, were you the foreman on line 7,

22  and on line 8 you are saying yes, sir.

23         Do you recall being asked that question and

24  giving that answer?

25  A.    I'll repeat it.  Yes, sir.

Sage - Direct/Reilly

32

1    Q.    And oftentimes you were actually on the roof

2    installing shingles with the mechanics; is that correct.

3    A.    I'm sorry, with what?

4    Q.    Oftentimes you were actually on the roof installing

5    shingles with the mechanics; is that correct?

6    A.    Yes, sir.

7    Q.    And if you saw a mechanic seeing something that was

8    wrong, you would correct it.

9    A.    That's correct.

10   Q.    Over the past six years, say 2011 up until the

11   current date, you were an LLC and your corporation has had

12   worker's compensation insurance; is that correct.

13   A.    That is true.

14   Q.    And your LLC and now your corporation has had

15   worker's compensation insurance just in case one or more

16   of the companies' workers got injured; is that correct.

17   A.    That's correct.

18   Q.    Over the past six years if a worker of the LLC or the

19   corporation became injured on the job, either on the roof

20   or on the ground, there was worker's compensation

21   insurance to cover that injury or injuries; is that

22   correct?

23   A.    It would be up to the insurance company if they were

24   negligent or not.

25   Q.    Okay.  But there was worker's compensation coverage

Sage - Direct/Reilly

33

1   during that time period; is that correct.

2   A.   That is correct.

3   Q.   And the LLC and now the corporation's worker's

4   compensation insurance covered each and every worker that

5   you chose to perform work either on the roof or on the

6   ground; is that correct.

7   A.   That is correct.

8   Q.   And the worker's compensation carrier that you made

9   payments to was the State Insurance Fund; is that correct.

10  A.   That's correct.

11  Q.   Now your LLC and now your corporation, has also

12  maintained liability insurance over the years; is that

13  correct.

14  A.   It is required to have a license that you have both

15  types of insurance, compensation and liability, otherwise

16  you can't get a license.

17  Q.   Okay.  So you've always had your company, your LLC

18  and now your company, has always had liability insurance.

19  A.   Yes.

20  Q.   And the liability insurance covers the workers that

21  you choose to work on the job sites of the LLC or the

22  corporation; is that correct.

23  A.   That is correct.

24  Q.   And am I correct that the liability insurance that

25  your LLC and now your corporation pays for each year

Sage - Direct/Reilly

34

1    covers any problems that may occur by the workers you

2    choose to work on the roofs of your customers; is that

3    correct.

4    A.    That's correct.

5    Q.    Now let's take an a quick look at Exhibit 12 which is

6    in evidence, and the last page of the exhibit.

7          Turn to the last page of the exhibit, sir.

8    A.    I'm trying to, sir.

9          Okay.

10   Q.    And do you see where it has under -- there's the word

11   description's appears six times on that page. Do you see

12   that.

13   A.    I'm not sure if I'm at the right one. You say

14   Exhibit 12, the last page. It says additional information

15   for your 2014 federal tax returns?

16   Q.    Yes.

17   A.    Okay.

18   Q.    On that page you see where it says business insurance

19   and worker's comp insurance.

20   A.    Yes, sir.

21   Q.    For the years 2014, did your LLC pay $8,799 for

22   business insurance for the roofing company.

23   A.    That's what it indicates here, sir.

24   Q.    And for the year 2014 did your business pay the

25   amount of $22,772 for worker's compensation insurance.

Sage - Direct/Reilly

35

1    A.    That's what it says here.

2    Q.    And if you go two pages closer to the front of the

3    exhibit, do you see where it says part 5, listed property.

4    A.    Yes, sir.

5    Q.    Okay.  And do you see under number 26, do you see

6    where it says GMC heavy duty truck.

7    A.    Yes, sir.

8    Q.    And during the year 2014, you had a GMC van that was

9    used for work purposes, right?

10   A.    Yes, sir.  It carries equipment.

11   Q.    And the GMC van was also used during the year 2013;

12   is that correct.

13   A.    I've always had a van, sir.

14   Q.    During the year 2012, did you have the same GMC van

15   as well.

16   A.    Yes, sir.

17   Q.    The van is used to carry the equipment from your home

18   to the job site each day; is that correct.

19   A.    That's correct.

20   Q.    And there's a worker of the LLC and now the

21   corporation that has always taken the van from your home

22   with the equipment if it goes to the job site.

23   A.    Not always.

24   Q.    But that has been done in the past.

25   A.    That's correct.

Sage - Direct/Reilly

36

1   Q.   And Jose Sanchez was one of those workers who would

2   go to your house in the morning and pick up the GMC van

3   with tools in it and drive to the job site; is that

4   correct.

5   A.   Incorrect.

6   Q.   Did --

7   A.   I said incorrect.

8   Q.   Am I correct, let's just make this clear for the

9   record, am I correct that there were times during the

10  years 2012 to the end of 2015 that Jose Sanchez took the

11  GMC van from your home in the morning and brought the van

12  to the work site.

13  A.   That is incorrect.

14  Q.   Okay.

15       And were there times that during the years 2012

16  through 2015, that Jose Sanchez took the van from the job

17  site when the job is done back to your home in Oceanside?

18  A.   We can go back and forth but you keep saying my home.

19       I have a place to park the trucks.  I cannot

20  park the trucks at my house.  They give me a $1,000

21  ticket.

22  Q.   Is there a yard in Oceanside or Long Beach where you

23  keep your tracks and vans.

24  A.   Yes, sir.

25  Q.   What is that address.

Sage - Direct/Reilly

37

1    A.    The address is in Oceanside.  It's called Oil City.

2    Q.    And you had your LLC and corporation, you had that

3    yard for many years; is that correct.

4    A.    That's correct.

5    Q.    During the years 2012 through 2015, there are times

6    when Jose Sanchez went to that yard in the morning to pick

7    up the van and drive that van to the job site; is that

8    correct.

9    A.    That's correct.

10   Q.    And Mr. Sanchez would work at the job site all day;

11   is that correct.

12   A.    That's correct.

13   Q.    And at the end of the day when the job is done he

14   would take the van and he would bring that van back to the

15   place in Oil City; is that correct?

16   A.    That's correct.

17   Q.    And Mr. Sanchez did that for a period of years; is

18   that correct.

19   A.    For an extra $100 per day.

20   Q.    But he did that from a period of years, at least from

21   2012 up to the end of 2015; is that correct.

22   A.    That's correct.

23   Q.    Did he also did that during the year 2011 where he

24   would go to the place in Oil City to pick up your van and

25   take your van to the job site and then work the job site

38

1   all day and at the end of the day take the van back to the

2   place in Oil City.

3   A.    No, sir.

4   Q.    So that began in 2012; is that correct.

5   A.    Approximately.

6   Q.    Now you hired Jose Sanchez; is that correct?

7   A.    That's correct.

8   Q.    And Jose Sanchez provided work for your LLC and your

9   corporation for at least four years; is that correct.

10  A.    That is correct.

11  Q.    And Jose Sanchez provided labor for your LLC and your

12  corporation during the years 2012, 2013, 2014 and 2015; is

13  that correct.

14  A.    That is correct.

15  Q.    And Antonio Palacio, the other plaintiff in this

16  case, he provided services to your LLC and your

17  corporation during the years 2012, 2013, 2014, and 2015;

18  is that correct.

19  A.    That is correct.

20  Q.    And the two plaintiffs were part of the five to seven

21  individuals that you testified earlier that have done work

22  for the LLC and now the corporation over the years; is

23  that correct.

24  A.    That is correct.

25  Q.    You assigned Jose Sanchez the jobs, the jobs of your

Sage - Direct/Reilly

39

1   LLC and your corporations; is that correct.

2   A.    That's correct.

3   Q.    And you told Jose Sanchez where to go to work.

4   A.    Yes, sir, I would text him the address.

5   Q.    And you texted him the address for a period of years;

6   is that correct.

7   A.    That is true.

8   Q.    And you were only able to recover some of the text

9   messages you sent to him.

10  A.    I believe I was able to recover over three-quarters.

11  Q.    You texted him in 2012.

12  A.    Yes.

13  Q.    And 2013.

14  A.    Yes.

15  Q.    And 2014 and 2015.

16  A.    Yes.

17  Q.    Am I correct you weren't able to find any text

18  messages you sent to Jose Sanchez during the year 2012

19  that you sent to him.

20  A.    If I recall, that's correct.

21  Q.    Am I also correct you weren't able to find any text

22  messages you sent to Jose Sanchez during the years 2013,

23  is that correct.

24  A.    I think we found some of them.

25  Q.    And am I correct, am I not, that you did not produce

Sage - Direct/Reilly

40

1    any of those text messages in this case; is that correct?

2    A.    I produced every text message that was on my phone.

3    Q.    And you didn't make an effort to find text messages

4    that you sent to Jose Sanchez other than the ones you

5    found on your phone; is that correct.

6    A.    That is correct.

7    Q.    Okay.  And the ones you found on your phone begin

8    February 27, 2014; is that correct.

9    A.    I thought it was before that but --

10   Q.    Let's take a look at Exhibit 15 while we're on the

11   topic.

12   A.    Okay.

13   Q.    The first text message on the exhibit, is that dated

14   February 27, 2014.

15   A.    Yes, sir.

16   Q.    Okay.  And the last text message, am I correct, end

17   on December 15, 2015; is that correct?

18   A.    That is correct.

19   Q.    And Mr. Sanchez's working relationship with your LLC

20   and your corporation and you, ended in the middle of

21   December of 2015; is that correct.

22   A.    That is correct.

23   Q.    And Antonio Palacio's business relationship with you

24   or working relationship with you, your LLC and your

25   corporation, ended sometime in 2015, a few months before

Sage - Direct/Reilly

41

1    that; is that correct.

2    A.    That's correct.

3    Q.    And am I correct that in this exhibit there are no

4    text messages prior to February 27, 2014; is that correct?

5    A.    That is correct.

6    Q.    And text message communication was the primary way

7    you informed Jose Sanchez what job to go to and what

8    address to appear at; is that correct?

9    A.    That is correct.

10   Q.    Did your van, the GMC van, did it have GPS.

11   A.    Yes, sir.

12   Q.    And each morning would you plug the address into the

13   GPS so that Jose Sanchez could -- would know where to

14   drive to.

15   A.    When he started driving the van, yes.

16   Q.    And Jose Sanchez would appear at your -- at the yard

17   in Oil City about 5:00 a.m. on days that you worked; is

18   that correct.

19   A.    That is incorrect.

20   Q.    And he would appear obviously before the job started;

21   is that correct.

22   A.    That is correct.

23   Q.    How long before the job started would he appear to

24   pick up the van to bring to the job site.

25   A.    It depends what town we were traveling to.

Sage - Direct/Reilly

42

1    Q.    Okay.  So there were times that Jose Sanchez went to

2    the Oil City yard at 5:00 a.m. to pick up the van to drive

3    to the job site; is that correct.

4    A.    Never at five.

5    Q.    Okay.  So there were times he did it at 5:30; is that

6    correct.

7    A.    No, sir.

8    Q.    Now you sent Antonio Sanchez to the addresses where

9    other workers that you hired to work on the roofs of your

10   customers were working as well; is that correct.

11   A.    That's correct.

12   Q.    And Jose Sanchez would go to the houses that were the

13   customers of the LLC and the corporation and work with

14   others that you sent to those addresses to go work; is

15   that correct?

16   A.    That's correct.

17   Q.    And you assigned Jose Sanchez to work at the houses

18   of your customers; is that correct.

19   A.    I have found him sleeping sometimes.

20              (Continued on the following page.)

21

22

23

24

25

Sage - Direct/Reilly

43

1    Q.   But what I'm asking you, you're the one that would

2    have assigned him to go to work at the houses of your

3    customers; is that correct?

4    A.   That is correct.

5    Q.   And the same with Antonio Palacio, you assigned him

6    to go to work at the houses of your customers?

7    A.   That's correct.

8    Q.   And am I correct that you directed Jose Sanchez's

9    work at the house of your customer, correct?

10   A.   That's correct.

11   Q.   And you also directed the work of Antonio Palacio at

12   the homes of your customers; is that correct?

13   A.   That is correct.

14   Q.   And for a period of years Jose Sanchez worked for

15   your LLC and your corporation ripping off roofs from the

16   houses of your customers?

17   A.   That is correct.

18   Q.   And am I direct that you gave Jose Sanchez a First

19   Class Roofing T-shirt; is that correct?

20   A.   When I had them made I gave them out to everybody.

21   Q.   And you gave the T-shirts out to the workers who

22   worked the roofs of the LLC and now the corporation; is

23   that correct?

24   A.   That is correct.

25   Q.   And Jose Sanchez and Antonio Palacio were workers who

Sage - Direct/Reilly

44

1    got the First Class Roofing T-shirt?

2    A.    I'm sorry, repeat that.

3    Q.    Jose Sanchez and Antonio Palacio were workers of the

4    LLC and the corporation that got the First Class Roofing

5    T-shirts, that is correct?

6    A.    That is correct.

7    Q.    And they had the option of wearing the T-shirts while

8    at the job sites of your customers, that is correct?

9    A.    Had the options, yes, sir.

10   Q.    You paid Jose Sanchez by the day; is that correct?

11   A.    That is correct.

12   Q.    And you paid Antonio Palacio by the day; is that

13   correct?

14   A.    That was the agreement.

15   Q.    And anyone who worked for the LLC and the corporation

16   were paid by the day; is that correct?

17   A.    That's the agreement.

18   Q.    And no one was paid by the hour, correct?

19   A.    That is correct.

20   Q.    What was the last daily rate that you paid Jose

21   Sanchez?

22   A.    $200 a day.

23   Q.    When were you paying him $200 a day?

24   A.    Shortly thereafter he started.

25   Q.    So sometime in 2012?

Sage - Direct/Reilly

45

1    A.    Sometime around there.  I don't recall exactly.  I

2    gave him braces raises as I saw they would perform and

3    wanted to learn.

4    Q.    Do you recall the first daily raise that you gave

5    Jose Sanchez?

6    A.    Probably $150 for day.

7    Q.    Okay.  And then did that 150 increased?

8    A.    That is correct.

9    Q.    Before it got to 200, did it increase a couple of

10   times?

11   A.    Maybe once or twice.

12   Q.    And you paid Jose Sanchez by check?

13   A.    Yes, sir.

14   Q.    And you also paid him in cash; is that correct?

15   A.    There were times where I gave him some cash.

16   Q.    Didn't you often give him cash?

17   A.    Only when he borrowed money.

18   Q.    But you also gave him cash to drive the van for a

19   period of years, right?

20   A.    That is correct, a hundred dollars a day.

21   Q.    So each week you gave Jose Sanchez a check and you

22   also gave him cash; is that correct?

23   A.    I would give the hundred dollars every single day in

24   front of everybody, I wrote -- say here's a hundred

25   dollars extra, so you don't say you don't pay you for

Sage - Direct/Reilly

46

1    that.

2    Q.    My question to you is a little different.  Each week

3    in 2012 to the end of 2015 you gave Jose Sanchez a check

4    and you also gave him cash, correct?

5    A.    Oh, yes, that is correct, yes, sir.

6    Q.    And you never paid Jose Sanchez or any other employee

7    overtime compensation ever; is that correct?

8    A.    If a job -- no, that's incorrect.

9    Q.    Am I correct that no would be offer got paid got paid

10   by the hour, right?

11   A.    That is correct.

12   Q.    Okay.  So you never ever made an effort to try to

13   determine an overtime rate for any of your workers

14   including Jose Sanchez and Jose Palacio; is that correct?

15   A.    That is correct.

16   Q.    If they worked more hours than usual maybe you would

17   just throw them some extra cash; is that correct?

18   A.    That is correct.

19   Q.    Okay.  But you never calculated the amount of cash

20   that you had given them extra by using the hourly rate and

21   the overtime rate, that is correct?

22   A.    That is correct.

23   Q.    So no one ever, including Jose Sanchez and Antonio

24   Palacio ever received overtime compensation or time and a

25   half?

Sage - Direct/Reilly

47

1    A.    Never worked overtime, sir.

2    Q.    But your LLC and your corporation never kept time

3    records; is that correct?

4    A.    That is correct.

5    Q.    So for the period of years that Jose Sanchez was

6    going to the yard at Oil City, he didn't sign in when he

7    arrived there; is that correct?

8    A.    That is correct.

9    Q.    And then he didn't sign in at the job site that he

10   went to, correct?

11   A.    That is correct.

12   Q.    And he didn't sign in and out when he took lunch,

13   correct?

14   A.    That is correct.

15   Q.    And then you had no idea when if he left the job site

16   when it was done to drive back to your yard in Oil City;

17   correct?

18   A.    Yes, I do.

19   Q.    But there are no records that you could point to that

20   would indicate when he left the job site when it was over

21   to drive the van back to Oil City; is that correct?

22   A.    I would drive the big truck, the dump truck, and he

23   would drive the van.  So like I always knew when he was

24   driving the van.

25   Q.    Okay.

Sage - Direct/Reilly

48

1    A.    Always.

2    Q.    But you never wrote down any times that he was

3    driving the van; is that correct?

4    A.    That's correct.

5    Q.    So you don't know when picked up the van what time

6    that was, right?

7    A.    I do know, because I was there.

8    Q.    And am I correct that you don't know what time he

9    left the job sites each day to drive the van back to oil

10   city; is that correct?

11   A.    As I just testified, I know because I drove the big

12   truck and he followed me with the van.

13   Q.    Okay.  But a job could have ended in the late

14   afternoon, is that correct, and a job could have ended in

15   the early evening; is that correct?

16   A.    When you say late afternoon, you're talking about

17   time-wise?

18   Q.    Time-wise, yes.

19   A.    My jobs don't end late in the afternoon.

20   Q.    From year to year, from 2012 to the end of 2015, you

21   don't have any type of record to indicate when Jose

22   Sanchez arrived at Oil City to pick up the van, right?

23   A.    No, sir.

24   Q.    And you don't have any record to indicate how long it

25   took him to take the van to the job site, correct?

49

1   A.   That's correct.

2   Q.   And you don't have any record to indicate how long

3   Jose Sanchez was at the job site each day, correct?

4   A.   That's correct.

5   Q.   And you don't have any record to indicate how long it

6   took Jose Sanchez to drive from the job site back to Oil

7   City; is that correct?

8   A.   That is correct.

9   Q.   And none of your workers were required to punch in

10  when they arrived at the job site?

11  A.   I already answered that, that's correct.

12  Q.   So Antonio Palacio during the years 2012 through 2015

13  he was never asked to sign in or punch in when he arrived

14  at the job site; is that correct?

15  A.   That is correct.

16  Q.   And he wasn't required to sign in or sign out or

17  punch in or punch out when he took lunch; is that correct?

18  A.   For the third time, that is correct.

19  Q.   And Antonio Palacio when he left the work site at the

20  end of the day, he was not required to sign in or sign

21  out; is that correct?

22  A.   That is correct.

23  Q.   So for Antonio Palacio, you don't have any record at

24  all to indicate the hours of the day that he worked from

25  2012 through 2015; is that correct?

Sage - Direct/Reilly

50

1    A.    He would leave when everybody would leave.

2    Q.    Okay.  But you don't have any records to indicate

3    when he arrived at the job sites and when he left the job

4    sites; is that correct?

5    A.    That is correct.

6    Q.    And you don't have any records to indicate what days

7    of the week that Antonio Palacio worked from 2012 to the

8    end of 2015, correct?

9    A.    Incorrect.

10   Q.    And you don't have any records to indicate what days

11   of the week Jose Sanchez worked during the years 2012

12   through the 2015; is that correct?

13   A.    Incorrect.

14   Q.    And the records that you're talking about are those

15   the records that you created after you gave your first

16   deposition?

17   A.    I didn't create any records, sir.

18   Q.    Okay.  After your first deposition, did you try to do

19   figure out how many days during each week that Jose

20   Sanchez and Antonio Palacio worked?

21   A.    I did not try to figure out, sir.

22   Q.    Okay.  So then you have records to indicate what days

23   of the week they worked from 2012 to the end of 2015?

24   A.    I certainly do.

25   Q.    And where are those records?

**Sage - Direct/Reilly**

1  A.   They were given to you in the calendar book of the

2  business calendar books, it's very clear.  It says two

3  jobs, and the calendar books it says repairs, and it goes

4  on and on and on, every customer, my whole life is in that

5  calendar book.

6  Q.   Am I correct that you transferred the days from the

7  calendar book that you believe that Jose Sanchez and

8  Antonio Palacio worked on a piece of loose-leaf paper; is

9  that right?

10  A.   That is correct.

11  Q.   And am I correct that you then gave that piece of

12  loose-leaf paper to your daughter and your daughter typed

13  up a typewritten document, correct?

14  A.   That is correct.

15  Q.   And on the typewritten document are all the dates

16  that you believe Jose Sanchez and Antonio Palacio are on

17  there?

18  A.   That is correct.

19  Q.   And that's for the years 2012 through 2015; is that

20  correct?

21  A.   That is correct.

22  Q.   And on that summary that your daughter typed up, by

23  the way, is your daughter a lawyer?

24  A.   She's going to be.

25  Q.   She graduated law school?

Sage - Direct/Reilly

1   A.   4.0.

2   Q.   When you first got sued in this lawsuit, did you give

3   the complaint to your daughter to review?

4            MR. PEARLMAN:  Objection.

5            What's the relevance?

6            THE COURT:  Sustained.

7   Q.   Did your daughter help you prepare an answer to the

8   complaint when you were first sued?

9   A.   Yes, sir.

10  Q.   And did your daughter sign an affidavit of service

11  saying it was served on my office?

12  A.   I believe so, sir.

13  Q.   So you and your daughter went over the allegations in

14  the complaint and the both of you participated in drafting

15  an answer to the allegations in the complaint; is that

16  correct?

17  A.   To the best of our ability.

18  Q.   Okay.  So your daughter, after you gave the first

19  deposition, helped you try to figure out the days that

20  Antonio Palacio and Jose Sanchez worked; is that correct?

21  A.   Incorrect.

22  Q.   Okay.  So you tried to do that; is that correct?

23  A.   Incorrect.

24  Q.   Didn't you just testify that you put all the days

25  that you thought that they worked in in 2012 to the end of

1    2015 onto a looseleaf paper that was then put into a

2    typewritten document formed by your daughter?

3    A.   There's the problem.  You're going from years back

4    and years forward.  I'm getting a little bit confused what

5    you're talking about.  You're talking about the calendar

6    book which was just done last week when we went on that

7    deposition.  And then you're going back to when the

8    complaint was served to me, which was whatever, a year and

9    a half ago.

10          So I don't know what year you're talking about,

11   sir, which one you're talking about.  I'm not clear on

12   that.

13   Q.   Okay.  I think your testimony is clear anyway.  Okay.

14          MR. PEARLMAN:  Objection.

15          THE COURT:  I won't consider the editorial

16   comment.  So another question.

17          MR. PEARLMAN:  Thank you.

18   Q.   You paid Antonio Palacio in cash; is that right?

19   A.   That is correct.

20   Q.   And you never gave him a check; is that correct?

21   A.   That's correct.

22   Q.   And you never gave him a pay stub; is that correct?

23   A.   That is correct.

24   Q.   And you never gave Jose Sanchez a pay stub either; is

25   that correct?

Sage - Direct/Reilly

54

1    A.    That is correct.

2    Q.    And you never gave Antonio Palacio any type of tax

3    form at the end of the year; is that correct?

4    A.    That is correct.

5    Q.    And you've often paid other workers in cash as well;

6    is that correct?

7    A.    I have.

8    Q.    And when you paid any worker in cash over the years

9    you've never given that worker a tax form at the end of

10   the year; is that correct?

11   A.    That is correct.

12   Q.    And the last daily rate that Antonio Palacio earned

13   was $200 a day?

14   A.    That is correct.

15   Q.    And what did he start at?

16   A.    Probably 150.  That was like my common start.

17   Q.    Didn't Jose Sanchez, didn't he begin working for your

18   LLC in the year 2003, around there?

19   A.    That's incorrect.

20   Q.    You haven't known Jose Sanchez for more than a

21   decade?

22   A.    I knew his brother.

23   Q.    Okay.  So you just met him about in what year, around

24   2012, 2013.

25   A.    I'm not certain on that.

Sage - Direct/Reilly

1   Q.   And do you have any records at all to indicate that

2   Jose Sanchez did not work for the LLC during the years

3   2010 and 2011?

4            MR. PEARLMAN:  Objection to the form.

5            THE COURT:  Overruled.

6   A.   I'm sorry, repeat that question.  I'm not sure that I

7   understand it.

8   Q.   Sure.  Do you have any records to indicate -- let's

9   do it this way first.  Do you have any records to indicate

10  that Jose Sanchez worked for the LLC during the years 2010

11  and 2011?

12  A.   I'm a little confused with the names, you're talking

13  about Wcho, right?

14  Q.   Jose Sanchez.  How do you spell "Wcho" for the

15  record?

16  A.   I usually spell it W-C-H-O.

17  Q.   Was that his nickname?

18  A.   Yes, sir.

19  Q.   Did all the workers have nicknames?

20  A.   They all came in with nicknames.  That's what they

21  wanted to be called.

22  Q.   And Antonio Palacio, did he have a nickname?

23  A.   No, I don't think so.

24  Q.   Okay.  Do you have any records that indicate whether

25  Wcho or Jose Sanchez worked for the LLC during 2010 and

56

1   2011?

2   A.    Other than the pay stubs that I gave you, the check

3   stubs that I gave you, that's what I have.

4   Q.    You never gave a pay stub?

5   A.    Not a pay stub, pay.  Whatever the slip at the end of

6   the check.

7   Q.    The check stubs begin in September of 2013; is that

8   correct?

9   A.    That's correct.

10  Q.    And am I correct that you tried your hardest but

11  couldn't find any checks made payable to Jose Sanchez

12  during the year 2013 up until September?

13  A.    I gave you what I was able to pull up.  Those two

14  things.

15  Q.    And during the year 2012 or for the year 2012 you

16  didn't find any checks made payable to Jose Sanchez; is

17  that correct?

18  A.    They weren't preserved, no, sir.

19  Q.    What happened, did you throw those out?

20  A.    I have no idea what happened to them.

21  Q.    Okay.  But you gave him a 1099 for the year 2012; is

22  that correct?

23  A.    That's correct.

24  Q.    And you gave him a 1099 for the entire year 2013; is

25  that correct?

Sage - Direct/Reilly

57

1    A.    That is correct.

2    Q.    But the only check stubs that you have for Jose

3    Sanchez begin in September of 2013; is that correct?

4    A.    That is correct, sir.

5    Q.    Now, Jose Sanchez was on the job sites 2012, 2015,

6    through the beginning of the job site to the end of the

7    job site; is that correct?

8    A.    That is correct.

9    Q.    And so was Antonio Palacio; is that correct?

10   A.    That is correct.

11   Q.    And have you ever thought that Jose or Antonio was

12   doing something improper you would tell them to do the

13   right way, correct?

14   A.    Asked and answered.  That's correct.

15   Q.    Now, am I correct that you never kept any time

16   records for any of the workers because you decided every

17   worker was going to be paid a flat daily rate; is that

18   correct?

19   A.    Not necessarily that; like that.

20   Q.    Do you recall, page 92 beginning and line 13 of your

21   deposition being asked the question:  Did you ever keep a

22   record of the hours that anybody over the last six years

23   has worked for either the LLC or the corporation and on

24   line 16 giving the answer:  No, sir.

25              Do you recall being asked that question and

Sage - Direct/Reilly

58

1   giving that answer?

2   A.   Yes, sir.

3   Q.   And then do you recall being asked the very next

4   question:  Is that because you just decided that they will

5   be paid a flat daily rate, is that correct?  Line 20

6   giving the answer:  That is correct.

7           Do you recall being asked that question and

8   giving that answer in your sworn deposition?

9   A.   Yes, sir.

10  Q.   So you never kept anytime records for any of the

11  workers because you just decided that everyone was going

12  get paid a flat daily rate; is that correct?

13  A.   Not necessarily, sir.

14  Q.   Am I correct that no worker has ever been paid

15  anything other than flat daily rate to work during his

16  employment with the LLC and the corporation?

17  A.   That is correct.

18  Q.   And am I correct that for all of the workers that

19  have worked for the LLC and now the corporation, that the

20  LLC and the corporation had never paid any payroll taxes

21  on any of the money that the workers were paid; is that

22  correct?

23  A.   They get paid 1099s, sir.

24  Q.   Okay.  And if you treated them as employees, am I

25  correct, the LLC and the corporation would have to pay

Sage - Direct/Reilly

59

1    payroll taxes; is that correct?

2              MR. PEARLMAN:  Objection.

3              THE COURT:  Sustained.

4    A.    I didn't understand, sir.

5              THE COURT:  You don't have to answer the

6    question because the question was sustained.

7    Q.    Am I correct that the over at years the LLC and the

8    corporation has never paid any payroll taxes at all for

9    the money that the workers have earned?

10   A.    That is correct.

11   Q.    Am I correct that you don't even know what a W-2 form

12   is?  Correct?

13   A.    That is correct.

14   Q.    And you've never had a job in your life where you

15   received a W-2 form; is that correct?

16   A.    I don't recall that, sir.

17   Q.    Am I correct that you've never seen a W-2 form in

18   your entire life; is that correct?

19   A.    I don't recall seeing a W-2 form, sir.  Not that you

20   start mentioning it.

21   Q.    Am I correct you never filed a quarterly tax

22   statement showing the money you paid to the corporation or

23   the workers?

24   A.    That is correct.

25   Q.    Now, you do know what a 1099 form is; is that

Sage - Direct/Reilly

60

1    correct?

2    A.    I have seen it, sir.

3    Q.    And so the workers that you paid by check get 1099

4    forms; is that correct?

5    A.    That's correct.

6    Q.    And they only get 1099 forms on the amount of checks

7    that they receive; is that correct?

8    A.    That is correct.

9    Q.    So someone like Jose Sanchez receives a check and

10   cash he only gets a 1099 for the checks that he received,

11   correct?

12   A.    That's correct.

13   Q.    And someone like Antonio Palacio, who received all

14   cash, he gets no fax form at all, am I correct?

15   A.    That is correct.

16   Q.    And when your LLC and your corporation pays a worker

17   with a 1099 form, that means that no taxes are withheld

18   from his pay; is that correct?

19   A.    That is correct.

20   Q.    And am I correct that the LLC and corporation has

21   never ever withheld any taxes from any workers' pay over

22   the many years that your company has been in existence, am

23   I correct?

24   A.    That is correct.

25   Q.    Now, am I correct that you did not have any type of

**Sage - Direct/Reilly**

61

1   written agreement with either Jose Sanchez or Antonio

2   Palacio for the LLC or the corporation; is that correct?

3   A.    That is correct.

4   Q.    And you never asked Jose Sanchez or Antonio Palacio

5   to get their own insurance for the work that they did at

6   the customers' home; is that correct?

7   A.    That is correct.

8   Q.    And am I correct you never asked Jose Sanchez or

9   Antonio Palacio to give you evidence of insurance

10   indicating that your LLC or your corporation was a loss

11   payee in case they committed any negligence at the job

12   sites of your customers, correct?

13   A.    That is correct.

14   Q.    Now, am I correct that you use or your LLC and your

15   corporation uses shingle rippers to rip shingles off of

16   the customers homes?

17   A.    Yes, that is correct.

18   Q.    And it's either your LLC or the corporation has been

19   the company that owns, purchased the shingle rippers to

20   give the workers to use; is that correct?

21   A.    That is correct.

22   Q.    So none of the workers have ever been asked to come

23   to the job site with their shingle rippers; is that

24   correct?

25   A.    They bring their own nail bags and hammer.

**Sage - Direct/Reilly**

1  Q.   They bring their own what?

2  A.   Nail bags.

3  Q.   But you never asked any worker to bring their own

4  shingle ripper; is that correct?

5  A.   That is correct.

6  Q.   The LLC and the corporation is the one that provides

7  the shingle rippers; is that correct?

8  A.   That's correct.

9  Q.   And you gave Jose and Antonio shingle rippers so they

10  can do their jobs; is that correct?

11  A.   That is correct.

12  Q.   And your corporation and your LLC also uses rakes,

13  shovels and blowers at the job sites; is that correct?

14  A.   Correct.

15  Q.   And the LLC and the corporation are the companies

16  that purchased the shovels and blowers and rakes to use at

17  the job sites?

18  A.   Correct.

19  Q.   And you provide -- am I correct that you provided

20  this equipment to Jose and Antonio to work at the house of

21  your customers?

22  A.   That's correct.

23  Q.   And Jose Sanchez did not have a business that you

24  wrote checks to; is that correct?

25  A.   That's correct.

Sage - Direct/Reilly

63

1    Q.    And none of your workers over the years have had

2    businesses that you wrote checks to; is that correct?

3    A.    That is correct.

4    Q.    Now, am I correct that all the individuals that you

5    paid cash to over the years, you've considered them to be

6    helpers or laborers; is that correct?

7    A.    GC's.

8    Q.    That's?

9    A.    General contractors, sir.

10   Q.    Okay.  Do you recall at your deposition on page 134

11   beginning at line 12:  Question:  The individuals that you

12   paid solely in cash, did you consider them subcontractors?

13   And giving the answer:  I consider them helpers, laborers.

14         Do you recall being asked that question?

15   A.    Yes, sir.

16   Q.    And that answer.  Okay.

17         Do you recall being asked the question at line

18   19:  Do you consider them labor, help, working for your

19   LLC?  And do you recall giving the answer on line 21.

20   A.    Can you speak into the microphone.

21   Q.    Sure.  Do you recall line 19:  Do you consider them

22   labor, help, working for your LLC and giving the answer

23   line 21, you can add that, yes.

24   A.    Yes, sir.

25   Q.    Do you recall being asked is that question and giving

Sage - Direct/Reilly

64

1    that answer?

2    A.    Yes, sir.

3    Q.    Do you recall being asked the question on page 134

4    beginning and line 24, would you consider Jose Sanchez a

5    laborer or a helper that you hired to work for your LLC

6    and your corporation and line three-page 135 giving the

7    answer:  Yes, sir.

8         Do you recall being asked that question and

9    giving that answer?

10   A.    Yes, sir.

11   Q.    Okay.  Let's turn to exhibit 3.  Plaintiff's Exhibit

12   3.

13   A.    Okay, sir.

14   Q.    Okay, is this the answer that your daughter and

15   yourself prepared in response to the complaint that was

16   filed?

17   A.    Yes, sir.

18   Q.    And on the last page of the exhibit do you see where

19   it says affidavit of service?

20   A.    The last page?

21   Q.    The last page of the exhibit.

22   A.    Okay, sir.

23   Q.    Yes?

24   A.    Yes, sir.

25   Q.    And is the individual that signed the affidavit of

Sage - Direct/Reilly

65

1   service is her name Jennifer Ward?

2   A.    That's correct.

3   Q.    And that's your daughter; is that correct?

4   A.    That's correct.

5   Q.    And on the page before that, do you see your name,

6   Ethan Sage there?

7   A.    That is correct.

8   Q.    And is that your signature?

9   A.    Yes, sir.

10  Q.    And is this the answer that was filed in this Federal

11  Courthouse on behalf of Oceanside First Class Roofing and

12  Ethan Sage?

13  A.    Yes, sir.

14  Q.    And am I correct that you signed off on the answer

15  because everything in the answer was true; is that

16  correct?

17  A.    To the best of our ability.

18  Q.    Now, on page two of the exhibit which is exhibit 3

19  which is in evidence, after number 7, does it say:  Admits

20  the allegations contained in paragraph 7, 8, 9 and 10 of

21  the complaint?

22  A.    I see that, yes, sir.

23  Q.    Okay.  Does it also say next to number 8, admits the

24  allegations contained in paragraphs 11 and 12 of the

25  complaint?

Sage - Direct/Reilly

66

1    A.   I see that, yes, sir.

2    Q.   And next to number 10 does it say:  Admits the

3    allegation contained in paragraph 18 of the complaint?

4    A.   I see that, yes, sir.

5    Q.   And next to number 12 does it say:  Admits that

6    Palacio's responsibilities when defendants helped him out

7    were general cleanups and trash removal?

8    A.   I see that, yes.

9    Q.   Does it say that?

10   A.   Yes, sir.

11        MR. PEARLMAN:  Your Honor, object.  He didn't

12   read the full sentence.

13   Q.   Does it partially say that?

14   A.   Partially.

15   Q.   Yes.  What I read says that there, right?

16   A.   Partially.

17   Q.   And next to 14 does it say admits the allegations

18   contained in paragraphs 25 and 26 of the complaint?

19   A.   I see that here.

20   Q.   And let's take a look at exhibit 2.

21   A.   Okay.

22   Q.   That's the complaint that you answered, correct?

23   A.   I'm sorry?

24   Q.   Exhibit 12 is the complaint that you answered; is

25   that correct?

Sage - Direct/Reilly

67

1    A.    That is correct.

2    Q.    And paragraph on the second page, paragraph 10, do

3    you see that?

4    A.    Yes, I do.

5    Q.    Yes?

6    A.    Yes, sir.

7    Q.    That's not one of the paragraphs that was admitted;

8    is that correct?

9    A.    That's correct.

10   Q.    And paragraph number 11 is also admitted; is that

11   correct?

12   A.    That's correct.

13   Q.    And paragraph 12 its also admitted; is that correct?

14   A.    If that's what it says, yes, sir.

15   Q.    And paragraph 18 was also admitted; is that correct?

16   A.    That is correct.

17   Q.    And paragraphs 25 and 26 were also admitted; is that

18   correct?

19   A.    That's correct.

20   Q.    Now, the LLC had a website; is that right?

21   A.    Yes, sir.

22   Q.    And the corporation also has a website; is that

23   correct?

24   A.    It had.

25   Q.    Okay.  The LLC and the corporation's website was the

Sage - Direct/Reilly

68

1    same website; is that correct?

2    A.   I don't know if the website maker made changes to it.

3    Q.   Well, there is one website for First Class Roofing;

4    is that correct?

5    A.   That's the only website that I remember.

6    Q.   Okay.  And that website existed for years; is that

7    correct?

8    A.   I don't think years, sir.

9    Q.   Okay.  But the contents of the website you had

10   approved; is that correct?

11   A.   Incorrect.

12   Q.   On page 110 of your deposition transcript beginning

13   at line 23, do you recall being asked the question:  Did

14   you approve of a content of your website?  And line 25

15   giving the answer:  Yes.

16        Do you recall being asked that question and

17   giving that answer?

18   A.   The website became a website because I gave the

19   approval to the website maker to make me a website.  I

20   don't know about websites.

21   Q.   My question with all due respect was a little

22   different.  My question was:  Do you recall being asked

23   the question on page 110 line 23 did you approve the

24   contents of your website and give the answer on line 25:

25   Yes, sir.

Sage - Direct/Reilly

69

1              Do you recall that?

2    A.    Yes, sir.

3    Q.    So you recall being asked that question and giving

4    that answer?  Correct?

5    A.    That is correct.

6    Q.    And do you also recall on page 125 of your deposition

7    transcript being asked the question line 2:  Would you

8    agree that by allowing this language to be put on a

9    website that's on line that you approved of language in

10   the actual website itself?  And giving the answer:  Yes,

11   sir.

12             Do you recall being asked is that question and

13   giving that answer?

14   A.    Yes, sir.

15   Q.    Okay, let's turn to exhibit 4, which is in evidence.

16   On exhibit 4 do you see the First Class Roofing logo?

17   A.    Yes.

18   Q.    That's your company's logo; is that correct?

19   A.    That's correct.

20   Q.    To the right of that you see the 516 phone number?

21   A.    Yes.

22   Q.    That's company's phone number?

23   A.    Yes.

24   Q.    Your cell phone number?

25   A.    It looks like both or them are my business number.

Sage - Direct/Reilly

70

1  They're both the same number.  764-3636, they're both the

2  same number.

3  Q.   And do you see next to quality do you see where it

4  says we combine great materials with our highly trained

5  work force to offer a final product that is second to

6  none.

7        Do you see that?

8  A.   Yes, sir.

9  Q.   And where it's written, highly trained work force, am

10  I correct that you understood that to be the five or seven

11  workers that you paid over the years for work on your

12  customers roofs?

13  A.   I consider that to be First Class Roofing.

14  Q.   First Class Roofing?

15  A.   First Class Roofing, not the workers, the roofing

16  company.

17  Q.   Let's turn to page 115 of your deposition transcript.

18  Beginning on line 10 do you recall being asked the

19  question:  When it is written highly trained work force,

20  did you understand that to be you or you and others?  And

21  do you recall giving the answer me and others.

22        Do you recall asked that question and giving

23  that answer?

24  A.   Yes, sir.

25  Q.   And do your recall on line 14 being asked the

Sage - Direct/Reilly

71

1  question:  The others are the people, the five or seven

2  people who you either pay cash or check and consider them

3  subcontractors because that's who we're talking about,

4  right?  And do you recall giving the answer:  Yes, sir?

5  A.    Yes, sir.

6  Q.    Now, am I correct that you wanted the website company

7  who created your website to come up with something that

8  was appealing to the public?

9  A.    That's incorrect.

10  Q.    Do you recall on page 117 of your deposition

11  transcript being asked the question beginning on line

12  nine:  You want the company to come up with something that

13  was appealing to the public, and line 11 giving the

14  answer:  Yes?

15  A.    Yes.

16  Q.    Do you recall being asked that question and giving

17  that answer?

18  A.    Yes, sir.

19  Q.    And am I correct that the language highly trained

20  work force is something that's appealing to the public; is

21  that correct?

22          MR. PEARLMAN:  Objection.

23          THE COURT:  Sustained.

24  Q.    Do you recall on page 117 of your deposition

25  transcript at line 12 being asked the question highly

Sage - Direct/Reilly

72

1    trained work force is something that's appealing to the

2    public and giving the answer on line 14, yes.

3              Do you recall being asked that question and

4    giving that answer?

5    A.    To make the record clear, sir, I have never -- I

6    don't even use the words highly work force.  I never used

7    those words, highly work force.  That was generated by the

8    maker of the company, those words were made just like the

9    phone numbers, he put two phone numbers.  I never do that,

10   I always put my cell number so people can reach me

11   directly.  That makes people feel comfortable.

12             He created all of this.  I never really hardly

13   looked at this.

14   Q.    But this is the website that was on the worldwide

15   web; is that correct?

16   A.    That is correct.

17   Q.    So if a potential customer wanted to look up your

18   company, this is what the potential customer would see; is

19   that correct?

20   A.    He would have done anything to get me work.  He's my

21   neighbor, lives in Oceanside as well, whatever.  But it

22   didn't work, so he actually carried me for nine months and

23   complained that I didn't pay him.  He's not suing me, but

24   I didn't pay him.

25   Q.    When I asked you on page 117 beginning on line 12 of

73

1    your deposition transcript, do you recall being asked the

2    question highly trained force is something that's

3    appealing to the public and giving the answer yes?

4              MR. PEARLMAN:  Objection, asked and answered.

5              THE COURT:  He never answered it.  Overruled.

6    Q.   Do you recall being asked that question and giving

7    that answer?

8    A.   Yes.

9    Q.   Do you recall page 117 of your deposition transcript

10   beginning at line 12 being asked the question:  Highly

11   trained work force is something that's appealing to the

12   public, and giving the answer:  Yes?

13   A.   Yes, sir.

14             THE COURT:  At this point we're going recess for

15   lunch.  We'll recess until two o'clock and you'll resume

16   with the direct at two o'clock.  Have a pleasant lunch and

17   we'll see you then.

18             MR. REILLY:  Thank you, Judge.

19             (Luncheon recess taken at this point.)

20             (Continued on next page.)

21

22

23

24

25

**Sage - Direct/Reilly**

74

1          A F T E R N O O N   S E S S I O N.

2

3          THE COURT:  If you would all be seated, please.

4          We will continue with the direct examination of

5   Mr. Sage.

6          Mr. Reilly.

7          MR. REILLY:  Thank you, Judge.

8

9   BY MR. REILLY:

10  Q.   Mr. Sage, let's turn to Plaintiff's Exhibit 5 in the

11  black book.

12          Are you there?

13  A.   Yes, sir.

14  Q.   At the top of the exhibit, do you see the First Class

15  Roofing logo?

16  A.   Yes.

17  Q.   To the right, you see the First Class Roofing

18  telephone number?

19  A.   Yes.

20  Q.   You see where it says about us?

21  A.   Yes.

22  Q.   It says, First Class Roofing, Inc., is a friendly,

23  reliable and affording roofing company; do you see that?

24  A.   Yes, sir.

25  Q.   This exhibit 5 is part of the First Class Roofing

Sage  -  Direct/Reilly

75

1   website that appears on the worldwide web; is that

2   correct?

3   A.   That's correct.

4   Q.   Do you see where it says, we do not subcontract any

5   of our roofing work; do you see that?

6   A.   That is correct.

7   Q.   That was written on your website; is that correct?

8   A.   That is correct.

9   Q.   On your website, First Class Roofing is representing

10  to the public that it is you and your employees that are

11  going to perform the work that your customers hire you to

12  do; is that correct?

13          MR. PEARLMAN:  Objection, your Honor, the

14  document speaks for itself.

15          THE COURT:  It certainly lends itself to that

16  interpretation, but the defendant indicated earlier,

17  Mr. Sage indicated earlier with respect to a website that

18  it was actually prepared by his next door neighbor and

19  some of the language was not the language he would adopt,

20  and so forth, so I'll permit Mr. Reilly to pursue this

21  line of inquiry.

22          MR. REILLY:  Thank you, Judge.

23  BY MR. REILLY:

24  Q.   On your website, you were representing that it is you

25  and your employees that are going to perform the work that

Sage   -   Direct/Reilly

76

1    your customers hire you to do; is that correct?

2    A.    That is correct.

3    Q.    And you bring First Class Roofing, that crew, to work

4    on your customers' roofs; is that correct?

5    A.    That is correct.

6    Q.    Jose Sanchez and Antonio Palacio, they were part of

7    the First Class Roofing crew that you brought to your

8    customers' homes to work; is that correct?

9    A.    That is correct.

10    Q.    Now, turning to Exhibit D-D in the blue binder.

11    A.    You said D?

12    Q.    D-D in the blue binder which is in evidence.

13    A.    Okay.

14    Q.    Now, looking at Exhibit D-D, am I correct that there

15    are 11 instances in writing where Jose Sanchez provided

16    debris removal services for First Class Roofing?

17    A.    I don't know if there's 11.  I see one of them here

18    in the front of Exhibit D.

19    Q.    Do you see -- how many pages are in the exhibit?

20    A.    That's something different.  Okay.  Yes, sir.

21    Q.    Okay.

22          Do you see 11 instances from October 28, 2013,

23    to May 2nd, 2014, where Jose Sanchez provided debris

24    removal services for First Class Roofing?

25    A.    Yes, sir.

Sage  -  Direct/Reilly

1   Q.   Am I correct that you do not know whether or not Jose

2   Sanchez provided debris removal services to either you or

3   your companies prior to October 28, 2013?

4   A.   Repeat that again, sir?

5   Q.   Sure.

6        Am I correct that you do not know whether or not

7   Jose Sanchez provided debris removal services to you or

8   your companies prior to October 28, 2013?

9   A.   He did, sir.  He did provide services.

10  Q.   Turn to page 186 of your deposition which was taken

11  just a few months ago in May of this year.  On line 15, do

12  you recall being asked the question:

13       Do you know whether or not Jose Sanchez provided

14  debris removal services either to you or your companies

15  prior to October 28, 2013?

16       And on line 20, giving the answer:  I really

17  don't remember, sir.

18       Do you recall being asked that question and

19  giving that answer just a few months ago when you were

20  giving sworn deposition testimony?

21  A.   Yes, sir.

22  Q.   Okay.

23       So you don't know whether or not Jose Sanchez

24  was providing debris removal services prior to October 28,

25  2013; is that correct?

Sage  -  Direct/Reilly

78

1    A.    I was able to look up the date that he got the truck,

2    that he purchased the truck that he used for the removal.

3    Q.    Am I correct that you don't know whether or not Jose

4    Sanchez provided debris removal services to you or your

5    companies after May 2nd, 2014?

6    A.    He provided services for my company until I got my

7    truck which was in 2015.

8    Q.    Okay.

9          You're talking about debris removal services; is

10   that correct?

11   A.    Yes, sir.

12   Q.    Do you recall on page 186 at your deposition being

13   asked the question, at line 21:

14         Do you know whether or not he provided debris

15   removal services to you or your company after May 2nd,

16   2014?

17         And giving the answer on line 24:  I really

18   don't remember.

19         Do you recall being asked that question and

20   giving that answer?

21   A.    Yes, sir.

22   Q.    Am I correct that you do not know whether Jose

23   Sanchez provided debris removal services to you or your

24   companies on dates other than the 11 times shown between

25   October 28, 2013, and May 2nd, 2014?

Sage  -  Direct/Reilly

79

1    A.    As I indicated before, after that questioning I was

2    able to look up further and he purchased the truck before

3    that time.

4    Q.    Do you recall on page 187 of your deposition

5    transcript, beginning on line 12, being asked the

6    question:

7             Were there any other times between these two

8    dates, October 28, 2013, and May 2nd, 2014, that he

9    provided additional debris removal services for either you

10   or your companies?

11            And on line 16 giving the answer:  Oh, I don't

12   remember, sir.

13            Do you recall being asked that question and

14   giving that answer?

15            MR. PEARLMAN:  Objection, your Honor.

16   BY MR. REILLY:

17   Q.    Do you recall that?

18            THE COURT:  What's the objection?

19            MR. PEARLMAN:  He didn't read the full answer.

20   It's a misleading quote from the transcript.

21            THE COURT:  If it's misleading, that invokes

22   Rule 106.  So for purposes of completeness, read the whole

23   question and answer.

24            MR. REILLY:  Sure.

25

Sage  -  Direct/Reilly

80

1    BY MR. REILLY:

2    Q.   Do you recall giving the answer:  Oh, I don't

3    remember, sir.  The checks should correspond to the dates.

4         Is that correct?

5    A.   That is correct.

6    Q.   And on the checks that you wrote to Jose Sanchez, am

7    I correct that you never wrote whether the checks were for

8    just labor or labor and debris removal or something else;

9    is that correct?

10   A.   That is correct.

11   Q.   You just gave them checks, right?

12   A.   That is correct.

13   Q.   From looking at the checks you gave, no one can

14   figure out if the checks were strictly for debris removal

15   services, right?

16   A.   It was written on the check stub.  If it went to

17   dump, it would say dump on it.

18   Q.   Okay.

19        Let's take a look, since we're on the topic,

20   let's go back to the checks, okay.

21   A.   Not the check, the stubs.

22   Q.   You gave, in discovery in this lawsuit, you gave

23   copies of the checks; is that correct?

24   A.   That is correct.

25   Q.   And you didn't give copies of the stubs; is that

Sage   -   Direct/Reilly

81

1    correct?

2    A.    They weren't asked for, sir.

3    Q.    Okay.

4          So what's in evidence in this lawsuit is just

5    copies of the checks, right?

6    A.    That is correct.

7    Q.    And the checks do not indicate one way or another

8    whether they're just for labor, right?

9    A.    That is correct.

10   Q.    Or for labor and debris removal services, correct?

11   A.    That is correct.

12   Q.    Or both; is that correct?

13   A.    That is correct.

14   Q.    And so from looking at the checks that are in

15   evidence at this trial, no one can tell what exactly they

16   were written for; is that right?

17   A.    That is correct.

18   Q.    And going back to the question that I asked, am I

19   correct that you do not know whether Jose Sanchez provided

20   debris removal services to you or your companies on dates

21   other than the 11 times shown between October 28, 2013,

22   and May 2nd, 2014?

23   A.    That is correct.

24   Q.    And just so we're clear, when you provided a check to

25   Jose Sanchez, that could have just been for labor, right?

Sage  -  Direct/Reilly

82

1    A.    Wrong.

2    Q.    Do you recall on page 182 of your deposition

3    transcript at line 7 being asked the question:

4          Whenever you provided a check for Jose Sanchez,

5    that could have been for just labor, correct?

6          And your answer at line 10 being yes, sir.

7          Do you recall being asked that question and

8    giving that answer?

9    A.    Yes.

10   Q.    When you wrote a check to Jose Sanchez, it could have

11   also been for labor and carting away debris combined; is

12   that correct?

13   A.    That is correct.

14   Q.    And when you wrote a check to Jose Sanchez, it could

15   have been just for carting away the debris; is that

16   correct?

17   A.    That is correct.

18   Q.    Am I correct that you never wrote Jose Sanchez a

19   check and gave him a stub which indicated what exactly the

20   money was for that you were giving him?

21   A.    We had a verbal agreement.

22   Q.    Okay.  But my question is a little different.  Pay

23   attention to the question.

24         Am I correct that you never wrote Jose Sanchez a

25   check and gave him a stub which indicated what the money

Sage  -  Direct/Reilly

83

1    was for; is that correct?

2    A.    That's correct.

3    Q.    Okay.

4          Let's take a look at Exhibit 14, and that's

5    Plaintiff's Exhibit 14.

6          On that exhibit go to page D 0242.

7    A.    I'm sorry, that number was D 0...

8    Q.    242.

9    A.    Okay, sir.

10   Q.    So do you see on July 22nd, 2014, you wrote a check

11   to Jose Sanchez for $450?

12   A.    That is correct.

13   Q.    On the next page did you write a check on July 24th,

14   2014?

15   A.    That is correct.

16   Q.    And then on the next page after that do you write him

17   a second check on July 24th, 2014?

18   A.    That is correct.

19   Q.    And then on the page after that, you write him a

20   check on July 30th, 2014?

21   A.    That is correct.

22   Q.    And did you write him a check on August 1st, 2014, on

23   the next page?

24   A.    That is correct.

25   Q.    And then did you write him a check on August 7th,

Sage   -   Direct/Reilly

84

1    2014, on the next page?

2    A.    That is correct.

3    Q.    And then did you write him a check on August 9th,

4    2014?

5    A.    That is correct.

6    Q.    And did you write him a check on August 10th, 2014?

7    A.    That is correct.

8    Q.    And did you write him a check on August 12, 2014?

9    A.    That is correct.

10   Q.    And did you write him a check on August 16, 2014?

11   A.    That is correct.

12   Q.    And did you write him a check on August 20th, 2014?

13   A.    That is correct.

14   Q.    Did you write him a check on August 22nd, 2014?

15   A.    That is correct.

16   Q.    Did you write him a check on August 25th, 2014?

17   A.    That is correct.

18   Q.    Did you write him a check on August 26, 2014?

19   A.    That is correct.

20   Q.    Did you write him a second check on August 26, 2014?

21   A.    That is correct.

22   Q.    Did you write him a check on August 30th, 2014?

23   A.    That is correct.

24   Q.    And did you write him a check on November -- on

25   September 5, 2014?

Sage  -  Direct/Reilly

85

```
1   A.   That is correct.

2   Q.   Now, if you could turn to Exhibit D-I.

3   A.   D-I?

4   Q.   Yes.

5   A.   Where would I find that, sir?

6   Q.   Do you have D-I?

7   A.   There's no D-I.  There's D-02.  There's no D-I.

8            MR. REILLY:  Do you want me to help you find it?

9            THE WITNESS:  If you could, that would help the

10  time.

11           MR. REILLY:  You're in the wrong book.

12  Defendant's Exhibit I.  I apologize.

13  BY MR. REILLY:

14  Q.   Turn to Defendant's Exhibit D-I.

15  A.   Okay.

16           It must be my dyslexia, but I can't find it.

17  I'm sorry.

18           (Pause in proceedings.)

19           THE WITNESS:  Thank you very much.

20  BY MR. REILLY:

21  Q.   Defendant's Exhibit D-I consists of four pages; is

22  that correct?

23  A.   I'm sorry, this says I and not D-I.  Yes, sir.

24  Q.   It's a Defendant's Exhibit.

25  A.   Yes.
```

Sage  -  Direct/Reilly

86

1   Q.    These are the dates on 2012 through 2014 and 2015

2   that you and your daughter felt that Jose and Antonio

3   worked; is that correct?

4   A.    That is correct.

5   Q.    And if you turn to 2014, which is the third page of

6   the exhibit, you see from July 22nd to July 30th there is

7   seven workdays that you wrote down that Jose and Antonio

8   worked; is that correct?

9   A.    It says eight at the end, sir.

10  Q.    But from July 22nd, put aside July 18th, July 22nd to

11  July 30th, during that time period there are seven

12  workdays that both Antonio and Jose worked; is that

13  correct?

14  A.    It could be, sir.

15  Q.    That's what you wrote down as days Antonio worked; is

16  that correct?

17  A.    Not necessarily, sir.

18  Q.    In August of 2014, you wrote down that there were 18

19  days that both Jose and Antonio worked; is that correct?

20  A.    Not necessarily, sir.

21  Q.    Well, we saw the checks that you wrote from July

22  22nd, 2014, all the way through September 5th, 2014,

23  correct?

24  A.    Correct.

25  Q.    You wrote a lot of checks to Jose Sanchez during that

Sage  -  Direct/Reilly

87

1    time; is that correct?

2    A.    That is correct.

3    Q.    And so when you wrote down that there were 18

4    workdays in August, including four Saturdays, weren't

5    these the dates at the very least Jose Sanchez worked?

6    A.    Not necessarily, sir.

7    Q.    Well, let's turn to Plaintiff's Exhibit 15.

8    A.    Where would I find that?

9    Q.    Go back to the black binder.

10   A.    Okay.

11           I can make this simple with a simpler

12   explanation.

13   Q.    Okay.

14           And turn to page 20 of exhibit 15.  Are you

15   there?

16   A.    When you say exhibit 20...

17   Q.    Exhibit 15, page 20.

18   A.    It says 8 of 16.  Okay.  My last page -- okay.

19   Q.    Exhibit 15, do you see at the bottom on the left-hand

20   side it says 20?

21   A.    Yes.

22   Q.    And 21?

23   A.    Thank you very much.

24   Q.    Do you see on page 20 there begins a series of text

25   messages beginning on July 21st, 2014?

Sage   -   Direct/Reilly

88

1    A.    Yes, sir.

2    Q.    If you look from page 20 to page 31, the text

3    messages continue; is that correct?

4    A.    That is correct.

5    Q.    Are these all text messages that you sent to Jose

6    Sanchez giving him the addresses of the roof installations

7    that he was going to work on?

8    A.    That's the way we communicated.

9    Q.    So the answer is yes?

10   A.    Yes, sir.

11   Q.    So going back to Exhibit I, Defendant's Exhibit I,

12   all of the days that you put on Defendant's Exhibit I were

13   days that there were roof installations; is that correct?

14   A.    That is correct, and some repairs.

15   Q.    They were all roof installations; is that correct?

16   A.    And repairs.  They're different.

17           If you recall, you complained to me because I

18   had written repairs on there as well.

19   Q.    Okay.

20           Let's turn to page 247 of your deposition

21   transcript.  We will start at -- do you recall on page 246

22   of your deposition transcript, and this is the transcript

23   that you reviewed this morning, okay, do you recall on

24   line 22 being asked the question:

25           In December, we see that there are four

Sage  -  Direct/Reilly

89

1   Saturdays and one Saturday worked.  In total, 24 days,

2   right?

3            And do you recall giving the answer that's

4   correct?

5   A.   That's correct.

6   Q.   This is for December 2012; is that correct?

7   A.   Yes, sir.

8   Q.   And then do you recall on page 247, beginning on line

9   2, being asked the question:

10           All those were roof installations; is that

11  correct?

12           And giving the answer on line 4:  That is

13  correct.

14           Do you recall being asked that question and

15  giving that answer?

16  A.   Yes, sir.

17  Q.   And do you recall the very next page, on 247, line 5,

18  being asked the question:

19           In November there were 11 days that were worked

20  and two Saturdays.  Do you see that?

21           And giving the answer:  That's correct.

22           And do you recall on line 8 being asked the

23  question:

24           Were those all roof installations?

25           And on line 9 giving your response that's

Sage  -  Direct/Reilly

90

1   correct?

2   A.    That's correct.

3   Q.    And do you recall on the next line being asked the

4   question:

5          Anywhere on this document which is marked as

6   exhibit 19, which was marked for the day, for days worked,

7   does that always mean that there was a roof installation?

8          And you giving the answer yes, sir.

9          Do you recall being asked that question and

10  giving that answer?

11  A.    Yes, sir.

12  Q.    So were all of the days that were put on Defendant's

13  Exhibit I, were they all days that there were roof

14  installations?

15  A.    For me, yes.

16  Q.    For your company; is that correct?

17  A.    That's correct.

18  Q.    And they were all do jobs; is that correct?

19  A.    Yes, sir.

20  Q.    Earlier you tried to explain do jobs in your calendar

21  book means the whole crew has to work; is that correct?

22  A.    Not everybody appears on the jobs at one time.

23  Sometimes they're small jobs.

24  Q.    The do jobs, all of the do jobs from your calendar

25  book, you transferred to Defendant's Exhibit I; is that

Sage   -   Direct/Reilly

91

1    correct?

2    A.    And some repairs, as you complained about.

3    Q.    Okay.  We will get back to that.

4          Let's take a look at Defendant's Exhibit C,

5    okay.

6          On Defendant's Exhibit C do you see copies of

7    1099 forms?

8    A.    Yes, sir.

9    Q.    In 2012, you wrote checks to Jose Sanchez for the

10   total sum of $19,290; is that correct?

11   A.    That is correct.

12   Q.    You also gave him cash as well; is that correct,

13   that's not reflected on here?

14   A.    I could have.

15   Q.    Okay.

16         In 2012, you hadn't turned over any checks like

17   you did in the beginning of September of 2013; is that

18   correct?

19   A.    Repeat that, please?

20   Q.    Sure.

21         When you looked to try to find the checks you

22   had written out to Jose Sanchez in 2012, you weren't able

23   to find any; is that correct?

24   A.    That is correct.

25   Q.    For example, we can't see how many checks you wrote

Sage  -  Direct/Reilly

92

1    to Jose Sanchez during the month of November 2012; is that

2    correct?

3    A.    That is correct.

4    Q.    And we can't see how many checks you wrote out to

5    Jose Sanchez during the month of September 2012; is that

6    correct?

7    A.    The federal government issues the paper.

8    Q.    My question is a little different.

9              For the month of December 2012, you didn't

10   provide copies of any of the checks you wrote out to Jose

11   Sanchez; is that correct?

12   A.    That's correct.

13   Q.    Remember, a few minutes ago, we looked at all of the

14   checks, the whole bunch of checks you wrote to Jose

15   Sanchez from July 22nd to September 5th, remember we saw

16   that?

17   A.    Yes, sir.

18   Q.    So we can figure out pretty much that Jose Sanchez

19   was working a lot during that time frame, July 22nd to

20   September 5th of 2014; is that correct?

21   A.    You could say that, sir.

22   Q.    We saw all the text messages as well during that

23   time?

24   A.    That is correct.

25   Q.    You didn't turn over any text messages for any of the

93

1   year 2012; is that correct?

2   A.   As I indicated before, I couldn't located them.

3   Q.   We don't know all of the jobs that you sent Jose

4   Sanchez to work on at least in November and December of

5   2012; is that correct?

6   A.   That is correct.

7   Q.   If we go back to Defendant's Exhibit I, on the first

8   page, you wrote down from November 16th to November 29th

9   of 2012, there were 10 workdays including two Saturdays;

10  is that correct?

11  A.   That's correct.

12  Q.   Those were all roof installations; is that correct?

13  A.   They could have been.

14  Q.   Do you recall, when you reviewed your second day of

15  the transcript this morning, do you recall on page 247,

16  beginning on line 5, do you recall being asked the

17  question:

18        In November, there were 11 days that were worked

19  and two Saturdays.  Do you see that?

20        And giving the answer:  That's correct?

21  A.   What year was that, sir?

22  Q.   2012.

23  A.   That was during Super Storm Sandy; that's correct.

24  Q.   Post-Sandy was a very busy time; is that correct?

25  A.   It dwindled real fast.

Sage  -  Direct/Reilly

94

1    Q.    But November and December post Hurricane Sandy was

2    very, very busy; is that correct?

3    A.    That's correct, a lot of repairs.

4    Q.    That also led into the year 2013; is that correct?

5    A.    Repairs, sir.

6           Yes, people started getting their checks back

7    from insurance companies and stuff like that so...

8    Q.    Do you recall being asked beginning on page 247, line

9    5:

10          In November, there were 11 days that were worked

11   and two Saturdays.  Do you see that?

12          And giving the answer:  That's correct.

13          Do you recall being asked that question and

14   giving that answer?

15   A.    That's correct.

16   Q.    And do you recall being asked at the very next line,

17   line 8:

18          Were those all roof installations?

19          And giving the answer:  That's correct?

20   A.    That's correct.

21   Q.    The 11 workdays in November 2012 are all roof

22   installations; is that correct?

23   A.    That's correct.

24   Q.    And then the 24 workdays in December 2012 --

25   A.    If you could tell me where we are so I could follow

Sage  -  Direct/Reilly

95

1    along.

2    Q.    Going back to Defendant's Exhibit I.

3    A.    Okay.

4    Q.    The 24 days that you and your daughter put on this

5    exhibit for December 2012, they were all roof

6    installations as well; is that correct?

7    A.    They could have been, sir.

8    Q.    Okay.

9          Well, do you recall on page 247 of your

10   deposition transcript being asked the question:

11   Anywhere -- line 10:

12          Anywhere on this document which is marked as

13   exhibit 19 for days worked, does that always mean there

14   was a roof installation, and giving the answer at line 13,

15   yes, sir.

16   A.    I'll repeat that.  Yes, sir.

17   Q.    If you had the checks that were written to Jose

18   Sanchez, we could have seen just how many checks you wrote

19   to him in November and December of 2012 for working for

20   the LLC at that time; is that correct?

21   A.    The checks and the dates weren't necessarily

22   corresponding to the dates that the jobs were done.

23   Q.    Payday was every Saturday, wasn't it?

24   A.    That's correct.

25   Q.    You paid your workers every Saturday for the work

96

1   they did during the week; is that correct?

2   A.   Wcho used to ask for a lot of advances.

3   Q.   You gave -- any advances you gave to him were in

4   cash; is that correct?

5   A.   I don't recall that, sir.

6   Q.   So if we had the checks from December -- November and

7   December 2012 made payable to Jose Sanchez, we could have

8   figured out exactly or about how many days he worked; is

9   that correct?

10  A.   To be clear, sometimes he used to come and ask for

11  advances, like can you pay me for that dumpster, and I

12  used to oblige him before the Saturday.

13  Q.   And the 24 workdays in December were all do jobs; is

14  that correct?

15  A.   Which one?

16  Q.   The 24 workdays in December 2012, were all do jobs;

17  is that correct?

18  A.   December when, sir?

19  Q.   2012.

20  A.   Not necessarily.

21  Q.   Didn't you testify at your deposition that all of the

22  do jobs were transferred from the calendar books onto a

23  looseleaf paper and then that was transferred onto this

24  document which is Exhibit I?

25  A.   For the third time, you scolded me because I put some

Sage  -  Direct/Reilly

97

1   repairs on there as well.

2   Q.    Okay.  Let's go back to exhibit D-C, page 2.

3   A.    Is that 2013, sir?

4   Q.    Yes.

5         In 2013, did you write or does your company

6   write $35,150 worth of checks to Jose Sanchez?

7   A.    How much?

8   Q.    $35,150?

9   A.    To Jose Sanchez?  Never.

10  Q.    Does the 2013 1099 say $35,150?

11  A.    Now, you clarified that.  You said the 1099.  Yes,

12  sir.

13  Q.    Yes.

14        The 2013 1099 says $35,150; is that correct?

15  A.    That's correct.

16  Q.    And so First Class Home Improvement, the LLC, wrote

17  checks to Jose Sanchez in 2013 totaling $35,150?

18  A.    That is correct.

19  Q.    But if you look back at Defendant's Exhibit I, page

20  2, for 2013 you wrote that there were 15 workdays in

21  February; is that correct?

22  A.    Yes, sir.

23  Q.    And then you wrote that there were 16 workdays in

24  March; is that correct?

25  A.    That is correct.

Sage  -  Direct/Reilly

98

1   Q.   And then you wrote that there were 15 workdays in
2   June; is that correct?
3   A.   That is correct.
4   Q.   And you wrote that there were 19 workdays in
5   September; is that correct?
6   A.   That is correct.
7   Q.   And am I correct that you didn't provide any of the
8   checks that you wrote out to Jose Sanchez for the months
9   of February, March, April, May, June, July and August of
10  2013; is that correct?
11  A.   I provided every check I could get my hands on for
12  you.
13  Q.   My question is a little different.  Pay attention to
14  the question.
15       Am I correct that during the months of February,
16  March, April, May, June, July, August, that you didn't
17  provide any of the checks that you wrote to Jose Sanchez
18  during that time period; is that correct?
19  A.   That is correct.
20  Q.   And on this document for 2013, on page 2, all of the
21  days that were written down are roof installations; is
22  that correct?
23  A.   Not necessarily.
24  Q.   And for the year 2013, you didn't provide any text
25  messages, am I correct, to show what jobs Jose Sanchez

Sage  -  Direct/Reilly

99

1    worked on during the months of February through the end of

2    the year; is that correct?

3    A.   I provided every text message that was on my phone,

4    sir.

5    Q.   Okay.

6          You didn't provide any text messages for the

7    year 2013 so that we could see how many jobs that he

8    worked on; is that correct?

9    A.   That's correct.

10   Q.   For 2013, all of the dates here on page 2 of

11   Defendant's I, these are the dates that you believe that

12   Jose Sanchez and Antonio worked; is that correct?

13   A.   Repeat that, please.

14   Q.   Sure.

15          On page 2 of Exhibit D-I, am I correct that all

16   these days were put on here because these are the days

17   that you and your daughter felt that Jose Sanchez worked

18   during February through December of that year?

19   A.   When you say page 2, what year are you talking about,

20   sir?

21   Q.   2013.

22   A.   Okay.  Not necessarily.

23   Q.   Well, when you wrote down all of the roof

24   installations for the year 2013, were you trying to figure

25   out how many of those roof installations that Jose Sanchez

Sage   -   Direct/Reilly

100

1    and Antonio Palacio worked on?

2    A.    I was trying to give you a total of the days we

3    worked for that month, for those months.

4    Q.    So in 2013, from February through March -- February

5    through December, these are all of the days that First

6    Class Roofing had work to do; is that correct?

7    A.    Not necessarily everybody.  There could have been

8    repairs in there that would require one or two guys.

9    Q.    You don't know which were repairs and which were new

10   jobs; is that correct?

11   A.    I do know that it's a total of the days that we

12   worked.

13   Q.    Jose Sanchez and Antonio Palacio, they could have

14   worked all 15 days in February; is that correct?

15   A.    Very doubtful.

16   Q.    They could have worked all 16 days in March?

17   A.    Very doubtful.

18   Q.    But you have no records to indicate whether or not

19   Jose and Antonio worked all the days in February and all

20   the days in March; is that correct?

21   A.    It's my business, sir.

22   Q.    My question is a little different.

23         Am I correct that you don't have any records to

24   indicate whether or not Jose Sanchez and Antonio Palacio

25   worked all of the days in February and all the days in

Sage  -  Direct/Reilly

101

1   March that are on Defendant's Exhibit D-I for the year

2   2013?

3   A.   Other than the text messages.

4   Q.   We don't have any text messages in 2013, do you

5   recall that?

6   A.   No.

7   Q.   Am I correct that you don't know whether or not Jose

8   Sanchez and Antonio Palacio worked all the days in

9   February and all of the days in March that are listed on

10   page 2 of Defendant's Exhibit I?

11   A.   I am 100 percent positive they did not work every day

12   all those days.

13   Q.   You have no records to indicate that; is that

14   correct?

15   A.   That is correct.

16   Q.   And for all of the rest of the days that you wrote,

17   including 19 workdays in September 2013, you do not know

18   whether or not Jose Sanchez and Antonio Palacio worked all

19   those days; is that correct?

20   A.   That is correct.

21   Q.   Going back to the first page of Defendant's Exhibit

22   I, just so we can make it clear for the record, actually

23   go to page 271, beginning on line 11, do you recall being

24   asked the question:

25          Looking at Plaintiff's Exhibit 19, when you look

Sage  -  Direct/Reilly

102

1   at this document -- and on line 13 answering yes, sir --

2   are you confident that all of the days listed on the

3   document were days that were actual roof installations

4   done?

5          And do you recall giving the answer absolutely

6   at line 17.

7   A.   Yes, sir.

8   Q.   Okay.

9          On page 272 of your deposition transcript,

10  beginning on line 2, do you recall being asked the

11  question:

12          What is exhibit 21?

13          And on line 3 giving the answer:  It's a

14  calendar of the days we worked in that month in 2013, that

15  year.

16          Do you recall being asked that question and

17  giving that answer?

18  A.   Yes, sir.

19  Q.   Do you recall on page 272, beginning at line 10,

20  being asked the question:

21          Looking from January through December, are these

22  all the days that roof installations were done by First

23  Class Roofing for that year?

24          And giving the answer:  That is correct.

25          And do you recall being asked that question and

Sage   -   Direct/Reilly

103

1   giving that answer?

2   A.   Yes, sir.

3   Q.   Then on page -- page 272, do you recall being asked

4   the question:

5        When you looked at this document after your

6   daughter created it, were you confident that all of these

7   days encompassed all of the roof installations that were

8   done in January through December?

9        And the answer yes, sir on line 19?

10  A.   I'll repeat it.  Yes, sir.

11  Q.   Now, going back to Exhibit 14, the checks that you

12  provided during this case that was written out to Jose

13  Sanchez ends on June 16, 2015; is that correct?

14  A.   That's correct.

15  Q.   As you stated earlier, Jose Sanchez worked for First

16  Class Roofing until the middle of December 2015; is that

17  correct?

18  A.   That is correct.

19  Q.   You found no checks payable to Jose Sanchez from June

20  17, 2015, through the end of 2015; is that correct?

21  A.   That's correct.

22  Q.   From 2012 until the end of 2015, whenever you sent to

23  Jose Sanchez text messages about a job, he usually showed

24  up at that job and worked; is that correct?

25  A.   Not all the time.

104

1    Q.   Do you recall on page 209 of your deposition being

2    asked the question, at line 12:

3              During the time period that you gave us text

4    messages for, was Mr. Sanchez generally available to you

5    to appear at job sites and work for you and/or your

6    companies?

7              And on line 16 giving the answer if I sent a

8    text message to him, yeah.

9              Do you recall being asked that question and

10   giving that answer?

11   A.   Yes, sir.

12   Q.   Do you recall on line 17 of page 209 being asked a

13   question:

14             He never sent a text message back saying I'm

15   doing another job, or working with someone else that day;

16   is that correct?

17             And do you recall on page 209 giving the answer

18   not that I recall?

19   A.   That's correct.

20   Q.   Do you recall on page 209, line 21, being asked the

21   question:

22             When you sent him a text, he generally showed up

23   at the place you told him to go to; is that correct?

24             And on line 24 giving the answer:  Yeah.

25             Do you recall that?

Sage  -  Direct/Reilly

105

1    A.    Yes, sir.

2    Q.    It was part of your company's practice for the

3    majority of time to give a written estimate for a roof

4    removal and installation; is that correct?

5    A.    The majority of the time, yes, whether it was a

6    partial roof or a full roof.

7    Q.    And during the last six years your company was paid

8    by check for all of the roof removals and installations

9    that were done; is that correct?

10   A.    That's correct, sir.

11         If I may go back to your question prior, to

12   clear the record, I just found in number 93 the text

13   messages says --

14         MR. REILLY:  There's no question that's pending.

15   His attorney will be able to ask him follow-up questions.

16         THE COURT:  Since you made the ruling, there's

17   no need for me to comment.

18         I'll remind the witness that once this

19   examination is over, we will take a break and you'll have

20   a chance to confer with your attorney.  And to the extent

21   Mr. Pearlman feels there's additional information that

22   should be added or clarification provided, or whatever,

23   he'll have an opportunity to do that.

24         THE WITNESS:  Thank you, Judge.

25         THE COURT:  Remember that you don't really have

Sage   -   Direct/Reilly

106

1    to volunteer information.

2              THE WITNESS:  What happened is when I turned

3    that page, it said where are you and I figured I would

4    bring it up while I was there.

5              THE COURT:  Just follow the general

6    instructions, but that's fine for this instance.

7              THE WITNESS:  Thank you, sir.

8    Q.    All the checks that the LLC and the corporation

9    received for roof removals and installations during the

10   last six years have been deposited into the Chase bank

11   account; is that correct?

12   A.    That is correct.

13   Q.    The LLC and the corporation have a record of each and

14   every customer that it provided services for over the last

15   six years; is that correct?

16   A.    That's correct.

17   Q.    There's a file that the LLC and the corporation has

18   generated for all of the company's customers for the last

19   six years; is that correct?

20   A.    That is correct.

21   Q.    And the company records are kept in an office in your

22   house; is that correct?

23   A.    That is correct.

24              (Continued on next page.)

25

Sage - Direct/Reilly

107

1    Q.    And in the files, the customer files that is, there's

2    an indication of how much job cost and how much was paid

3    for the job; is that correct?

4    A.    That is correct.

5    Q.    And the LLC and the corporation sent bills to its

6    customers for payment, correct?

7    A.    I hand deliver my bills to the customers.

8    Q.    Okay.  So when the job is completed, there's always

9    an invoice that is given to the customer; is that correct?

10   A.    That is correct.

11   Q.    And the customer makes the payment and the payment

12   its deposited into the Chase bank account, correct?

13   A.    That is correct.

14   Q.    And you have copies of all the invoices for all the

15   customers who make payments for those invoices for the

16   years 2013, 2014 and 2015; is that correct?

17   A.    That is correct.

18   Q.    And these invoices are kept in separate files for

19   each customer; is that correct?

20   A.    That is correct.

21   Q.    And the documents maintained by the LLC and now the

22   corporation there's not kept electrically, there's

23   physical files for them, correct?

24   A.    That is correct.

25   Q.    And all the invoices show the jobs that the LLC and

Sage - Direct/Reilly

108

1  the corporation has done from year to year?

2  A.   Yes, sir.

3  Q.   And there are always 2 copies of the invoices that

4  are printed out, one given to the customer and one

5  maintained by the LLC or the corporation; is that correct?

6  A.   That is correct.

7  Q.   And am I correct that you produced none of the

8  customer invoices for the last six years?

9  A.   You did not require it.

10  Q.   Am I correct that you produced none of the customer

11  invoices for the last six years?

12  A.   You did not require it, sir.

13  Q.   So is the answer yes?

14        THE COURT:  No.  If he was to deliver the

15  customer invoices, that's one thing.  If no request was

16  made, the question is meaningless.

17  Q.   And did you ever receive -- did you ever review any

18  of the document demands that were sent in this case?

19  A.   Did I ever review?

20  Q.   Any of the document demands that were sent in this

21  case or served upon your counsel in this case?

22  A.   I have an attorney, I'm dyslexic and I have a hard

23  time reading fast so I kind of like cruise through it as

24  best as I could.

25  Q.   So you recall receiving or reviewing document

Sage - Direct/Reilly

109

1   demands?

2   A.   Yes, sir.

3   Q.   Now, after you gave your deposition in May of 2017,

4   you went and looked and found your daily plans; is that

5   correct?

6   A.   After my first deposition, yes, sir.

7   Q.   And after your first deposition in May of 2017 you

8   looked at the calendars from 2012, 2013, 2014, 2015 to try

9   to figure out how many days both Jose and Antonio worked

10  during that time period; is that correct?

11  A.   Incorrect.

12  Q.   Do you recall page 221 of your deposition transcript

13  beginning at line 25 being asked the question:  Did you

14  look in your 2012 calendar book going on to page 222 to

15  try to determine how many days both Jose and Antonio

16  worked during the course of the year 2012 and giving the

17  answer line five:  That's correct.

18          Do you recall being asked that question and

19  giving that answer:  That's correct, and the very next

20  question, do you recall on page 222 line 6, being asked

21  the question:  Did you create some type of document that

22  you turned over to my office to show how many days during

23  the year of 2012 that both Antonio and Jose worked, and

24  giving the answer on line 10:  That is correct, do you

25  recall being asked that question and giving that answer?

Sage - Direct/Reilly

110

1    A.    That is correct.

2    Q.    And Defendant's Exhibit DI was created solely based

3    upon about what you looked at in your calendars, correct?

4    A.    The totality, yes, sir.

5    Q.    And when you and your daughter created exhibit DI,

6    you did not look at any written estimates to determine how

7    many days Jose and Antonio worked in 2012 and 2015?

8    A.    That's correct.

9    Q.    When you created exhibit DI, you did not look at any

10   written contracts to try and figure out how many days

11   Antonio and Jose worked in 2012 and 2015, if it is not in

12   the book, sir, so we did not work those days, so

13   everything revolves around the business planner.  The

14   surgeries, everything was in there.

15         My question is when you and your daughter

16   created exhibit DI, am I correct that you did not look at

17   any written contracts to trying to figure out how many

18   days Jose and Antonio worked in 2012 and 2015?

19   A.    No, sir, I didn't.

20   Q.    About am I correct when you and your daughter create

21   exhibit DI you did not look at any invoices or bills that

22   you sent to your customers to try to figure out how many

23   days Jose and Antonio worked during the years 2012 to

24   2015?

25   A.    That's correct.

Sage - Direct/Reilly

111

1    Q.    Am I correct that the calendar books are the only

2    documents that you looked at to try to determine how many

3    days Jose and Antonio worked during 2012 and 2015; is that

4    correct?

5    A.    That's incorrect.

6    Q.    Do you recall at page 225 of your deposition, and

7    this is the transcript that you reviewed just a few hours

8    ago, do you recall at line 22 being asked the question:

9    When you looked at calendar book for 2012 to try to

10   determine how many days Jose and Antonio worked, is the

11   calendar book the only thing that you looked at, and on

12   226 line 2, answer:  Yes, sir.

13          Do you recall being asked that question and

14   giving that answer only two weeks ago?

15   A.    Yes, sir.

16   Q.    And the calendar books that you have for 2012 through

17   2015 they're also personal calendar books; is that

18   correct?

19   A.    I'm sorry.

20   Q.    The calendar books that you are referring to, they're

21   also personal calendar books; is that correct?

22   A.    That is correct.

23   Q.    And in the calendar books, if any job was to be done

24   it says do job in the calendar book; is that correct?

25   A.    That is correct.

Sage - Direct/Reilly

112

1  Q.   And if you were actually doing a job it says do job,

2  right?

3  A.   That is correct.

4  Q.   And your daughter is the one that kept the calendar

5  books for about your LLC and your corporation; is that

6  correct?

7  A.   That is correct.

8  Q.   And all the handwriting in your calendar books from

9  2012 and 2015 is your daughter's handwriting; is that

10  correct?

11  A.   Yes, sir.

12  Q.   And your daughter is the one that wrote in the 2012

13  through 2015 calendar books; is that correct?

14  A.   Yes, sir.

15  Q.   And am I correct that your daughter assisted you in

16  looking at the calendar books to try to determine how many

17  days Jose and Antonio worked during the years 2012 through

18  2015?

19  A.   She has four kids.  She breezed through it as much as

20  she could help me.

21  Q.   Okay.  Am I correct that she assisted you?

22  A.   Yes, sir.

23  Q.   And when you looked at the calendar books you went

24  page by page and wrote down dates that jobs were done,

25  correct?

Sage - Direct/Reilly

113

1    A.    Yes, sir.

2    Q.    And you wrote on a separate piece of paper the date

3    that the jobs were done for the years 2012 through 2015?

4    A.    Yes, sir.

5    Q.    And through 2012 you went through the entire calendar

6    book and wrote down all the days that Jose and Antonio

7    worked on a loose-leaf pad, correct?

8    A.    Incorrect.

9    Q.    Do you recall in the transcript that you read this

10   morning beginning at page 232 line 3 being asked the

11   question:  Did you go through the entire year of 2012

12   looking at the calendar book and writing down all the days

13   that both Jose and Antonio worked on some lined loose-leaf

14   pad and at line seven do you recall being asked that

15   question and giving that answer:  Yes, sir.

16   A.    Yes.

17   Q.    The next line do you recall being asked the question

18   did you transfer that to a loose-leaf book and line nine

19   answering:  Yes.

20         Do you recall being asked that question and

21   giving that answer?

22   A.    Yes, sir.

23   Q.    And for the dates that you wrote down for 2012 you

24   and your daughter then transferred those days on to a

25   computer; is that correct?

Sage - Direct/Reilly

114

1   A.   That is correct.

2   Q.   And your daughter did the actual typing; is that

3   right?

4   A.   Some of it.  Some of it I tried to do.

5   Q.   Do you recall on page 232 beginning at line 13 being

6   asked the question:  Did she do the actual typing, on line

7   14 giving the answer:  Yes.

8   A.   Yes, I recall saying that, sir.

9   Q.   And you gave her the pad and then she transferred the

10  dates on to the computer; is that correct?

11  A.   That is correct.

12  Q.   And you shredded the loose-leaf pages when you wrote

13  down the dates that jobs were done for the years 2012

14  through 2015?

15  A.   It was related to me.  I had the books.

16  Q.   My question is a little different, pay attention.  Am

17  I correct that you shredded the loose-leaf pages that you

18  wrote down the dates that the jobs were done for the years

19  2012 through 2015?

20  A.   Yes, sir.

21  Q.   And for the 2012 calendar year, wherever it says

22  jobs, you transferred that on to a piece of paper, there

23  is an actual job that was done that day; is that correct?

24  A.   That is correct.

25  Q.   And you looked at the 2012, 2013, 2014 and 2015

Sage - Direct/Reilly

115

1    calendars and wherever it says do job, you transferred

2    that on to a piece of paper because there was an actual

3    job that were done that day, correct?

4    A.    That is correct.

5    Q.    And what you transferred on the piece of paper was

6    used to create the exhibit DI that we've been looking at

7    today; is that correct?

8    A.    DI, yes, sir.

9    Q.    And on exhibit -- withdraw that.

10          And on the first page of exhibit DI the 24 days

11   of work in December, that was actual roof installations;

12   is that correct?

13   A.    What year, sir?

14   Q.    And am I correct that you are confident that all of

15   the days listed on the DI for the entire year 2012 are

16   days that there were actual roof installations done; is

17   that correct?

18   A.    Not necessarily.

19          Are you referring to 2012, sir?

20   Q.    Yes.

21   A.    Yes, sir, not necessarily.

22   Q.    Do you recall, page 271, beginning at line 11 of your

23   deposition transcript being asked the question looking at

24   Plaintiff's Exhibit 19 when you look at this document and

25   answering at line 13:  Yes, sir.

Sage - Direct/Reilly

116

1          Are you confident that all of the days listed on

2    the document are days there were actual roof installations

3    done, and on line 17 state -- testify:  Absolutely.

4          Do you recall being asked those questions and

5    giving those answers?

6    A.    Yes, sir.  With a reason.

7    Q.    And when you had your daughter transfer what was on

8    your loose-leaf paper on to the computer did you not

9    include any days that you did repairs; is that correct?

10   A.    Some of them were repairs, sir.  You scolded me for

11   that.

12   Q.    And do you recall on page 247 of your deposition

13   transcript being, at line 14 being asked the question when

14   you had your daughter transfer what was on your loose-leaf

15   paper on to the computer, you didn't include any days that

16   you did repairs, right, and answering on line 17:  No.

17          Do you recall being asked that question and

18   giving that answer?

19   A.    Yes, sir.

20   Q.    And when you wrote down on the loose-leaf pad all the

21   jobs that were actually done, you looked where it says do

22   job and you saw an actual checkmark; is that correct?

23   A.    That is correct.

24   Q.    And for the month of December 2012 when you wrote

25   down the days that were worked, you did not take into

Sage - Direct/Reilly

117

1    account the days where X's were marked; is that correct?

2    A.    That is correct.

3    Q.    And for the year 2013 total days worked, these are

4    all the days that roof installations were done by First

5    Class Roofing for the entire year; is that correct?

6    A.    I'm sorry, repeat that again.

7    Q.    Sure.

8              DI, exhibit 123, DI for the year 2013 on page 2?

9    A.    Which is what year, 2012?

10   Q.    No.  2013.

11   A.    Okay.  I'm sorry.

12   Q.    Do you recall testifying at your deposition that

13   these are all the days that roof installations were done

14   by First Class for the entire year?

15   A.    That is correct.

16   Q.    And on these calendars if it's written "do job,"

17   everybody works; is that correct?

18   A.    Not necessarily, sir.

19   Q.    Do you recall beginning on page 277 line 24 being

20   asked the question:  Do you know whether or not on

21   February 19th the Frank Krupp, K-R-U-P-P job was repaired

22   and giving the answer on page 278 line 2:  I don't

23   remember that.  If it's a do job, everybody works.  That

24   means everybody is on the job.  I go on estimates

25   sometimes and I end fixing people's leaks for free.  I

Sage - Direct/Reilly

118

1    have hundreds of people that I fix for free.  If you go on

2    the internet and call up and see my write-up, my company,

3    I'm the only company in the world that doesn't charge

4    people.

5              Do you recall being asked that question and

6    giving that answer?

7    A.    Yes, sir.

8    Q.    So especially the part where you said if it's "do

9    job," everybody works, right?

10   A.    Not necessarily everybody, every man, not necessarily

11   all the guys.  Could be five guys, could be seven guys,

12   could be three guys.

13   Q.    When you asked the questions under oath did you make

14   that statement if it "do jobs, everybody works"?

15   A.    To clarify that, if I made that statement that's what

16   I meant, it can be five guys, four jobs, depending on the

17   size of the job.  Okay.

18   Q.    If it's a do job, it's a complete job, everyone

19   receives a text as to where they are going; is that

20   correct?

21   A.    That is correct.

22   Q.    And when you testified that every is required to

23   work, everyone means or includes Jose and Antonio; is that

24   correct?

25   A.    80 percent of the time, sir.

Sage - Direct/Reilly

119

1    Q.    Okay.  Do you recall on page 292 of your deposition

2    transcript line 20 being asked the question:  Everyone

3    required means Jose and Antonio.  Question on line 21

4    giving the answer:  That is correct, especially the truck.

5    He was using his truck around that time.  I'm sure that

6    Wcho was there.

7            Do you recall that.

8    A.    You're talking about a specific time, sir.

9    Q.    Do you recall being asked that question and giving

10   that answer?

11   A.    Yes.

12   Q.    And looking at exhibit DI for 2013, there are 19 work

13   days listed for the month of September, do you see that?

14   A.    Yes, sir.

15   Q.    And all 19 days could be full installations; is that

16   correct?

17   A.    Incorrect.

18   Q.    Okay, do you recall on page 315 of your deposition

19   transcript beginning at line 15 being asked the question:

20   Is it possible that one or two days out of the 19 work

21   days of September was an actual full installation and on

22   line 18 giving the answer all 19 days could be full

23   installation, I put everything on the calendar so there

24   wouldn't be any arguments.  I doubt every day was a full

25   installation.

Sage - Direct/Reilly

120

1      Do you recall being asked is that question and

2  giving that answer?

3  A.   Yes, sir.

4  Q.   And where there's ago check mark on calendars that

5  could be a full installation, correct?

6  A.   It could be, or I showed up on the job.

7  Q.   But a check mark could be a full installation?

8  A.   That's correct.

9  Q.   Going back to DI, going to the year 2014:  Let's

10  actually take a look, look at DG, exhibit DG?

11  A.   What year is that, sir?

12  Q.   2014.  Your appointment book.

13  A.   Okay.

14  Q.   Are you there?

15  A.   Yes, sir.

16  Q.   Okay.  Looking at the week beginning August 4th, do

17  you want to turn that and tell me when you're look?

18  A.   You can ask, sir, I basically know everything.

19  Q.   On Monday August 4th is there a "do job" with a check

20  mark on it?

21  A.   It could have been a repair, sir.

22  Q.   Why don't you turn to the page, 000493.

23  A.   Where, sir?

24  Q.   DO 493.

25  A.   Okay.  D0493?

Sage - Direct/Reilly

121

1   Q.   Yes.

2   A.   I got you.

3   Q.   Do you see on Monday August 1, it says do job with a

4   check mark in it?

5   A.   Yes.

6   Q.   Turn to the next page on Thursday and Friday, there's

7   a do job that was for two days; is that correct?

8   A.   That's correct.

9   Q.   And then on Saturday --

10  A.   Or --

11  Q.   There's a do job with a check mark on it; is that

12  correct?

13  A.   That's correct.  If I can explain, sir, while we're

14  here.  The arrow that goes through it, could have been

15  carried on or it could have been the job was done the next

16  day because it rained on that day.  Here it says day 2.

17  So you're right, it was a 2 day job that day.

18  Q.   So during that week there was a do job on Monday,

19  right?

20  A.   That's correct.

21  Q.   And there's a do job on Thursday and a do job on

22  Friday and a do job on Saturday?

23  A.   That is correct.

24  Q.   Then you can turn to the week of August 25th.

25  A.   Yes, sir.

Sage - Direct/Reilly

122

1    Q.    There's a do job on Tuesday, right, August 26th?

2    A.    Yes, sir.

3    Q.    And day two of the do job is Tuesday; is that

4    correct?

5    A.    That's correct.

6    Q.    And Thursday there's do job; is that correct?

7    A.    That's correct.

8    Q.    And Friday there's a do job as well?

9    A.    That is correct.

10   Q.    And then Saturday is day two of the Friday do job; is

11   that correct?

12   A.    That is correct.

13   Q.    Okay.  So there was at least five days of work during

14   August 25th through 31st, correct?

15   A.    Friday got carried on to Saturday, yes, and not

16   everybody goes the second day on Saturday because the

17   majority of the work is usually done on the one day and we

18   go back on the second day the majority of the job is

19   already done, so not everybody goes.

20   Q.    When you reviewed your transcript this morning, did

21   you count the times where you testified that "do job"

22   means everybody is required to work?

23   A.    I don't know if I'm being misunderstood, but when I

24   say everybody, I mean, I don't mean the whole crew,

25   because if a job is small and there's no money to be made,

Sage - Direct/Reilly

123

1   I can't take everybody.  I'd be bankrupt.  There will be

2   no business, sir.  I have to plan things as they come up.

3   Everything is not set in stone.  I have to plan it as it

4   comes up.

5   Q.   Turn to September 15, excuse me, September 19, 2014

6   on the exhibit?

7   A.   I didn't hear you, sir.

8   Q.   On the same exhibit DG, can you turn to the week

9   September 15 to the 19th.  15th to the 21st.

10  A.   Okay.

11  Q.   And do you see on Monday it says job, on September

12  15?

13  A.   That is correct.

14  Q.   And on Tuesday it says day 2?

15  A.   That is correct.

16  Q.   Wednesday it says day 3?

17  A.   That is correct.

18  Q.   And underneath Wednesday there's a do job for another

19  address; is that correct?

20  A.   Are we on the same page, September 15, to 21.

21  Q.   So September 17th, right?

22  A.   Yes.

23  Q.   Do you see where it says day 3?

24  A.   Okay.  So it's Monday, Tuesday, and Wednesday, is

25  that what you're talking about?

Sage - Direct/Reilly

124

1    Q.    Monday says do job, right?

2    A.    Yes.

3    Q.    And then September 16th says day 2, correct?

4    A.    That is correct.

5    Q.    And then September 17th says day 3, correct?

6    A.    That is correct.

7    Q.    And underneath Wednesday, day 3 it also says "do job"

8    with a check mark in it?

9    A.    I don't see "do job."  I don't see where it says "do

10   job" on there.  If -- there's a check mark, but I don't

11   see "do job" there.

12   Q.    Let me see where you're at.

13   A.    You're saying right across or underneath?

14   Q.    Does it say day 3?

15   A.    Yes.

16   Q.    Does it say "do job" underneath that?

17   A.    Yes, sir.

18   Q.    Does it have a different address than the address

19   that the Monday job started at?

20   A.    That is correct, sir.

21   Q.    And then turn to the next page, Thursday says day 4,

22   correct?

23   A.    That is correct.

24   Q.    And Friday it says day five, correct?

25   A.    That is correct.

Sage - Direct/Reilly

125

1    Q.    So on the week of September 15 to the 21st there was

2    a five day job from Monday through Friday; is that

3    correct?

4    A.    It looks that way here, sir.

5    Q.    And then on going back to Defendant's Exhibit DI for

6    the year 2015 in September, can you turn to that.

7    A.    What year is that?

8    Q.    2015.

9    A.    Okay.

10   Q.    Did you write down or was it typewritten on the

11   document that there was work or that there were jobs done

12   for September 16th, 17th, 18th, 19th, 20, 21, 22, 23 and

13   24?

14   A.    On what month are we looking at, sir?

15   Q.    September.

16   A.    Yes, sir.

17   Q.    So it's written down that those were work days.

18   Every day from September 16th through September 24th it's

19   written down that that's a work day?

20   A.    It coordinates, yes, sir.

21         MR. REILLY:  I have no further questions, Judge.

22         THE COURT:  Very good.  What we'll do is we'll

23   take 15 minute recess.  So we'll resume at 20 of four.

24         MR. PEARLMAN:  Thank you, your Honor.

25         THE COURT:  Sir, you can step down.  We'll see

Sage - Cross/Pearlman

126

1    you at 20 to 4.

2            (Recess taken at this point.)

3            (After recess.)

4            THE COURT:  Mr. Pearlman.

5            MR. PEARLMAN:  Thank you, your Honor.

6

7    CROSS-EXAMINATION

8    BY MR. PEARLMAN:

9    Q.    Mr. Sage, do you recall at your deposition two weeks

10   ago Mr. Reilly asking you this question and you giving

11   that answer:  Question 293 line 8, "do job" generally

12   means that Jose and Antonio were working, right?

13           "Answer:  Not 100 percent, sir.

14   A.    Yes, sir.

15   Q.    Did you give that answer to that question?

16   A.    Yes, sir.

17   Q.    Now, a little while ago on your direct examination

18   you gave an answer something about 80 percent.  What were

19   you referring to?

20   A.    80 percent of the time they weren't used.  I didn't

21   need everybody on the jobs.

22   Q.    Was 80 percent the amount of time they worked or the

23   amount of time that they didn't work or can you explain

24   that?

25   A.    80 percent of the time I didn't need everybody on the

Sage - Cross/Pearlman

127

1   jobs, so they would be included on that.

2   Q.   Okay.  Now, the different workers that worked with

3   you, did they all have the state your name title or

4   ranking or did they have different job?

5   A.   They have different details, different titles,

6   different jobs.

7   Q.   So let's talk about plaintiff Jose Sanchez.  What was

8   his position?

9   A.   Sanchez, we used his truck as a dump truck and all he

10  did was rip and put the garbage into the truck and carry

11  up shingles whenever he wasn't sweeping.

12  Q.   And for the dumper, did you tell him where he had to

13  physically take the debris to what dumper he had to use?

14  A.   No, sir.

15  Q.   He can choose that himself?

16  A.   That is correct.

17  Q.   And did the people that you described as workers, did

18  they have the uniform?

19  A.   No, sir.

20  Q.   They were free to wear whatever they wanted?

21  A.   Yes, sir.

22  Q.   And referring to plaintiffs in this case, was their

23  work a full-time work or would you describe it some other

24  way?

25  A.   I'm sorry, sir.

Sage - Cross/Pearlman

128

1   Q.   Would you describe the plaintiff's work as full-time

2   work or was it -- would you describe it some other way?

3   A.   I would describe it as part-time.

4   Q.   And did you have a set working schedule every day of

5   the week for every week of the year?

6   A.   No, sir.

7   Q.   And how did your schedule get determined?

8   A.   Depending upon the job that if it came in, if it

9   didn't, then we had work.

10  Q.   And is there a seasonal nature of your business?

11  A.   Yes.

12  Q.   And what is that?

13  A.   We normally worked for like three months of the year.

14  Sometimes during the summer we don't work for two months

15  because there's no work.

16  Q.   So -- and what about plaintiff Palacio, what

17  description would you give up his services in terms of

18  what he was required to do?

19  A.   I always looked at him as a muscle man.  He only

20  ripped and loaded garbage into the truck.

21  Q.   And with both of these plaintiffs, is it correct that

22  you paid them by the day?

23  A.   Yes, sir.

24  Q.   And did that vary if the day was two hours, four

25  hours, eight hours?

Sage - Cross/Pearlman

129

1    A.    No, sir.  They got paid the same thing if they came

2    in one hour.  They would get paid for the whole day.

3    Q.    And were there ever days that were more than eight

4    hours?

5    A.    I'm sorry?

6    Q.    Were there ever days that were more than eight hours?

7    A.    No, never.

8    Q.    Was there any local ordinances you were required to

9    follow with regards to when you were allowed to work what

10   hours?

11   A.    Yes, sir.

12   Q.    And what were those?

13   A.    You can't start before eight o'clock in some towns

14   and other towns before nine and you have to be out of the

15   job by five o'clock.

16   Q.    Okay.  And now, you also mentioned about weather.

17   How does weather affect the number of days a week or the

18   number of hours per day that people such as the plaintiff

19   could provide services?

20   A.    Well, I can set up a job for tomorrow and all of a

21   sudden it's going to rain tomorrow so we can't do that job

22   we have to move it to the next convenient date for the

23   customer.

24   Q.    And you were asked some questions about why you

25   didn't supply invoices, estimates.  Do you recall those

Sage - Cross/Pearlman

130

1    questions?

2    A.    Yes, sir.

3    Q.    Do your invoices include the names of what workers

4    worked on any particular job?

5    A.    No, sir.

6    Q.    And do your contracts with the customers give the

7    name of any particular worker or workers that are on a

8    given job?

9    A.    No, sir.

10   Q.    So would invoices be of any help to figuring out who

11   was on the job?

12   A.    No, sir.

13   Q.    And would the invoices to the customer be of any help

14   to figure out who's on the job?

15   A.    No, sir.

16   Q.    On the job?

17   A.    No, sir.

18   Q.    Now, I want to turn your attention to Plaintiff's

19   Exhibit number 12.  And I'm referring to the third page of

20   that exhibit.  Your 2014 tax returns.

21   A.    I'm not sure where I'll find that, sir.

22   Q.    In the black book.

23   A.    Okay.

24   Q.    Number 12, third page.

25   A.    Yes, sir.  Okay.

Sage - Cross/Pearlman

131

1    Q.    See the part that says Schedule C profit and loss

2    from business?

3    A.    Yes, sir.

4    Q.    Okay.  And going down to part one it says income,

5    when it says gross receipts or sales, do you see that

6    part?

7    A.    Yes.

8    Q.    What did you report for your total gross receipts or

9    sales for the year 2014?

10   A.    It says $427,606.

11   Q.    Now, referring to, turn to exhibit number 13.  Your

12   2015 tax returns, sir.  Referring to the first page.  US

13   tax return for S corporation.  You see the part where it

14   says gross sales or receipts?

15   A.    Yes, sir.

16   Q.    What did you report as your gross sales or receipts

17   for the year of 2015?

18   A.    $427,249.

19   Q.    And that was a truthful and accurate figure?

20   A.    Yes, sir.

21   Q.    And what about the number that you reported for 2014,

22   is that also a truthful and accurate figure?

23   A.    Yes, sir.

24   Q.    Now, just for the record, you state your level of

25   education, your highest level of education for the Court?

Sage - Cross/Pearlman

132

1    A.    GED.

2    Q.    So you have no college?

3    A.    No, sir.

4    Q.    And you mentioned a few times something about

5    dyslexia.  Could you tell the Court about that?

6    A.    It's kind of emotional for me.  I'm a smart person

7    but because of my dyslexia I ended up as a roofer.

8    Q.    How does it affect you in terms of your day-to-day

9    ability such as your ability to read?

10          MR. REILLY:  Objection to the question, to the

11   relevance of this line of questioning.

12          THE COURT:  Yes.  I'm not sure of the relevance.

13   I'll permit this question, however, but this will be the

14   end of the inquiry.

15   A.    My reading is disturbed, I'll try to read a sentence

16   and my words and everything else get all tangled up and my

17   numbers and my letters, it's horrible, and then I end up

18   with a headache.

19   Q.    Now, to your knowledge, did Mr. Sanchez own a dump

20   truck?

21   A.    Yes, sir.

22   Q.    And was there a time where you used his services

23   involving his dump truck?

24   A.    Yes, sir.

25   Q.    And what period of time did you do that?

Sage - Cross/Pearlman

133

1    A.    I believe it was from 2012, 13 and 14.

2    Q.    And are you finished with your answer?

3    A.    Yes.

4    Q.    Did there come a time where you or your company

5    purchased its own dump truck?

6    A.    Yes, sir.

7    Q.    When was that?

8    A.    I believe it was May of 2015.

9    Q.    So for the first four months or so of 2015, who, if

10   anyone, provided the dumping services for your business?

11   A.    Sanchez.

12   Q.    And before you started using Mr. Sanchez to do your

13   dumping, cartage, did you have some other arrangements

14   that you --

15   A.    Yes, sir.

16   Q.    What were those?

17   A.    I used containers.

18   Q.    And how did the rates for containers compare to the

19   rates you paid Mr. Sanchez to do carting?

20   A.    Initially I got Mr. Sanchez because he had a truck

21   and I preferred to give him the money instead of the

22   dumpster company and he requested -- he asked me if I can

23   use his truck instead of the dumpsters and I agreed with

24   him.

25   Q.    And how did you -- strike that.

Sage - Cross/Pearlman

134

1    How was it determined what rate of compensation

2    he would get for the dumping services?

3    A.   Sanchez would make that determination.

4    Q.   I'm sorry, I didn't hear you?

5    A.   Sanchez would make that determination as to how much

6    I would pay him for the dump.

7    Q.   And did you pay him by check, by cash or some

8    combination for the dumping services?

9    A.   Mostly by check.

10   Q.   Okay.  Now, do you recall also there was some

11   questions and answer regarding Mr. Sanchez driving your

12   van, do you recall that?

13   A.   Yes, sir.

14   Q.   And when did he start driving your van?

15   A.   Immediately after I purchased my truck.

16   Q.   So -- and that was in May of 2015?

17   A.   That is correct.

18   Q.   Okay.  Had he taken your van before that?

19   A.   No, sir.

20   Q.   Okay.  And for performing that service of bringing

21   the van to and from work, did he receive compensation just

22   for doing that?

23   A.   I would give him a hundred dollars in front of

24   everybody so that he wouldn't say that I didn't pay him

25   for that.

Sage - Cross/Pearlman

135

1  Q.   And was that for each and every day that he brought

2  the van to the job site?

3  A.   Yes, sir.

4  Q.   Now, let's talk about the different types of jobs

5  that you did.  Is it correct in roofing there's different

6  types of jobs?

7  A.   Yes, sir.

8  Q.   And what were the two main categories of jobs that

9  you do in your roofing business?

10 A.   They are houses which require shingles, and then they

11 are commercial buildings which required just flat roofs,

12 torched down material.

13 Q.   Just for the Court's benefit, when you say, "torched

14 down," could you explain what that involves?

15 A.   Sure.  That's a flat roof and it gets torched down

16 with a heavy speed of fire so the material melts on to the

17 roof.

18 Q.   And were these plaintiffs experienced or able to use

19 the torch method of installing commercial roofing?

20 A.   Never, sir.

21 Q.   And did they ever do any work on a job site where

22 there was a commercial roof?

23 A.   There was one job where after storm Sandy the

24 customer came to my house and banged on my door and said

25 that his roof blew off and we went on that job and I used

Sage - Cross/Pearlman

136

1    a majority of the men and we took off all the material off

2    the roof that blew off, and then we just left, it

3    wasn't -- I have a guy that --

4    Q.   I'll ask you.  You don't have to keep going.

5              And where was that job.

6    A.   That was in East Rockaway.

7    Q.   And when was that job?

8    A.   That was right after storm Sandy.

9    Q.   Was any of that job performed in December of 2012?

10   A.   If that's when storm Sandy occurred, sir.

11   Q.   Now, who is this person or company that you use as

12   a -- to perform the commercial torch, roofing job.

13   A.   I have one specific friend which I trained 35 years

14   ago and his name is Robert Sanders.

15   Q.   Who does he work for or is that his own?

16   A.   He's on his own.

17   Q.   And does he have people that work for him?

18   A.   Yes, sir.

19   Q.   How many people does he have on his crew?

20   A.   I'm not certain on that.  I seen three or four or

21   five, I'm not certain about how many people he has.

22   Q.   And this particular job, what was the type of

23   building?

24   A.   It was a flat roof.

25   Q.   What was the nature of the business?

Sage - Cross/Pearlman

137

1   A.   It's a gym.

2   Q.   So for that gymnasium, after the first day of the

3   initial cleanup, who did the work on the job?

4   A.   Robert Sanders, I would ask him how much he wanted

5   for any flat roof job and he would give me a price

6   beforehand, and then I would figure materials and how much

7   the business, you know, to stay competitive, wanted, and

8   then he would take over the job.

9        That would be his job.

10  Q.   So other than initial cleanup on the first day of

11  that job, were these plaintiffs involved with that job

12  after that point in time?

13  A.   No, sir.

14  Q.   Were you involved with that job?

15  A.   No, sir.

16  Q.   So that was exclusively left to Mr. Sanders?

17  A.   That's what he required.  Yes, sir.

18  Q.   Do you recall being asked some questions about your

19  checking account and the time period that you provided

20  checks?

21  A.   Yes, sir.

22  Q.   Did there come a point in time where you changed

23  banks?

24  A.   Yes, I did.

25  Q.   Approximately when did that occur?

Sage - Cross/Pearlman

138

1   A.   I stayed with Chase, but I incorporated, I don't

2   remember specifically the time, 2015, somewhere around

3   there.

4   Q.   And did you make attempts to retrieve checks for the

5   periods prior to the time of the checks that we disclosed

6   in this case?

7   A.   Yes, sir.

8   Q.   And what did those attempts consist of?

9   A.   I went to the bank, I pulled up everything I could in

10  the office and I went to the bank and the lady was nice

11  enough to help me out with some of the checks that she

12  could pull up at that time.

13  Q.   So did you disclose all of the checks that you were

14  able to retrieve?

15  A.   Everyone of them.

16  Q.   And do you recall also being asked some questions

17  regarding text messages?

18  A.   Yes, sir.

19  Q.   And did there come a point in time where you

20  exchanged either telephones or telephone carriers?

21  A.   I could have went from like a -- from a cheaper phone

22  to a better phone, like an I-6 phone.

23  Q.   And before that, you used some other device?

24  A.   Before the phone?

25  Q.   Before the I-6.

Sage - Cross/Pearlman

139

1    A.    Yes, sir.

2    Q.    And do you still have that prior device?

3    A.    No.  It was a flip phone.  My kids harassed me about

4    it.

5    Q.    So you don't have that phone to try to retrieve any

6    text messages from?

7    A.    No, sir.

8    Q.    Okay.  Now, these particular plaintiffs, were they

9    permitted to work for other people on days they weren't

10   working for you?

11   A.    Absolutely.  Absolutely.

12   Q.    And did you tell them that?

13   A.    Yes.

14         They were aware of that and they did do that.

15   Q.    And how often did Mr. Palacio work for you on the

16   average, how many days a week?

17   A.    That all depended when we needed him.  He was the

18   muscle guy.  We didn't need him on every job.

19   Q.    When you had multi-day jobs, you were asked some

20   questions about five day jobs, six day jobs, did you use

21   your full crew on each and every day?

22   A.    No, sir.  I would be broke.

23   Q.    Well, when would you use these plaintiffs?

24   A.    On a multi-day job.  Their task on jobs was limited

25   because all they can do is rip and clean up around

Sage - Cross/Pearlman

140

1  people's homes. They can't install. They can't. I

2  wouldn't trust them to do anything else other than that.

3  Q.   And the ripping and the removal of the shingles, when

4  does that occur on the job?

5  A.   When we first get to the job that's when the ripping

6  occurs, and then after that they clean up.

7  Q.   And whatever they clean up, what do they do?

8  A.   That's why I've caught them sleeping in the truck

9  several times. They did -- just talk on the phone. They

10  do whatever they want.

11  Q.   And if it's a multi-day job, do they then come back

12  on days two, three, four and five?

13  A.   Not necessarily, sir.

14  Q.   Could they ever?

15  A.   No, they weren't needed.

16  Q.   Were there days where Mr. Sanchez although he wasn't

17  needed for roofing work, but on the second, third or

18  fourth day, so forth, did he sometimes come to do carting?

19  A.   Yes, sir.

20  Q.   And you paid him separately for that?

21  A.   Absolutely.

22  Q.   Now, before you began using the services of

23  Mr. Palacio, did you have conversations with him?

24  A.   Yes, sir.

25  Q.   And did you make any inquiries regarding his

Sage - Cross/Pearlman

141

1    immigration status?

2            MR. REILLY:  Objection, Judge.

3            THE COURT:  What's the relevance of that?

4            MR. PEARLMAN:  I'll withdraw it and ask him

5    differently.

6    Q.   Did you make any determination after speaking to him

7    as to whether or not he had working papers?

8            MR. REILLY:  Objection, Judge.

9            THE COURT:  Sustained.

10   A.   Yes, sir.

11   Q.   No.  When he says sustained it means you can't

12   answer.

13   A.   I'm sorry.

14   Q.   Did Mr. Palacio ever discuss with you or make a

15   request as to how he wished to be paid?  By that I mean by

16   check, cash, or some other combination?

17   A.   He would ask for cash sometimes.  He would borrow

18   on -- a lot of money all the time.

19   Q.   Speaking of borrowing, did you loan money to

20   Mr. Sanchez?

21   A.   Lots.

22   Q.   And did he repay you?

23   A.   Some I just let it go or I felt bad for him.

24   Q.   When he wrote repay you, did that come out of the

25   compensation that you were giving him for his services?

Sage - Cross/Pearlman

142

1    A.    No.  I always told him that whenever I loaned him

2    money, I said I'm not going into it out of your pay.  You

3    come and pay me for the reason that I didn't know if he

4    would need the money -- he always need money -- but for

5    that reason, sir.

6    Q.    And when you lend him money, did you do that in cash,

7    by check or some combination?

8    A.    Cash.

9          Can I answer something to that, sir?

10   Q.    No.

11         Now, earlier you were asked about text messages

12   by Mr. Reilly, and you started to try to volunteer some

13   information.  Was there something in particular at page 93

14   of the text messages that regarded Mr. Sanchez?

15   A.    Yes, sir.

16   Q.    And what was that?

17   A.    He left me waiting and I text him like where are you,

18   it was several times where that occurred.

19   Q.    And from that are you able to determine whether or

20   not he showed up that day?

21   A.    No, sir.

22   Q.    What was this the only time that it ever happened

23   where you had difficulty locating him?

24   A.    No.

25         He left me many times with the other crew, the

Sage - Cross/Pearlman

143

1    other guys on the job and he didn't bring the van.  I

2    couldn't drive both the truck and the van.

3              (Continued on next page.)

Sage - Cross/Pearlman

144

1   Q     Now, to the best of your recollection, did

2   Mr. Sanchez ever take time away from providing any

3   services for you in order to go on vacation?

4   A     I'm sorry, sir, I didn't understand that.

5   Q     Were there times that Mr. Sanchez was not available

6   to work or provide services for you because he left the

7   country on vacation?

8   A     Oh, yeah.  Many times.  Went back to his country.

9   Q     And what about Mr. Palacio?  Did he sometimes leave

10  the country for vacation as well?

11  A     I don't think he would leave for vacation but he

12  would work for someone else.

13  Q     To communicate with Mr. Palacio, were you able to

14  communicate by cell phone with him directly?

15  A     Yes, sir.

16  Q     Now, also, you were asked some questions before

17  regarding if there was a foreman or not.  Do you recall

18  that?

19  A     Yes, sir.

20  Q     If you were on the job, if you were physically there,

21  who was the foreman?

22  A     I most certainly was.

23  Q     And if you were not physically on the job, did you

24  leave somebody in charge to be the foreman?

25  A     Oh, absolutely.

Sage - Cross/Pearlman

145

1   Q     Who was that?

2   A     His name is Leo.

3   Q     What is his full name?

4   A     Leo.  I don't remember his last name.  I always call

5   him Leo.

6   Q     If you don't remember, okay.  Is he still somebody

7   that provides services to you at the present time?

8   A     Yes, sir.

9   Q     In what capacity does he do that at the present time?

10  A     He's a full shingle roof mechanic.

11  Q     And was he providing services to your companies while

12  the plaintiffs were likewise providing services to the

13  company?

14  A     Yes, sir.

15  Q     Okay.  And did he ever act as the foreman to these

16  plaintiffs?

17  A     Actually even when I'm on the job, I trust him

18  100 percent.  He's a foreman.  He's a full -- I've made

19  him a full mechanic.

20  Q     Now, do you have another fellow that provides some

21  services for you named Nahim?

22  A     Yes, sir.

23  Q     What level of worker would you classify him?

24  A     He's a young buck.  I'm training him to be a full

25  mechanic for the site.  I love his brother that works for

Sage - Cross/Pearlman

146

1   me as well and he committed suicide tragically and I'm

2   training him to be a full mechanic.

3   Q    And did he ever work at any times to provide services

4   for you at the same time these plaintiffs were providing

5   services?

6   A    Yes, sir.

7   Q    Now, referring to plaintiff Palacio, did his brother

8   ever provide any services for you?

9   A    Yes, sir.

10  Q    And how long did that go on?

11  A    Prior to Palacio coming to the business, I don't

12  remember exactly, but there were many years prior to that.

13  Q    What, if anything, happened with Mr. Palacio's

14  brother?

15  A    He got drunk like always, crossing a woman across the

16  street.  He got hit by a car.

17  Q    What happened to him?

18  A    He got killed.

19  Q    And did you start using the services of Mr. Palacio,

20  the plaintiff, in this case before or after his brother

21  got killed?

22  A    A little bit before.

23  Q    And --

24       MR. PEARLMAN:  Your Honor, I don't have any

25  other questions.  I'll reserve the rest of my questions

Sage - Redirect/Reilly

147

1    when I call him on my case.

2              THE COURT:  Yes, very good.

3              Mr. Reilly, based on the examination just

4    conducted, do you have additional questions?

5              MR. REILLY:  Just a couple, Judge.

6              THE COURT:  Yes.

7    FURTHER REDIRECT EXAMINATION

8    BY MR. REILLY:

9    Q    Can you look, sir, can you look at Exhibit DE?

10   A    DE.  You are talking about in the blue book, sir?

11   Q    In the blue book, Defendant's Exhibit DE.

12   A    Okay.

13   Q    Before I ask you anything about that exhibit, when I

14   questioned you for three or so hours, did you answer all

15   my questions truthfully and accurately?

16   A    To the best of my ability, sir.

17   Q    Okay.  Now looking at Exhibit DE, I want you to turn

18   to the month of November.

19   A    November 20th --

20   Q    Let me know when you are at the page?

21   A    You say November.  There are several here for

22   November.  I'm looking at D, is that correct?  D?

23   Q    Exhibit --

24   A    The dumpster receipts?

25   Q    No, Exhibit E.

Sage - Redirect/Reilly

148

1   A    Oh, E.  Okay, sir.  The calendar.

2   Q    And turn to page DO638 which is October 29th --

3   A    DO638.  Is there a DO638 --

4   Q    DO638.

5   A    I'm sorry, I have it right here.  Yes, sir.

6   Q    I want you to take a look at DO638, through DO387,

7   and tell me if you find the big flat roof job you

8   testified after Hurricane Sandy?

9   A    No, sir.

10  Q    Have you taken a look at the pages?

11  A    Yes, sir, I had done that before.

12  Q    And the big flat roof job you are talking about is

13  not in any of those pages; is that correct?

14  A    That's correct, sir.

15  Q    So when you wrote down there were eleven working days

16  in November of 2012, that is not including the big flat

17  roof job; is that correct?

18  A    That is correct.

19  Q    When you wrote down there were 24 working days in

20  December, none of those working days including the big

21  flat roof job; is that correct?

22  A    I must correct you on that, sir.

23       Every day I went out to work was on that paper.

24  If I went out to work on that job, that flat job was being

25  done, so that flat job is on that, and I also had given

Sage - Redirect/Reilly

149

1   checks from Robert Sanders on those days, sir.

2   Q    Okay.  Exhibit D or Defense E, okay.

3   A    Yes, sir.

4   Q    This is the book you used to create the days worked

5   on Defendant's Exhibit I; is that correct?

6   A    That's correct, sir.

7   Q    Nowhere in this book for the months of October,

8   November and December of 2012, do you see the flat roof

9   job; is that correct?

10  A    The reason being is that I wanted to be as precise as

11  I could with the days that we worked.  The man came to my

12  house.  He didn't call my office.  Anybody that calls my

13  office for a job would be placed in this book and they

14  didn't call my office.  So my daughter did not put it in

15  this book.

16        We knew the job was to be done and I got the

17  renewal after I gave this price and that's why it's not.

18  Q    This book, Exhibit E, was used to write down the

19  day's notes in December and November of 2012?

20  A    That's correct.

21  Q    That was the only book used to write down the day's

22  work in November and December of 2012; is that correct?

23  A    If the customers called my office, that would be in

24  this book, sir.

25  Q    And nowhere in this book marked as Defendant E is

Sage - Redirect/Reilly

1   there anything about the flat roof job you testified a few

2   minutes ago when your attorney asked you questions; is

3   that correct?

4   A    That's correct.

5   Q    Thank you.

6   A    You're welcome.

7           THE COURT:  Thank you, Mr. Reilly.

8           MR. PEARLMAN:  No other questions, your Honor,

9   at this time.

10          THE COURT:  Plaintiff's next witness.

11          MR. REILLY:  Jose Sanchez, your Honor.

12          THE COURT:  You know where you are going,

13  Mr. Sanchez.

14          Swear in the witness, please.

15          THE CLERK:  Please raise your right hand.

16  **JOSE     SANCHEZ**,

17       called as a witness, having been first

18       duly sworn, was examined and testified

19       as follows:

20          THE CLERK:  Please state your name for the

21  record.

22          THE WITNESS:  Jose A. Sanchez.

23          THE CLERK:  Thank you.  You may be seated.

24

25

Sanchez - Direct/Reilly

151

1    DIRECT EXAMINATION

2    BY MR. REILLY:

3             (Through the interpreter.)

4    Q    Good afternoon, Mr. Sanchez.

5    A    Good afternoon.

6    Q    When did you first begin working for First Class

7    Roofing?

8             THE WITNESS:  2003.

9    Q    And who was your boss?

10   A    Jay.

11   Q    And for how long of a period of time did you work for

12   First Class Roofing?

13   A    Up to 2015.

14   Q    Was there a particular month?

15            THE INTERPRETER:  Your Honor, may I interrupt

16   for a second.  The interpreter needs a chair.  Okay.

17   Q    What month in 2015 did you stop working for First

18   Class Roofing?

19   A    December 2015.

20   Q    And who hired you to work for First Class roofing?

21   A    Mr. Jay.

22   Q    Did you work for any other company during the time

23   that you were working for First Class Roofing?

24   A    No.

25   Q    What type of work did you do for First Class Roofing?

Sanchez - Direct/Reilly

152

1   A    We removed the roofing on the houses and we will

2   bring materials up.  And we will throw the debris into the

3   dumpster.

4   Q    Was there a particular time of the year there was a

5   busy season at First Class Roofing?

6   A    From April to October.

7   Q    And from April to October during the last five years

8   of your employment, how many days a week did you usually

9   work?

10  A    Five or six.

11  Q    And from April through October during the last five

12  years of your employment, was there a particular time of

13  day that you began working?

14  A    From five to seven.

15  Q    When you say five, 5:00 a.m.?

16  A    Five in the morning.

17  Q    Okay.  And why did you start working at five in the

18  morning?

19  A    Because I had to pick up the van of the owner.

20  Q    And did the van of the owner have any materials or

21  tools in it?

22  A    Yeah, there were tools, ladders.

23  Q    And were those the tools to be used at the work

24  sites?

25  A    Yes.

Sanchez - Direct/Reilly

153

1   Q    And where would you go to pick up this van at

2   5:00 a.m. in the morning?

3   A    To the yard, in Oceanside.

4   Q    And once you picked up the van, where would you go?

5   A    To the address that we put in the GPS that he put

6   there.

7   Q    Did you say to the address that the GPS was put in

8   the van?

9   A    Yes.

10  Q    And was the address that was put in the GPS of the

11  van, was that the job site that you would go to for the

12  day?

13  A    Yes, the house we were going to.

14  Q    And then you would spend each day working at the job

15  site?

16  A    Yes.

17  Q    And then when the job was over for the day what, if

18  anything, would you do with the van?

19  A    I would take it back to the yard.

20  Q    So you would take the van from the job site back to

21  the yard in Oceanside?

22  A    Yes.

23  Q    And what time did you usually arrive at the yard in

24  Oceanside after the work there was over?

25  A    Seven.

Sanchez - Direct/Reilly

154

1   Q    Is that 7:00 p.m.?

2   A    7:00 p.m.

3   Q    So during the busy season, April through October, did

4   you work 14 hours a day?

5   A    Yes.

6   Q    And did you work at least five days a week?

7   A    Yes.

8   Q    And for how long of a period of time were you picking

9   up the van in the morning and taking it to the work site

10  and then taking the van back to Jay's yard after the job

11  was done?

12  A    Could you repeat the question?

13  Q    Sure.

14       Did you pick up Jay's van in the mornings for a

15  period of years to bring it to the job site?

16       MR. PEARLMAN:  Objection.  He's leading the

17  witness.

18       THE COURT:  Yes, he's already testified to that

19  in any event.

20       Sustained.

21       MR. REILLY:  Okay.

22  Q    Now, did you take lunch breaks during the busy

23  season, April through October?

24       Did you take lunch breaks.

25       THE COURT:  Mr. Reilly, on the question of the

Sanchez - Direct/Reilly

155

1  busy time of the year, I thought he said May 1st to

2  October.  I may be wrong on that.  You've been using April

3  to October.

4           MR. REILLY:  Can the reporter find the witness's

5  response, please?

6           (Testimony read.)

7  Q    So during the busy season April to October, did you

8  work at least five days a week?

9  A    Yes.

10  Q    And did you work about 14 hours a day?

11  A    Yes.

12  Q    And if Jay -- were there times that Jay asked you to

13  work in November and December of each year?

14           THE INTERPRETER:  The interpreter needs

15  repetition.

16  Q    Were there times during the last five years during

17  your employment that Jay asked you to work in November and

18  December?

19  A    Yes, a couple of days.

20  Q    And were there times during the last five years of

21  your employment that Jay asked you to work during the

22  months of February and March?

23  A    If the weather was fine, then I would work.

24  Q    And did you always go to work if Jay texted you that

25  there was a job to do?

Sanchez - Direct/Reilly

156

1     THE INTERPRETER:  The interpreter couldn't hear

2 you.

3 Q    Did you always go to work for Jay if Jay texted you

4 there was a job to do?

5 A    Yes.

6 Q    Do you know who, if anyone, owns the van that you

7 drove from Jay's yard to the job site and back from the

8 job site to Jay's yard?

9 A    Yes, Jay.

10 Q    Once you drove the van to the job site, did you work

11 at the job site all day?

12 A    Yes.

13 Q    And at the end of the day when the job was completed,

14 is that when you brought the van back to Jay's yard?

15 A    Yes.

16 Q    Who, if anyone, paid you to do work for First Class

17 Roofing?

18 A    Mr. Jay.

19 Q    And did he pay you with a check or cash, or something

20 else?

21 A    With a check.

22 Q    And were there times that he gave you cash?

23 A    Sometimes.

24 Q    And during what time period in the last five years of

25 your employment did he give you cash?

Sanchez - Direct/Reilly

157

1   A     2015.

2   Q     And in 2015, how often did Jay give you cash?

3   A     Sometimes it was twice checks and twice cash.

4   Q     Is that per month?

5   A     During the week, no.  Every month.

6   Q     So just so we have this on the record, so every month

7   in the year 2015 would Jay pay you twice with checks and

8   twice in cash?

9   A     Yes.

10  Q     Did Jay pay you by the day?

11  A     Yes.

12  Q     Did Jay ever pay you by the hour?

13  A     No.

14  Q     And what was the daily rate that Jay first paid you

15  when you first began working?

16  A     110.  Yes, 110.

17  Q     And what was the last daily rate that Jay paid you?

18  A     180.

19  Q     For how long a period of time were you being paid

20  $180 a day?

21  A     I would get a raise every year for about $10.

22  Q     Do you recall what year when you first started you

23  got paid $180 a day?

24  A     After making 160, it took a long time to get to 180.

25  Q     And do you know approximately what year it was that

Sanchez - Direct/Reilly

158

1   Jay started paying you $180 a day?

2   A    Around 2010, maybe 2009.  I'm not sure.

3   Q    So around 2010 until the end of your employment, did

4   Jay pay you $180 a day?

5   A    Yes.

6   Q    Did Jay ever pay you overtime compensation?

7   A    No.

8   Q    Now, did Antonio Palacio, did he also work for First

9   Class?

10  A    Yes.

11  Q    And for how long a period of time did Antonio Palacio

12  work for First Class Roofing?

13  A    I'm not sure whether it was beginning in 2006.

14  Q    During the last five years of your employment for

15  First Class Roofing, was Antonio always at the job sites

16  with you?

17  A    Yes.

18  Q    Did Jay ever give you any type of document,

19  indicating how it was that he was going to pay you?

20  A    No, just one that he would give me to figure out my

21  income tax return.

22  Q    Is that the 1099 form?

23  A    I believe so.

24  Q    Did Jay ever give you a document that stated how much

25  you were being paid per day?

Sanchez - Direct/Reilly

159

1    A    No.

2    Q    Did Jay ever give you a document stating who your

3    employer was?

4    A    No.

5    Q    Did Jay ever give you a document stating what your

6    overtime rate was, if any?

7    A    No.

8    Q    Did Jay ever give you a document stating what day was

9    payday?

10    A    No.

11    Q    And did Jay just give you checks and cash and no

12    other document other than that?

13    A    Only the document that he told me I could use to

14    figure out my taxes.

15    Q    And what, if anything, did you observe Antonio doing

16    at the job sites over the last five years of your

17    employment?

18          THE INTERPRETER:  The interpreter needs

19    repetition.

20          MR. REILLY:  Sure.

21          What did you observe Antonio Palacio doing at

22    the job sites during the last five years of your

23    employment?

24    A    Throw down the roof of the house.

25    Q    Anything else?

160

1   A    And bring up the materials and throw away the debris.

2   Q    And the materials that he was bringing up, were those

3   the shingles that would go to be installed on the roofs?

4   A    Yes, we will bring the shingles from his shoulder to

5   bring them up.

6   Q    Besides yourself and Antonio, was there anyone else

7   at the job sites during the last five years of your

8   employment?

9   A    Yes.

10  Q    And was someone named Leo at the job site?

11  A    Yes.

12  Q    And how often did you see Leo at the job sites?

13  A    Every day.

14  Q    Was there someone named Nahim at the job site?

15  A    For the last two years, it was when he showed up

16  first and he will be there maybe one day.  Just one day

17  yes; one day no.

18  Q    During the last five years of your employment, were

19  there oftentimes you worked at a job site that Nahim was

20  not there?

21        THE INTERPRETER:  Could you repeat, please?

22  Q    During the last five years of your employment, did

23  you often go and work at job sites where Nahim was not

24  there working?

25  A    I saw him a couple of times.  Then he was arrested

Sanchez - Direct/Reilly

161

1    and jailed.  And I didn't see him for awhile and then he

2    showed up again.

3    Q    And after he showed up again, were there times that

4    you worked at job sites where he wasn't there?

5    A    There were several occasions where he would just work

6    two or three days.

7    Q    Was there a particular day that was payday?

8    A    Saturday.

9    Q    Did you ever own your own company?

10   A    No.

11   Q    Did you ever have your own customers or clients?

12   A    No, I don't know any English.

13   Q    When you arrived each morning during the busy season

14   to pick up the van, did you either punch in or out or sign

15   in or out?

16   A    No.

17   Q    And during the last five years of your employment

18   when you arrived at the job site with the van, did you

19   either sign in or punch in?

20   A    No.

21   Q    During the last five years of your employment, did

22   you ever sign in or out for lunch or punch in and out for

23   lunch?

24   A    No.

25   Q    And during the the last five years of your

162

1    employment, did you ever sign out or punch out when you

2    left the job site to bring the van back to the Oceanside

3    yard?

4    A    No.

5    Q    During the last five years of your employment, did

6    you ever punch out or sign out at the time that you

7    arrived with the van back at the yard?

8    A    No.

9    Q    And did Jay ever give you any type of document that

10   stated what your rate of pay was?

11   A    No.

12            MR. REILLY:  I have no further questions.

13            THE COURT:  Very good.  Thank you.  What we'll

14   do at this point, we'll recess.  It's 12 of 5.  So we'll

15   resume tomorrow at 9:30.

16            MR. PEARLMAN:  Thank you, Judge.

17            MR. REILLY:  9:30?

18            THE COURT:  Yes.

19            Sir, you may step down.  We'll see you tomorrow

20   at 9:30.

21            (Whereupon, the proceedings were adjourned until

22   Tuesday, November 28, 2017, at 9:30 a.m.)

23

24

25

**163**

## <u>I-N-D-E-X</u>

<u>W-I-T-N-E-S-S-E-S</u>

ETHAN   SAGE                                    11

DIRECT EXAMINATION                              12

BY MR. REILLY

CROSS-EXAMINATION                               126

BY MR. PEARLMAN

FURTHER REDIRECT EXAMINATION                    147

BY MR. REILLY

JOSE   SANCHEZ                                  150

DIRECT EXAMINATION                              151

BY MR. REILLY

## $

**$1,000** [1] - 36:20
**$10** [1] - 157:21
**$100** [1] - 37:19
**$150** [1] - 45:6
**$180** [4] - 157:20, 157:23, 158:1, 158:4
**$19,290** [1] - 91:10
**$200** [3] - 44:22, 44:23, 54:13
**$22,772** [1] - 34:25
**$35,150** [5] - 97:6, 97:8, 97:10, 97:14, 97:17
**$427,249** [1] - 131:18
**$427,606** [1] - 131:10
**$450** [1] - 83:11
**$658,000** [2] - 19:22, 20:5
**$8,799** [1] - 34:21

## 0

**0..** [1] - 83:7
**000493** [1] - 120:22
**0242** [1] - 83:6

## 1

**1** [5] - 14:4, 14:12, 14:13, 22:25, 121:3
**10** [10] - 29:18, 65:20, 66:2, 67:2, 70:18, 82:6, 93:9, 95:11, 102:19, 109:24
**100** [4] - 1:22, 101:11, 126:13, 145:18
**106** [1] - 79:22
**109** [1] - 8:23
**1099** [12] - 56:21, 56:24, 59:25, 60:3, 60:6, 60:10, 60:17, 91:7, 97:10, 97:11, 97:14, 158:22
**1099s** [1] - 58:23
**10th** [1] - 84:6
**11** [24] - 20:8, 20:9, 20:10, 20:13, 20:19, 20:20, 20:22, 21:3, 21:12, 65:24, 67:10, 71:13, 76:15, 76:17, 76:22, 78:24, 81:21, 89:19, 93:18, 94:10, 94:21, 101:23, 115:22, 163:4
**110** [4] - 68:12, 68:23, 157:16
**115** [1] - 70:17
**117** [4] - 71:10, 71:24,

72:25, 73:9
**11720** [1] - 1:19
**11722** [1] - 1:23
**11758** [1] - 1:17
**11:30** [1] - 10:23
**12** [19] - 29:17, 29:22, 34:5, 34:14, 63:11, 65:24, 66:5, 66:24, 67:13, 71:25, 72:25, 73:10, 79:5, 84:8, 104:2, 130:19, 130:24, 162:14, 163:5
**123** [1] - 117:8
**125** [1] - 69:6
**126** [1] - 163:7
**12th** [1] - 8:2
**13** [8] - 28:7, 57:20, 95:14, 102:1, 114:5, 115:25, 131:11, 133:1
**134** [2] - 63:10, 64:3
**135** [1] - 64:6
**13th** [1] - 7:17
**14** [11] - 66:17, 70:25, 72:2, 83:4, 83:5, 103:11, 114:7, 116:13, 133:1, 154:4, 155:10
**147** [1] - 163:9
**15** [19] - 10:24, 28:8, 40:10, 40:17, 77:11, 87:7, 87:14, 87:17, 87:19, 97:20, 98:1, 100:14, 119:19, 123:5, 123:9, 123:12, 123:20, 125:1, 125:23
**150** [3] - 45:7, 54:16, 163:11
**151** [1] - 163:12
**15th** [1] - 123:9
**16** [9] - 14:4, 57:24, 79:11, 84:10, 87:18, 97:23, 100:16, 103:13, 104:7
**16-2064** [1] - 2:6
**16-CV-2064** [1] - 1:4
**160** [1] - 157:24
**16th** [4] - 93:8, 124:3, 125:12, 125:18
**17** [5] - 102:6, 103:20, 104:12, 116:3, 116:16
**17th** [3] - 123:21, 124:5, 125:12
**18** [6] - 28:11, 66:3, 67:15, 86:18, 87:3, 119:22
**180** [2] - 157:18,

157:24
**182** [1] - 82:2
**186** [2] - 77:10, 78:12
**187** [1] - 79:4
**18th** [3] - 8:2, 86:10, 125:12
**19** [14] - 63:18, 63:21, 90:6, 95:13, 98:4, 101:17, 101:25, 103:9, 115:24, 119:12, 119:15, 119:20, 119:22, 123:5
**1997** [1] - 16:14
**19th** [3] - 117:21, 123:9, 125:12
**1st** [2] - 83:22, 155:1

## 2

**2** [19] - 66:20, 69:7, 89:9, 97:2, 97:20, 98:20, 99:10, 99:15, 99:19, 101:10, 102:10, 108:3, 111:12, 117:8, 117:22, 121:16, 121:17, 123:14, 124:3
**20** [13] - 16:12, 17:1, 58:5, 77:16, 87:14, 87:17, 87:20, 87:24, 88:2, 119:2, 125:12, 125:23, 126:1
**20..** [1] - 87:16
**200** [1] - 45:9
**2003** [2] - 54:18, 151:8
**2006** [1] - 158:13
**2009** [1] - 158:2
**2010** [6] - 29:12, 55:3, 55:10, 55:25, 158:2, 158:3
**2011** [8] - 26:10, 26:11, 28:24, 32:10, 37:23, 55:3, 55:11, 56:1
**2012** [77] - 35:14, 36:10, 36:15, 37:5, 37:21, 38:4, 38:12, 38:17, 39:11, 39:18, 44:25, 46:3, 48:20, 49:12, 49:25, 50:7, 50:11, 50:23, 51:19, 52:25, 54:24, 56:15, 56:21, 57:5, 86:1, 89:6, 91:9, 91:16, 91:22, 92:1, 92:5, 92:9, 93:1, 93:5, 93:9, 93:22, 94:21, 94:24, 95:5, 95:19,

96:7, 96:16, 96:19, 103:22, 109:8, 109:14, 109:16, 109:23, 110:7, 110:11, 110:18, 110:23, 111:3, 111:9, 111:16, 112:9, 112:12, 112:17, 113:3, 113:5, 113:11, 113:23, 114:13, 114:19, 114:21, 114:25, 115:15, 115:19, 116:24, 117:9, 133:1, 136:9, 148:16, 149:8, 149:19, 149:22
**2013** [51] - 19:22, 20:5, 20:23, 22:9, 22:15, 25:11, 35:11, 38:12, 38:17, 39:13, 39:22, 54:24, 56:7, 56:12, 56:24, 57:3, 76:22, 77:3, 77:8, 77:15, 77:25, 78:25, 79:8, 81:21, 91:17, 94:4, 97:3, 97:5, 97:10, 97:14, 97:17, 97:20, 98:10, 98:20, 98:24, 99:7, 99:10, 99:21, 99:24, 100:4, 101:2, 101:4, 101:17, 102:14, 107:16, 109:8, 114:25, 117:3, 117:8, 117:10, 119:12
**2014** [49] - 34:15, 34:21, 34:24, 35:8, 38:12, 38:17, 39:15, 40:8, 40:14, 41:4, 76:23, 78:5, 78:16, 78:25, 79:8, 81:22, 83:10, 83:14, 83:17, 83:20, 83:22, 84:1, 84:4, 84:6, 84:8, 84:10, 84:12, 84:14, 84:16, 84:18, 84:20, 84:22, 84:25, 86:1, 86:5, 86:18, 86:22, 87:25, 92:20, 107:16, 109:8, 114:25, 120:9, 120:12, 123:5, 130:20, 131:9, 131:21
**2015** [61] - 15:17, 16:15, 17:18, 18:6, 29:13, 36:10, 36:16, 37:5, 37:21, 38:12, 38:17, 39:15, 40:17, 40:21, 40:25, 46:3,

48:20, 49:12, 49:25, 50:8, 50:12, 50:23, 51:19, 53:1, 57:5, 78:7, 86:1, 103:13, 103:16, 103:20, 103:22, 107:16, 109:8, 110:7, 110:11, 110:18, 110:24, 111:3, 111:17, 112:9, 112:13, 112:18, 113:3, 114:14, 114:19, 114:25, 125:6, 125:8, 131:12, 131:17, 133:8, 133:9, 134:16, 138:2, 151:13, 151:17, 151:19, 157:1, 157:2, 157:7
**2016** [1] - 1:10
**2017** [6] - 12:12, 12:23, 26:11, 109:3, 109:7, 162:22
**209** [3] - 104:12, 104:17, 104:20
**20th** [2] - 84:12, 147:19
**21** [10] - 31:1, 63:19, 63:23, 78:13, 87:22, 102:12, 104:20, 119:3, 123:20, 125:12
**218** [1] - 10:21
**21st** [3] - 87:25, 123:9, 125:1
**22** [3] - 88:24, 111:8, 125:12
**221** [1] - 109:12
**222** [2] - 109:14, 109:20
**225** [1] - 111:6
**226** [1] - 111:12
**22nd** [8] - 83:10, 84:14, 86:6, 86:10, 86:22, 92:15, 92:19
**23** [3] - 68:13, 68:23, 125:12
**232** [2] - 113:10, 114:5
**24** [12] - 64:4, 78:17, 89:1, 94:24, 95:4, 96:13, 96:16, 104:24, 115:10, 117:19, 125:13, 148:19
**242** [1] - 83:8
**246** [1] - 88:21
**247** [7] - 88:20, 89:8, 89:17, 93:15, 94:8, 95:9, 116:12

**24th** [3] - 83:13, 83:17, 125:18
**25** [5] - 66:18, 67:17, 68:14, 68:24, 109:13
**25th** [3] - 84:16, 121:24, 122:14
**26** [5] - 35:5, 66:18, 67:17, 84:18, 84:20
**26th** [1] - 122:1
**27** [4] - 1:10, 40:8, 40:14, 41:4
**271** [2] - 101:23, 115:22
**272** [1] - 102:9, 102:19, 103:3
**277** [1] - 117:19
**278** [1] - 117:22
**28** [9] - 76:22, 77:3, 77:8, 77:15, 77:24, 78:25, 79:8, 81:21, 162:22
**29** [1] - 24:20
**292** [1] - 119:1
**293** [1] - 126:11
**29th** [2] - 93:8, 148:2
**2nd** [6] - 76:23, 78:5, 78:15, 78:25, 79:8, 81:22
**2O9** [1] - 104:1

## 3

**3** [11] - 31:15, 64:11, 64:12, 65:18, 102:13, 113:10, 123:16, 123:23, 124:5, 124:7, 124:14
**3072** [4] - 15:1, 16:9, 16:18, 18:25
**30th** [4] - 83:20, 84:22, 86:6, 86:11
**31** [1] - 88:2
**315** [1] - 119:18
**31st** [1] - 122:14
**32** [1] - 28:7
**35** [1] - 136:13

## 4

**4** [7] - 21:3, 21:12, 69:15, 69:16, 89:12, 124:21, 126:1
**4.0** [1] - 52:1
**40** [2] - 29:16, 30:25
**4242** [1] - 1:16
**493** [1] - 120:24
**4th** [2] - 120:16, 120:19

## 5

**5** [8] - 35:3, 74:10, 74:25, 84:25, 89:17, 93:16, 94:9, 162:14
**516** [1] - 69:20
**54** [2] - 1:19, 2:19
**5:00** [4] - 41:17, 42:2, 152:15, 153:2
**5:30** [1] - 42:5
**5th** [3] - 86:22, 92:15, 92:20

## 6

**6** [1] - 109:20
**631** [1] - 1:23
**658,347** [4] - 22:2, 22:6, 22:23, 23:5

## 7

**7** [4] - 31:21, 65:19, 65:20, 82:3
**70** [1] - 8:22
**712-6101** [1] - 1:23
**76** [1] - 31:15
**764-3636** [1] - 70:1
**7:00** [2] - 154:1, 154:2
**7th** [1] - 83:25

## 8

**8** [7] - 31:22, 65:20, 65:23, 87:18, 89:22, 94:17, 126:11
**80** [6] - 8:22, 118:25, 126:18, 126:20, 126:22, 126:25

## 9

**9** [2] - 65:20, 89:25
**92** [1] - 57:20
**93** [2] - 105:12, 142:13
**9:30** [5] - 1:11, 162:15, 162:17, 162:20, 162:22
**9th** [1] - 84:3

## A

**a.m** [6] - 1:11, 41:17, 42:2, 152:15, 153:2, 162:22
**a/k/a** [2] - 1:9, 1:9
**ability** [5] - 52:17, 65:17, 132:9, 147:16
**able** [17] - 4:2, 5:3, 5:12, 5:14, 39:8,

39:10, 39:17, 39:21, 56:13, 78:1, 79:2, 91:22, 105:15, 135:18, 138:14, 142:19, 144:13
**absolute** [1] - 9:5
**absolutely** [7] - 10:16, 102:5, 116:3, 139:11, 140:21, 144:25
**account** [7] - 17:9, 17:13, 18:14, 106:11, 107:12, 117:1, 137:19
**accountant** [4] - 18:1, 18:23, 22:10, 22:14
**accurate** [2] - 131:19, 131:22
**accurately** [3] - 12:21, 13:10, 147:15
**achieved** [1] - 3:23
**act** [1] - 145:15
**active** [2] - 15:15, 15:17
**actual** [12] - 27:5, 69:10, 102:3, 114:2, 114:6, 114:23, 115:2, 115:11, 115:16, 116:2, 116:22, 119:21
**add** [1] - 63:23
**added** [1] - 105:22
**additional** [4] - 34:14, 79:9, 105:21, 147:4
**address** [12] - 36:25, 37:1, 39:4, 39:5, 41:8, 41:12, 123:19, 124:18, 153:5, 153:7, 153:10
**addresses** [3] - 42:8, 42:14, 88:6
**adjourned** [1] - 162:21
**admit** [1] - 6:8
**admits** [5] - 65:19, 65:23, 66:2, 66:5, 66:17
**admitted** [5] - 67:7, 67:10, 67:13, 67:15, 67:17
**adopt** [1] - 75:19
**advances** [3] - 96:2, 96:3, 96:11
**affect** [2] - 129:17, 132:8
**affidavit** [3] - 52:10, 64:19, 64:25
**affording** [1] - 74:23
**afternoon** [5] - 48:14, 48:16, 48:19, 151:4, 151:5

**ago** [12] - 7:16, 53:9, 77:11, 77:19, 92:13, 111:8, 111:14, 120:4, 126:10, 126:17, 136:14, 150:2
**agree** [5] - 3:6, 3:8, 4:6, 4:8, 69:8
**agreed** [5] - 3:3, 4:4, 4:14, 6:8, 133:23
**agreement** [4] - 44:14, 44:17, 61:1, 82:21
**al** [2] - 2:6, 2:7
**allegation** [1] - 66:3
**allegations** [5] - 52:13, 52:15, 65:20, 65:24, 66:17
**allegedly** [1] - 6:10
**allowed** [1] - 129:9
**allowing** [1] - 69:8
**Americas** [1] - 24:15
**amount** [5] - 34:25, 46:19, 60:6, 126:22, 126:23
**Ann** [1] - 1:22
**answer** [105] - 8:7, 13:8, 22:20, 28:18, 28:19, 28:22, 29:22, 29:25, 31:3, 31:6, 31:18, 31:19, 31:24, 52:7, 52:15, 57:24, 58:1, 58:6, 58:8, 59:5, 63:13, 63:16, 63:19, 63:22, 64:1, 64:7, 64:9, 64:14, 65:10, 65:14, 65:15, 68:15, 68:17, 68:24, 69:4, 69:10, 69:13, 70:21, 70:23, 71:4, 71:14, 71:17, 72:2, 72:4, 73:3, 73:7, 73:12, 77:16, 77:19, 78:17, 78:20, 79:11, 79:14, 79:19, 79:23, 80:2, 82:6, 82:8, 88:9, 89:3, 89:12, 89:15, 89:21, 90:8, 90:10, 93:20, 94:12, 94:14, 94:19, 95:14, 102:5, 102:13, 102:17, 102:24, 103:1, 103:9, 104:7, 104:10, 104:17, 104:24, 108:13, 109:17, 109:19, 109:24, 109:25, 111:12, 111:14, 113:15, 113:21, 114:7, 116:18, 117:22, 118:6,

119:4, 119:10, 119:22, 120:2, 126:11, 126:15, 126:18, 133:2, 134:11, 141:12, 142:9, 147:14
**Answer** [1] - 126:13
**answered** [10] - 12:17, 12:20, 13:9, 28:2, 49:11, 57:14, 66:22, 66:24, 73:4, 73:5
**answering** [5] - 28:11, 102:1, 113:19, 115:25, 116:16
**answers** [2] - 13:6, 116:5
**Anthony** [1] - 25:23
**anticipation** [1] - 13:14
**Antonio** [67] - 25:12, 25:23, 26:6, 26:15, 38:15, 40:23, 42:8, 43:5, 43:11, 43:25, 44:3, 44:12, 46:23, 49:12, 49:19, 49:23, 50:7, 50:20, 51:8, 51:16, 52:20, 53:18, 54:2, 54:12, 55:22, 57:9, 57:11, 60:13, 61:1, 61:4, 61:9, 62:9, 62:20, 76:6, 86:2, 86:7, 86:12, 86:15, 86:19, 99:12, 100:1, 100:13, 100:19, 100:24, 101:8, 101:18, 109:9, 109:15, 109:23, 110:7, 110:11, 110:18, 110:23, 111:3, 111:10, 112:17, 113:6, 113:13, 118:23, 119:3, 126:12, 158:8, 158:11, 158:15, 159:15, 159:21, 160:6
**ANTONIO** [1] - 1:3
**anytime** [1] - 58:10
**anyway** [1] - 53:13
**apologize** [1] - 85:12
**appealing** [6] - 71:8, 71:13, 71:20, 72:1, 73:3, 73:11
**appear** [6] - 23:5, 41:8, 41:16, 41:20, 41:23, 104:5
**appearances** [1] - 2:8
**APPEARANCES** [1] - 1:15

appeared [1] - 12:23
appointment [3] - 5:2, 6:2, 120:12
appreciate [1] - 9:2
approach [1] - 20:15
appropriate [1] - 9:5
approval [1] - 68:19
approve [2] - 68:14, 68:23
approved [2] - 68:10, 69:9
April [9] - 98:9, 98:16, 152:6, 152:7, 152:11, 154:3, 154:23, 155:2, 155:7
area [1] - 24:19
arguments [1] - 119:24
arrange [2] - 9:24, 10:18
arrangement [1] - 6:17
arrangements [2] - 6:19, 133:13
arrested [1] - 160:25
arrive [1] - 153:23
arrived [8] - 47:7, 48:22, 49:10, 49:13, 50:3, 161:13, 161:18, 162:7
arrow [1] - 121:14
aside [1] - 86:10
assign [1] - 27:12
assigned [5] - 28:10, 38:25, 42:17, 43:2, 43:5
assisted [2] - 112:15, 112:21
ASSOCIATES [1] - 1:16
assume [1] - 25:3
attached [1] - 20:25
attempted [1] - 8:20
attempts [2] - 138:4, 138:8
attention [4] - 82:23, 98:13, 114:16, 130:18
attorney [6] - 7:21, 9:6, 105:15, 105:20, 108:22, 150:2
August [23] - 6:6, 83:22, 83:25, 84:3, 84:6, 84:8, 84:10, 84:12, 84:14, 84:16, 84:18, 84:20, 84:22, 86:18, 87:4, 98:9, 98:16, 120:16, 120:19, 121:3, 121:24, 122:1,

122:14
available [4] - 5:21, 6:24, 104:4, 144:5
Avenue [4] - 15:1, 16:9, 16:18, 18:25
average [1] - 139:16
aware [3] - 8:19, 21:2, 139:14
awhile [1] - 161:1

**B**

bad [1] - 141:23
bags [2] - 61:25, 62:2
banged [1] - 135:24
bank [4] - 106:10, 107:12, 138:9, 138:10
bankrupt [1] - 123:1
banks [1] - 137:23
based [2] - 110:2, 147:3
Beach [1] - 36:22
bears [2] - 4:15
became [2] - 32:19, 68:18
BEFORE [1] - 1:13
beforehand [1] - 137:6
began [4] - 38:4, 140:22, 152:13, 157:15
begin [5] - 40:7, 54:17, 56:7, 57:3, 151:6
beginning [31] - 28:7, 28:8, 29:17, 31:15, 57:6, 57:20, 63:11, 64:4, 68:12, 70:18, 71:11, 72:25, 73:10, 79:5, 87:25, 89:8, 91:17, 93:16, 94:8, 101:23, 102:10, 102:19, 109:13, 113:10, 114:5, 115:22, 117:19, 119:19, 120:16, 158:13
begins [2] - 31:11, 87:24
behalf [1] - 65:11
behind [1] - 2:15
BENCH [1] - 1:13
bench [1] - 2:5
benefit [1] - 135:13
best [5] - 52:17, 65:17, 108:24, 144:1, 147:16
better [1] - 138:22
between [3] - 78:24,

79:7, 81:21
big [6] - 47:22, 48:11, 148:7, 148:12, 148:16, 148:20
bills [3] - 107:5, 107:7, 110:21
binder [9] - 14:4, 14:5, 14:6, 14:11, 20:9, 20:10, 76:10, 76:12, 87:9
binders [1] - 14:3
bit [3] - 3:11, 53:4, 146:22
black [6] - 14:4, 20:9, 20:10, 74:11, 87:9, 130:22
blew [2] - 135:25, 136:3
blowers [2] - 62:13, 62:16
blue [5] - 14:5, 76:10, 76:12, 147:10, 147:11
Blydenburgh [2] - 1:19, 2:19
book [28] - 51:1, 51:5, 51:7, 53:6, 74:11, 85:11, 90:21, 90:25, 109:14, 110:12, 111:9, 111:11, 111:24, 113:6, 113:12, 113:18, 120:12, 130:22, 147:10, 147:11, 149:4, 149:7, 149:13, 149:15, 149:18, 149:21, 149:24, 149:25
books [17] - 5:2, 6:2, 51:2, 51:3, 96:22, 111:1, 111:16, 111:17, 111:20, 111:21, 111:23, 112:5, 112:8, 112:13, 112:16, 112:23, 114:15
boots [1] - 23:16
borrow [1] - 141:17
borrowed [1] - 45:17
borrowing [1] - 141:19
boss [1] - 151:9
bottom [1] - 87:19
braces [1] - 45:2
break [1] - 105:19
breaks [2] - 154:22, 154:24
breezed [1] - 112:19
briefs [1] - 11:10
bring [14] - 37:14,

41:24, 61:25, 62:1, 62:3, 76:3, 106:4, 143:1, 152:2, 154:15, 160:1, 160:4, 160:5, 162:2
bringing [4] - 25:20, 25:25, 134:20, 160:2
broke [1] - 139:22
brother [5] - 54:22, 145:25, 146:7, 146:14, 146:20
brought [5] - 23:23, 36:11, 76:7, 135:1, 156:14
Brower [4] - 15:1, 16:9, 16:18, 18:25
buck [1] - 145:24
building [1] - 136:23
buildings [1] - 135:11
bunch [1] - 92:14
business [28] - 14:17, 14:18, 15:1, 15:4, 16:8, 16:18, 17:9, 17:12, 18:14, 18:21, 21:13, 34:18, 34:22, 34:24, 40:23, 51:2, 62:23, 69:25, 100:21, 110:13, 123:2, 128:10, 131:2, 133:10, 135:9, 136:25, 137:7, 146:11
businesses [2] - 16:22, 63:2
busy [6] - 93:24, 94:2, 152:5, 154:3, 154:22, 155:1, 155:7, 161:13
BY [15] - 1:17, 12:8, 74:9, 75:23, 79:16, 80:1, 85:13, 85:20, 126:8, 147:8, 151:2, 163:6, 163:8, 163:10, 163:13

**C**

calculated [1] - 46:19
calendar [30] - 51:1, 51:2, 51:3, 51:5, 51:7, 53:5, 90:20, 90:24, 96:22, 102:14, 109:14, 111:1, 111:9, 111:11, 111:16, 111:17, 111:20, 111:21, 111:23, 111:24, 112:4, 112:8, 112:13, 112:16, 112:23,

113:5, 113:12, 114:21, 119:23, 148:1
calendars [5] - 109:8, 110:3, 115:1, 117:16, 120:4
CANDELARIA [1] - 1:9
cannot [1] - 36:19
capacity [1] - 145:9
capping [2] - 24:23, 25:1
car [1] - 146:16
card [3] - 14:17, 14:18, 15:4
carried [3] - 72:22, 121:15, 122:15
carrier [1] - 33:8
carriers [1] - 138:20
carries [1] - 35:10
carry [2] - 35:17, 127:10
cartage [1] - 133:13
carting [4] - 82:11, 82:15, 133:19, 140:18
case [13] - 5:16, 32:15, 38:16, 40:1, 61:11, 103:12, 108:18, 108:21, 127:22, 138:6, 146:20, 147:1
cash [30] - 45:14, 45:15, 45:16, 45:18, 45:22, 46:4, 46:17, 46:19, 53:18, 54:5, 54:8, 60:10, 60:14, 63:5, 63:12, 71:2, 91:12, 96:4, 134:7, 141:16, 141:17, 142:6, 142:8, 156:19, 156:22, 156:25, 157:2, 157:3, 157:8, 159:11
categories [1] - 135:8
caught [1] - 140:8
cell [4] - 15:7, 69:24, 72:10, 144:14
Centereach [2] - 1:19, 2:19
Central [1] - 1:7, 1:23
certain [3] - 54:25, 136:20, 136:21
certainly [5] - 7:25, 9:18, 50:24, 75:15, 144:22
chair [1] - 151:16
chance [1] - 105:20
change [1] - 20:1
changed [5] - 15:20, 17:23, 18:22, 137:22
changes [1] - 68:2

**charge** [2] - 118:3, 144:24
**Chase** [3] - 106:10, 107:12, 138:1
**cheaper** [1] - 138:21
**check** [52] - 3:5, 45:12, 45:21, 46:3, 53:20, 56:2, 56:6, 56:7, 57:2, 60:3, 60:9, 71:2, 80:16, 80:21, 81:24, 82:4, 82:10, 82:14, 82:19, 82:25, 83:10, 83:13, 83:17, 83:20, 83:22, 83:25, 84:3, 84:6, 84:8, 84:10, 84:12, 84:14, 84:16, 84:18, 84:20, 84:22, 84:24, 98:11, 105:8, 120:4, 120:7, 120:19, 121:4, 121:11, 124:8, 124:10, 134:7, 134:9, 141:16, 142:7, 156:19, 156:21
**checking** [4] - 17:9, 17:13, 18:14, 137:19
**checkmark** [1] - 116:22
**checks** [48] - 56:11, 56:16, 60:6, 60:10, 62:24, 63:2, 80:3, 80:6, 80:7, 80:11, 80:13, 80:14, 80:20, 80:23, 81:5, 81:7, 81:14, 86:21, 86:25, 91:9, 91:16, 91:21, 91:25, 92:4, 92:10, 92:14, 94:6, 95:17, 95:18, 95:21, 96:6, 97:6, 97:17, 98:8, 98:17, 103:11, 103:19, 106:8, 137:20, 138:4, 138:5, 138:11, 138:13, 149:1, 157:3, 157:7, 159:11
**choose** [3] - 33:21, 34:2, 127:15
**chose** [1] - 33:5
**circle** [1] - 14:1
**citing** [1] - 6:14
**City** [11] - 37:1, 37:15, 37:24, 38:2, 41:17, 42:2, 47:6, 47:16, 47:21, 48:22, 49:7
**city** [1] - 48:10
**civil** [2] - 2:5
**civilized** [1] - 9:4
**claim** [1] - 4:8

**claims** [1] - 4:11
**clarification** [1] - 105:22
**clarified** [1] - 97:11
**clarify** [1] - 118:15
**CLASS** [3] - 1:7, 1:8, 1:8
**Class** [58] - 2:6, 14:15, 14:20, 14:22, 14:25, 15:9, 15:12, 15:20, 15:24, 16:1, 17:24, 17:25, 18:8, 18:10, 18:13, 18:18, 19:6, 19:10, 19:21, 20:4, 21:21, 22:8, 25:13, 43:19, 44:1, 44:4, 65:11, 68:3, 69:16, 70:13, 70:14, 70:15, 74:14, 74:17, 74:22, 74:25, 75:9, 76:3, 76:7, 76:16, 76:24, 97:16, 100:6, 102:23, 103:16, 117:5, 117:14, 151:6, 151:12, 151:18, 151:20, 151:23, 151:25, 152:5, 156:16, 158:9, 158:12, 158:15
**classify** [1] - 145:23
**clean** [3] - 139:25, 140:6, 140:7
**cleanup** [2] - 137:3, 137:10
**cleanups** [1] - 66:7
**clear** [9] - 36:8, 51:2, 53:11, 53:13, 72:5, 81:24, 96:10, 101:22, 105:12
**CLERK** [8] - 2:1, 2:5, 3:17, 11:20, 11:25, 150:15, 150:20, 150:23
**client** [2] - 4:24, 5:15
**clients** [1] - 161:11
**closed** [1] - 18:17
**closer** [1] - 35:2
**Cobra** [1] - 25:8
**college** [1] - 132:2
**combination** [1] - 134:8, 141:16, 142:7
**combine** [1] - 70:4
**combined** [1] - 82:11
**comfortable** [1] - 72:11
**coming** [3] - 8:1, 27:24, 146:11
**comment** [2] - 53:16, 105:17

**commercial** [5] - 24:16, 135:11, 135:19, 135:22, 136:12
**committed** [2] - 61:11, 146:1
**common** [1] - 54:16
**communicate** [2] - 144:13, 144:14
**communicated** [1] - 88:8
**communication** [3] - 7:24, 8:12, 41:6
**comp** [1] - 34:19
**companies** [11] - 62:15, 77:3, 77:8, 77:14, 78:5, 78:24, 79:10, 81:20, 94:7, 104:6, 145:11
**companies'** [1] - 32:16
**company** [36] - 14:22, 15:12, 15:17, 15:20, 15:23, 18:10, 24:7, 25:13, 26:17, 27:4, 32:23, 33:17, 33:18, 34:22, 60:22, 61:19, 70:16, 71:6, 71:12, 72:8, 72:18, 74:23, 78:6, 78:15, 90:16, 97:5, 105:7, 106:21, 118:2, 118:3, 133:4, 133:22, 136:11, 145:13, 151:22, 161:9
**Company** [1] - 16:6
**company's** [4] - 69:18, 69:22, 105:2, 106:18
**compare** [1] - 133:18
**compensation** [14] - 32:12, 32:15, 32:20, 32:25, 33:4, 33:8, 33:15, 34:25, 46:7, 46:24, 134:1, 134:21, 141:25, 158:6
**competitive** [1] - 137:7
**complained** [3] - 72:23, 88:17, 91:2
**complaint** [13] - 4:9, 52:3, 52:8, 52:14, 52:15, 53:8, 64:15, 65:21, 65:25, 66:3, 66:18, 66:22, 66:24
**complete** [1] - 118:18
**completed** [2] - 107:8, 156:13
**completeness** [1] -

79:22
**computer** [5] - 1:25, 113:25, 114:10, 116:8, 116:15
**concerning** [1] - 8:8
**conclusion** [2] - 3:4, 3:7
**conduct** [1] - 9:10
**conducted** [1] - 147:4
**confer** [2] - 9:6, 105:20
**conference** [1] - 6:6
**confident** [4] - 102:2, 103:6, 115:14, 116:1
**confused** [3] - 5:17, 53:4, 55:12
**consented** [1] - 4:25
**consider** [9] - 30:2, 53:15, 63:12, 63:13, 63:18, 63:21, 64:4, 70:13, 71:2
**considered** [2] - 31:17, 63:5
**considers** [1] - 30:6
**consist** [1] - 138:8
**consists** [1] - 85:21
**contacted** [1] - 6:23
**contacting** [1] - 5:3
**contained** [4] - 65:20, 65:24, 66:3, 66:18
**containers** [2] - 133:17, 133:18
**content** [1] - 68:14
**contents** [3] - 13:13, 68:9, 68:24
**continue** [2] - 74:4, 88:3
**continued** [4] - 42:20, 73:20, 106:24, 143:3
**continuously** [1] - 16:14
**contractors** [1] - 63:9
**contracts** [3] - 110:10, 110:17, 130:6
**convenient** [1] - 129:22
**conversations** [1] - 140:23
**coordinates** [1] - 125:20
**copies** [7] - 80:23, 80:25, 81:5, 91:6, 92:10, 107:14, 108:3
**copy** [21] - 5:13, 5:18, 5:19, 5:20, 5:21, 6:14, 6:20, 7:13, 7:23, 8:11, 8:13, 8:16, 9:24, 10:2, 10:13, 10:18, 10:20, 10:22, 14:18, 15:4

**Corp** [1] - 15:22
**corporation** [61] - 18:2, 18:13, 18:18, 18:24, 19:2, 23:19, 24:1, 24:4, 25:5, 26:13, 26:20, 26:23, 27:12, 28:10, 32:11, 32:14, 32:19, 33:11, 33:22, 33:25, 35:21, 37:2, 38:9, 38:12, 38:17, 38:22, 40:20, 40:25, 42:13, 43:15, 43:22, 44:4, 44:15, 47:2, 57:23, 58:16, 58:19, 58:20, 58:25, 59:8, 59:22, 60:16, 60:20, 61:2, 61:10, 61:15, 61:18, 62:6, 62:12, 62:15, 64:6, 67:22, 106:8, 106:13, 106:17, 107:5, 107:22, 108:1, 108:5, 112:5, 131:13
**corporation's** [2] - 33:3, 67:25
**corporations** [1] - 39:1
**correct** [711] - 4:13, 12:12, 12:13, 12:16, 12:18, 12:19, 12:21, 12:22, 12:25, 13:1, 13:4, 13:6, 13:7, 13:11, 13:14, 13:15, 13:17, 13:18, 13:21, 13:23, 14:23, 15:2, 15:3, 15:8, 15:13, 16:3, 16:4, 16:3, 16:4, 16:6, 16:7, 16:9, 16:10, 16:12, 16:13, 16:15, 16:16, 16:18, 16:19, 16:20, 16:23, 17:1, 17:2, 17:4, 17:5, 17:8, 17:10, 17:11, 17:14, 17:15, 17:19, 17:20, 17:22, 18:3, 18:8, 18:9, 18:11, 18:12, 18:16, 18:19, 19:1, 19:4, 19:16, 19:18, 19:19, 19:22, 20:5, 21:10, 21:11, 22:12, 22:16, 22:18, 23:7, 23:18, 23:21, 23:22, 24:2, 24:9, 24:10, 24:13, 24:14, 24:24, 24:25, 25:2, 25:6, 25:7, 25:11, 25:17, 25:22, 26:1, 26:2, 26:9, 26:13, 26:14,

26:17, 26:18, 27:2, 27:6, 27:8, 27:13, 27:25, 28:3, 28:5, 28:22, 28:23, 29:1, 29:2, 29:3, 29:6, 29:9, 30:14, 30:15, 31:4, 31:8, 31:10, 31:13, 32:2, 32:5, 32:8, 32:9, 32:12, 32:16, 32:17, 32:22, 33:1, 33:2, 33:6, 33:7, 33:9, 33:10, 33:13, 33:22, 33:23, 33:24, 34:3, 34:4, 35:12, 35:18, 35:19, 35:25, 36:4, 36:8, 36:9, 37:3, 37:4, 37:8, 37:9, 37:11, 37:12, 37:15, 37:16, 37:18, 37:21, 37:22, 38:4, 38:6, 38:7, 38:9, 38:10, 38:13, 38:14, 38:18, 38:19, 38:23, 38:24, 39:1, 39:2, 39:6, 39:17, 39:20, 39:21, 39:23, 39:25, 40:1, 40:5, 40:6, 40:8, 40:16, 40:17, 40:18, 40:21, 40:22, 41:1, 41:2, 41:3, 41:4, 41:5, 41:8, 41:9, 41:18, 41:21, 41:22, 42:3, 42:6, 42:10, 42:11, 42:15, 42:16, 42:18, 43:3, 43:4, 43:7, 43:8, 43:9, 43:10, 43:12, 43:13, 43:17, 43:19, 43:23, 43:24, 44:5, 44:6, 44:8, 44:10, 44:11, 44:13, 44:16, 44:18, 44:19, 45:8, 45:14, 45:20, 45:22, 46:4, 46:5, 46:7, 46:9, 46:11, 46:14, 46:15, 46:17, 46:18, 46:21, 46:22, 47:3, 47:4, 47:7, 47:8, 47:10, 47:11, 47:13, 47:14, 47:17, 47:21, 48:3, 48:4, 48:8, 48:10, 48:14, 48:15, 48:25, 49:1, 49:3, 49:4, 49:7, 49:8, 49:11, 49:14, 49:15, 49:17, 49:18, 49:21, 49:22, 49:25, 50:4, 50:5, 50:8, 50:12, 51:6, 51:10, 51:11, 51:13, 51:14, 51:18, 51:20, 51:21,

52:16, 52:20, 52:22, 53:19, 53:20, 53:21, 53:22, 53:23, 53:25, 54:1, 54:3, 54:4, 54:6, 54:10, 54:11, 54:14, 54:8, 56:9, 56:10, 56:17, 56:22, 56:23, 56:25, 57:1, 57:3, 57:4, 57:7, 57:8, 57:9, 57:10, 57:13, 57:14, 57:15, 57:18, 58:5, 58:6, 58:12, 58:14, 58:17, 58:18, 58:22, 58:25, 59:1, 59:7, 59:10, 59:11, 59:12, 59:13, 59:15, 59:17, 59:18, 59:21, 59:24, 60:1, 60:4, 60:5, 60:7, 60:8, 60:11, 60:12, 60:14, 60:15, 60:18, 60:19, 60:20, 60:23, 60:24, 60:25, 61:2, 61:3, 61:6, 61:7, 61:8, 61:12, 61:13, 61:14, 61:17, 61:20, 61:21, 61:24, 62:4, 62:5, 62:7, 62:8, 62:10, 62:11, 62:13, 62:14, 62:18, 62:19, 62:22, 62:24, 62:25, 63:2, 63:3, 63:4, 63:6, 65:2, 65:3, 65:4, 65:7, 65:14, 65:16, 66:22, 66:25, 67:1, 67:8, 67:9, 67:11, 67:12, 67:13, 67:15, 67:16, 67:18, 67:19, 67:23, 68:1, 68:4, 68:7, 68:10, 69:4, 69:5, 69:18, 69:19, 70:10, 71:6, 71:19, 71:21, 72:15, 72:16, 72:19, 75:2, 75:3, 75:6, 75:7, 75:8, 75:12, 76:1, 76:2, 76:4, 76:5, 76:8, 76:9, 76:14, 77:1, 77:6, 77:25, 78:3, 78:10, 78:22, 80:4, 80:5, 80:7, 80:9, 80:10, 80:12, 80:23, 80:24, 81:1, 81:6, 81:9, 81:10, 81:11, 81:12, 81:13, 81:17, 81:19, 81:23, 82:5, 82:12, 82:13, 82:16, 82:17, 82:18, 82:24, 83:1, 83:2, 83:12, 83:15, 83:18, 83:21, 83:24, 84:2,

84:5, 84:7, 84:9, 84:11, 84:13, 84:15, 84:17, 84:19, 84:21, 84:23, 85:1, 85:22, 86:3, 86:4, 86:8, 86:13, 86:16, 86:19, 86:23, 86:24, 87:1, 87:2, 88:3, 88:4, 88:13, 88:14, 88:15, 89:4, 89:5, 89:6, 89:11, 89:13, 89:21, 90:1, 90:2, 90:16, 90:17, 90:18, 90:21, 91:1, 91:10, 91:11, 91:12, 91:18, 91:23, 91:24, 92:2, 92:3, 92:6, 92:11, 92:12, 92:20, 92:24, 93:1, 93:5, 93:6, 93:10, 93:11, 93:12, 93:20, 93:23, 93:24, 94:2, 94:3, 94:4, 94:12, 94:15, 94:19, 94:20, 94:22, 94:23, 95:6, 95:20, 95:24, 96:1, 96:4, 96:9, 96:14, 96:17, 97:14, 97:15, 97:18, 97:21, 97:24, 97:25, 98:2, 98:3, 98:5, 98:6, 98:7, 98:10, 98:15, 98:18, 98:19, 98:22, 98:25, 99:2, 99:8, 99:9, 99:12, 99:15, 100:6, 100:10, 100:14, 100:20, 100:23, 101:7, 101:14, 101:15, 101:19, 101:20, 102:24, 103:13, 103:14, 103:17, 103:18, 103:20, 103:21, 103:24, 104:16, 104:19, 104:23, 105:4, 105:9, 105:10, 106:11, 106:12, 106:15, 106:16, 106:19, 106:20, 106:22, 106:23, 107:3, 107:4, 107:6, 107:9, 107:10, 107:12, 107:13, 107:16, 107:17, 107:19, 107:20, 107:23, 107:24, 108:5, 108:6, 108:7, 108:10, 109:5, 109:10, 109:17, 109:19, 109:24, 110:1, 110:3, 110:8,

110:16, 110:20, 110:25, 111:1, 111:4, 111:18, 111:21, 111:22, 111:24, 111:25, 112:3, 112:6, 112:7, 112:10, 112:13, 112:15, 112:21, 112:25, 113:7, 113:25, 114:1, 114:10, 114:11, 114:17, 114:23, 114:24, 115:3, 115:4, 115:7, 115:12, 115:14, 115:17, 116:9, 116:22, 116:23, 117:1, 117:2, 117:5, 117:15, 117:17, 118:20, 118:21, 118:24, 119:4, 119:16, 120:5, 120:8, 121:7, 121:8, 121:12, 121:13, 121:20, 121:23, 122:4, 122:5, 122:6, 122:7, 122:9, 122:11, 122:12, 122:14, 123:13, 123:15, 123:17, 123:19, 124:3, 124:4, 124:5, 124:6, 124:20, 124:22, 124:23, 124:24, 124:25, 125:3, 127:16, 128:21, 134:17, 135:5, 147:22, 148:13, 148:14, 148:17, 148:18, 148:21, 148:22, 149:5, 149:6, 149:9, 149:20, 149:22, 150:3, 150:4

**correspond** [1] - 80:3
**corresponding** [1] - 95:22
**cost** [1] - 107:2
**costs** [1] - 6:21
**counsel** [6] - 2:8, 3:3, 7:11, 12:14, 13:2, 108:21
**count** [1] - 122:21
**country** [3] - 144:7, 144:8, 144:10
**couple** [4] - 45:9, 147:5, 155:19, 160:25
**course** [2] - 27:3, 109:16

**court** [1] - 12:1
**COURT** [76] - 1:1, 2:2, 2:12, 2:16, 2:22, 3:9, 3:21, 4:4, 4:12, 4:17, 4:20, 4:22, 5:7, 5:17, 6:13, 7:1, 7:4, 7:13, 8:5, 8:21, 9:2, 9:13, 9:16, 9:20, 10:6, 10:17, 10:22, 11:1, 11:5, 11:7, 11:15, 11:17, 12:3, 12:6, 19:25, 20:17, 22:19, 27:9, 27:15, 27:22, 28:16, 30:7, 30:19, 30:21, 30:24, 52:6, 53:15, 55:5, 59:3, 59:5, 71:23, 73:5, 73:14, 74:3, 75:15, 79:18, 79:21, 105:16, 105:25, 106:5, 108:14, 125:22, 125:25, 126:4, 132:12, 141:3, 141:9, 147:2, 147:6, 150:7, 150:10, 150:12, 154:18, 154:25, 162:13, 162:18
**Court** [4] - 1:22, 6:18, 131:25, 132:5
**Court's** [1] - 135:13
**Courthouse** [2] - 1:6, 65:11
**cover** [1] - 32:21
**coverage** [1] - 32:25
**covered** [1] - 33:4
**covers** [2] - 33:20, 34:1
**create** [7] - 10:7, 22:15, 50:17, 109:21, 110:20, 115:6, 149:4
**created** [9] - 8:24, 50:15, 71:7, 72:12, 103:6, 110:2, 110:5, 110:9, 110:16
**crew** [7] - 76:3, 76:7, 90:21, 122:24, 136:19, 139:21, 142:25
**CROSS** [2] - 126:7, 163:7
**cross** [2] - 7:7, 8:8
**cross-examination** [1] - 8:8
**CROSS-EXAMINATION** [2] - 126:7, 163:7
**cross-examined** [1] - 7:7

**crossing** [1] - 146:15
**cruise** [1] - 108:23
**curiosity** [1] - 8:15
**current** [5] - 18:6, 26:11, 28:25, 29:1, 32:11
**customer** [17] - 27:4, 43:9, 51:4, 72:17, 72:18, 106:14, 107:1, 107:9, 107:11, 107:19, 108:4, 108:8, 108:10, 108:15, 129:23, 130:13, 135:24
**customers** [25] - 19:11, 24:4, 34:2, 42:10, 42:13, 42:18, 43:3, 43:6, 43:12, 43:16, 44:8, 61:12, 61:16, 62:21, 70:12, 75:11, 76:1, 106:18, 107:6, 107:7, 107:15, 110:22, 130:6, 149:23, 161:11
**customers'** [6] - 24:12, 31:13, 31:18, 61:6, 76:4, 76:8

## D

**D-I** [5] - 85:2, 85:7, 85:14, 85:23
**D-O2** [1] - 85:7
**D0493** [1] - 120:25
**DA** [1] - 14:6
**daily** [14] - 6:9, 8:24, 9:15, 9:23, 44:20, 45:4, 54:12, 57:17, 58:5, 58:12, 58:15, 109:4, 157:14, 157:17
**date** [7] - 18:6, 26:11, 28:25, 32:11, 78:1, 113:2, 129:22
**dated** [1] - 40:13
**dates** [8] - 8:25, 51:15, 78:24, 79:8, 80:3, 81:20, 86:1, 87:5, 95:21, 95:22, 99:10, 99:11, 112:24, 113:23, 114:10, 114:13, 114:18
**daughter** [27] - 51:12, 51:22, 51:23, 52:3, 52:7, 52:10, 52:13, 52:18, 53:2, 64:14, 65:3, 86:2, 95:4,

99:17, 103:6, 110:5, 110:15, 110:20, 112:4, 112:12, 112:15, 113:24, 114:2, 116:7, 116:14, 149:14
**daughter's** [1] - 112:9
**day's** [2] - 149:19, 149:21
**day-to-day** [3] - 16:25, 18:7, 132:8
**days** [97] - 6:10, 41:17, 50:6, 50:10, 50:19, 50:22, 51:6, 52:19, 52:24, 86:15, 86:19, 88:12, 88:13, 89:1, 89:19, 90:6, 90:12, 90:13, 93:18, 94:10, 95:4, 95:13, 96:8, 98:21, 99:16, 100:2, 100:5, 100:11, 100:14, 100:16, 100:19, 100:20, 100:25, 101:8, 101:9, 101:12, 101:16, 101:19, 102:2, 102:3, 102:14, 102:22, 103:7, 109:9, 109:15, 109:22, 110:7, 110:10, 110:12, 110:18, 110:23, 111:3, 111:10, 112:17, 113:6, 113:12, 113:24, 115:10, 115:15, 115:16, 116:1, 116:2, 116:9, 116:15, 116:25, 117:1, 117:3, 117:4, 117:13, 119:13, 119:15, 119:20, 119:21, 119:22, 121:7, 122:13, 125:17, 129:3, 129:6, 129:17, 139:9, 139:16, 140:12, 140:16, 148:15, 148:19, 148:20, 149:1, 149:4, 149:11, 152:8, 154:6, 155:8, 155:19, 161:6
**DB** [1] - 14:7
**DC** [1] - 97:2
**DD** [3] - 76:10, 76:12, 76:14
**DE** [4] - 147:9, 147:10, 147:11, 147:17

**deal** [1] - 8:19
**debris** [20] - 76:16, 76:23, 77:2, 77:7, 77:14, 77:24, 78:4, 78:9, 78:14, 78:23, 79:9, 80:8, 80:14, 81:10, 81:20, 82:11, 82:15, 127:13, 152:2, 160:1
**decade** [1] - 54:21
**December** [33] - 8:2, 8:4, 40:17, 40:21, 88:25, 89:6, 92:9, 93:4, 94:1, 94:24, 95:5, 95:19, 96:6, 96:7, 96:13, 96:16, 96:18, 99:18, 100:5, 102:21, 103:8, 103:16, 115:11, 116:24, 136:9, 148:9, 149:19, 149:22, 151:19, 155:13, 155:18
**decided** [3] - 57:16, 58:4, 58:11
**defendant** [9] - 6:16, 7:6, 7:17, 7:18, 8:7, 9:3, 10:1, 10:23, 75:16
**Defendant** [1] - 149:25
**defendant's** [1] - 85:12
**Defendant's** [20] - 85:14, 85:21, 85:24, 88:11, 88:12, 90:12, 90:25, 91:4, 91:6, 93:7, 95:2, 97:19, 99:11, 101:1, 101:10, 101:21, 110:2, 125:5, 147:11, 149:5
**Defendants** [2] - 1:11, 1:18
**defendants** [5] - 2:20, 2:21, 3:8, 5:21, 66:6
**defense** [1] - 11:15
**Defense** [1] - 149:2
**degree** [1] - 5:5
**deliver** [2] - 107:7, 108:14
**demands** [3] - 108:18, 108:20, 109:1
**DENIS** [1] - 1:13
**depended** [1] - 139:17
**deposited** [2] - 106:10, 107:12
**deposition** [60] - 4:25, 5:2, 5:24, 6:8, 6:22,

7:7, 8:8, 8:21, 8:25, 9:14, 9:22, 9:24, 10:2, 10:18, 12:11, 12:24, 13:8, 13:12, 27:20, 27:24, 29:16, 30:8, 30:25, 31:6, 50:16, 50:18, 52:19, 53:7, 57:21, 58:8, 63:10, 68:12, 69:6, 70:17, 71:10, 71:24, 73:1, 73:9, 77:10, 77:20, 78:12, 79:4, 82:2, 88:20, 88:22, 95:10, 96:21, 102:9, 104:1, 109:3, 109:6, 109:7, 109:12, 111:6, 115:23, 116:12, 117:12, 119:1, 119:18, 126:9
**describe** [4] - 127:23, 128:1, 128:2, 128:3
**described** [1] - 127:17
**description** [1] - 128:17
**description's** [1] - 34:11
**details** [1] - 127:5
**determination** [3] - 134:3, 134:5, 141:6
**determine** [7] - 46:13, 109:15, 110:6, 111:2, 111:10, 112:16, 142:19
**determined** [2] - 128:7, 134:1
**device** [2] - 138:23, 139:2
**DG** [3] - 120:10, 123:8
**DI** [20] - 14:6, 85:3, 85:6, 85:21, 99:15, 101:1, 110:2, 110:5, 110:9, 110:16, 110:21, 115:6, 115:8, 115:10, 115:15, 117:8, 119:12, 120:9, 125:5
**different** [17] - 46:2, 68:22, 76:20, 82:22, 88:16, 92:8, 98:13, 100:22, 114:16, 124:18, 127:2, 127:4, 127:5, 127:6, 135:4, 135:5
**differently** [1] - 141:5
**difficult** [1] - 10:7
**difficulty** [1] - 142:23
**direct** [6] - 12:6, 31:9, 43:18, 73:16, 74:4, 126:17
**DIRECT** [4] - 12:7,

151:1, 163:5, 163:12
**directed** [4] - 9:3, 31:10, 43:8, 43:11
**directly** [5] - 5:4, 5:13, 8:20, 72:11, 144:14
**disadvantage** [1] - 5:12
**disclose** [1] - 138:13
**disclosed** [1] - 138:5
**discovery** [1] - 80:22
**discuss** [1] - 141:14
**discussed** [1] - 3:9
**discussion** [1] - 2:25
**disregard** [1] - 22:20
**DISTRICT** [3] - 1:1, 1:1, 1:14
**disturbed** [1] - 132:15
**DO** [1] - 120:24
**DO387** [1] - 148:6
**DO638** [5] - 148:2, 148:3, 148:4, 148:6
**document** [26] - 51:13, 51:15, 53:2, 75:14, 90:5, 95:12, 96:24, 98:20, 102:1, 102:3, 103:5, 108:18, 108:20, 108:25, 109:21, 115:24, 116:2, 125:11, 158:18, 158:24, 159:2, 159:5, 159:8, 159:12, 159:13, 162:9
**documents** [3] - 8:24, 107:21, 111:2
**dollars** [4] - 45:20, 45:23, 45:25, 134:23
**done** [37] - 30:17, 31:3, 31:13, 31:17, 35:24, 36:17, 37:13, 38:21, 47:16, 53:6, 72:20, 95:22, 102:4, 102:22, 103:8, 105:9, 108:1, 111:23, 112:24, 113:3, 114:13, 114:18, 114:23, 115:3, 115:16, 116:3, 116:21, 117:4, 117:13, 121:15, 122:17, 122:19, 125:11, 148:11, 148:25, 149:16, 154:11
**door** [2] - 75:18, 135:24
**doubt** [1] - 119:24
**doubtful** [2] - 100:15, 100:17

**down** [32] - 3:15, 18:17, 48:2, 86:7, 86:15, 86:18, 87:3, 93:8, 98:21, 99:23, 112:24, 113:6, 113:12, 113:23, 114:13, 114:18, 116:20, 116:25, 125:10, 125:17, 125:19, 125:25, 131:4, 135:12, 135:14, 135:15, 148:15, 148:19, 149:18, 149:21, 159:24, 162:19
**drafting** [1] - 52:14
**drive** [12] - 36:3, 37:7, 41:14, 42:2, 45:18, 47:16, 47:21, 47:22, 47:23, 48:9, 49:6, 143:2
**driving** [5] - 41:15, 47:24, 48:3, 134:11, 134:14
**drove** [3] - 48:11, 156:7, 156:10
**drunk** [1] - 146:15
**due** [2] - 28:13, 68:21
**duly** [2] - 11:23, 150:18
**dump** [8] - 47:22, 80:17, 127:9, 132:19, 132:23, 133:5, 134:6
**dumper** [2] - 127:12, 127:13
**dumping** [4] - 133:10, 133:13, 134:2, 134:8
**dumpster** [4] - 96:11, 133:22, 147:24, 152:3
**dumpsters** [1] - 133:23
**during** [74] - 9:6, 13:8, 19:22, 22:15, 25:11, 29:12, 33:1, 35:8, 35:11, 35:14, 36:9, 36:15, 37:5, 37:23, 38:12, 38:17, 39:18, 39:22, 49:12, 50:11, 50:19, 55:2, 55:10, 55:25, 56:12, 56:15, 58:15, 86:11, 86:25, 92:1, 92:5, 92:19, 92:22, 93:23, 96:1, 98:15, 98:18, 99:1, 99:18, 103:12, 104:3, 105:7, 106:9, 109:10, 109:16, 109:22, 110:23,

111:3, 112:17, 121:18, 122:13, 128:14, 151:22, 152:7, 152:11, 154:3, 154:22, 155:7, 155:16, 155:20, 155:21, 156:24, 157:5, 158:14, 159:22, 160:7, 160:18, 160:22, 161:13, 161:17, 161:21, 161:25, 162:5
**duties** [1] - 26:6
**duty** [1] - 35:6
**dwindled** [1] - 93:25
**dyslexia** [3] - 85:16, 132:5, 132:7
**dyslexic** [1] - 108:22

# E

**early** [1] - 48:15
**earned** [3] - 22:15, 54:12, 59:9
**East** [1] - 136:6
**EASTERN** [1] - 1:1
**editorial** [1] - 53:15
**education** [2] - 131:25
**effort** [3] - 7:13, 40:3, 46:12
**eight** [5] - 86:9, 128:25, 129:3, 129:6, 129:13
**either** [15] - 11:15, 28:9, 32:19, 33:5, 53:24, 57:23, 61:1, 61:18, 71:2, 77:2, 77:14, 79:9, 138:20, 161:14, 161:19
**electrically** [1] - 107:22
**eleven** [1] - 148:15
**emotional** [2] - 9:7, 132:6
**employee** [1] - 46:6
**employees** [8] - 27:5, 27:11, 27:17, 28:9, 31:9, 58:24, 75:10, 75:25
**employer** [1] - 159:3
**employment** [17] - 58:16, 152:8, 152:12, 155:17, 155:21, 156:25, 158:3, 158:14, 159:17, 159:23, 160:8, 160:18, 160:22, 161:17, 161:21, 162:1, 162:5

**encompassed** [1] - 103:7
**end** [26] - 29:12, 36:10, 37:13, 37:21, 38:1, 40:16, 46:3, 48:19, 48:20, 49:20, 50:8, 50:23, 52:25, 54:3, 54:9, 56:5, 57:6, 86:9, 99:1, 103:20, 103:22, 117:25, 132:14, 132:17, 156:13, 158:3
**ended** [5] - 40:20, 40:25, 48:13, 48:14, 132:7
**ends** [1] - 103:13
**English** [1] - 161:12
**entire** [7] - 56:24, 59:18, 113:5, 113:11, 115:5, 117:5, 117:14
**equipment** [4] - 35:10, 35:17, 35:22, 62:20
**especially** [2] - 118:8, 119:4
**ESQ** [2] - 1:17, 1:18
**estimate** [1] - 105:3
**estimates** [3] - 110:6, 117:24, 129:25
**et** [2] - 2:6, 2:7
**ETHAN** [3] - 1:9, 11:21, 163:4
**Ethan** [8] - 2:20, 9:12, 11:19, 12:2, 13:16, 21:16, 65:6, 65:12
**evening** [1] - 48:15
**event** [1] - 154:19
**evidence** [15] - 4:15, 6:5, 6:9, 14:5, 14:7, 20:22, 21:4, 34:6, 61:9, 65:19, 69:15, 76:12, 81:4, 81:15
**exactly** [6] - 10:4, 45:1, 81:15, 82:19, 96:8, 146:12
**examination** [7] - 7:17, 8:8, 10:3, 74:4, 105:19, 126:17, 147:3
**EXAMINATION** [8] - 12:7, 126:7, 147:7, 151:1, 163:5, 163:7, 163:9, 163:12
**Examination** [1] - 28:16
**examined** [3] - 7:7, 11:23, 150:18
**example** [1] - 91:25
**except** [1] - 14:7

**exchanged** [1] - 138:20
**exclusively** [1] - 137:16
**excuse** [1] - 123:5
**exhibit** [43] - 34:6, 34:7, 35:3, 40:13, 41:3, 64:11, 64:18, 64:21, 65:18, 66:20, 66:24, 69:15, 69:16, 74:14, 74:25, 76:19, 83:6, 86:6, 87:14, 87:16, 87:17, 87:19, 90:6, 95:5, 95:13, 97:2, 102:12, 110:5, 110:9, 110:16, 110:21, 115:6, 115:9, 115:10, 117:8, 119:12, 120:10, 123:6, 123:8, 130:20, 131:11, 147:13
**Exhibit** [55] - 14:12, 14:13, 20:8, 20:9, 20:13, 20:19, 20:20, 20:22, 21:3, 21:12, 34:5, 34:14, 40:10, 64:11, 74:10, 76:10, 76:14, 76:18, 83:4, 83:5, 85:2, 85:12, 85:14, 85:21, 85:24, 87:7, 88:11, 88:12, 90:13, 90:25, 91:4, 91:6, 93:7, 95:2, 96:24, 97:19, 99:15, 101:1, 101:10, 101:21, 101:25, 103:11, 110:2, 115:24, 125:5, 130:19, 147:9, 147:11, 147:17, 147:23, 147:25, 149:2, 149:5, 149:8, 149:18
**exhibits** [5] - 5:25, 6:3, 14:3, 14:6, 14:9
**Exhibits** [1] - 14:4
**existed** [1] - 68:6
**existence** [1] - 60:22
**experienced** [1] - 135:18
**explain** [4] - 90:20, 121:13, 126:23, 135:14
**explanation** [1] - 87:12
**extent** [1] - 105:20
**extra** [4] - 37:19, 45:25, 46:17, 46:20

# F

**faces** [2] - 9:2, 9:4
**fair** [2] - 8:6, 10:10
**faith** [1] - 8:11
**far** [1] - 6:17
**fashion** [1] - 9:4
**fast** [2] - 93:25, 108:23
**fax** [1] - 60:14
**February** [16] - 40:8, 40:14, 41:4, 97:21, 98:9, 98:15, 99:1, 99:18, 100:4, 100:14, 100:19, 100:25, 101:9, 117:21, 155:22
**federal** [3] - 6:20, 34:15, 92:7
**Federal** [2] - 1:22, 65:10
**fellow** [1] - 145:20
**felt** [4] - 23:12, 86:2, 99:17, 141:23
**few** [8] - 2:23, 40:25, 77:11, 77:19, 92:13, 111:7, 132:4, 150:1
**figure** [16] - 50:19, 50:21, 52:19, 80:14, 92:18, 99:24, 100:9, 110:10, 110:17, 110:22, 130:14, 131:19, 131:22, 137:6, 158:20, 159:14
**figured** [2] - 96:8, 106:3
**figuring** [1] - 130:10
**file** [1] - 106:17
**filed** [6] - 6:1, 17:15, 17:17, 17:21, 22:12, 59:21, 64:16, 65:10
**files** [4] - 107:1, 107:18, 107:23
**final** [1] - 70:5
**fine** [5] - 3:15, 3:25, 11:12, 106:6, 155:23
**finished** [1] - 133:2
**fire** [1] - 135:16
**First** [58] - 2:6, 14:15, 14:20, 14:22, 14:25, 15:9, 15:12, 15:20, 15:24, 16:1, 17:23, 17:24, 18:8, 18:10, 18:13, 18:18, 19:6, 19:10, 19:21, 20:4, 21:21, 22:8, 25:13, 43:18, 44:1, 44:4, 65:11, 68:3, 69:16, 70:13, 70:14, 70:15, 74:14, 74:17, 74:22,

74:25, 75:9, 76:3, 76:7, 76:16, 76:24, 97:16, 100:5, 102:22, 103:15, 117:4, 117:14, 151:6, 151:12, 151:17, 151:20, 151:23, 151:25, 152:5, 156:16, 158:8, 158:12, 158:15
**first** [32] - 3:5, 7:18, 8:25, 9:11, 11:18, 11:22, 14:13, 14:15, 40:13, 45:4, 50:15, 50:18, 52:2, 52:8, 52:18, 55:9, 93:7, 101:21, 109:6, 109:7, 115:10, 131:12, 133:9, 137:2, 137:10, 140:5, 150:17, 151:6, 157:14, 157:15, 157:22, 160:16
**FIRST** [3] - 1:7, 1:8, 1:8
**firstly** [2] - 2:25, 9:2
**five** [40] - 26:12, 26:16, 26:20, 26:23, 38:20, 42:4, 70:10, 71:1, 109:17, 118:11, 118:16, 122:13, 124:24, 125:2, 129:15, 136:21, 139:20, 140:12, 152:7, 152:10, 152:11, 152:14, 152:15, 152:16, 152:17, 154:6, 155:8, 155:16, 155:20, 156:24, 158:14, 159:16, 159:22, 160:7, 160:18, 160:22, 161:17, 161:21, 161:25, 162:5
**fix** [1] - 118:1
**fixing** [1] - 117:25
**flat** [16] - 57:17, 58:5, 58:12, 58:15, 135:11, 135:15, 136:24, 137:5, 148:7, 148:12, 148:16, 148:21, 148:24, 148:25, 149:8, 150:1
**flip** [1] - 139:3
**follow** [4] - 94:25,

105:15, 106:5, 129:9
**follow-up** [1] - 105:15
**followed** [1] - 48:12
**following** [1] - 42:20
**follows** [2] - 11:24, 150:19
**force** [9] - 70:5, 70:9, 70:19, 71:20, 72:1, 72:6, 72:7, 73:2, 73:11
**foreman** [9] - 31:12, 31:17, 31:20, 31:21, 144:17, 144:21, 144:24, 145:15, 145:18
**forgot** [1] - 3:11
**form** [18] - 19:23, 22:17, 22:19, 27:7, 27:14, 30:18, 30:19, 54:3, 54:9, 55:4, 59:11, 59:15, 59:17, 59:19, 59:25, 60:14, 60:17, 158:22
**formed** [2] - 17:24, 53:2
**forms** [3] - 60:4, 60:6, 91:7
**forth** [3] - 36:18, 75:20, 140:18
**forward** [1] - 53:4
**four** [11] - 38:9, 85:21, 87:4, 88:25, 112:19, 118:16, 125:23, 128:24, 133:9, 136:20, 140:12
**fourth** [1] - 140:18
**frame** [1] - 92:19
**Frank** [1] - 117:21
**free** [3] - 117:25, 118:1, 127:20
**Friday** [7] - 121:6, 121:22, 122:8, 122:10, 122:15, 124:24, 125:2
**friend** [1] - 136:13
**friendly** [1] - 74:22
**front** [5] - 20:6, 35:2, 45:24, 76:18, 134:23
**full** [18] - 66:12, 79:19, 105:6, 119:15, 119:21, 119:22, 119:24, 120:5, 120:7, 127:23, 128:1, 139:21, 145:3, 145:10, 145:18, 145:19, 145:24, 146:2
**full-time** [2] - 127:23, 128:1
**Fund** [1] - 33:9

**FURTHER** [2] - 147:7, 163:9

## G

**GAF** [13] - 24:1, 24:7, 24:9, 24:15, 24:18, 24:20, 24:23, 25:5, 25:9, 26:3, 26:4, 26:7, 26:8
**garbage** [2] - 127:10, 128:20
**GC's** [1] - 63:7
**GED** [1] - 132:1
**general** [3] - 63:9, 66:7, 106:5
**generally** [3] - 104:4, 104:22, 126:11
**generated** [3] - 22:10, 72:7, 106:18
**gentlemen** [1] - 2:22
**given** [7] - 46:20, 51:1, 54:9, 107:9, 108:4, 130:8, 148:25
**glasses** [1] - 21:9
**GMC** [7] - 35:6, 35:8, 35:11, 35:14, 36:2, 36:11, 41:10
**goal** [2] - 3:24, 9:8
**government** [1] - 92:7
**GPS** [5] - 41:10, 41:13, 153:5, 153:7, 153:10
**graduated** [1] - 51:25
**great** [1] - 70:4
**GREENBERG** [1] - 1:16
**gross** [11] - 20:2, 20:4, 21:24, 22:6, 22:8, 22:22, 23:2, 131:5, 131:8, 131:14, 131:16
**ground** [4] - 25:21, 25:25, 32:20, 33:6
**guy** [3] - 31:16, 136:3, 139:18
**guys** [9] - 26:20, 26:23, 100:8, 118:11, 118:12, 118:16, 143:1
**gym** [1] - 137:1
**gymnasium** [1] - 137:2

## H

**half** [3] - 10:13, 46:25, 53:9
**hammer** [1] - 61:25
**hand** [1] - 11:20,

87:19, 107:7, 150:15
**handling** [4] - 25:15, 25:18, 25:19, 25:24
**hands** [1] - 98:11
**handwriting** [2] - 112:8, 112:9
**harassed** [1] - 139:3
**hard** [1] - 108:22
**hardest** [1] - 56:10
**hardly** [1] - 72:12
**headache** [1] - 132:18
**headquartered** [1] - 24:18
**hear** [4] - 123:7, 134:4, 156:1
**heavy** [2] - 35:6, 135:16
**help** [12] - 27:22, 30:3, 30:9, 52:7, 63:18, 63:22, 85:8, 85:9, 112:20, 130:10, 130:13, 138:11
**helped** [2] - 52:19, 66:6
**helper** [1] - 64:5
**helpers** [2] - 63:6, 63:13
**highest** [1] - 131:25
**highly** [9] - 70:4, 70:9, 70:19, 71:19, 71:25, 72:6, 72:7, 73:2, 73:10
**himself** [1] - 127:15
**hire** [2] - 75:11, 76:1
**hired** [6] - 27:4, 27:10, 38:6, 42:9, 64:5, 151:20
**hit** [1] - 146:16
**home** [10] - 16:20, 16:22, 18:25, 21:18, 35:17, 35:21, 36:11, 36:17, 36:18, 61:6
**HOME** [1] - 1:7
**Home** [9] - 2:6, 15:12, 16:1, 19:21, 20:4, 21:22, 22:8, 25:13, 97:16
**homes** [4] - 43:12, 61:16, 76:8, 140:1
**Honor** [23] - 2:4, 2:17, 2:18, 3:14, 4:23, 7:12, 10:5, 11:4, 11:6, 11:14, 11:16, 11:19, 12:5, 30:23, 66:11, 75:13, 79:15, 125:24, 126:5, 146:24, 150:8, 150:11, 151:15
**HONORABLE** [1] - 1:13

**HONTORIA** [1] - 3:19
**Hontoria** [1] - 3:19
**horrible** [1] - 132:17
**hour** [5] - 10:13, 44:18, 46:10, 129:2, 157:12
**hour-and-a-half** [1] - 10:13
**hourly** [1] - 46:20
**hours** [15] - 28:2, 46:16, 49:24, 57:22, 111:7, 128:24, 128:25, 129:4, 129:6, 129:10, 129:18, 147:14, 154:4, 155:10
**house** [9] - 36:2, 36:20, 43:9, 62:20, 106:22, 135:24, 149:12, 153:13, 159:24
**houses** [9] - 31:13, 31:18, 42:12, 42:17, 43:2, 43:6, 43:16, 135:10, 152:1
**hundred** [4] - 45:20, 45:23, 45:24, 134:23
**hundreds** [1] - 118:1
**HURLEY** [1] - 1:13
**Hurricane** [2] - 94:1, 148:8

## I

**I-6** [2] - 138:22, 138:25
**ice** [1] - 25:4
**idea** [4] - 7:4, 24:17, 47:15, 56:20
**immediately** [1] - 134:15
**immigration** [1] - 141:1
**improper** [1] - 57:12
**IMPROVEMENT** [1] - 1:7
**Improvement** [7] - 15:12, 16:2, 19:21, 20:4, 22:9, 25:13, 97:16
**improvements** [1] - 21:19
**Improvements** [2] - 2:7, 21:22
**Inc** [8] - 15:21, 17:24, 18:8, 18:14, 18:18, 19:6, 19:10, 74:22
**INC** [2] - 1:8, 1:9
**Inc.** [2] - 15:24, 17:25
**include** [3] - 116:9, 116:15, 130:3

**included** [1] - 127:1
**includes** [2] - 19:14, 118:23
**including** [7] - 46:14, 46:23, 87:4, 93:9, 101:17, 148:16, 148:20
**income** [6] - 21:24, 22:3, 22:14, 22:25, 131:4, 158:21
**incorporated** [1] - 138:1
**incorrect** [17] - 19:8, 36:5, 36:7, 36:13, 41:19, 46:8, 50:9, 50:13, 52:21, 52:23, 54:19, 68:11, 71:9, 109:11, 111:5, 113:8, 119:17
**increase** [1] - 45:9
**increased** [1] - 45:7
**independent** [1] - 9:22
**INDEX** [1] - 163:1
**indicate** [18] - 47:20, 48:21, 48:24, 49:2, 49:5, 49:24, 50:2, 50:6, 50:10, 50:22, 55:1, 55:8, 55:9, 55:24, 81:7, 100:18, 100:24, 101:13
**indicated** [7] - 3:2, 75:16, 75:17, 79:1, 82:19, 82:25, 93:2
**indicates** [1] - 34:23
**indicating** [2] - 61:10, 158:19
**indication** [1] - 107:2
**individual** [3] - 7:6, 20:23, 64:25
**individuals** [6] - 26:12, 26:16, 27:1, 38:21, 63:4, 63:11
**information** [4] - 34:14, 105:21, 106:1, 142:13
**informed** [1] - 41:7
**initial** [2] - 137:3, 137:10
**injured** [2] - 32:16, 32:19
**injuries** [1] - 32:21
**injury** [1] - 32:21
**inquiries** [1] - 140:25
**inquiry** [2] - 75:21, 132:14
**install** [8] - 19:7, 19:11, 23:7, 25:16, 27:10, 30:4, 30:10, 140:1
**installation** [9] -

26:24, 90:7, 95:14, 105:4, 119:21, 119:23, 119:25, 120:5, 120:7
**installations** [25] - 23:20, 88:6, 88:13, 88:15, 89:10, 89:24, 90:14, 93:12, 94:18, 94:22, 95:6, 98:21, 99:24, 99:25, 102:3, 102:22, 103:7, 105:8, 106:9, 115:11, 115:16, 116:2, 117:4, 117:13, 119:15
**installed** [6] - 17:7, 24:4, 24:11, 26:1, 26:8, 160:3
**installing** [4] - 19:14, 32:2, 32:4, 135:19
**installs** [1] - 19:3
**instance** [1] - 106:6
**instances** [2] - 76:15, 76:22
**instead** [2] - 133:21, 133:23
**instructions** [1] - 106:6
**insurance** [17] - 32:12, 32:15, 32:21, 32:23, 33:4, 33:12, 33:15, 33:18, 33:20, 33:24, 34:18, 34:19, 34:22, 34:25, 61:5, 61:9, 94:7
**Insurance** [1] - 33:9
**intention** [1] - 7:15
**internet** [1] - 118:2
**interpretation** [1] - 75:16
**interpreter** [8] - 3:11, 3:12, 3:16, 151:3, 151:16, 155:14, 156:1, 159:18
**INTERPRETER** [6] - 3:14, 151:15, 155:14, 156:1, 159:18, 160:21
**interpreting** [1] - 3:18
**interrupt** [1] - 151:15
**interruption** [1] - 18:21
**invoice** [1] - 107:9
**invoices** [13] - 107:14, 107:15, 107:18, 107:25, 108:3, 108:8, 108:11, 108:15, 110:21, 129:25, 130:3, 130:10, 130:13

**invokes** [1] - 79:21
**involved** [3] - 5:5, 137:11, 137:14
**involves** [1] - 135:14
**involving** [1] - 132:23
**IRS** [1] - 22:12
**Islip** [2] - 1:7, 1:23
**issue** [2] - 4:3, 5:8
**issues** [4] - 3:22, 3:24, 11:11, 92:7
**item** [1] - 3:9
**itself** [4] - 18:10, 69:10, 75:14, 75:15

## J

**J-A-Y** [3] - 13:24, 14:1, 15:5
**jailed** [1] - 161:1
**James** [1] - 3:19
**January** [2] - 102:21, 103:8
**Jay** [30] - 13:22, 14:1, 15:10, 151:10, 151:21, 155:12, 155:17, 155:21, 155:24, 156:3, 156:9, 156:18, 157:2, 157:7, 157:10, 157:12, 157:14, 157:17, 158:1, 158:4, 158:6, 158:18, 158:24, 159:2, 159:5, 159:8, 159:11, 162:9
**Jay's** [5] - 154:10, 154:14, 156:7, 156:8, 156:14
**Jennifer** [1] - 65:1
**Jersey** [8] - 24:9, 24:13, 24:18, 25:1, 25:21, 25:25
**JESUS** [2] - 1:9, 1:10
**Jesus** [1] - 13:19
**job** [171] - 26:5, 26:6, 26:19, 27:2, 31:11, 31:14, 31:20, 32:19, 33:21, 35:18, 35:22, 36:3, 36:16, 36:17, 37:7, 37:10, 37:13, 37:25, 41:7, 41:20, 41:23, 41:24, 42:3, 44:8, 46:8, 47:9, 47:15, 47:20, 48:9, 48:13, 48:14, 48:25, 49:3, 49:6, 49:10, 49:14, 50:3, 57:5, 57:6, 57:7, 59:14, 61:11, 61:23, 62:13, 62:17, 103:23,

103:24, 104:5, 104:15, 107:2, 107:3, 107:8, 111:23, 111:24, 112:1, 114:23, 115:1, 115:3, 116:22, 117:16, 117:21, 117:23, 117:24, 118:9, 118:17, 118:18, 120:6, 120:19, 121:3, 121:7, 121:11, 121:15, 121:17, 121:18, 121:21, 121:22, 122:1, 122:3, 122:6, 122:8, 122:10, 122:18, 122:21, 122:25, 123:11, 123:18, 124:1, 124:7, 124:9, 124:10, 124:11, 124:16, 124:19, 125:2, 126:11, 127:4, 128:8, 129:15, 129:20, 129:21, 130:4, 130:8, 130:11, 130:14, 130:16, 135:2, 135:21, 135:23, 135:25, 136:5, 136:7, 136:9, 136:12, 136:22, 137:3, 137:5, 137:8, 137:9, 137:11, 137:14, 139:18, 139:24, 140:4, 140:5, 140:11, 143:1, 144:20, 144:23, 145:17, 148:7, 148:12, 148:17, 148:21, 148:24, 148:25, 149:9, 149:13, 149:16, 150:1, 153:11, 153:14, 153:17, 153:20, 154:10, 154:15, 155:25, 156:4, 156:7, 156:8, 156:10, 156:11, 156:13, 158:15, 159:16, 159:22, 160:7, 160:10, 160:12, 160:14, 160:19, 160:23, 161:4, 161:18, 162:2
**jobs** [47] - 25:4, 26:22, 29:3, 29:5, 29:8, 29:13, 31:12, 31:17, 38:25, 48:19, 51:3,

62:10, 90:18, 90:20, 90:22, 90:23, 90:24, 93:3, 95:22, 96:13, 96:16, 96:22, 98:25, 99:7, 100:10, 107:25, 112:24, 113:3, 114:13, 114:18, 114:22, 116:21, 118:14, 118:16, 125:11, 126:21, 127:1, 127:6, 135:4, 135:6, 135:8, 139:19, 139:20, 139:24
**joint** [3] - 5:24, 6:1, 6:4
**Jose** [137] - 25:11, 25:15, 26:6, 26:15, 36:1, 36:10, 36:16, 37:6, 38:6, 38:8, 38:11, 38:25, 39:3, 39:18, 39:22, 40:4, 41:7, 41:13, 41:16, 42:1, 42:12, 42:17, 43:8, 43:14, 43:18, 43:25, 44:3, 44:10, 44:20, 45:5, 45:12, 45:21, 46:3, 46:6, 46:14, 46:23, 47:5, 48:21, 49:3, 49:6, 50:11, 50:19, 51:7, 51:16, 52:20, 53:24, 54:17, 54:20, 55:2, 55:10, 55:14, 55:25, 56:11, 56:16, 57:2, 57:5, 57:11, 60:9, 61:1, 61:4, 61:8, 62:9, 62:20, 62:23, 64:4, 76:6, 76:15, 76:23, 77:1, 77:7, 77:13, 77:23, 78:3, 78:22, 80:6, 81:19, 81:25, 82:4, 82:10, 82:14, 82:18, 82:24, 83:11, 86:2, 86:7, 86:12, 86:19, 86:25, 87:5, 88:5, 91:9, 91:22, 92:1, 92:5, 92:10, 92:14, 92:18, 93:3, 95:17, 96:7, 97:6, 97:9, 97:17, 98:8, 98:17, 98:25, 99:12, 99:17, 99:25, 100:13, 100:19, 100:24, 101:7, 101:18, 103:12, 103:15, 103:19, 103:23, 109:9, 109:15, 109:23, 110:7, 110:11, 110:18, 110:23,

111:3, 111:10,
112:17, 113:6,
113:13, 118:23,
119:3, 126:12,
127:7, 150:11,
150:22
**JOSE** [3] - 1:3,
150:16, 163:11
**Judge** [19] - 2:11, 3:6,
4:14, 4:18, 8:2, 8:3,
9:18, 10:21, 20:15,
27:19, 73:18, 74:7,
75:22, 105:24,
125:21, 141:2,
141:8, 147:5, 162:16
**judge** [3] - 5:19, 5:23,
7:15
**JUDGE** [1] - 1:14
**July** [16] - 83:10,
83:13, 83:17, 83:20,
86:6, 86:10, 86:11,
86:21, 87:25, 92:15,
92:19, 98:9, 98:16
**June** [5] - 98:2, 98:9,
98:16, 103:13,
103:19
**jury** [1] - 7:9
**JUSTIN** [1] - 1:17
**Justin** [1] - 2:10

## K

**keep** [4] - 36:18,
36:23, 57:21, 136:4
**Keith** [1] - 2:13
**kept** [7] - 47:2, 57:15,
58:10, 106:21,
107:18, 107:22,
112:4
**kids** [2] - 112:19,
139:3
**killed** [2] - 146:18,
146:21
**kind** [4] - 9:18, 25:18,
108:23, 132:6
**knowledge** [1] -
132:19
**known** [5] - 13:16,
13:19, 14:1, 18:10,
54:20
**Krupp** [1] - 117:21
**KRUPP** [1] - 117:21

## L

**labor** [10] - 38:11,
63:18, 63:22, 80:8,
81:8, 81:10, 81:25,
82:5, 82:11
**laborer** [1] - 64:5

**laborers** [2] - 63:6,
63:13
**ladders** [1] - 152:22
**lady** [1] - 138:10
**language** [7] - 3:18,
3:19, 69:8, 69:9,
71:19, 75:19
**largest** [1] - 24:15
**last** [46] - 3:1, 5:1,
5:20, 6:23, 7:22,
15:17, 17:17, 26:10,
28:24, 34:6, 34:7,
34:14, 40:16, 44:20,
53:6, 54:12, 57:22,
64:18, 64:20, 64:21,
87:18, 105:7,
106:10, 106:14,
106:18, 108:8,
108:11, 145:4,
152:7, 152:11,
155:16, 155:20,
156:24, 157:17,
158:14, 159:16,
159:22, 160:7,
160:15, 160:18,
160:22, 161:17,
161:21, 161:25,
162:5
**late** [3] - 48:13, 48:16,
48:19
**law** [1] - 51:25
**lawsuit** [3] - 52:2,
80:22, 81:4
**lawyer** [2] - 4:20,
51:23
**leading** [1] - 154:16
**leaf** [10] - 51:8, 51:12,
113:7, 113:13,
113:18, 114:12,
114:17, 116:8,
116:14, 116:20
**leaks** [1] - 117:25
**learn** [1] - 45:3
**least** [7] - 37:20, 38:9,
87:5, 93:4, 122:13,
154:6, 155:8
**leave** [5] - 50:1, 144:9,
144:11, 144:24
**led** [1] - 94:4
**LEE** [1] - 1:18
**Lee** [1] - 2:18
**left** [12] - 47:15, 47:20,
48:9, 49:19, 50:3,
87:19, 136:2,
137:16, 142:17,
142:25, 144:6, 162:2
**left-hand** [1] - 87:19
**lend** [1] - 142:6
**lends** [1] - 75:15
**Leo** [5] - 145:2, 145:4,

145:5, 160:10,
160:12
**letters** [1] - 132:17
**level** [3] - 131:24,
131:25, 145:23
**liability** [5] - 33:12,
33:15, 33:18, 33:20,
33:24
**Liability** [1] - 16:5
**license** [2] - 33:14,
33:16
**life** [4] - 13:20, 51:4,
59:14, 59:18
**likewise** [1] - 145:12
**Limited** [1] - 16:5
**limited** [2] - 5:15,
139:24
**line** [92] - 28:7, 28:11,
29:17, 29:18, 29:22,
31:1, 31:15, 31:21,
31:22, 57:20, 57:24,
58:5, 63:11, 63:17,
63:19, 63:21, 63:23,
64:4, 64:6, 68:13,
68:14, 68:23, 68:24,
69:7, 69:9, 70:18,
70:25, 71:11, 71:13,
71:25, 72:2, 72:25,
73:10, 75:21, 77:11,
77:16, 78:13, 78:17,
79:5, 79:11, 82:3,
82:6, 88:24, 89:8,
89:12, 89:17, 89:22,
89:25, 90:3, 93:16,
94:8, 94:16, 94:17,
95:11, 95:14,
101:23, 102:1,
102:6, 102:10,
102:13, 102:19,
103:9, 104:2, 104:7,
104:12, 104:20,
104:24, 109:13,
109:17, 109:20,
109:24, 111:8,
111:12, 113:10,
113:14, 113:17,
113:18, 114:5,
114:6, 115:22,
115:25, 116:3,
116:13, 116:16,
117:19, 117:22,
119:2, 119:3,
119:19, 119:22,
126:11, 132:11
**lined** [1] - 113:13
**listed** [7] - 6:4, 35:3,
101:9, 102:2,
115:15, 116:1,
119:13
**lives** [1] - 72:21

**LLC** [93] - 1:8, 15:13,
16:1, 16:2, 16:5,
16:8, 16:11, 16:14,
16:17, 16:25, 17:3,
17:6, 17:9, 17:15,
17:17, 17:21, 17:23,
18:17, 19:21, 20:5,
21:22, 22:9, 22:15,
23:19, 23:25, 24:3,
25:5, 25:13, 26:13,
26:19, 26:22, 27:11,
28:10, 32:11, 32:14,
32:18, 33:3, 33:11,
33:17, 33:21, 33:25,
34:21, 35:20, 37:2,
38:8, 38:11, 38:16,
38:22, 39:1, 40:19,
40:24, 42:13, 43:15,
43:22, 44:4, 44:15,
47:2, 54:18, 55:2,
55:10, 55:25, 57:23,
58:16, 58:19, 58:20,
58:25, 59:7, 60:16,
60:20, 61:2, 61:10,
61:14, 61:18, 62:6,
62:12, 62:15, 63:19,
63:22, 64:5, 67:20,
67:25, 95:20, 97:16,
106:8, 106:13,
106:17, 107:5,
107:21, 107:25,
108:5, 112:5
**LLP** [1] - 19:3
**loaded** [2] - 27:17,
128:20
**loan** [1] - 141:19
**loaned** [1] - 142:1
**local** [1] - 129:8
**located** [3] - 24:9,
24:19, 93:2
**locating** [1] - 142:23
**logo** [5] - 14:15,
14:20, 69:16, 69:18,
74:15
**look** [31] - 14:8, 14:11,
20:8, 22:3, 22:4,
34:5, 40:10, 66:20,
72:17, 78:1, 79:2,
80:19, 83:4, 88:2,
91:4, 97:19, 101:25,
109:14, 110:6,
110:9, 110:16,
110:21, 115:24,
120:10, 120:17,
147:9, 148:6, 148:10
**looked** [14] - 72:13,
91:21, 92:13, 103:5,
109:4, 109:8, 110:3,
111:2, 111:9,
111:11, 112:23,

114:25, 116:21,
128:19
**looking** [15] - 20:16,
76:14, 80:13, 81:14,
101:25, 102:21,
112:16, 113:12,
115:6, 115:23,
119:12, 120:16,
125:14, 147:17,
147:22
**looks** [2] - 69:25,
125:4
**loose** [10] - 51:8,
51:12, 113:7,
113:13, 113:18,
114:12, 114:17,
116:8, 116:14,
116:20
**loose-leaf** [10] - 51:8,
51:12, 113:7,
113:13, 113:18,
114:12, 114:17,
116:8, 116:14,
116:20
**looseleaf** [2] - 53:1,
96:23
**loss** [3] - 21:13, 61:10,
131:1
**love** [1] - 145:25
**lunch** [9] - 10:3,
47:12, 49:17, 73:15,
73:16, 154:22,
154:24, 161:22,
161:23
**luncheon** [3] - 9:23,
10:1, 73:19

## M

**main** [1] - 135:8
**maintained** [3] -
33:12, 107:21, 108:5
**majority** [5] - 105:3,
105:5, 122:17,
122:18, 136:1
**maker** [3] - 68:2,
68:19, 72:8
**man** [3] - 118:10,
128:19, 149:11
**MANUEL** [1] - 1:9
**manufactured** [6] -
24:12, 25:1, 25:5,
25:8, 25:20, 25:24
**manufacturer** [1] -
24:15
**manufactures** [1] -
24:7
**manufacturing** [1] -
24:20
**March** [9] - 97:24,

98:9, 98:16, 100:4, 100:16, 100:20, 101:1, 101:9, 155:22
**mark** [7] - 120:4, 120:7, 120:20, 121:4, 121:11, 124:8, 124:10
**marked** [5] - 90:5, 90:6, 95:12, 117:1, 149:25
**Mary** [1] - 1:22
**Massapequa** [1] - 1:17
**material** [3] - 135:12, 135:16, 136:1
**materials** [11] - 23:20, 23:22, 23:24, 24:24, 25:16, 70:4, 137:6, 152:2, 152:20, 160:1, 160:2
**matter** [3] - 3:21, 9:8, 10:13
**matters** [1] - 2:23
**mean** [7] - 14:17, 25:18, 90:7, 95:13, 122:24, 141:15
**meaningless** [1] - 108:16
**means** [8] - 60:17, 90:21, 117:24, 118:23, 119:3, 122:22, 126:12, 141:11
**meant** [1] - 118:16
**mechanic** [5] - 32:7, 145:10, 145:19, 145:25, 146:2
**mechanical** [1] - 1:25
**mechanics** [2] - 32:2, 32:5
**MEJIA** [1] - 1:4
**melts** [1] - 135:16
**member** [2] - 16:2, 16:11
**men** [1] - 136:1
**mentioned** [2] - 129:16, 132:4
**mentioning** [1] - 59:20
**Merrick** [1] - 1:16
**message** [7] - 40:2, 40:13, 40:16, 41:6, 99:3, 104:8, 104:14
**messages** [22] - 39:9, 39:18, 39:22, 40:1, 40:3, 41:4, 87:25, 88:3, 88:5, 92:22, 92:25, 98:25, 99:6, 101:3, 101:4, 103:23, 104:4, 105:13, 138:17, 139:6, 142:11,

142:14
**met** [1] - 54:23
**method** [1] - 135:19
**microphone** [1] - 63:20
**middle** [2] - 40:20, 103:16
**minimum** [1] - 4:9
**minute** [1] - 125:23
**minutes** [4] - 5:13, 10:24, 92:13, 150:2
**misleading** [2] - 79:20, 79:21
**missed** [1] - 23:22
**misunderstood** [1] - 122:23
**mixed** [1] - 9:19
**Monday** [9] - 5:20, 120:19, 121:3, 121:18, 123:11, 123:24, 124:1, 124:19, 125:2
**money** [14] - 45:17, 58:21, 59:9, 59:22, 82:20, 82:25, 122:25, 133:21, 141:18, 141:19, 142:2, 142:4, 142:6
**month** [15] - 12:24, 92:1, 92:5, 92:9, 100:3, 102:14, 116:24, 119:13, 125:14, 147:18, 151:14, 151:17, 157:4, 157:5, 157:6
**months** [13] - 40:25, 72:22, 77:11, 77:19, 98:8, 98:15, 99:1, 100:3, 128:13, 128:14, 133:9, 149:7, 155:22
**morning** [25] - 2:2, 2:4, 2:11, 2:12, 2:16, 2:17, 2:18, 2:22, 3:13, 3:14, 12:9, 12:10, 36:2, 36:11, 37:6, 41:12, 88:23, 93:15, 113:10, 122:20, 152:16, 152:18, 153:2, 154:9, 161:13
**mornings** [1] - 154:14
**most** [5] - 29:3, 29:5, 29:8, 29:13, 144:22
**mostly** [1] - 134:9
**move** [1] - 129:22
**MR** [97] - 2:4, 2:10, 2:13, 2:17, 2:18, 3:6, 3:8, 3:19, 4:2, 4:6, 4:13, 4:14, 4:16,

4:18, 4:19, 4:23, 5:9, 5:19, 6:19, 6:23, 7:2, 7:12, 7:15, 8:18, 8:23, 9:12, 9:15, 9:18, 10:4, 10:16, 10:20, 11:4, 11:6, 11:14, 11:16, 11:19, 12:5, 12:8, 19:23, 20:15, 22:17, 22:21, 27:7, 27:14, 27:19, 27:23, 30:5, 30:18, 52:4, 53:14, 53:17, 55:4, 59:2, 66:11, 71:22, 73:4, 73:18, 74:7, 74:9, 75:13, 75:22, 75:23, 79:15, 79:16, 79:19, 79:24, 80:1, 85:8, 85:11, 85:13, 85:20, 105:14, 125:21, 125:24, 126:5, 126:8, 132:10, 141:2, 141:4, 141:8, 146:24, 147:5, 147:8, 150:8, 150:11, 151:2, 154:16, 154:21, 155:4, 159:20, 162:12, 162:16, 162:17, 163:6, 163:8, 163:10, 163:13
**multi** [3] - 139:19, 139:24, 140:11
**multi-day** [3] - 139:19, 139:24, 140:11
**muscle** [2] - 128:19, 139:18
**must** [2] - 85:16, 148:22

## N

**Nahim** [4] - 145:21, 160:14, 160:19, 160:23
**nail** [2] - 61:25, 62:2
**name** [17] - 3:17, 11:25, 15:5, 15:23, 17:23, 18:22, 21:15, 21:16, 65:1, 65:5, 127:3, 130:7, 136:14, 145:2, 145:3, 145:4, 150:20
**named** [3] - 145:21, 160:10, 160:14
**names** [3] - 15:20, 55:12, 130:3
**narrow** [2] - 3:22, 4:2
**narrowed** [1] - 3:24

**nature** [2] - 128:10, 136:25
**necessarily** [17] - 4:6, 57:19, 58:13, 86:17, 86:20, 87:6, 95:21, 96:20, 98:23, 99:22, 100:7, 115:18, 115:21, 117:18, 118:10, 140:13
**necessary** [1] - 3:3
**need** [12] - 3:7, 23:8, 23:10, 23:14, 23:16, 31:9, 105:17, 126:21, 126:25, 139:18, 142:4
**needed** [4] - 3:12, 139:17, 140:15, 140:17
**needs** [4] - 23:12, 151:16, 155:14, 159:18
**negligence** [1] - 61:11
**negligent** [1] - 32:24
**neighbor** [2] - 72:21, 75:18
**NEIL** [1] - 1:16
**never** [40] - 4:14, 8:9, 8:13, 42:4, 46:6, 46:12, 46:19, 47:1, 47:2, 48:2, 49:13, 53:20, 53:22, 53:24, 54:2, 54:9, 56:4, 57:15, 58:10, 58:20, 59:8, 59:14, 59:17, 59:21, 60:21, 61:4, 61:8, 62:3, 72:5, 72:6, 72:9, 72:12, 73:5, 80:7, 82:18, 82:24, 97:9, 104:14, 129:7, 135:20
**NEW** [1] - 1:1
**new** [4] - 19:15, 26:8, 27:11, 100:9
**New** [10] - 1:7, 1:23, 2:19, 16:5, 24:9, 24:12, 24:18, 25:1, 25:20, 25:25
**next** [30] - 2:13, 18:22, 22:6, 22:22, 30:22, 31:21, 58:3, 65:23, 66:2, 66:5, 66:17, 70:3, 73:20, 75:18, 83:13, 83:16, 83:23, 84:1, 89:17, 90:3, 94:16, 106:24, 109:19, 113:17, 121:6, 121:15, 124:21, 129:22, 143:3, 150:10
**nice** [1] - 138:10

**nickname** [3] - 13:22, 55:17, 55:22
**nicknames** [2] - 55:19, 55:20
**nine** [4] - 71:12, 72:22, 113:18, 129:14
**non** [1] - 7:9
**non-jury** [1] - 7:9
**none** [7] - 49:9, 61:22, 63:1, 70:6, 108:7, 108:10, 148:20
**normal** [1] - 6:19
**normally** [3] - 6:21, 7:2, 128:13
**North** [1] - 24:15
**note** [4] - 4:24, 5:4
**notes** [1] - 149:19
**notice** [1] - 30:12
**noting** [1] - 5:11
**November** [26] - 1:10, 7:16, 12:23, 84:24, 89:19, 92:1, 93:4, 93:8, 93:18, 94:1, 94:10, 94:21, 95:19, 96:6, 147:18, 147:19, 147:21, 147:22, 148:16, 149:8, 149:19, 149:22, 155:13, 155:17, 162:22
**nowhere** [2] - 149:7, 149:25
**Number** [1] - 14:12
**number** [29] - 15:7, 20:10, 22:2, 22:3, 22:23, 22:25, 23:4, 35:5, 65:19, 65:23, 66:2, 66:5, 67:10, 69:20, 69:22, 69:24, 69:25, 70:1, 70:2, 72:10, 74:18, 83:7, 105:12, 129:17, 129:18, 130:19, 130:24, 131:11, 131:21
**numbers** [4] - 21:8, 72:9, 132:17
**NY** [2] - 1:17, 1:19

## O

**o'clock** [4] - 73:15, 73:16, 129:13, 129:15
**O2** [1] - 85:7
**oath** [4] - 12:18, 13:5, 13:6, 118:13
**object** [1] - 66:11
**objection** [23] - 19:23, 20:1, 22:17, 27:7,

27:14, 27:18, 30:5,
30:18, 30:21, 30:22,
52:4, 53:14, 55:4,
59:2, 71:22, 73:4,
75:13, 79:15, 79:18,
132:10, 141:2,
141:8, 154:16
**oblige** [1] - 96:12
**observe** [2] - 159:15,
159:21
**obtain** [2] - 5:3, 5:13
**obviously** [3] - 4:4,
9:14, 41:20
**occasions** [1] - 161:5
**occur** [3] - 34:1,
137:25, 140:4
**occurred** [2] - 136:10,
142:18
**occurs** [1] - 140:6
**OCEANSIDE** [1] - 1:8
**Oceanside** [21] - 15:1,
15:20, 15:23, 16:9,
17:23, 18:7, 18:13,
18:18, 18:24, 19:2,
19:6, 19:10, 36:17,
36:22, 37:1, 65:11,
72:21, 153:3,
153:21, 153:24,
162:2
**October** [18] - 76:22,
77:3, 77:8, 77:15,
77:24, 78:25, 79:8,
81:21, 148:2, 149:7,
152:6, 152:7,
152:11, 154:3,
154:23, 155:2,
155:3, 155:7
**OF** [2] - 1:1, 1:13
**offer** [2] - 46:9, 70:5
**office** [11] - 2:14,
12:12, 27:25, 52:11,
106:21, 109:22,
138:10, 149:12,
149:13, 149:14,
149:23
**often** [9] - 28:25,
30:16, 31:1, 45:16,
54:5, 139:15, 157:2,
160:12, 160:23
**oftentimes** [3] - 32:1,
32:4, 160:19
**Oil** [11] - 37:1, 37:15,
37:24, 38:2, 41:17,
42:2, 47:6, 47:16,
47:21, 48:22, 49:6
**oil** [1] - 48:9
**old** [1] - 19:14
**once** [4] - 45:11,
105:18, 153:4,
156:10

**one** [51] - 2:20, 3:9,
4:23, 7:9, 7:19, 8:1,
8:2, 9:14, 9:21,
10:15, 10:22, 17:9,
17:24, 18:7, 18:22,
22:3, 27:1, 30:12,
32:15, 34:13, 36:1,
43:1, 44:18, 46:23,
53:11, 62:6, 67:7,
68:3, 76:17, 80:13,
81:7, 81:15, 89:1,
90:22, 96:15, 100:8,
108:4, 108:15,
112:4, 112:12,
119:20, 122:17,
129:2, 131:4,
135:23, 136:13,
158:20, 160:16,
160:17
**ones** [3] - 14:10, 40:4,
40:7
**open** [1] - 9:20
**opening** [4] - 11:8,
11:12, 11:14, 11:15
**operated** [1] - 16:14
**operates** [1] - 18:24
**operating** [1] - 18:19
**operations** [2] - 16:25,
18:7
**opportunity** [3] - 6:15,
10:9, 105:23
**option** [2] - 10:15,
44:7
**options** [2] - 10:12,
44:9
**order** [5] - 5:25, 6:1,
6:4, 23:7, 144:3
**ordinances** [1] - 129:8
**otherwise** [4] - 3:25,
10:10, 11:12, 33:15
**ought** [1] - 3:10
**overruled** [5] - 19:25,
27:9, 30:7, 55:5,
73:5
**overtime** [8] - 4:10,
46:7, 46:13, 46:21,
46:24, 47:1, 158:6,
159:6
**own** [12] - 6:21, 61:5,
61:25, 62:1, 62:3,
132:19, 133:5,
136:15, 136:16,
161:9, 161:11
**owner** [4] - 30:2, 30:9,
152:19, 152:20
**owns** [2] - 61:19,
156:6

# P

**p.m** [2] - 154:1, 154:2
**pad** [4] - 113:7,
113:14, 114:9,
116:20
**page** [107] - 10:21,
14:13, 14:16, 21:3,
21:6, 21:7, 21:12,
28:7, 29:16, 30:25,
31:15, 34:6, 34:7,
34:11, 34:14, 34:18,
42:20, 57:20, 63:10,
64:3, 64:6, 64:18,
64:20, 64:21, 65:5,
65:18, 67:2, 68:12,
68:23, 69:6, 70:17,
71:10, 71:24, 72:25,
73:9, 73:20, 77:10,
78:12, 79:4, 82:2,
83:6, 83:13, 83:16,
83:19, 83:23, 84:1,
86:5, 87:14, 87:17,
87:18, 87:24, 88:2,
88:20, 88:21, 89:8,
89:17, 93:8, 93:15,
94:8, 95:9, 97:2,
97:19, 98:20, 99:10,
99:15, 99:19,
101:10, 101:21,
101:23, 102:9,
102:19, 103:3,
104:1, 104:12,
104:17, 104:20,
106:3, 106:24,
109:12, 109:14,
109:20, 111:6,
112:24, 113:10,
114:5, 115:10,
115:22, 116:12,
117:8, 117:19,
117:22, 119:1,
119:18, 120:22,
121:6, 123:20,
124:21, 130:19,
130:24, 131:12,
142:13, 143:3,
147:20, 148:2
**pages** [9] - 8:22, 8:23,
35:2, 76:19, 85:21,
114:12, 114:17,
148:10, 148:13
**paid** [43] - 7:1, 8:12,
44:10, 44:12, 44:16,
44:18, 44:20, 45:12,
45:14, 46:6, 46:9,
53:18, 54:5, 54:8,
57:17, 58:5, 58:12,
58:14, 58:20, 58:21,
58:23, 59:8, 59:22,

60:3, 63:5, 63:12,
70:11, 95:25, 105:7,
107:2, 128:22,
129:1, 129:2,
133:19, 140:20,
141:15, 156:16,
157:14, 157:17,
157:19, 157:23,
158:25
**Palacio** [46] - 25:12,
25:23, 26:15, 38:15,
43:5, 43:11, 43:25,
44:3, 44:12, 46:14,
46:24, 49:12, 49:19,
49:23, 50:7, 50:20,
51:8, 51:16, 52:20,
53:18, 54:2, 54:12,
55:22, 57:9, 60:13,
61:2, 61:4, 61:9,
76:6, 100:1, 100:13,
100:24, 101:8,
101:18, 128:16,
139:15, 140:23,
141:14, 144:9,
144:13, 146:7,
146:11, 146:19,
158:8, 158:11,
159:21
**PALACIO** [1] - 1:4
**Palacio's** [4] - 26:7,
40:23, 66:6, 146:13
**paper** [13] - 23:12,
51:8, 51:12, 53:1,
92:7, 96:23, 113:2,
114:22, 115:2,
115:5, 116:8,
116:15, 148:23
**papers** [1] - 141:7
**paragraph** [7] - 65:20,
66:3, 67:2, 67:10,
67:13, 67:15
**paragraphs** [4] -
65:24, 66:18, 67:7,
67:17
**park** [2] - 36:19, 36:20
**Parsippany** [1] - 24:18
**part** [14] - 7:17, 24:23,
26:6, 35:3, 38:20,
74:25, 76:6, 105:2,
118:8, 128:3, 131:1,
131:4, 131:6, 131:13
**part-time** [1] - 128:3
**partial** [1] - 105:6
**partially** [3] - 66:13,
66:14, 66:16
**participated** [3] -
25:15, 25:24, 52:14
**particular** [12] - 27:11,
28:9, 28:18, 130:4,
130:7, 136:22,

139:8, 142:13,
151:14, 152:4,
152:12, 161:7
**parties** [1] - 9:3
**past** [3] - 32:10, 32:18,
35:24
**pause** [1] - 85:18
**Pause** [1] - 4:21
**pay** [36] - 6:18, 6:21,
7:2, 7:3, 34:21,
34:24, 45:25, 53:22,
53:24, 56:2, 56:4,
56:5, 58:25, 60:18,
60:21, 71:2, 72:23,
72:24, 82:22, 96:11,
98:13, 114:16,
134:6, 134:7,
134:24, 142:2,
142:3, 156:19,
157:7, 157:10,
157:12, 158:4,
158:6, 158:19,
162:10
**payable** [4] - 56:11,
56:16, 96:7, 103:19
**payday** [3] - 95:23,
159:9, 161:7
**payee** [1] - 61:11
**paying** [2] - 44:23,
158:1
**payment** [3] - 107:6,
107:11
**payments** [2] - 33:9,
107:15
**payroll** [2] - 58:20,
59:1, 59:8
**pays** [2] - 33:25, 60:16
**PEARLMAN** [43] -
1:18, 2:4, 2:18, 3:8,
4:6, 4:13, 4:16, 4:19,
4:23, 5:9, 6:23, 7:2,
7:12, 8:18, 10:4,
11:6, 11:16, 19:23,
22:17, 27:7, 27:14,
30:5, 30:18, 52:4,
53:14, 53:17, 55:4,
59:2, 66:11, 71:22,
73:4, 75:13, 79:15,
79:19, 125:24,
126:5, 126:8, 141:4,
146:24, 150:8,
154:16, 162:16,
163:8
**Pearlman** [10] - 2:19,
4:1, 4:5, 6:13, 8:13,
8:15, 11:5, 27:16,
105:21, 126:4
**pending** [1] - 105:14
**people** [13] - 71:1,
71:2, 72:10, 72:11,

94:6, 118:1, 118:4,
127:17, 129:18,
136:17, 136:19,
136:21, 139:9
**people's** [2] - 117:25,
140:1
**per** [4] - 37:19,
129:18, 157:4,
158:25
**percent** [8] - 101:11,
118:25, 126:13,
126:18, 126:20,
126:22, 126:25,
145:18
**perform** [5] - 33:5,
45:2, 75:11, 75:25,
136:12
**performed** [2] - 26:16,
136:9
**performing** [1] -
134:20
**performs** [2] - 19:3,
19:7
**period** [20] - 24:5,
33:1, 37:17, 37:20,
39:5, 43:14, 45:19,
47:5, 86:11, 98:18,
104:3, 109:10,
132:25, 137:19,
151:11, 154:8,
154:15, 156:24,
157:19, 158:11
**periods** [1] - 138:5
**permission** [1] - 9:25
**permit** [4] - 8:9, 10:11,
75:20, 132:13
**permitted** [1] - 139:9
**person** [2] - 132:6,
136:11
**personal** [2] - 111:17,
111:21
**phone** [18] - 15:7,
40:2, 40:5, 40:7,
69:20, 69:22, 69:24,
72:9, 99:3, 138:21,
138:22, 138:24,
139:3, 139:5, 140:9,
144:14
**physical** [1] - 107:23
**physically** [3] -
127:13, 144:20,
144:23
**pick** [10] - 36:2, 37:6,
37:24, 41:24, 42:2,
48:22, 152:19,
153:1, 154:14,
161:14
**picked** [2] - 48:5,
153:4
**picking** [1] - 154:8

**picks** [1] - 27:1
**picture** [2] - 20:12,
20:14
**piece** [7] - 5:15, 51:8,
51:11, 113:2,
114:22, 115:2, 115:5
**pipes** [1] - 23:16
**place** [8] - 14:25, 16:8,
16:17, 36:19, 37:15,
37:24, 38:2, 104:23
**placed** [2] - 3:4,
149:13
**plaintiff** [6] - 38:15,
127:7, 128:16,
129:18, 146:7,
146:20
**Plaintiff** [1] - 1:5
**Plaintiff's** [12] - 14:4,
20:8, 20:13, 20:19,
20:22, 64:11, 74:10,
83:5, 87:7, 101:25,
115:24, 130:18
**plaintiff's** [4] - 11:18,
14:11, 128:1, 150:10
**Plaintiffs** [1] - 1:16
**plaintiffs** [15] - 2:10,
2:15, 6:10, 9:1,
25:12, 38:20,
127:22, 128:21,
135:18, 137:11,
139:8, 139:23,
145:12, 145:16,
146:4
**plan** [2] - 123:2, 123:3
**planner** [2] - 9:23,
110:13
**planners** [3] - 6:9,
8:24, 9:15
**plans** [1] - 109:4
**plants** [1] - 24:20
**Plaza** [1] - 1:22
**pleasant** [1] - 73:16
**plug** [1] - 41:12
**plumbers** [1] - 23:16
**point** [14] - 3:10, 5:8,
9:6, 11:2, 11:17,
47:19, 73:14, 73:19,
126:2, 137:12,
137:22, 138:19,
162:14
**position** [4] - 7:6,
10:7, 127:8
**positive** [1] - 101:11
**possible** [2] - 13:10,
119:20
**possibly** [1] - 6:11
**post** [2] - 93:24, 94:1
**post-Sandy** [1] - 93:24
**potential** [2] - 72:17,
72:18

**practice** [1] - 105:2
**precise** [1] - 149:10
**prefer** [1] - 10:15
**preferred** [1] - 133:21
**prejudice** [4] - 5:5,
5:12, 6:12, 6:13
**preliminary** [2] - 2:23,
3:21
**prepare** [2] - 5:14,
52:7
**prepared** [2] - 64:15,
75:18
**present** [2] - 145:7,
145:9
**preserved** [1] - 56:18
**president** [1] - 18:2
**pretrial** [3] - 5:24, 6:1,
6:4
**pretty** [2] - 8:22, 92:18
**price** [3] - 23:23,
137:5, 149:17
**primary** [1] - 41:6
**principal** [2] - 14:25,
16:8, 16:17
**printed** [1] - 108:4
**problem** [4] - 6:25,
7:5, 27:16, 53:3
**problems** [1] - 34:1
**proceed** [4] - 3:25,
4:17, 11:2, 11:13
**proceeding** [2] - 8:11,
10:15
**Proceedings** [1] -
1:25
**proceedings** [4] -
4:21, 9:7, 85:18,
162:21
**produce** [1] - 39:25
**produced** [4] - 1:25,
40:2, 108:7, 108:10
**product** [1] - 70:5
**profit** [2] - 21:12,
131:1
**properly** [1] - 30:13
**property** [1] - 35:3
**proprietor** [1] - 21:16
**provide** [13] - 27:4,
27:5, 62:19, 77:9,
92:10, 98:7, 98:17,
98:24, 99:6, 129:19,
144:6, 146:3, 146:8
**provided** [26] - 9:25,
17:3, 38:8, 38:11,
38:16, 62:19, 76:15,
76:23, 77:2, 77:7,
77:13, 78:4, 78:6,
78:14, 78:23, 79:9,
81:19, 81:24, 82:4,
98:11, 99:3, 103:12,
105:22, 106:14,

133:10, 137:19
**provides** [3] - 62:6,
145:7, 145:20
**providing** [5] - 77:24,
144:2, 145:11,
145:12, 146:4
**public** [8] - 17:3, 71:8,
71:13, 71:20, 72:2,
73:3, 73:12, 75:10
**pull** [2] - 56:13, 138:12
**pulled** [1] - 138:9
**punch** [9] - 49:9,
49:13, 49:17,
161:14, 161:19,
161:22, 162:1, 162:6
**purchased** [11] - 23:8,
23:10, 23:12, 23:14,
23:16, 61:19, 62:16,
78:2, 79:2, 133:5,
134:15
**purchases** [1] - 23:19
**purposes** [2] - 35:9,
79:22
**pursue** [1] - 75:20
**pursued** [1] - 4:10
**put** [22] - 5:24, 7:10,
8:3, 10:12, 52:24,
53:1, 69:8, 72:9,
72:10, 86:10, 88:12,
90:12, 95:4, 96:25,
99:16, 119:23,
127:10, 149:14,
153:5, 153:7, 153:10
**putting** [1] - 8:5

## Q

**quality** [1] - 70:3
**quarterly** [1] - 59:21
**quarters** [2] - 13:19,
39:10
**questioned** [1] -
147:14
**questioning** [3] - 5:15,
79:1, 132:11
**questions** [28] - 7:19,
7:20, 7:21, 8:7,
12:17, 12:18, 12:20,
13:5, 13:10, 28:2,
105:15, 116:4,
118:13, 125:21,
129:24, 130:1,
134:11, 137:18,
138:16, 139:20,
144:16, 146:25,
147:4, 147:15,
150:2, 150:8, 162:12
**quick** [1] - 34:5
**quote** [1] - 79:20
**quoting** [1] - 27:20

## R

**rain** [1] - 129:21
**rained** [1] - 121:16
**raise** [4] - 11:20, 45:4,
150:15, 157:21
**raises** [1] - 45:2
**rakes** [2] - 62:12,
62:16
**ran** [1] - 16:25
**ranking** [1] - 127:4
**rate** [14] - 44:20,
46:13, 46:20, 46:21,
54:12, 57:17, 58:5,
58:12, 58:15, 134:1,
157:14, 157:17,
159:6, 162:10
**rates** [2] - 133:18,
133:19
**reach** [1] - 72:10
**reacting** [1] - 9:7
**read** [11] - 6:20, 10:10,
11:10, 66:12, 66:15,
79:19, 79:22, 113:9,
132:9, 132:15, 155:6
**reading** [2] - 21:9,
108:23, 132:15
**ready** [2] - 4:17, 11:2
**real** [1] - 93:25
**really** [4] - 72:12,
77:16, 78:17, 105:25
**reason** [5] - 5:23,
116:6, 142:3, 142:5,
149:10
**receipts** [12] - 20:3,
20:4, 21:25, 22:6,
22:8, 22:22, 23:2,
131:5, 131:8,
131:14, 131:16,
147:24
**receive** [3] - 60:7,
108:17, 134:21
**received** [6] - 8:12,
46:24, 59:15, 60:10,
60:13, 106:9
**receives** [2] - 60:9,
118:19
**receiving** [1] - 108:25
**Recess** [1] - 126:2
**recess** [9] - 9:23, 10:1,
10:25, 73:14, 73:15,
73:19, 125:23,
126:3, 162:14
**recognize** [2] - 26:3,
26:4
**recollection** [1] -
144:1
**record** [21] - 2:9, 3:4,
3:18, 5:5, 5:11,
11:25, 36:9, 48:21,

48:24, 49:2, 49:5, 49:23, 55:15, 57:22, 72:5, 101:22, 105:12, 106:13, 131:24, 150:21, 157:6
**recorded** [1] - 1:25
**records** [20] - 47:3, 47:19, 50:2, 50:6, 50:10, 50:14, 50:15, 50:17, 50:22, 50:25, 55:1, 55:8, 55:9, 55:24, 57:16, 58:10, 100:18, 100:23, 101:13, 106:21
**recover** [2] - 39:8, 39:10
**recuse** [2] - 3:2, 3:7
**REDIRECT** [2] - 147:7, 163:9
**refer** [2] - 15:9, 27:20
**referring** [8] - 111:20, 115:19, 126:19, 127:22, 130:19, 131:11, 131:12, 146:7
**reflected** [1] - 91:13
**refrain** [1] - 9:9
**regarded** [1] - 142:14
**regarding** [5] - 7:20, 134:11, 138:17, 140:25, 144:17
**regards** [1] - 129:9
**REILLY** [54] - 1:17, 2:10, 2:13, 3:6, 4:2, 4:14, 4:18, 5:19, 6:19, 7:15, 8:23, 9:12, 9:15, 9:18, 10:16, 10:20, 11:4, 11:14, 11:19, 12:5, 12:8, 20:15, 22:21, 27:19, 27:23, 73:18, 74:7, 74:9, 75:22, 75:23, 79:16, 79:24, 80:1, 85:8, 85:11, 85:13, 85:20, 105:14, 125:21, 132:10, 141:2, 141:8, 147:5, 147:8, 150:11, 151:2, 154:21, 155:4, 159:20, 162:12, 162:17, 163:6, 163:10, 163:13
**Reilly** [18] - 2:10, 2:12, 3:5, 4:1, 5:17, 8:10, 10:6, 11:3, 11:11, 11:18, 12:6, 74:6, 75:20, 126:10, 142:12, 147:3,

150:7, 154:25
**related** [2] - 8:23, 114:15
**relationship** [3] - 40:19, 40:23, 40:24
**relevance** [4] - 52:5, 132:11, 132:12, 141:3
**reliable** [1] - 74:23
**remember** [13] - 68:5, 77:17, 78:18, 79:12, 80:3, 92:13, 92:15, 105:25, 117:23, 138:2, 145:4, 145:6, 146:12
**remind** [1] - 105:18
**removal** [20] - 19:12, 66:7, 76:16, 76:24, 77:2, 77:7, 77:14, 77:24, 78:2, 78:4, 78:9, 78:15, 78:23, 79:9, 80:8, 80:14, 81:10, 81:20, 105:4, 140:3
**removals** [2] - 105:8, 106:9
**remove** [2] - 19:10, 27:10
**removed** [2] - 17:6, 152:1
**removing** [2] - 19:9, 19:14
**renewal** [1] - 149:17
**repair** [1] - 120:21
**repaired** [2] - 17:6, 117:21
**repairs** [17] - 19:3, 19:4, 19:7, 19:19, 51:3, 88:14, 88:16, 88:18, 91:2, 94:3, 94:5, 97:1, 100:8, 100:9, 116:9, 116:10, 116:16
**repay** [2] - 141:22, 141:24
**repeat** [13] - 22:24, 26:21, 31:25, 44:2, 55:6, 77:4, 91:19, 95:16, 99:13, 103:10, 117:6, 154:12, 160:21
**repetition** [2] - 155:15, 159:19
**report** [2] - 131:8, 131:16
**reported** [1] - 131:21
**reporter** [5] - 5:14, 6:23, 8:20, 12:1, 155:4
**Reporter** [2] - 1:22,

6:18
**reporters** [1] - 5:4
**represented** [2] - 12:14, 13:2
**representing** [3] - 12:15, 75:9, 75:24
**request** [3] - 6:20, 108:15, 141:15
**requested** [2] - 5:22, 133:22
**require** [5] - 7:5, 100:8, 108:9, 108:12, 135:10
**required** [13] - 8:7, 8:19, 33:14, 49:9, 49:16, 49:20, 118:22, 119:3, 122:22, 128:18, 129:8, 135:11, 137:17
**reserve** [1] - 146:25
**residential** [1] - 24:16
**resolved** [1] - 9:9
**respect** [5] - 3:23, 9:5, 28:13, 68:21, 75:17
**response** [4] - 9:7, 64:15, 89:25, 155:5
**responsibilities** [1] - 66:6
**rest** [2] - 101:16, 146:25
**result** [1] - 6:15
**resume** [5] - 10:2, 10:23, 73:15, 125:23, 162:15
**retrieve** [3] - 138:4, 138:14, 139:5
**return** [7] - 17:17, 20:23, 21:1, 22:11, 22:15, 131:13, 158:21
**returns** [5] - 17:15, 17:21, 34:15, 130:20, 131:12
**review** [6] - 6:15, 7:11, 10:1, 52:3, 108:17, 108:19
**reviewed** [6] - 13:13, 28:5, 88:23, 93:14, 111:7, 122:20
**reviewing** [1] - 108:25
**revolves** [1] - 110:13
**Reyes** [1] - 8:2
**ridge** [1] - 25:8
**ridges** [1] - 23:14
**rip** [7] - 26:4, 26:7, 30:3, 30:9, 61:15, 127:10, 139:25
**ripped** [1] - 128:20
**ripper** [1] - 62:4

**rippers** [5] - 61:15, 61:19, 61:23, 62:7, 62:9
**ripping** [3] - 43:15, 140:3, 140:5
**rise** [1] - 2:1
**Road** [3] - 1:16, 1:19, 2:19
**Robert** [3] - 136:14, 137:4, 149:1
**Rockaway** [1] - 136:6
**roof** [63] - 19:9, 19:14, 19:15, 23:20, 24:1, 25:21, 26:4, 26:20, 26:24, 27:10, 27:11, 29:3, 30:3, 30:12, 30:16, 31:2, 32:1, 32:4, 32:19, 33:5, 88:6, 88:13, 88:15, 89:10, 89:24, 90:7, 90:13, 93:12, 94:18, 94:21, 95:5, 95:14, 98:21, 99:23, 99:25, 102:3, 102:22, 103:7, 105:3, 105:6, 105:8, 106:9, 115:11, 115:16, 116:2, 117:4, 117:13, 135:15, 135:17, 135:22, 135:25, 136:2, 136:24, 137:5, 145:10, 148:7, 148:12, 148:17, 148:21, 149:8, 150:1, 159:24
**roofer** [1] - 132:7
**Roofing** [46] - 14:15, 14:20, 14:22, 14:25, 15:9, 15:21, 15:24, 17:24, 17:25, 18:8, 18:10, 18:13, 18:18, 19:6, 19:10, 43:19, 44:1, 44:4, 65:11, 68:3, 69:16, 70:13, 70:14, 70:15, 74:15, 74:17, 74:22, 74:25, 75:9, 76:3, 76:7, 76:16, 76:24, 100:6, 102:23, 103:16, 117:5, 151:7, 151:12, 151:18, 151:23, 151:25, 152:5, 156:17, 158:12, 158:15
**ROOFING** [2] - 1:8, 1:8
**roofing** [19] - 17:3, 18:21, 19:4, 19:5, 19:13, 24:16, 26:17,

34:22, 70:15, 74:23, 75:5, 135:5, 135:9, 135:19, 136:12, 140:17, 151:20, 152:1
**roofs** [28] - 17:6, 17:7, 19:7, 19:10, 19:11, 23:7, 24:4, 24:12, 25:16, 26:1, 26:7, 28:25, 29:5, 29:8, 29:14, 29:20, 29:21, 31:8, 34:2, 42:9, 43:15, 43:22, 70:12, 76:4, 135:11, 160:3
**rule** [2] - 6:3, 6:20
**Rule** [1] - 79:22
**rules** [1] - 8:19
**ruling** [2] - 20:2, 105:16
**run** [2] - 16:22, 18:7

**S**

**sage** [1] - 126:9
**Sage** [13] - 2:20, 9:12, 11:19, 12:2, 12:9, 12:11, 13:16, 21:16, 65:6, 65:12, 74:5, 74:10, 75:17
**SAGE** [4] - 1:9, 11:21, 12:2, 163:4
**Sage's** [1] - 4:25
**sales** [8] - 21:25, 22:6, 22:22, 23:2, 131:5, 131:9, 131:14, 131:16
**SANCHEZ** [3] - 1:3, 150:16, 163:11
**Sanchez** [133] - 2:6, 25:12, 25:15, 26:6, 26:15, 36:1, 36:10, 36:16, 37:6, 37:10, 37:17, 38:6, 38:8, 38:11, 38:25, 39:3, 39:18, 39:22, 40:4, 41:7, 41:13, 41:16, 42:1, 42:8, 42:12, 42:17, 43:14, 43:18, 43:25, 44:3, 44:10, 44:21, 45:5, 45:12, 45:21, 46:3, 46:6, 46:14, 46:23, 47:5, 48:22, 49:3, 49:6, 50:11, 50:20, 51:7, 51:16, 52:20, 53:24, 54:17, 54:20, 55:2, 55:10, 55:14, 55:25, 56:11, 56:16, 57:3, 57:5, 60:9, 61:1, 61:4, 61:8, 62:23,

64:4, 76:6, 76:15, 76:23, 77:2, 77:7, 77:13, 77:23, 78:4, 78:23, 80:6, 81:19, 81:25, 82:4, 82:10, 82:14, 82:18, 82:24, 83:11, 86:25, 87:5, 88:6, 91:9, 91:22, 92:1, 92:5, 92:11, 92:15, 92:18, 93:4, 95:18, 96:7, 97:6, 97:9, 97:17, 98:8, 98:17, 98:25, 99:12, 99:17, 99:25, 100:13, 100:24, 101:8, 101:18, 103:13, 103:15, 103:19, 103:23, 104:4, 127:7, 127:9, 132:19, 133:11, 133:12, 133:19, 133:20, 134:3, 134:5, 134:11, 140:16, 141:20, 142:14, 144:2, 144:5, 150:11, 150:13, 150:22, 151:4

**Sanchez's** [2] - 40:19, 43:8

**Sanders** [4] - 136:14, 137:4, 137:16, 149:1

**Sandy** [7] - 93:23, 93:24, 94:1, 135:23, 136:8, 136:10, 148:8

**Saturday** [10] - 89:1, 95:23, 95:25, 96:12, 121:9, 121:22, 122:10, 122:15, 122:16, 161:8

**Saturdays** [6] - 87:4, 89:1, 89:20, 93:9, 93:19, 94:11

**saw** [7] - 32:7, 45:2, 86:21, 92:15, 92:22, 116:22, 160:25

**Schedule** [4] - 20:25, 21:2, 21:7, 131:1

**schedule** [2] - 128:4, 128:7

**school** [1] - 51:25

**scolded** [2] - 96:25, 116:10

**season** [5] - 152:5, 154:3, 154:23, 155:7, 161:13

**seasonal** [1] - 128:10

**seated** [5] - 2:3, 11:1, 12:3, 74:3, 150:23

**second** [12] - 7:16,

8:8, 9:22, 67:2, 70:5, 83:17, 84:20, 93:14, 122:16, 122:18, 140:17, 151:16

**see** [76] - 6:11, 14:15, 14:18, 14:20, 15:4, 20:15, 21:8, 21:15, 21:18, 21:21, 21:24, 21:25, 22:2, 22:25, 23:2, 26:3, 29:5, 34:10, 34:11, 34:18, 35:3, 35:5, 64:18, 65:5, 65:22, 66:1, 66:4, 66:8, 66:19, 67:3, 69:16, 69:20, 70:3, 70:7, 72:18, 73:17, 74:14, 74:17, 74:20, 74:23, 75:4, 75:5, 76:17, 76:19, 76:22, 83:10, 86:6, 87:19, 87:24, 88:25, 89:20, 91:6, 91:25, 92:4, 93:19, 94:11, 99:7, 118:2, 119:13, 121:3, 123:11, 123:23, 124:9, 124:11, 124:12, 125:25, 131:1, 131:5, 131:13, 149:8, 160:12, 161:1, 162:19

**seeing** [2] - 32:7, 59:19

**send** [1] - 7:23

**sent** [17] - 39:9, 39:18, 39:19, 39:22, 40:4, 42:8, 42:14, 88:5, 93:3, 103:22, 104:7, 104:14, 104:22, 107:5, 108:18, 108:20, 110:22

**sentence** [2] - 66:12, 132:15

**separate** [4] - 9:19, 9:21, 107:18, 113:2

**separately** [1] - 140:20

**September** [27] - 56:7, 56:12, 57:3, 84:25, 86:22, 91:17, 92:5, 92:15, 92:20, 98:5, 101:17, 119:13, 119:21, 123:5, 123:9, 123:11, 123:20, 123:21, 124:3, 124:5, 125:1, 125:6, 125:12, 125:15, 125:18

**series** [1] - 87:24

**served** [3] - 52:11,

53:8, 108:21

**service** [5] - 27:5, 52:10, 64:19, 65:1, 134:20

**services** [39] - 6:18, 17:3, 26:16, 38:16, 76:16, 76:24, 77:2, 77:7, 77:9, 77:14, 77:24, 78:4, 78:6, 78:9, 78:15, 78:23, 79:9, 80:15, 81:10, 81:20, 106:14, 128:17, 129:19, 132:22, 133:10, 134:2, 134:8, 140:22, 141:25, 144:3, 144:6, 145:7, 145:11, 145:12, 145:21, 146:3, 146:5, 146:8, 146:19

**session** [1] - 9:17

**set** [3] - 123:3, 128:4, 129:20

**seven** [11] - 26:12, 26:16, 38:20, 70:10, 71:1, 86:7, 86:11, 113:14, 118:11, 152:14, 153:25

**several** [5] - 28:2, 140:9, 142:18, 147:21, 161:5

**share** [1] - 7:1

**shareholder** [1] - 18:4

**shield** [1] - 25:4

**shingle** [8] - 26:3, 61:15, 61:19, 61:23, 62:4, 62:7, 62:9, 145:10

**shingles** [22] - 23:8, 23:25, 24:1, 24:3, 24:7, 24:11, 25:20, 25:24, 26:4, 26:7, 26:8, 30:3, 30:9, 30:10, 32:2, 32:5, 61:15, 127:11, 135:10, 140:3, 160:3, 160:4

**shirt** [2] - 43:19, 44:1

**shirts** [3] - 43:21, 44:5, 44:7

**shortly** [1] - 44:24

**shoulder** [1] - 160:4

**shovels** [2] - 62:13, 62:16

**show** [3] - 98:25, 107:25, 109:22

**showed** [7] - 103:23, 104:22, 120:6, 142:20, 160:15, 161:2, 161:3

**showing** [1] - 59:22

**shown** [2] - 78:24, 81:21

**shredded** [2] - 114:12, 114:17

**side** [1] - 87:20

**sides** [2] - 4:17, 6:21

**sign** [15] - 6:20, 47:6, 47:9, 47:12, 49:13, 49:16, 49:20, 52:10, 161:14, 161:19, 161:22, 162:1, 162:6

**signatory** [3] - 17:12, 17:20, 18:15

**signature** [1] - 65:8

**signed** [3] - 22:11, 64:25, 65:14

**silentio** [1] - 4:8

**simple** [1] - 87:11

**simpler** [1] - 87:11

**simply** [2] - 7:21, 9:7

**simultaneously** [1] - 7:3

**single** [1] - 45:23

**site** [40] - 35:18, 35:22, 36:3, 36:12, 36:17, 37:7, 37:10, 37:25, 41:24, 42:3, 47:9, 47:15, 47:20, 48:25, 49:3, 49:6, 49:10, 49:14, 49:19, 57:6, 57:7, 61:23, 135:2, 135:21, 145:25, 153:11, 153:15, 153:20, 154:9, 154:15, 156:7, 156:8, 156:10, 156:11, 160:10, 160:14, 160:19, 161:18, 162:2

**sites** [18] - 33:21, 44:8, 48:9, 50:3, 50:4, 57:5, 61:12, 62:13, 62:17, 104:5, 152:24, 158:15, 159:16, 159:22, 160:7, 160:12, 160:23, 161:4

**sitting** [1] - 2:14

**six** [14] - 26:10, 28:24, 32:10, 32:18, 34:11, 57:22, 105:7, 106:10, 106:15, 106:19, 108:8, 108:11, 139:20, 152:10

**size** [1] - 118:17

**sleeping** [2] - 42:19, 140:8

**slip** [1] - 56:5

**slow** [2] - 3:11, 3:15

**small** [2] - 90:23, 122:25

**smart** [1] - 132:6

**so..** [1] - 94:7

**sole** [4] - 17:12, 17:20, 18:4, 18:15

**solely** [2] - 63:12, 110:2

**someone** [6] - 60:9, 60:13, 104:15, 144:12, 160:10, 160:14

**sometime** [5] - 2:25, 8:4, 40:25, 44:25, 45:1

**sometimes** [10] - 42:19, 90:23, 96:10, 117:25, 128:14, 140:18, 141:17, 144:9, 156:23, 157:3

**somewhere** [1] - 138:2

**sorry** [18] - 22:24, 26:21, 32:3, 44:2, 55:6, 66:23, 83:7, 85:17, 85:23, 111:19, 117:6, 117:11, 127:25, 129:5, 134:4, 141:13, 144:4, 148:5

**sorts** [1] - 19:13

**Spanish** [1] - 3:20

**speaking** [2] - 141:6, 141:19

**speaks** [1] - 75:14

**specific** [2] - 119:8, 136:13

**specifically** [2] - 6:3, 138:2

**speed** [1] - 135:16

**spell** [3] - 12:1, 55:14, 55:16

**spelled** [1] - 13:24

**spend** [1] - 153:14

**start** [9] - 10:14, 54:15, 54:16, 59:20, 88:21, 129:13, 134:14, 146:19, 152:17

**started** [11] - 18:18, 41:15, 41:20, 41:23, 44:24, 94:6, 124:19, 133:12, 142:12, 157:22, 158:1

**starts** [1] - 10:21

**state** [7] - 2:8, 3:17, 24:12, 116:3, 127:3, 131:24, 150:20

**State** [2] - 11:25, 33:9
**statement** [4] - 11:12, 59:22, 118:14, 118:15
**statements** [1] - 11:9
**STATES** [2] - 1:1, 1:14
**States** [2] - 1:6, 24:21
**stating** [3] - 159:2, 159:5, 159:8
**status** [1] - 141:1
**stay** [1] - 137:7
**stayed** [1] - 138:1
**Steiger** [1] - 1:22
**stenography** [1] - 1:25
**step** [2] - 125:25, 162:19
**still** [2] - 139:2, 145:6
**stone** [1] - 123:3
**stop** [1] - 151:17
**storm** [3] - 135:23, 136:8, 136:10
**Storm** [1] - 93:23
**street** [1] - 146:16
**strictly** [1] - 80:14
**strike** [1] - 133:25
**stub** [7] - 53:22, 53:24, 56:4, 56:5, 80:16, 82:19, 82:25
**stubs** [6] - 56:2, 56:3, 56:7, 57:2, 80:21, 80:25
**stuff** [1] - 94:7
**sub** [1] - 4:8
**subcontract** [1] - 75:4
**subcontractors** [2] - 63:12, 71:3
**subject** [1] - 9:23
**subjects** [2] - 9:13, 9:16
**submitted** [1] - 11:10
**subsequent** [2] - 5:23, 7:7
**success** [1] - 3:23
**sudden** [2] - 6:1, 129:21
**sued** [2] - 52:2, 52:8
**suggest** [1] - 10:5
**suggestion** [1] - 9:21
**suggestions** [1] - 9:20
**suicide** [1] - 146:1
**suing** [1] - 72:23
**sum** [1] - 91:10
**summary** [2] - 6:9, 51:22
**summer** [1] - 128:14
**Super** [1] - 93:23
**supply** [1] - 129:25
**surgeries** [1] - 110:14
**sustain** [2] - 20:1,

27:17
**sustained** [10] - 22:19, 30:19, 30:22, 52:6, 59:3, 59:6, 71:23, 141:9, 141:11, 154:20
**swear** [2] - 3:10, 150:14
**sweeping** [1] - 127:11
**sworn** [7] - 3:16, 11:23, 12:11, 12:24, 58:8, 77:20, 150:18

**T**

**T-shirt** [2] - 43:19, 44:1
**T-shirts** [3] - 43:21, 44:5, 44:7
**tangled** [1] - 132:16
**task** [1] - 139:24
**tax** [15] - 17:15, 17:17, 17:21, 20:23, 20:25, 22:11, 22:15, 34:15, 54:2, 54:9, 59:21, 130:20, 131:12, 131:13, 158:21
**taxes** [6] - 58:20, 59:1, 59:8, 60:17, 60:21, 159:14
**telephone** [2] - 74:18, 138:20
**telephones** [1] - 138:20
**terms** [2] - 128:17, 132:8
**testified** [10] - 7:20, 11:23, 38:21, 48:11, 118:22, 122:21, 148:8, 150:1, 150:18, 154:18
**testify** [4] - 19:12, 52:24, 96:21, 116:3
**testifying** [3] - 13:14, 30:8, 117:12
**Testimony** [1] - 155:6
**testimony** [6] - 11:13, 12:11, 12:24, 27:20, 53:13, 77:20
**text** [33] - 39:4, 39:8, 39:17, 39:21, 40:1, 40:2, 40:3, 40:13, 40:16, 41:4, 41:6, 87:24, 88:2, 88:5, 92:22, 92:25, 98:24, 99:3, 99:6, 101:3, 101:4, 103:23, 104:3, 104:8, 104:14, 104:22, 105:12, 118:19,

138:17, 139:6, 142:11, 142:14, 142:17
**texted** [4] - 39:5, 39:11, 155:24, 156:3
**THE** [101] - 1:13, 2:1, 2:2, 2:5, 2:12, 2:16, 2:22, 3:9, 3:14, 3:17, 3:21, 4:4, 4:12, 4:17, 4:20, 4:22, 5:7, 5:17, 6:13, 7:1, 7:4, 7:13, 8:5, 8:21, 9:2, 9:13, 9:16, 9:20, 10:6, 10:17, 10:22, 11:1, 11:5, 11:7, 11:15, 11:17, 11:20, 11:25, 12:2, 12:3, 12:4, 12:6, 19:25, 20:17, 20:18, 22:19, 27:9, 27:15, 27:22, 28:16, 30:7, 30:19, 30:21, 30:23, 30:24, 52:6, 53:15, 55:5, 59:3, 59:5, 71:23, 73:5, 73:14, 74:3, 75:15, 79:18, 79:21, 85:9, 85:19, 105:16, 105:24, 105:25, 106:2, 106:5, 106:7, 108:14, 125:22, 125:25, 126:4, 132:12, 141:3, 141:9, 147:2, 147:6, 150:7, 150:10, 150:12, 150:15, 150:20, 150:22, 150:23, 151:8, 151:15, 154:18, 154:25, 155:14, 156:1, 159:18, 160:21, 162:13, 162:18
**thereafter** [1] - 44:24
**therefore** [1] - 5:14
**thick** [1] - 8:22
**thinking** [1] - 8:5
**third** [6] - 49:18, 86:5, 96:25, 130:19, 130:24, 140:17
**three** [9] - 13:19, 39:10, 64:6, 118:12, 128:13, 136:20, 140:12, 147:14, 161:6
**three-page** [1] - 64:6
**three-quarters** [2] - 13:19, 39:10
**throw** [5] - 46:17, 56:19, 152:2, 159:24, 160:1

**Thursday** [4] - 121:6, 121:21, 122:6, 124:21
**ticket** [1] - 36:21
**time-wise** [2] - 48:17, 48:18
**title** [1] - 127:3
**titles** [1] - 127:5
**today** [4] - 12:15, 13:3, 13:14, 115:7
**together** [1] - 9:19
**tomorrow** [4] - 129:20, 129:21, 162:15, 162:19
**took** [10] - 5:23, 6:8, 36:10, 36:16, 47:12, 48:25, 49:6, 49:17, 136:1, 157:24
**tools** [4] - 36:3, 152:21, 152:22, 152:23
**top** [3] - 21:7, 21:12, 74:14
**topic** [2] - 40:11, 80:19
**torch** [2] - 135:19, 136:12
**torched** [3] - 135:12, 135:13, 135:15
**TORRES** [2] - 1:9, 1:10
**Torres** [1] - 13:19
**total** [6] - 89:1, 91:10, 100:2, 100:11, 117:3, 131:8
**totaling** [1] - 97:17
**totality** [1] - 110:4
**town** [1] - 41:25
**towns** [2] - 129:13, 129:14
**tracks** [1] - 36:23
**tragically** [1] - 146:1
**trained** [8] - 70:4, 70:9, 70:19, 71:19, 72:1, 73:2, 73:11, 136:13
**training** [2] - 145:24, 146:2
**transcript** [35] - 1:25, 5:3, 5:18, 5:20, 6:14, 7:10, 7:16, 7:23, 10:14, 29:17, 31:1, 68:12, 69:7, 70:17, 71:11, 71:25, 73:1, 73:9, 79:5, 79:20, 82:3, 88:21, 88:22, 93:15, 95:10, 102:9, 109:12, 111:7, 113:9, 115:23, 116:13, 119:2,

119:19, 122:20
**TRANSCRIPT** [1] - 1:13
**transcripts** [3] - 13:12, 13:13, 28:5
**transfer** [3] - 113:18, 116:7, 116:14
**transferred** [9] - 51:6, 90:25, 96:22, 96:23, 113:24, 114:9, 114:22, 115:1, 115:5
**trash** [1] - 66:7
**traveling** [1] - 41:25
**treated** [1] - 58:24
**Trial** [1] - 28:17
**TRIAL** [1] - 1:13
**trial** [4] - 2:5, 7:9, 8:6, 81:15
**trials** [1] - 8:1
**tried** [4] - 52:22, 56:10, 90:20, 114:4
**truck** [22] - 35:6, 47:22, 48:12, 78:1, 78:2, 78:7, 79:2, 119:4, 119:5, 127:9, 127:10, 128:20, 132:20, 132:23, 133:5, 133:20, 133:23, 134:15, 140:8, 143:2
**trucks** [2] - 36:19, 36:20
**true** [4] - 13:9, 32:13, 39:7, 65:15
**trust** [2] - 140:2, 145:17
**truthful** [2] - 131:19, 131:22
**truthfully** [3] - 12:21, 13:10, 147:15
**try** [19] - 3:22, 6:7, 9:4, 9:21, 46:12, 50:18, 50:21, 52:19, 91:21, 109:8, 109:15, 110:10, 110:22, 111:2, 111:9, 112:16, 132:15, 139:5, 142:12
**trying** [5] - 9:8, 34:8, 99:24, 100:2, 110:17
**Tuesday** [5] - 122:1, 122:3, 123:14, 123:24, 162:22
**turn** [27] - 14:13, 21:3, 34:7, 64:11, 69:15, 70:17, 74:10, 77:10, 85:2, 85:14, 86:5, 87:7, 87:14, 88:20, 92:25, 120:17, 120:22, 121:6,

121:24, 123:5, 123:8, 124:21, 125:6, 130:18, 131:11, 147:17, 148:2
**turned** [3] - 91:16, 106:2, 109:22
**turning** [1] - 76:10
**twice** [5] - 45:11, 157:3, 157:7, 157:8
**twisted** [1] - 28:14
**two** [33] - 2:15, 7:16, 8:1, 10:12, 14:3, 25:12, 26:15, 35:2, 38:20, 51:2, 56:13, 65:18, 72:9, 73:15, 73:16, 79:7, 89:20, 93:9, 93:19, 94:11, 100:8, 111:14, 119:20, 121:7, 122:3, 122:10, 126:9, 128:14, 128:24, 135:8, 140:12, 160:15, 161:6
**type** [9] - 19:2, 48:21, 54:2, 60:25, 109:21, 136:22, 151:25, 158:18, 162:9
**typed** [2] - 51:12, 51:22
**types** [3] - 33:15, 135:4, 135:6
**typewritten** [4] - 51:13, 51:15, 53:2, 125:10
**typical** [2] - 26:19, 26:22
**typically** [1] - 26:25
**typing** [2] - 114:2, 114:6

## U

**under** [10] - 6:19, 12:18, 13:5, 13:6, 21:24, 22:3, 22:25, 34:10, 35:5, 118:13
**undergarments** [1] - 23:10
**underneath** [6] - 21:18, 21:21, 123:18, 124:7, 124:13, 124:16
**understood** [1] - 70:10
**uniform** [1] - 127:18
**UNITED** [2] - 1:1, 1:14
**United** [2] - 1:6, 24:21
**up** [63] - 3:11, 8:1,

8:16, 10:20, 23:23, 25:21, 25:25, 26:10, 26:11, 32:10, 32:23, 36:2, 37:7, 37:21, 37:24, 41:24, 42:2, 48:5, 48:22, 51:13, 51:22, 56:12, 56:13, 71:7, 71:12, 72:17, 78:1, 79:2, 103:24, 104:22, 105:15, 106:4, 118:2, 120:6, 123:2, 123:4, 127:11, 128:17, 129:20, 132:7, 132:16, 132:17, 138:9, 138:12, 139:25, 140:6, 140:7, 142:20, 151:13, 152:2, 152:19, 153:1, 153:4, 154:9, 154:14, 160:1, 160:2, 160:5, 160:15, 161:2, 161:3, 161:14
**US** [1] - 131:12
**uses** [3] - 24:1, 61:15, 62:12
**usual** [1] - 46:16

## V

**vacation** [4] - 144:3, 144:7, 144:10, 144:11
**van** [57] - 35:8, 35:11, 35:13, 35:14, 35:17, 35:21, 36:2, 36:11, 36:16, 37:7, 37:14, 37:24, 37:25, 38:1, 41:10, 41:15, 41:24, 42:2, 45:18, 47:21, 47:23, 47:24, 48:3, 48:5, 48:9, 48:12, 48:22, 48:25, 134:12, 134:14, 134:18, 134:21, 135:2, 143:1, 143:2, 152:19, 152:20, 153:1, 153:4, 153:8, 153:11, 153:18, 153:20, 154:9, 154:10, 154:14, 156:6, 156:10, 156:14, 161:14, 161:18, 162:2, 162:7
**vans** [1] - 36:23
**vary** [1] - 128:24
**vents** [1] - 25:8
**verbal** [1] - 82:21

**via** [1] - 9:7
**volunteer** [2] - 106:1, 142:12

## W

**W-2** [4] - 59:11, 59:15, 59:17, 59:19
**W-C-H-O** [1] - 55:16
**wage** [1] - 4:9
**wait** [1] - 30:22
**waiting** [1] - 142:17
**Ward** [1] - 65:1
**water** [1] - 25:4
**Wcho** [5] - 55:13, 55:14, 55:25, 96:2, 119:6
**wear** [1] - 127:20
**wearing** [1] - 44:7
**weather** [3] - 129:16, 129:17, 155:23
**web** [2] - 72:15, 75:1
**website** [25] - 67:20, 67:22, 67:25, 68:1, 68:2, 68:3, 68:5, 68:6, 68:9, 68:14, 68:18, 68:19, 68:24, 69:9, 69:10, 71:6, 71:7, 72:14, 75:1, 75:7, 75:9, 75:17, 75:24
**websites** [1] - 68:20
**Wednesday** [4] - 123:16, 123:18, 123:24, 124:7
**week** [26] - 3:1, 5:1, 6:24, 7:22, 45:21, 46:2, 50:7, 50:11, 50:19, 50:23, 53:6, 96:1, 120:16, 121:18, 121:24, 123:8, 125:1, 128:5, 129:17, 139:16, 152:8, 154:6, 155:8, 157:5
**weeks** [3] - 7:16, 111:14, 126:9
**welcome** [1] - 150:6
**Wexler** [1] - 8:3
**whole** [6] - 51:4, 79:22, 90:21, 92:14, 122:24, 129:2
**Williams** [2] - 2:13, 2:16
**WILLIAMS** [1] - 2:17
**wise** [2] - 48:17, 48:18
**wished** [1] - 141:15
**withdraw** [2] - 115:9, 141:4
**withheld** [2] - 60:17,

60:21
**WITNESS** [11] - 12:2, 12:4, 20:18, 30:23, 85:9, 85:19, 105:24, 106:2, 106:7, 150:22, 151:8
**witness** [9] - 7:18, 9:11, 11:18, 11:22, 105:18, 150:10, 150:14, 150:17, 154:17
**witness's** [1] - 155:4
**WITNESSES** [1] - 163:2
**woman** [1] - 146:15
**word** [4] - 20:2, 27:16, 27:17, 34:10
**words** [5] - 28:14, 72:6, 72:7, 72:8, 132:16
**workdays** [13] - 86:7, 86:12, 87:4, 93:9, 94:21, 94:24, 96:13, 96:16, 97:20, 97:23, 98:1, 98:4, 101:17
**worker** [11] - 32:18, 33:4, 35:20, 54:8, 54:9, 57:17, 58:14, 60:16, 62:3, 130:7, 145:23
**worker's** [8] - 32:12, 32:15, 32:20, 32:25, 33:3, 33:8, 34:19, 34:25
**workers** [35] - 15:9, 29:1, 29:6, 30:12, 30:17, 31:2, 32:16, 33:20, 34:1, 36:1, 42:9, 43:21, 43:25, 44:3, 46:13, 49:9, 54:5, 55:19, 57:16, 58:11, 58:18, 58:21, 59:9, 59:23, 60:3, 61:20, 61:22, 63:1, 70:11, 70:15, 95:25, 127:2, 127:17, 130:3, 130:7
**workers'** [1] - 60:21
**works** [5] - 117:17, 117:23, 118:9, 118:14, 145:25
**world** [1] - 118:3
**worldwide** [2] - 72:14, 75:1
**worth** [1] - 97:6
**write** [22] - 83:13, 83:16, 83:19, 83:22, 83:25, 84:3, 84:6, 84:8, 84:10, 84:12, 84:14, 84:16, 84:18,

84:20, 84:22, 84:24, 97:5, 97:6, 118:2, 125:10, 149:18, 149:21
**write-up** [1] - 118:2
**writing** [2] - 76:15, 113:12
**written** [18] - 61:1, 70:9, 70:19, 75:7, 80:16, 81:16, 88:18, 91:22, 95:17, 98:21, 103:12, 105:3, 110:6, 110:10, 110:17, 117:16, 125:17, 125:19
**wrote** [45] - 45:24, 48:2, 62:24, 63:2, 80:6, 80:7, 82:10, 82:14, 82:18, 82:24, 83:10, 86:7, 86:15, 86:18, 86:21, 86:25, 87:3, 91:9, 91:25, 92:4, 92:10, 92:14, 93:8, 95:18, 97:16, 97:20, 97:23, 98:1, 98:4, 98:8, 98:17, 99:23, 101:16, 112:12, 112:24, 113:2, 113:6, 113:23, 114:12, 114:18, 116:20, 116:24, 141:24, 148:15, 148:19

## X

**X's** [1] - 117:1

## Y

**yard** [17] - 36:22, 37:3, 37:6, 41:16, 42:2, 47:6, 47:16, 153:3, 153:19, 153:21, 153:23, 154:10, 156:7, 156:8, 156:14, 162:3, 162:7
**year** [70] - 16:15, 17:18, 17:21, 19:22, 20:5, 20:23, 22:9, 22:15, 25:11, 33:25, 34:24, 35:8, 35:11, 35:14, 37:23, 39:18, 48:20, 53:8, 53:10, 54:3, 54:10, 54:18, 54:23, 56:12, 56:15, 56:21, 56:24, 77:11, 93:1, 93:21, 94:4, 98:24, 99:2, 99:7, 99:18, 99:19, 99:24, 101:1, 102:15,

102:23, 108:1,
109:16, 109:23,
113:11, 114:21,
115:13, 115:15,
117:3, 117:5, 117:8,
117:9, 117:14,
120:9, 120:11,
125:6, 125:7, 128:5,
128:13, 131:9,
131:17, 152:4,
155:1, 155:13,
157:7, 157:21,
157:22, 157:25

**years** [72] - 16:12,
17:1, 24:5, 26:10,
28:24, 29:12, 32:10,
32:18, 33:12, 34:21,
36:10, 36:15, 37:3,
37:5, 37:17, 37:20,
38:9, 38:12, 38:17,
38:22, 39:5, 39:22,
43:14, 45:19, 47:5,
49:12, 50:11, 51:19,
53:3, 53:4, 54:8,
55:2, 55:10, 57:22,
59:7, 60:22, 63:1,
63:5, 68:6, 68:8,
70:11, 105:7,
106:10, 106:15,
106:19, 107:16,
108:8, 108:11,
110:23, 112:17,
113:3, 114:13,
114:18, 136:13,
146:12, 152:7,
152:12, 154:15,
155:16, 155:20,
156:24, 158:14,
159:16, 159:22,
160:7, 160:15,
160:18, 160:22,
161:17, 161:21,
161:25, 162:5

**YORK** [1] - 1:1

**York** [4] - 1:7, 1:23,
2:19, 16:5

**young** [1] - 145:24

**yourself** [6] - 3:7,
30:2, 30:16, 31:2,
64:15, 160:6

164

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                                    :
JOSE SANCHEZ and ANTONIO
MEJIA PALACIO,
                                          16-CV-2064

        Plaintiff,

           -against-              :

                                    United States Courthouse
                                    Central Islip, New York
FIRST CLASS HOME IMPROVEMENT,
LLC, FIRST CLASS ROOFING, INC.,
OCEANSIDE FIRST CLASS ROOFING,
INC., and ETHAN SAGE, a/k/a JESUS
MANUEL TORRES CANDELARIA, a/k/a
JESUS TORRES,
                                    November 28, 2016
        Defendants.          :     9:30 a.m.

- - - - - - - - - - - - - - - X

            TRANSCRIPT OF BENCH TRIAL
        BEFORE THE HONORABLE DENIS R. HURLEY
            UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs:      NEIL H. GREENBERG & ASSOCIATES
                         4242 Merrick Road
                         Massapequa, NY  11758
                         BY:  JUSTIN M. REILLY, ESQ.

For the Defendants:      LEE R. PEARLMAN, ESQ.
                         54 Blydenburgh Road
                         Centereach, NY  11720


Court Reporter:          Mary Ann Steiger
                         Owen Wicker
                         Perry Auerbach
                         100 Federal Plaza
                         Central Islip, New York 11722
                         (631) 712-6101


        Proceedings recorded by mechanical stenography.
            Transcript produced by computer.

165

1          THE CLERK:  All rise.

2          THE COURT:  Good morning, everyone, if you would

3    all be seated.

4          Mr. Sanchez, why don't you retake the stand.

5

6    JOSE SANCHEZ,

7          called as a witness, having been previously

8          duly sworn, was examined and testified further

9          as follows:

10

11         THE COURT:  Yesterday, we finished the direct by

12   Mr. Reilly of Mr. Sanchez.

13         So, at this point, Mr. Pearlman,

14   cross-examination.

15         MR. PEARLMAN:  Yes, your Honor.

16

17   CROSS-EXAMINATION

18   BY MR. PEARLMAN:

19   Q.   Good morning, Mr. Sanchez.

20   A.   Good morning.

21   Q.   Is it correct that your testimony is that when you

22   went to a job site while you were providing some services

23   for the defendants, you were provided with the equipment

24   that you would need to perform your services?

25   A.   No.

Sanchez   -   Cross/Pearlman

166

1   The tools were loaded into the van the previous

2   day, and then they were unloaded at night.

3   Q.   I understand.  I appreciate that.

4        But if you provided any services at the job

5   site, you used those tools that came from the truck,

6   correct?

7   A.   Yes.

8        Among all of us we would unload the tools from

9   the van, and then we will load them back in the evening.

10  Q.   And while you were at the job site, if you actually

11  ripped some shingles down or provided other services, you

12  used those tools; is that correct?

13  A.   Yes, I used the owner's tools the tools from the job.

14  Q.   Did the owner provide you with night goggles?

15            THE INTERPRETER:  Could you repeat that?

16  BY MR. PEARLMAN:

17  Q.   Did the owner provide you with night goggles, night

18  vision goggles?

19  A.   No.

20  Q.   And did you have night vision goggles of your own

21  that you brought to the job site?

22  A.   No.

23  Q.   And after the sun went down, there was no artificial

24  illumination used so that the workers could continue

25  working on the roofs; isn't that correct?

Sanchez   -   Cross/Pearlman

167

1   A.   No, there were no lights.

2   Q.   Right.

3        And once it was dark, you couldn't work anymore

4   on the roofs; isn't that right?

5   A.   Correct.

6   Q.   So on any day that it was dark past 5:00, that it

7   went dark at 5:00 or approximately at that time, you

8   couldn't work past five; isn't that right?

9   A.   That is correct.

10  Q.   And so during those months where there was not

11  daylight savings time, you had to stop working earlier

12  than you would during the daylight savings time period; is

13  that correct?

14  A.   Yes.

15  Q.   And so you did not in fact have a set schedule of

16  hours that carried each and every week throughout the

17  entire year; isn't that correct?

18  A.   I would drive from five to seven.

19  Q.   So is it your testimony that when it got dark at

20  5:00, you just sat around the job site for two hours, from

21  5:00 p.m. to seven p.m., before you left to take the van

22  back; is that your testimony?

23  A.   I would drive until I got to that yard.

24  Q.   Well, if you finished at a job site at 5:00, it

25  didn't take you two hours to drive to that yard, did it?

Sanchez  -  Cross/Pearlman

168

1    A.    It was up to the traffic and the conditions.

2    Q.    And it was also up to how far away the job site was

3    from the yard; isn't that fair?

4    A.    Yes, because from Riverhead it would take me three

5    hours.

6    Q.    And there were also a lot of jobs that were in

7    Oceanside and Rockville Centre, and other sites, that were

8    approximately 15 minutes from the yard; isn't that

9    correct?

10   A.    Yes, and loading the tools would take half-an-hour or

11   an hour.

12   Q.    So on the days where you did a job at a location

13   within 15 minutes of the yard, you got to that yard

14   earlier than on the day where you did a job site that was

15   further away; isn't that correct?

16   A.    Yes, but that happened every so often, not daily.

17   Q.    What was not daily?

18   A.    Well, for example, there were occasions we were

19   working on a home that was next to his home.

20   Q.    And on those occasions, it didn't take you two hours

21   to drive to that yard, did it?

22   A.    Well, on that occasion, I either used the van because

23   it was next to his place.

24   Q.    So you didn't take the van each and every day to a

25   job site?

169

1    A.    Correct.

2    Q.    So how many days -- strike that.

3          If you worked five days during the week, how

4    many days did you take the van to the job site?

5    A.    I beg your pardon?

6    Q.    If you worked a week with five days on a job site,

7    how many of those days did you take the van to the job

8    site?

9          MR. REILLY:  Objection to form.

10         THE COURT:  Overruled.

11   A.    If there was no rainy days, then that would be five

12   days.  Otherwise, it would be four or three.

13   Q.    So your testimony is that if it rained or snowed when

14   a job was scheduled, the job would be cancelled for that

15   day, correct?

16         MR. REILLY:  Objection.

17         THE COURT:  I'll sustain it as to form.

18         MR. PEARLMAN:  Okay.

19   BY MR. PEARLMAN:

20   Q.    Is it your testimony that there were days where the

21   jobs didn't actually go forward on that specific day when

22   they were scheduled because of the weather?

23   A.    Yes, yes.

24   Q.    And you didn't get any form of compensation for those

25   days when the weather was inclement; isn't that correct?

Sanchez  -  Cross/Pearlman

170

1    A.    No.  If the weather was bad, we wouldn't work.

2    Q.    So, therefore, isn't it correct that you did not have

3    a schedule that was set in stone for each and every week

4    with a specific number of days because it was always

5    subject to the whether?

6              MR. REILLY:  Objection.

7              THE COURT:  Overruled.

8    A.    Yes.

9              If it rained, we couldn't work and typically

10   there was nothing in writing.

11   Q.    Now, can we agree that the size of the various jobs

12   or job sites varied from one job to the next?

13   A.    Yes.

14   Q.    And, for example, there was some houses where the

15   size of the roof was considerably smaller than other job

16   sites; is that correct?

17   A.    Yes, there were occasions that would take us to do a

18   house in four days.

19   Q.    And there were also occasions where it was a small

20   house that you worked and finished the job in less than a

21   day; isn't that correct?

22   A.    One day, yes.

23   Q.    One day out of all the years you allege you worked

24   with the defendants, only one day you ever had a small

25   job?

Sanchez  -  Cross/Pearlman

171

1     MR. REILLY:  Objection to form.  He's

2  mischaracterizing his testimony.

3     THE COURT:  Sustained.

4  BY MR. PEARLMAN:

5  Q.   Okay.  Let's go for the calendar year 2015.

6     In that year, how many jobs were you on the job

7  site with the defendants where the job took less than one

8  day?

9  A.   From Monday through Friday, five days.

10     MR. PEARLMAN:  Your Honor, I move to strike as

11  not responsive.

12     THE COURT:  It isn't responsive.  Application

13  granted.

14  BY MR. PEARLMAN:

15  Q.   I'll try it again.

16     In the calendar year 2015, on how many jobs did

17  you report to a job site for the defendants where the

18  total job took less than one full day?

19  A.    If it was a repair, sometimes it will take -- I don't

20  know.  It was always a full day.

21  Q.   In the 2015 calendar year, how many job sites did you

22  report to for the defendants in which a full roof was done

23  but it took less than a full day?

24  A.   As far as I remember, it always took a full day.

25  Q.   Now, on the days where you reported to a job site

Sanchez   -   Cross/Pearlman

172

1    that was within 15 minutes of the yard where you picked up

2    the truck, what did you do between 5:15 and eight a.m.?

3              MR. REILLY:  Objection.

4              THE COURT:  Sustained as to form.

5    BY MR. PEARLMAN:

6    Q.   Were there days you reported to job sites that were

7    within 15 minutes of where the yard was where you picked

8    up the truck, were there such days where you reported to

9    the job site within 15 minutes of where you picked up the

10   truck?

11   A.   Yes.

12             If it was 15 minutes away, yes.

13   Q.   And on those days, what did you do between the hours

14   of 5:15 a.m. and eight a.m.?

15             THE INTERPRETER:  The interpreter didn't

16   understand the answer.  I'm going to ask for his

17   rendition.

18   A.   At that time, we would have arrived at a set hour

19   where we could have start working.  We didn't know the

20   time when we were going to leave.

21             MR. PEARLMAN:  Move to strike as not responsive.

22             THE COURT:  No, I'll permit it to stand.  You

23   can pursue it further.

24             MR. PEARLMAN:  Thank you.

25

Sanchez  -  Cross/Pearlman

173

1  BY MR. PEARLMAN:

2  Q.   What was the set hour that you were to report to the

3  job site?

4  A.   The set hours was between 7:30 and eight.

5  Q.   Did he say at night?

6        THE INTERPRETER:   The Interpreter will repeat.

7        The set hour was between 7:30 and eight.

8  Q.   That's in the morning?

9  A.   In the morning.

10  Q.   If you picked up the truck -- I'm sorry.

11        If you picked up the van at 5:00, what did you

12  do between five a.m. and 7:30 or 8:00 that you had to

13  report to a job site?

14  A.   Since most of the trips were long trips, I had to

15  drive.

16  Q.   Now, is it correct that for some period of the time

17  that you provided services to the defendants, your

18  services included the use of a dump truck owned by you?

19  A.   It was my property, but I didn't use it for the job.

20  Q.   Just so we're clear, is it your testimony that you

21  never used your dump truck to remove any debris or garbage

22  from any job site that you were sent to by the defendants?

23  A.   On a few occasions he asked me to remove a very small

24  amount of garbage.

25  Q.   And did you receive separate compensation for that?

Sanchez   -   Cross/Pearlman

174

1    A.    No.

2    Q.    Okay.

3          At any time were you receiving a daily rate of

4    pay -- strike that.

5          Did you receive a daily rate of pay that was in

6    the form of compensation?

7    A.    Yes.

8          They paid me 180 per day.

9    Q.    And if you also brought your truck, your dump truck

10   on one of those days and you removed garbage, did you

11   receive something in addition to the $180.00?

12   A.    No.

13   Q.    And on those days where you brought your dump truck

14   and removed garbage, did you also work a full day on the

15   roof?

16   A.    On the days that was a job let's say with three guys

17   working there, at the end of the day we will pick up the

18   garbage and I will take a small amount of garbage and I

19   will take it to the dump site and I was paid at the dump

20   site by the dump site operator for that amount.

21         And I was using a Nissan Quest truck because it

22   was a very small amount of garbage.

23   Q.    Didn't you also, at one point in time, own a Ford 350

24   dump truck?

25   A.    The car was insured under my name, but it was being

Sanchez   -   Cross/Pearlman

175

1    used by my cousin who was doing housecleaning.

2           And he also asked me to insure -- he asked me

3    previously to insure the Toyota car to pick up the garbage

4    to go to the job sites and Leo will drive it.

5    Q.    And who was Leo?

6    A.    The foreman appointed by Mr. Jay who gave us the job

7    instructions.

8    Q.    How many times did you bring that Ford 350 to a job

9    site where you provided services for the defendants?

10   A.    If the -- I will bring it if the truck wasn't being

11   used by my cousin.  Otherwise, I wouldn't bring it.

12   Q.    And what was the capacity of that Ford 350 truck that

13   you owned?

14          MR. REILLY:  Objection.

15          THE COURT:  Capacity meaning the size of the

16   vehicle?

17          MR. PEARLMAN:  The size of the bed.

18          THE COURT:  Reframe it so it incorporates that.

19   BY MR. PEARLMAN:

20   Q.    Are you familiar with the term a truck bed?

21   A.    I know it was a Ford 350.

22   Q.    Are you familiar with whether or not that Ford 350

23   had an open back where you were able to put materials into

24   that open back area?

25   A.    Yes.

Sanchez  -  Cross/Pearlman

176

1      That car's been used to load on it the leaves

2  during the fall that the people that are working garden

3  use.

4  Q.   Well, that truck wasn't just for -- wasn't restricted

5  to carrying leaves, was it?

6  A.   Well, the car had the previous owner's, the previous

7  owner's stickers saying that that car was used for

8  landscaping and to load the debris from landscaping.

9  Q.   But there was nothing that prevented you from using

10 that vehicle to cart materials other than leaves; isn't

11 that correct?

12 A.   That car is not designed to -- that car is not

13 adequate to load materials from a construction site.  It

14 could be damage if you overload it.

15 Q.   Was there a weight limit of how many pounds of

16 material you could cart in that Ford 350 that you owned?

17 A.   I am not sure if there is something like three tons.

18 Q.   And at some point in time did the defendants use

19 dumpsters at any of their work sites?

20 A.   Yes.

21 Q.   And were you familiar with the different sizes of

22 dumpsters that the defendants ordered at their job sites?

23 A.   The dumpster has a sign saying 20, 30 or 40.

24 Q.   And your Ford 350 -- when it says -- strike that.

25      When it says 20 on the dumpsters, 20, 40, or

Sanchez  -  Cross/Pearlman

177

1   whatever other number, that's the number of yards that the

2   material can carry; is that correct?

3   A.   I believe so.

4   Q.   And your Ford 350 had the capacity to carry 13 yards;

5   isn't that correct?

6           MR. REILLY:  Objection.

7           THE COURT:  Overruled.

8   A.   I believe so.

9           THE COURT:  I couldn't hear the answer.  I

10  believe so?

11          THE INTERPRETER:  I believe so.

12  BY MR. PEARLMAN:

13  Q.   For the calendar year 2015, can you tell me a

14  specific week in which you worked more than 40 hours?

15  A.   Every week we worked from Monday through Friday, from

16  five to seven, with exception on one or two occasions

17  where we worked maybe two hours less.

18          MR. PEARLMAN:  Can I have the answer read back,

19  please?

20          THE COURT:  Yes.

21          (Record read.)

22  BY MR. PEARLMAN:

23  Q.   I'm going to ask you again, can you name me with

24  dates, a specific week in the calendar year 2015, that you

25  can sit here and remember that you worked more than 40

178

1  hours?

2          MR. REILLY:  Objection, asked and answered.

3          THE COURT:  Overruled.

4  BY MR. PEARLMAN:

5  Q.   Yes or no?

6  A.   Never, I never worked less than 40 hours.  I always

7  worked more.

8  Q.   You were paid by the day, correct?

9  A.   Yes.

10  Q.   Okay.

11          And because you were paid by the day, you really

12  didn't keep track of the exact number of hours that you

13  worked; isn't that fair enough to say?

14  A.   All I knew is that I ended at five and left at seven.

15  Q.   In the calendar year 2015, how many days did you not

16  work because of inclement weather?

17          MR. REILLY:  Objection.

18          THE COURT:  Overruled.

19  A.   If the weather was inclement, we didn't work.

20          But, also, on occasions we worked Saturdays and

21  Sundays.

22  Q.   For the calendar year 2015, can you tell me how many

23  weeks there was inclement weather in which you did not

24  work at least five days?

25          MR. REILLY:  Objection.

Sanchez  -  Cross/Pearlman

179

1      THE COURT:  Overruled.

2      Probably that question should end with if any.

3      MR. PEARLMAN:  If any.  I will adopt your

4  addition.  Thank you.

5  A.    What I remember is I worked every day.

6  Q.    You worked even when the weather was bad?

7  A.    As I told you before, when it rained we didn't work.

8  Q.    So, therefore, you did not work each and every day?

9  A.    Obviously, if the weather because bad, we didn't

10  work, but we recovered the time by working Saturdays and

11  Sundays if the weather allowed.

12  Q.    So in such a week where there was inclement weather,

13  you worked on the weekend to make up the time you did not

14  work more than 40 hours in any of those weeks; is that

15  correct?

16      MR. REILLY:  Objection.

17      THE COURT:  Overruled.  He can answer it.

18      If he doesn't understand the question, just so

19  indicate and another question will be asked.

20      THE INTERPRETER:  The interpreter didn't

21  understand the question.

22      MR. PEARLMAN:  Okay.

23  BY MR. PEARLMAN:

24  Q.    On the weeks that -- in 2015, on the weeks in which

25  there was inclement weather and the time was made up on a

Sanchez  -  Cross/Pearlman

180

1   weekend, isn't it correct that in those weeks he did not

2   perform services for more than 40 hours?

3           MR. REILLY:  Objection to form.

4           THE COURT:  Overruled.

5   A.   If work required us to work, to complete the work,

6   then we worked more than 40 hours.

7   Q.   In the calendar year 2015, how many Saturdays did you

8   perform services for the defendants?

9           MR. REILLY:  Objection.

10          THE COURT:  Overruled.

11  A.   I cannot tell you how many Saturdays, but maybe one,

12  maybe two per month.

13  Q.   Is that an estimate on your part?

14  A.   I cannot remember precisely the days that we worked,

15  that we were at work.

16  Q.   I understand.  And that's why I'm asking, is that an

17  estimate or an approximation on his part?

18          MR. REILLY:  Objection.

19          THE COURT:  I'll sustain it.  He said one or two

20  Saturdays a month maybe.  It's obvious from his answer

21  it's an estimate.

22  BY MR. PEARLMAN:

23  Q.   In the calendar year 2015, how many Sundays did you

24  perform any services for the defendant?

25  A.   The same way, maybe once per month.

Sanchez  -  Cross/Pearlman

181

1   Q.   And did there come a time that you became aware that

2   the defendants purchased their own dump truck?

3   A.   Yes.

4        We even went with him to pick it up.

5   Q.   And that was in or about May of 2015; isn't that

6   correct?

7        MR. REILLY:  Objection.

8        THE COURT:  I assume he has a good faith basis

9   for asking the question.

10       What's the objection?  It's cross-examination.

11  If he has a good faith basis for the question, he's

12  allowed to ask it.

13       MR. REILLY:  I'll withdraw the objection.

14  A.   I believe so.

15  Q.   And isn't it correct that you only started to drive

16  the van after the date at which the defendants purchased

17  the dump truck?

18  A.   No.

19  Q.   Now, on the days where you brought your dump truck to

20  a work site of the defendants, you didn't drive the van on

21  those days, did you?

22  A.   If it was a small job, I will either take the Nissan

23  Quest or they will let me use the van to take the garbage.

24  Q.   On a day where you brought either your dump truck or

25  the Nissan Quest to the job site, isn't it fair to say

Sanchez  -  Cross/Pearlman

182

1    that you did not drive the van?

2    A.   Yes, that is correct.

3    Q.   Thank you.

4         As you sit here today, you don't remember how

5    many days you actually provided services for any defendant

6    in this case, do you?

7    A.   How many days I worked for him?  From Monday through

8    Friday and sometimes Saturdays.

9    Q.   Do you recall being at a deposition in this case

10   where I asked you questions and you gave answers?

11   A.   Yes.

12   Q.   And you knew that you were under oath that day when

13   you gave the answers at the deposition; is that correct?

14   A.   Yes.

15   Q.   And, therefore, what you said at the deposition was

16   the truth; is that correct?

17   A.   Yes.

18   Q.   Okay.

19        Do you recall at page 17, starting at line 17,

20   do you recall me asking you the following question and you

21   giving the following answer.

22        THE INTERPRETER:  Excuse me, I need to refer to

23   the book.  Page 17?

24        MR. PEARLMAN:  Page 17, starting at line 17.

25   Strike that.  Starting at line -- I'll read you, so we

Sanchez  -  Cross/Pearlman

183

1   have the background, the questions leading up to where I

2   was going to be starting at line 19.  Strike that.  I'll

3   read you the background and then I'll start with the

4   questions starting at line 23 -- line 19.

5              "QUESTION:  Did you work for or provide services

6   for First Class Roofing in 2004?

7              "ANSWER:  From 2003 until now, until 2015, I

8   worked for the company."

9              Do you recall those questions and those answers?

10  A.   I have the first income tax paper that he gave me.

11             MR. PEARLMAN:  I move to strike as not

12  responsive.

13             THE COURT:  Yes, application granted.

14  BY MR. PEARLMAN:

15  Q.   Starting at page 17, line 23, and continuing until

16  line 25, do you recall me asking you the following

17  question and you giving the following answer:

18             "QUESTION:  In 2015, how many days did you

19  actually provide services for First Class Roofing, Inc.?

20             "ANSWER:  I don't remember."

21             Do you recall that question being asked and you

22  giving that answer under oath?

23  A.   Yes.

24  Q.   And that answer was true, correct?

25  A.   It is not the truth.

Sanchez  -  Cross/Pearlman

184

1   Q.   But you knew when you were under oath at that

2   deposition you were required to tell the truth; is that

3   right?  Yes or no?

4   A.   You made me nervous at that time and I didn't really

5   give me the chance to answer properly, but the truth is

6   that I work every day.

7   Q.   At the deposition did you ever ask to be allowed to

8   change any of your answers?

9   A.   That day you will recall that I was crying because it

10  was my employer who was loaning me money, and at that

11  moment when I was crying is when you made this question.

12  Q.   Just so I'm clear, it's your testimony that you cried

13  when I asked you at page 17, line 23:

14         "QUESTION:  In 2015, how many days did you

15  actually provide services for First Class Roofing, Inc.?

16         And you replied, at line 25, I don't remember.

17         And you were crying at that time?

18  A.   You know that.

19  Q.   Did you ask to take a break and take some time out

20  from the deposition after I asked you that question and

21  you gave that answer?

22  A.   I didn't ask for it, it was given, it was provided.

23  Q.   Exactly at that time?

24  A.   They told me to calm down and they gave me a glass of

25  water.

Sanchez   -   Cross/Pearlman

185

1    Q.    Well, in fact, at page 18 of the deposition, right

2    after that question and answer that I just read, there was

3    another question and answer; isn't that true?

4    A.    Yes.

5    Q.    And at that time at page 18, line 2 through 18, line

6    7, I asked you the following question and you gave the

7    following answer:

8            "QUESTION:  Do you have any documents or other

9    records that would provide information as to how many days

10   you provided services in 2015 for First Class Roofing,

11   Inc.?

12           "ANSWER:  Yes.  I don't know.  I think I have

13   it.  I think I was given a piece of paper for 2015 to fill

14   in my taxes.  I don't remember how much."  Do you recall

15   giving that answer to that question?

16   A.    Yes.

17   Q.    And, in fact, you gave the answer to that question on

18   page 18 directly after you gave the answers to the

19   preceding questions that I asked you from page 17; isn't

20   that correct?

21   A.    Yes, I understand.

22   Q.    I'm sorry?

23   A.    Yes, I understand.

24           (Continued on next page.)

25

Sanchez - Cross/Pearlman

186

1    BY MR. PEARLMAN:

2    Q    And there was no break in between those two --

3    between the first question and answer and the second

4    question and answer; is that right?

5    A    Yes, I believe so.

6    Q    Right.

7            So, in fact you weren't crying at that time;

8    isn't that correct?

9    A    I believe so.

10   Q    Isn't it correct that you became upset and crying

11   later on when I asked you if the defendant, Mr. Sage, ever

12   loaned you money.

13   A    Yes, I just started crying.  Yes, I started crying,

14   but I don't remember what time during the deposition.

15   Q    And when you started crying, you testified that

16   Mr. Sage treated you like you were family; is that

17   correct.

18   A    Exactly, that is correct.

19   Q    Okay.  And you cried because you felt guilty that you

20   were suing someone that treated you like family; isn't

21   that correct?

22   A    No.  I considered him as my father and because he

23   covered every need that I had.

24   Q    Are you familiar with someone named Leo Maldonato.

25   A    Yes.

Sanchez - Cross/Pearlman

187

1   Q    Is that the person you testified about before being

2   the foreman.

3   A    Yes, he was always that and I believe he has been in

4   the job for over 20 years.

5   Q    Okay.

6         After you started this case, isn't it correct

7   that you had one or more conversations with Leo Maldonato

8   concerning your allegations in this case.

9   A    They are the ones who told me to sue him.

10  Q    Who are "they".

11  A    I was calling the owner to get me back to work, and

12  he was not answering my request.

13        I was talking to the other workers and with Leo

14  and they are the ones who told me I should sue him so I

15  could return to work.

16  Q    Well, in fact, wasn't it you who told Mr. Maldonato

17  that you were only suing the defendant in this case

18  because you wanted to get your job back.

19  A    All I wanted is my job back.

20  Q    And is it also correct that there was a time in which

21  Mr. Sage, who you knew as Jay, told you you could no

22  longer work for the defendant.

23  A    I never told him that.

24  Q    Did he tell you that.

25  A    He never answered my phone calls.

Sanchez - Cross/Pearlman

188

1      MR. PEARLMAN:  I think there is some confusion,
2  so I want to clear it up.
3  Q   Was there a time in December of 2015 in which Jay, or
4  Mr. Sage, told you that your services were no longer to be
5  used by the defendants in this case?
6  A   No, but he had Leo, he had Leo to tell me that.  And
7  also that happened in 2016 when the season was going to
8  start.
9  Q   So, again, so I'm clear.  Was it Mr. Maldonato, Leo
10  Maldonato, who told you that your services where no longer
11  to be used by the defendant in this case.
12  A   They told me that he didn't need me any longer.  I
13  called him and he would just hang up from me.
14  Q   Were there occasions in 2015, Mr. Sanchez, in which
15  Jay, or Mr. Sage, cautioned you that you were working on
16  the roofs with your shoelaces untied and if you did not
17  start tying your shoes, you would be terminated.
18  A   No, I fell from a house.  I was out of work for a
19  week and they didn't even pay for a doctor's visit, and
20  thanking God that nothing happened to me.  And even I was
21  told I could have sued him because I had fallen from the
22  roof.
23      And since then I have this pain in my chest and
24  this knee that was damaged.
25      I was hurting in the knee.

Sanchez - Cross/Pearlman

189

1    Q    What year did that occur?

2    A    It was in 2015, May, June, July.  I believe it was

3    August.

4    Q    Do you -- strike that.

5         Can you tell us the exact date on which this

6    alleged falling off the roof occurred?

7    A    No, I don't remember the exact date.  I would have to

8    look at some paper.

9    Q    As you sit here, can you tell us the days of the week

10   that you didn't work in 2015 because of this alleged

11   injury.

12   A    I believe it was four, five days that I didn't work.

13   Since I was not receiving any compensation, I needed the

14   work and I went back to work.

15   Q    Can you tell us the dates of those four or five days

16   that you missed from work.

17   A    No, I don't recall.

18   Q    Also, it's true that from time to time you were

19   taking extended vacations and you would go back to your

20   native country; is that correct.

21   A    Only I was able to go back to my country in January

22   or February when because of the weather here, there's no

23   work.

24   Q    Were there entire months in 2015 where you did not

25   provide any services to the defendant.

Sanchez - Cross/Pearlman

190

1    A    I didn't leave in 2015.

2              MR. PEARLMAN:  I move to strike as a

3    nonresponsive answer.

4              THE COURT:  Yes, application granted.

5              MR. PEARLMAN:  Thank you.

6    Q    Were there any months, such as January, February or

7    some other month, that you did not provide any services to

8    the defendant during the calendar year of 2015.

9    A    In December, January or February, usually we didn't

10   work because there was snow.  But if there was a day

11   without the snow, then we would work.

12   Q    So you understood there was a seasonal aspect to the

13   job; is that correct.

14   A    Yes.

15   Q    And during those time periods when the weather

16   wouldn't permit you to work with the defendants, you

17   obtained income for yourself by doing other things; isn't

18   that correct.

19   A    We have to save in order to survive the months we

20   didn't work.

21   Q    Isn't it correct that in those times where you were

22   not providing services to the defendants because of the

23   weather, that you would go to Home Depot and stand out and

24   try to solicit day labor; isn't that correct.

25              MR. REILLY:  Objection.

Sanchez - Cross/Pearlman

191

1          THE COURT:  Overruled.

2   A    That is correct.  I needed to eat.

3          MR. PEARLMAN:  I can understand that.

4   Q    And also there were times where you took your dump

5   truck and you used to go around and collect metal to try

6   to turn it in in exchange for money; isn't that correct?

7   A    Yes, if I would find a little piece of metal, to try

8   to pick it up to try to sell it.

9   Q    Also during those times you didn't work with the

10  defendants because of inclemate weather or because of the

11  cold season, you also went around and collected wooden

12  pallets and you would sell them; isn't that correct.

13  A    At that time I was not picking up pallets.  I was

14  looking for soda cans to sell.

15  Q    In December of 2015, did you have an agreement with

16  somebody that would pay you to go around and collect

17  wooden pallets?  Yes or no.

18  A    No.

19  Q    Okay.  Page 55 of your deposition, starting at

20  line 20.

21          Do you recall me asking you this question and

22  you answering it at line 23 and 24 as follows:

23          Question:  Do you have an agreement with

24  somebody that pays you to go around and collect wooden

25  pallets and collect them in your truck?

Sanchez - Cross/Pearlman

192

1      Answer:  No, yes, no, yes, I have an agreement.

2    I pick up wooden pallets that are broken."

3         Do you recall that question and that answer?

4    A    Yes, that's true.  One or two pallets.  I would get

5    $3 for it.

6    Q    So your dump truck on occasion, you used for both

7    collecting wooden pallets and collecting scrap metal.  Is

8    that fair enough to say.

9    A    I just was using a small van and I would pick up and

10   find along my way cardboard, whatever.  I have children to

11   support.

12   Q    During the period of time you provided services to

13   the defendants, did Jay or Mr. Sage ever tell you that you

14   were prohibited from performing services for any other

15   company.

16   A    No.

17   Q    And that during that same time period, did Mr. Sage

18   or Jay ever tell you that you were prohibited from working

19   for yourself in terms of picking up pallets or scrap metal

20   or cans or anything else you choose to do.

21   A    No.

22   Q    And on those occasions where you took your dump truck

23   to a job site and then dumped material, did Jay or

24   Mr. Sage ever tell you what dump site you had to use.

25   A    No.

Sanchez - Cross/Pearlman

193

1   Q    So you were free to choose any dump site that you

2   chose.

3   A    The closest one.

4   Q    The closest to whatever job site you were near.

5   A    He would give me $100 to pay them in, the dump site.

6   Q    And on the days that you brought the van to and from

7   the job, he gave you $100 extra just for doing that; isn't

8   that correct.

9   A    Yes, the amount that it took to dump the garbage.

10          MR. PEARLMAN:  I think there is some confusion.

11  I'm not talking about the dumping.  I've changed to

12  another subject.

13          The subject now is driving the van.

14  Q    Is it correct that on the days you drove the van to

15  and from the job site, that Mr. Sage or Jay paid you a

16  separate amount of money of $100 per day for providing

17  that service?

18  A    No.

19  Q    And he never did that in front of all the workers.

20  A    If he would give me any money, it's because I had

21  asked him for a loan, and nobody knew whether it was for

22  one thing or the other.

23          On occasions, he would gift me $50 or $100.

24  Q    So it's your testimony that if Mr. Sage or Jay gave

25  you cash, it was either for a loan or for a gift; is that

Sanchez - Cross/Pearlman

194

1    correct?

2    A    Okay.  If I would ask him for a loan, he would give

3    me either a check or maybe $50 in cash.

4    Q    And what about the gifts.

5    A    I would ask him to loan me $50 and when -- at the

6    time I was going to repay him, he would say no, keep the

7    money.

8    Q    Are those the only items that you refer to as gifts?

9    A    Yes, that's it.

10   Q    Okay.

11             Is it correct that you received your primary

12   compensation by means of check?

13   A    Yes.

14   Q    And when you received those checks, what would you do

15   with them.

16   A    I will go to change them.

17   Q    At a cash checking place.

18   A    Wherever it was easiest.

19   Q    And in order to cash the checks, it's correct that

20   you had to sign or endorse the checks on the back; isn't

21   that correct.

22   A    Yes.

23   Q    During the time you provided services for the

24   defendants in this case, did you ever tell Jay that you

25   were refusing to be paid by the day and instead you

Sanchez - Cross/Pearlman

195

1    insisted to be paid by the hour.

2            Did that ever occur?

3    A    No, what I wanted is to be paid is with a check, with

4    a stub.  A check with a stub.

5    Q    Did you ever tell Jay that you were refusing to be

6    compensated on the daily rate and instead demand an hourly

7    rate.

8    A    No.

9            THE COURT:  You know at this point we'll take

10   the morning recess.  We'll recess until a quarter after.

11           MR. PEARLMAN:  Thank you, your Honor.

12           THE COURT:  Sir, you may step down.  We'll see

13   you a quarter after.

14           (Whereupon, a recess was taken.)

15           (Continued.)

16

17

18

19

20

21

22

23

24

25

Sanchez - Cross/Pearlman

196

1       THE COURT:  If you will all be seated, please.

2       (Witness resumes.)

3       THE COURT:  Mr. Pearlman.

4       MR. PEARLMAN:  Thank you, your Honor.

5   Q    Throughout the course of the time you provided

6   services for the defendant, were there dates in the summer

7   that no job could occur because it was too hot, that the

8   temperature got too hot?

9   A    Yes.

10  Q    And how often did that occur.

11  A    I can't tell you how often.  There were days that

12  were over 100.

13  Q    And if you tried to install a roof on those days,

14  isn't it correct that the granules that are on the roofing

15  shingles sometimes would melt and fall off; is that

16  correct?

17  A    That is correct.

18  Q    So isn't it correct that you really don't remember

19  how many times in the last six years of your work with the

20  defendants, how many Saturdays and Sundays you actually

21  provided those services.

22  A    No --

23      MR. PEARLMAN:  No, that he is correct, that he

24  can't remember, or --

25  A    -- No, I don't know in the last six years how many

197

1    Saturdays or Sundays I worked.

2    Q    Okay.

3          And as you sit here, you don't know if you

4    worked the same number of hours every week during those

5    last six years of employment, do you?

6    A    It could have been a lot more, but it was always

7    above 40 hours.

8    Q    Do you recall at your deposition, page 89, starting

9    at line 24 and going over to page 9 at line 2, me asking

10   you the following question and you giving the following

11   answer.

12         Question:  From 2009 to the end of 2015, did you

13   work the same number of hours each and every week?

14         Answer:  I don't know."

15         Do you recall giving that answer to that

16   question?

17   A    Yes.

18   Q    And that answer that you gave at your deposition was

19   true; isn't that right.

20   A    Yes.

21   Q    Okay.

22         And continuing, page 90, line 3.  Do you

23   remember me asking you the following question and you

24   giving the following answer, concluding at line 6.

25         Question:  During that timeframe, did you work

Sanchez - Cross/Pearlman

**198**

1    57 and-a-half hours each week?

2            Answer:  No, I never bothered to keep track.  I

3    don't know."

4            Do you recall being asked that question and

5    giving that answer.

6            MR. PEARLMAN:  That's page 90, lines 3 through

7    6.

8    A    Yes.

9    Q    You remember that answer.  That answer was the truth;

10   is that correct?

11   A    All I knew is that I got in at five and left at

12   seven.

13   Q    Was the answer that you gave from the question and

14   answer I just read from your deposition the truth?  Yes or

15   no.

16   A    All I knew is that that was it, that I entered at

17   five and left at seven.

18   Q    Okay.

19           Now, do you recall me asking, continuing at

20   page 90, at line 7, and then you giving your answer at

21   line 11, the following question and answer.

22           Question:  During that same time period, again

23   I'm talking about the last six years of your employment,

24   on the weeks you worked six days, how many hours did you

25   work each of those days?

Sanchez - Cross/Pearlman

199

1    Answer:  I have to calculate it.  I don't know."

2    Do you recall that question and you giving that

3    answer?

4    A    Yes, I said that.

5    Q    And when you said it.  It was the truth, correct?

6    A    Since I didn't work for the hour, since I wasn't paid

7    by the hour, I wasn't interested in the number of hours.

8    Q    Right, that's because you were paid by the day.

9    A    Yes, when I did.

10   Q    Okay.  Didn't you tell this Court the number of hours

11   of overtime that you believed you should be paid or the

12   Court should order the defendant to pay in this case.

13   A    What I understand is that actually I was working 14,

14   which means 70 hours per week.

15   Q    Is your memory better today than it was at your

16   deposition.

17   A    Only a doctor could tell that.

18             MR. PEARLMAN:  I'm sorry?

19             THE INTERPRETER:  Only a doctor could tell that.

20             MR. PEARLMAN:  I don't have any other questions,

21   your Honor.

22             THE COURT:  Thank you, Mr. Pearlman.

23             Mr. Reilly, redirect.

24             MR. REILLY:  Just a few, your Honor.

25             THE COURT:  Mr. Reilly, redirect.

Sanchez - Redirect/Reilly

200

1   REDIRECT EXAMINATION

2   BY MR. REILLY:

3   Q    Mr. Sanchez, did you ever drive Jay's van to work

4   sites located in Queens County?

5   A    Yes.

6   Q    And did you ever drive Jay's van to work sites

7   located in Riverhead out here in Suffolk County.

8   A    Yes.

9   Q    And you understand this courthouse is in Central

10  Islip.

11  A    Yes.

12  Q    Did you ever drive Jay's van from Oceanside to areas

13  in Central Islip to job sites.

14  A    Yes.

15  Q    And did you ever drive Jay's van from Oceanside to

16  job sites located in Suffolk County.

17          THE INTERPRETER:  Was it also Suffolk County?

18  The previous question?

19          THE COURT:  Independent of Central Islip in

20  Riverhead.

21          MR. REILLY:  That's fair.

22  Q    Do you recall at your deposition on page 30, being

23  asked the question by defendant's counsel, beginning at

24  line 3:  Approximately and to the best of your

25  recollection, how many hours did you work or provide

Sanchez - Redirect/Reilly

201

1   services for First Class Roofing, Inc., in the calendar

2   year 2012, and giving the answer at line 7 and 8:  I don't

3   know.  All I know is that we would go in at 5 and we would

4   leave at 7, 6, sometimes 8.

5           Do you recall being given that question and

6   giving that answer?

7   A    Correct.

8   Q    Okay.  And do you recall at page 45 of your

9   deposition transcript, the defendant's attorney asking you

10  the question at line 8:  What is the most number of hours

11  that you ever worked for or provided services for Mr. Sage

12  or any company with which he's affiliated in any workday.

13          And giving the answer at line 11:  So I would go

14  pick up the van at 5 or 5:30 and get back at 7.  I was the

15  last one to arrive."

16          Do you recall being given that question and

17  giving that answer?

18  A    Correct.

19  Q    Do you recall page 97 of your deposition transcript,

20  being asked the question beginning at line 12:  What time

21  did you start work every day, and giving the answers at

22  lines 14 and 15:  Well, when I would have to go, pick up

23  the car, at 5 o'clock, until I finished work.

24          Do you recall being asked that question and

25  giving that answer?

Sanchez - Recross/Pearlman

202

1    THE INTERPRETER:  The interpreter needs the

2  first line number.

3    MR. REILLY:  Okay.  At page 97 of your

4  deposition transcript, beginning at line 12.  Do you

5  recall being asked the question:  What time did you start

6  work every day, and giving the answer at line 14:  Well,

7  when I would have to go pick up the car, at 5 o'clock,

8  until I finished work.

9    Do you recall giving that answer -- being asked

10  that question and giving that answer?

11  A    Yes.

12    MR. REILLY:  Okay.  I have no further questions.

13  Thank you.

14    THE COURT:  Very good, Mr. Reilly.

15    Based on the examination of Mr. Reilly, do you

16  have additional questions?

17    MR. PEARLMAN:  One or two, your Honor.

18    THE COURT:  All right.  Go ahead.

19  RECROSS EXAMINATION

20  BY MR. PEARLMAN:

21  Q    Mr. Reilly read some questions from page 45 of your

22  deposition and I'll go through those questions and then

23  the question and answer that directly follows them.

24    Do you recall that Mr. Reilly asked you about

25  the question at page 45, line 8.

Sanchez - Recross/Pearlman

203

1    Question:  What is the most number of hours you

2   ever worked for or provided services for Mr. Sage or any

3   company with which he's affiliated any workday?

4            Answer:  So I would pick up the van at 5 or 5:30

5   and I would get back at seven.  I was the last one to

6   arrive."

7            Do you remember that question and that answer?

8   A    Yes.

9   Q    Okay.

10            Now, directly after that question, again at

11   page 45, starting at line 13 through line 15, do you

12   remember me then asking you this follow-up question.

13            Question:  In 2015, how many occasions did you

14   work those hours, from 5:00 a.m. to 7:00 p.m.

15            At line 15.

16            Answer:  I don't know.  I don't know."

17            Do you remember me asking you that question and

18   you giving that answer?

19            Do you remember that question and that answer?

20   A    Yes.

21   Q    And that answer was the truth; isn't that correct.

22   A    Yes.

23   Q    Now, going back to the first of those questions,

24   where you said, so I would pick up the van at 5 or 5:30.

25   Which one was it?  Was it 5 or 5:30.

204

1  A    It was up to the traffic conditions.

2  Q    Okay.  So would it be fair enough to say you didn't

3  arrive at the pickup site at the same time every day.

4  A    It could be a few minutes before or a few minutes

5  afterwards, 20, 10.

6  Q    Okay.

7        Now, also in that same answer, you said, quote,

8  I was the last one to arrive.

9        Does that mean you were the last person to

10  arrive at the job site.

11  A    I was the last one in the evening returning the van.

12  Q    All right.  I'll go back again and read the question

13  and the answer and I want to make sure that the witness

14  understands what is being asked.

15        Again, 45, line 8.  What was the most number of

16  hours you ever worked for and provided services for for

17  Mr. Sage and any company for which he was affiliated in

18  any work week?

19        Line 11.

20        So I would pick up the van at 5 or 5:30 and get

21  back at seven.  I was the last one to arrive."

22  A    Yes, that is correct.

23        (Continued on the following page.)

24

25

**Sanchez- Recross/Pearlman**

205

1   BY MR. PEARLMAN:

2   Q.   So when you used the words I was the last one to

3   arrive, those were words that you chose to use; isn't that

4   correct?

5   A.   Yes.

6   Q.   And you used those words because they were the truth;

7   isn't that right?  Yes or no?

8   A.   Yes.

9   Q.   Weren't you the last one to arrive at the job sites

10   at the morning?

11        MR. REILLY:  Objection.

12        THE COURT:  At some point he was the last one to

13   arrive, where/when.  So he can answer.

14   A.   I have to arrive considering traffic conditions

15   before eight o'clock to start the working.

16        MR. PEARLMAN:  I have no other questions.

17        THE COURT:  Does that complete the examination

18   of this witness?

19        MR. REILLY:  Yes.

20        THE COURT:  Mr. Sanchez, thank you, sir.  You

21   may step down.  Mr. Reilly, the plaintiff's next witness,

22   please.

23        MR. REILLY:  Antonio Palacio.

24        THE COURT:  Good morning, sir.  Just remain

25   standing for a moment and raise your right hand.

Sanchez- Recross/Pearlman

206

1

2    **ANTONIO MEJIA PALACIO,**

3              called as a witness, having been first

4              duly sworn, was examined and testified

5              through the interpreter as follows:

6         THE COURT:  If you'd be seated.  And if you

7    would state your first and last name and spell your last

8    name for the court reporter.

9         THE WITNESS:  Antonio Mejia Palacio.

10        THE INTERPRETER:  Spelling by interpreter, first

11   last name is M-E-J-I-A, second last name is

12   P-A-L-A-C-I-O-S.

13        MR. PEARLMAN:  Your Honor, my client and I are

14   unable to hear the witness' answers and we would like to

15   maybe be able to hear them.  So if we can have a

16   microphone set for him I would appreciate that.

17        THE COURT:  Yes.  He can do that.

18        THE INTERPRETER:  The interpreter will rearrange

19   the microphone.

20        THE COURT:  You're both going to have to use the

21   microphone.

22        THE INTERPRETER:  The interpreter will rearrange

23   the microphone.

24        THE COURT:  Swing it back and forth.  That will

25   work out fine.  So Mr. Reilly.

Palacio - Direct/Reilly

207

1   DIRECT EXAMINATION

2   BY MR. REILLY:

3   Q.   Good morning.  Can you tell the Court when you first

4   started working for Jay?

5               THE COURT:  What we have do is at this point

6   we'll move the head of the microphone over in front of the

7   witness if you would.  I think that swings easily.  Does

8   it, Lisa?

9               THE CLERK:  Yes, it bends.

10              THE COURT:  The point is the defendants and

11  defense counsel would like to be able to hear his answer,

12  he, the witness' answer as well as answer as interpreted.

13  All right.  So let's try to again.  Mr. Reilly, re-ask

14  that question.

15  Q.   Can you tell the Court when you first started working

16  for Jay.

17  A.   September 2006.

18  Q.   And for how long of a time period did you work for

19  Jay?

20  A.   From September 2006 to September 2014.

21  Q.   And did you have any other employer during the time

22  that you worked for Jay?

23  A.   No.

24  Q.   What type of work did you do for Jay?

25  A.   When the first thing was to bring from the, take out

Palacio - Direct/Reilly

208

1    the tools, ladders, the different materials, the plastic

2    covered the house so it's protected.

3    Q.   And what other type of work did you do for Jay other

4    than that.

5    A.   Only that.

6    Q.   Could you tell us what you did at the job sites when

7    you worked for Jay?

8    A.   As to after cleaning the house we would bring out the

9    materials and -- mainly the paper and the shingles.

10   Q.   And who paid you for your services that you provided

11   to Jay?

12   A.   Jay.

13   Q.   Do you see Jay here in the courtroom today.

14   A.   He will have me to make the payments.

15   Q.   Is Jay today here in this courtroom sitting here.

16   A.   Yes.

17   Q.   And was Jay your boss?

18   A.   Yes.

19   Q.   And was there a particular time of year that the

20   roofing company was busiest?

21   A.   Yes.

22   Q.   And during what months of the year was the roofing

23   company busiest?

24   A.   Every May, June, July, August, September, October,

25   November and December.

Palacio - Direct/Reilly

209

1   Q.   And during the last five years of your employment,

2   during that time period, April up until December, how many

3   days a week did you usually work?

4   A.   Five and sometimes six.

5   Q.   And when you worked five and sometimes six days a

6   week from April to December each year, was there a

7   particular time that you arrived at the job sites?

8   A.   Yes.

9   Q.   And what time was that?

10  A.   Seven to six.

11  Q.   Would you arrive at the job sites at 7 in the

12  morning.

13  A.   7 to 7:30.

14  Q.   Okay.  And then when you arrived if he job sites

15  between 7 and 7:30 each morning, is that when you began

16  working?

17  A.   Yes.

18  Q.   And would you work each day until the job was

19  completed?

20  A.   Yes.

21  Q.   And was there a particular time during the day, from

22  April up until December of each year, that you that your

23  day usually ended?

24  A.   Yes, at six o'clock.

25  Q.   So during the busy months of the year, did you

Palacio - Direct/Reilly

210

1    usually work from 7 to 7:30 a.m. up until about six p.m.

2    each day?

3    A.    September.  That was from April, May, June, July,

4    August, September and October.

5    Q.    So from April until the end of October, did you

6    usually begin your day at 7 or 7:30, and then work until 6

7    p.m. in the evening?

8    A.    At six, yes.

9    Q.    And did you do that for at least five days a week

10   during the busy months of each year?

11   A.    Yes.

12   Q.    And during the busy months of each year, which you

13   testified were April through October, did you usually take

14   a lunch break each day?

15   A.    Half an hour.

16   Q.    And were you paid by the day?

17   A.    Yes.  For the day.

18   Q.    And how much in the last five years of your

19   employment, how much were you paid per day.

20   A.    He started paying 110.  After one year he started

21   paying 120.  And in 2013 he started paying me 180.

22   Q.    And were you paid $180 a day for 2013 until the end

23   of your employment?

24         THE COURT:  I'm not sure -- okay.  Fine.

25   A.    Yes.

Palacio - Direct/Reilly

211

1   Q.   And immediately prior to being paid $180 were you

2   paid a lesser amount day?

3   A.   Yes.  130 or 140.

4   Q.   And do you recall what year you were paid $130 or

5   $140 a day?

6   A.   2012; 2013.

7   Q.   And was the last amount that you were paid per day

8   $180?

9   A.   Yes.  180.

10  Q.   And how were you paid?

11  A.   Cash.

12  Q.   Were you ever given a check?

13  A.   No.

14  Q.   Were you ever given a pay stub?

15  A.   No.

16  Q.   Did you ever punch in or sign in when you arrived at

17  the work site each day?

18  A.   No.

19  Q.   Did you ever punch in or out or sign in or out when

20  you took a half hour lunch break each day?

21  A.   No.  We didn't have anything to do that.

22  Q.   Did you ever punch in, withdraw that.  Did you ever

23  punch out at the end of the day when you went home for the

24  evening.

25  A.   No.

Palacio - Direct/Reilly

212

1  Q.   Were you ever given a cash receipt when you received

2  your?

3         THE INTERPRETER:   Interpreter needs a repetition

4  of that.

5  Q.   Sure.  When you received -- actually withdraw that.

6  Was there a particular day of the week that the work was

7  paid at?

8  A.   Saturdays.

9  Q.   And when you received your pay on Saturdays, did you

10 receive cash?

11 A.   Yes.  In cash.

12 Q.   And did you ever receive any type of document along

13 with the cash to indicate what you were being paid for?

14 A.   No.

15 Q.   Were you ever given any document indicating what your

16 rate of pay was?

17 A.   No.

18 Q.   Were you ever given any document indicating who your

19 employer was?

20 A.   No.

21 Q.   And did you ever sign any document for Jay?

22 A.   No.

23        THE INTERPRETER:  Excuse me.  Okay.

24 Q.   And how did you get to the job site each day.

25 A.   Leo will give me a ride.

Palacio - Direct/Reilly

213

1  Q.   And would he also take you home from the job site as

2  well?

3  A.   I live in Hempstead and I go to Roosevelt where Leo

4  was, and from there we go to the job site.

5  Q.   And at the end of the day would Leo take you back to

6  Roosevelt after the job?

7  A.   Yes, to Roosevelt.

8  Q.   And were you ever paid more than your daily rate of

9  pay?

10  A.   No.  180.

11  Q.   And were you ever paid overtime compensation when you

12  worked more than 40 hours a week?

13       MR. PEARLMAN:  Objection to form.

14       THE COURT:  Sustained as to form.

15  Q.   Were you ever paid overtime compensation?

16  A.   No.

17  Q.   Now, did Jose Sanchez always work at the job sites

18  with you?

19  A.   Yes.

20  Q.   And do you always see Jose Sanchez at the job sites

21  during your employment with Jay?

22  A.   Yes.

23  Q.   And what did you observe Jose doing at the job sites

24  during your employment?

25  A.   He will bring the van every day and then we will work

Palacio - Cross Pearlman

214

1    in the house, cleaning the materials and bringing the

2    materials.

3    Q.    Do you know who Naheem is, N-A-H-E-E-M?

4    A.    Naheem?

5    Q.    Yes.  Naheem.

6    A.    No.

7    Q.    And was Leo always at the job sites with you?

8    A.    Yes.

9    Q.    And if it ever rained during the week, during the

10   busy season, did you make up the time on Saturday or

11   Sunday?

12   A.    If it would rain on Saturday we will work on Sunday.

13   Q.    Okay.  And if it rained on Friday, would you work on

14   Saturday?

15   A.    Yes.

16          MR. REILLY:  I have no further questions.

17          THE COURT:  Thank you, Mr. Reilly.

18   Mr. Pearlman.

19

20   CROSS-EXAMINATION

21   BY MR. PEARLMAN:

22   Q.    Good morning, Mr. Palacio.

23   A.    Good morning.

24   Q.    Is it correct that the job sites you worked at varied

25   in size?

Palacio - Cross Pearlman

215

1    A.    Of the week?

2    Q.    No.   The size of the rooms that you were working on,

3    were they always the same or did they differ?

4    A.    There were days that they were smaller, but the

5    majority were larger homes.

6    Q.    Well, on the days where the roofs were smaller, did

7    it take as many hours to take down the old roofs and

8    install the new roofs as it would when the job sites

9    involved larger houses?

10   A.    Yes.   There was less time, but they were done, many

11   homes that they were smaller.

12   Q.    On the homes that were smaller, they took less time,

13   correct?   Yes or no.

14   A.    Of course.   Yes.

15   Q.    And on those days, you left the job sites earlier

16   than five o'clock; isn't that correct?

17   A.    Yes.   But not every day.

18   Q.    As you sit here today, can you tell me into the

19   calendar year 2015 a specific week in which you worked

20   more than 40 hours?

21   A.    I always worked from seven to six.

22   Q.    Talking about a total number of hours per week, can

23   you name me a specific week, can you give me the dates of

24   a specific week in 2015 in which you worked more than 40

25   hours.

Palacio - Cross Pearlman

216

1    A.    When my services finished or ended in 2014.

2    Q.    So you no longer worked in 2015.

3    A.    No.

4    Q.    And were you terminated from working or did your

5    separation occur in some other fashion?

6    A.    After 2014 I didn't work.

7    Q.    I understand that.  My question is, was he terminated

8    from working or did his separation occur in some other

9    fashion?

10             MR. REILLY:  Objection to form.

11             THE COURT:  Overruled.

12   A.    For all practical purposes, yes, because they

13   didn't -- they weren't calling me any longer.

14   Q.    And when you say they weren't calling you any longer,

15   who is the "they"?

16   A.    Jay.

17   Q.    And what about Leo?

18   A.    If I wouldn't call Leo, Leo wouldn't call me.

19   Q.    So if you didn't call Leo on a given day, you didn't

20   know whether or not there was a job site working that day;

21   isn't that correct?

22   A.    There were occasions where I called and I was told

23   that there was no work.

24   Q.    I understand that.  And I appreciate that answer.

25             But were there also occasions where you didn't

Palacio - Cross Pearlman

217

1    call Leo to determine whether or not there was work on a

2    given day?

3    A.    Yes.

4    Q.    And so if you didn't call Leo for a given day, then

5    you just didn't show up for work; is that correct?

6    A.    There was days like that where I didn't go, but most

7    of the times I go to work.  And there were days where it

8    rained.

9    Q.    In 2014, how many days did you just not show up.

10   A.    Maybe once or twice.  I don't remember.

11   Q.    Once or twice for the whole year or once or twice a

12   week or once or twice a month?  What's the correct answer?

13         MR. REILLY:  Objection to form.

14         THE COURT:  Overruled.

15   A.    In one month.

16   Q.    Okay.  And was that the same in 2013?

17   A.    Yes.

18   Q.    And also the same in 2012?

19   A.    Then we work every day.

20   Q.    But if you didn't call Leo, you wouldn't know if

21   there was a job every day, would you?

22   A.    When I always went to his place and we always worked.

23   Q.    Didn't you just testify a little while ago that you

24   would call Leo to determine if and when there was a job

25   available?

Palacio - Cross Pearlman

218

1    A.    The only time where I would call him was when it was

2    going to rain, and I would call him and there was no work

3    the following day.

4    Q.    So is it your testimony that any days you didn't show

5    up at the job site in 2014, it was strictly because of

6    weather?

7    A.    The days that it didn't rain.

8    Q.    In other words, there were days when you didn't show

9    up for work in 2014 where it didn't rain; isn't that

10   correct?

11   A.    No, I always went to work.

12   Q.    Throughout the entire time that you provided services

13   for the defendants, was the work schedule exactly the same

14   each and every week?

15   A.    Yes.

16   Q.    When say the work schedules were the same, does that

17   mean that you started at the same time each day?

18   A.    Yes.

19   Q.    All right.  And is it also your testimony that you

20   ended at the same time each and every day for all of those

21   years?

22   A.    Yes.

23   Q.    It never failed?

24   A.    The weather in December, it changes due to the

25   weather.

Palacio - Cross Pearlman

219

1   Q.   Were there ever occasions where you would start at

2   the job site and it would start to rain during the middle

3   of the day?

4   A.   Sometimes.  Once or twice.

5   Q.   And when that occurred, you had to leave the job

6   site; isn't that correct?

7   A.   Yes, it was raining.

8   Q.   So on those days you stopped at sometime other than

9   the regular time, is that your testimony?

10  A.   Yes.

11  Q.   Okay.  Now, there really was never a regular time

12  that you left the job site; isn't that correct?

13  A.   Yes, job site after six.

14  Q.   Not every job was the same, was it.

15  A.   Of course no, but the majority was from seven to six.

16  Q.   In 2014, can you tell me how many days that you

17  provided services for the defendant where you worked less

18  than the quote/unquote regular hours?

19  A.   Maybe two or three times per month.

20  Q.   And there were months where you only provided

21  services ten times, wouldn't that be true?

22  A.   It was most of the days of the months that I worked.

23  Q.   Well, in November of 2014, how many days did you work

24  that month?

25  A.   Well, that month, since it's cold and there is

Palacio - Cross Pearlman

220

1   weather, I worked less.  I believe I worked around 15

2   days.

3   Q.   And what about December of 2014, how many days did

4   you work that month?

5   A.   I have to make a correction.  I left on September

6   2014.

7   Q.   Okay.  Thank you.

8        So did you -- what part of the month did you

9   stop providing services for any of the defendants in

10  September of 2014.

11  A.   In September 2006.

12  Q.   I think there's a misunderstanding, so I want to try

13  to clarify the record.  In September of 2014, when you

14  stopped working with the defendants, was that at the

15  beginning of the month, the middle of the month, the end

16  of the month, or would you describe it some other way?

17  A.   It was around the end of September.

18  Q.   Okay.  So how many days did you work September of

19  2014 for any of the defendants?

20  A.   I don't remember.  Maybe between 15 or 16 days in the

21  month.

22  Q.   In the calendar year 2014, could you name for me a

23  specific week with the dates that you worked more than 40

24  hours?

25  A.   Could you please repeat the question.

Palacio - Cross Pearlman

221

1    Q.   In the calendar year of 2014, can you name me the

2    dates of any specific week in which you worked more than

3    40 hours?

4    A.   Yes.

5    Q.   What are the dates?

6    A.   You between 12 and 15, two weeks.

7    Q.   You say between 12 and 15.  Are you talking about

8    2012 and 2015, or are you talking about something else?

9    A.   Yes.

10    Q.   Were those dates, dates in September, September 12th,

11    September 15th of 2014 or were they something else?

12    A.   I'm confused.

13         MR. REILLY:  Judge, I just want to state for the

14    record I believe there's confusion between the

15    interpretation for the last several questions and answers.

16         THE COURT:  There's some confusion in the

17    questions and answers, the source of the confusion, I'm

18    not sure.  But I'm not foreclosing the line of inquiry.

19         MR. PEARLMAN:  I understand.

20         THE COURT:  You can cover that same territory

21    again.

22    Q.   For the calendar year of 2014 can you name for me by

23    specifying the dates a specific week that you worked more

24    than 40 hours?

25    A.   No.  I don't know.

Palacio - Cross Pearlman

222

1   Q.   And would your answer be the same for 2013?

2   A.   Yes.

3   Q.   And would your answer be the same for 2012?

4   A.   Yes.

5   Q.   Would your answer be the same for 2011?

6   A.   All I know is that I worked from seven to six.

7   Q.   Did somebody tell you to say that.

8           MR. REILLY:  Objection.

9           THE COURT:  No.  Overruled.

10  A.   No.

11  Q.   Did you discuss your testimony with Mr. Sanchez

12  before you testified today?

13  A.   No.

14  Q.   But you sat here and you listened to Mr. Sanchez's

15  testimony; isn't that correct?

16  A.   Yes.

17  Q.   Now, isn't it correct that you observed Mr. Sanchez

18  bring a dump truck that he owned to work sites of the

19  defendant, yes or no?

20          MR. REILLY:  Objection to form.

21          THE COURT:  Overruled.

22  A.   Yes, sometimes every once in a while.

23  Q.   And over what period of time, strike that.

24          Did Mr. Sanchez bring his dump truck to any work

25  site of the defendants in 2012?

Palacio - Cross Pearlman

223

1    A.    Yes, every once in a while.

2    Q.    And in 2013, did Mr. Sanchez bring his dump truck at

3    any time to any work site of the defendants?

4    A.    Sometimes, yes.

5    Q.    And in 2014, did Mr. Sanchez ever bring his dump

6    truck to any of the work sites of the defendant?

7    A.    No, because at that time Mr. Can Jay had his own

8    truck.

9    Q.    Now, on the days Mr. Sanchez brought his dump truck

10   to the job sites, he didn't also bring another truck to

11   the job site, did he?

12   A.    No, of course, because if he was bringing his own

13   dump truck he couldn't bring anything else.

14   Q.    And when Mr. Sanchez brought his dump truck to the

15   work sites, he used that truck to cart away debris from

16   the work sites; isn't that correct?

17   A.    Yes.  On occasion sometimes.  Not every time.

18   Q.    On the days -- strike that.

19          During the time period you provided any services

20   for the defendant, on the days that you did not actually

21   show up at a work site, were you free to work elsewhere?

22          THE INTERPRETER:  Interpreter needs repetition.

23          MR. PEARLMAN:  Okay, I'll rephrase the question.

24   Q.    From the time that you provided services for these

25   defendants, and there were days in which Mr. Palacio was

224

1    not on the work site, was there anybody -- was there

2    anyone that said to him, any defendant say to him that he

3    was not permitted to work elsewhere.

4            MR. PEARLMAN:  You know what, I'll rephrase the

5    question.

6    Q.   Did any defendant ever tell you that you were not

7    permitted to work elsewhere on days where you were not on

8    one of the defendant's job sites?

9    A.   No.

10   Q.   And on those days where you didn't report to the job

11   site, did you sometimes go to Home Depot and offer out

12   your services as day a laborer?

13   A.   Yes.  Sometimes.

14           MR. PEARLMAN:  I have no other questions.

15           THE COURT:  Thank you, Mr. Pearlman.

16           MR. REILLY:  Couple redirect.

17           THE COURT:  Yes, sir.

18           MR. REILLY:  Thank you.

19

20   REDIRECT EXAMINATION

21   BY MR. REILLY:

22   Q.   In 2014, did the busy season start in April?

23   A.   Yes.

24   Q.   And from April until you ended your employment in

25   September 2014, did you usually work with at least five

Palacio - Redirect/Reilly

225

1   days a week?

2   A.    Yes.

3   Q.    And did you usually begin your shift during that time

4   of the day at seven in the morning or 7:30 in the morning.

5   A.    Seven to 7:30 to 6 p.m.

6   Q.    And in 2013, during the busy season, did the busy

7   season for 2013 start in about April?

8   A.    Yes, sir.

9   Q.    And in 2013 from April until the end of October, did

10  you usually work five days a week, at least five days a

11  week?

12  A.    Yes.

13  Q.    And did you usually have the same hours, 7 a.m. or

14  7:30 a.m. until about 6 p.m.?

15  A.    Yes.

16  Q.    And in 2012, did the busy season start in about

17  April?

18  A.    In April.

19  Q.    And in 2012, beginning in April, did you usually

20  start working for five days a week?

21  A.    Yes.

22  Q.    And during the busy season of 2012 did you have the

23  same hours, 7 a.m. or 7:30 a.m. to about 6 p.m.?

24  A.    Yes.

25  Q.    And was that the same for 2010 and 2011 where the

Palacio - Redirect/Reilly

226

1    busy season started in April?

2    A.    Yes.

3    Q.    And during 2010 and 2011 during the busy season, did

4    you usually work at least five days a week?

5    A.    Yes.  Five or six.

6    Q.    And during 2010 and 2011 during the busy season, did

7    you usually work from 7 a.m. or 7:30 a.m. to about 6 p.m.

8    each day?

9    A.    Yes.

10            MR. REILLY:  I have no further with questions,

11   thank you.

12            MR. PEARLMAN:  No other questions.

13            THE COURT:  All right.  Sir, you may step down.

14   What we'll do is we'll break for lunch.  So we'll resume

15   at 10 of 2, so that's an hour and 12 minutes.  So we'll

16   see you at 10 of 2.

17            MR. PEARLMAN:  Your Honor, may make an inquiry.

18   Do the plaintiffs have any further witnesses.

19            MR. REILLY:  No further witnesses.

20            MR. PEARLMAN:  I'll have my first witness then.

21   Thank you.

22            THE COURT:  Very good.

23            (Luncheon recess taken at this point.)

24            (Continued on next page.)

25

227

1        A F T E R N O O N   S E S S I O N

2

3            THE COURT:  Good afternoon, everybody, if you

4    would all be seated.

5            Immediately before lunch when Mr. Reilly, on

6    behalf of plaintiffs, indicated that plaintiffs rested, I

7    don't know if there's any motions to be made.  I'm not

8    suggesting there should be, but I don't want to move on to

9    the next phase of the proceeding without providing

10   defendant with that opportunity.

11           MR. PEARLMAN:  Thank you, your Honor.

12           Yes, for the record, I would make a motion that

13   the plaintiffs' case be dismissed for its failure to meet

14   the plaintiffs' burden of proof; and, specifically, the

15   case law I've cited in our pretrial memorandum regarding

16   the inability of these plaintiffs to be able to state any

17   given week, a specific week, in which they worked more

18   than 40 hours.

19           And I asked these plaintiffs on multiple

20   occasions, multiple attempts, to try to have them name a

21   specific week in which they worked more than 40 hours, and

22   they were unable to do so.

23           So, on that basis, I believe that dismissal

24   should be in order.

25           THE COURT:  Thank you, Mr. Pearlman.

228

1          Mr. Reilly.

2          MR. REILLY:  Given what I believe has been shown

3     to be an employer/employee relationship between Mr. Sage

4     and his companies and the two plaintiffs, the employer is

5     supposed to keep detailed records of wages, time, clock-in

6     and outs, and a lot of other records under Federal FLSA

7     and also under the New York labor law.

8          Mr. Sage and his companies have not been keeping

9     any records at all, no records, to indicate the days of

10    the week that the plaintiffs worked, the hours of the day

11    that these plaintiffs worked, how many hours a week that

12    these plaintiffs worked.  There's a complete lack of

13    recordkeeping which is a violation of both Federal and

14    State law.

15         And given that the case law, the Supreme Court

16    case law, dates back to 1945, I believe, in the Mount St.

17    Clemens case, and it extends to today, that there is a

18    reduced burden on behalf of the plaintiffs that the

19    plaintiffs may -- and the case law coming out of this

20    courthouse and the Second Circuit as well, states that the

21    plaintiffs may give an estimate of the hours that they

22    worked each week.

23         Each plaintiffs were very, very, clear that

24    during the busy season, April through October, that they

25    worked five, sometimes six days a week.  They gave their

229

1    schedules of the schedules they worked.

2         And when you look at the schedules they gave,

3    and the days of the week that they said that they worked,

4    it exceeded 40 hours in every single week from April

5    through the month of October for the six year New York

6    Statute of Limitations period, and also for the three year

7    FLSA Statute of Limitations period.

8         So I believe that the plaintiffs have

9    established their prima facie case based on the reduced

10   burden that they have because of the employer's failure to

11   keep any records at all.

12        It can't be that an employer cannot keep a

13   record at all for an employee for any day, any week, any

14   hour that they worked and employ those people for a period

15   of years and be able to circumvent the law in that regard.

16        I respectfully submit that this case should

17   continue to the second phase and that the Court issue a

18   decision and order at some point thereafter.

19        THE COURT:  Mr. Pearlman, it's your application.

20   Anything further to add to what's already been said?

21        MR. PEARLMAN:  Yes.

22        I was going to read a quote from DeJesus vs. HF

23   Management Services, LLC, 726 F.3d 85 at page 90, the

24   Second Circuit 2013.

25        While plaintiffs in these type of cases, quote,

230

1    could not be expected to allege, with a mathematical

2    precision, the amount of overtime compensation owed by the

3    employer, they should be able to specify at least one work

4    week in which they worked in excess of 40 hours and were

5    not paid overtime wages.

6            As I said, your Honor, I asked these plaintiffs

7    multiple questions.  I tried to give them every

8    opportunity to clarify and they could not name any given

9    weeks.  I asked them for dates, a week, anything, and they

10   couldn't specify.

11           And I believe there's other cases in the Second

12   Circuit.  One of the main one's, Lundy vs. Catholic Health

13   Systems of Long Island, talks about when they only allege

14   in some or all weeks plaintiff worked more than 40 hours,

15   that was not sufficient to meet their burden.

16           Likewise, there's a case of Matere vs. Russo, an

17   Eastern District case.  Plaintiff's allegation during the

18   time relevant here is that plaintiff worked approximately

19   50 to 60 hours per week.  It was found insufficient to

20   plead a Fair Labor Standards Act claim.

21           So I believe they have not met -- and then in

22   addition, your Honor, one other point.

23           On the $500,000 threshold for this Court's

24   jurisdiction, in the testimony there was only one year in

25   which that occurred.  I believe it was 2013.  In the other

231

1   years in which the tax returns which are in evidence

2   although and I asked my client about it, questions, that

3   it was under 400,000.  To that extent I would ask the

4   Court to say that at most it has jurisdiction over one

5   year in which there's the $500,000 threshold and not any

6   of the other years.

7             Thank you, your Honor.

8             THE COURT:  Thank you, gentlemen.

9             MR. REILLY:  Could I respond?

10            THE COURT:  Yes, of course.

11            MR. REILLY:  With regard to the cases,

12  especially the Lundy case that defense counsel stated,

13  these are motion to dismiss cases where the courts want a

14  little more than worked more than 40 hours a week each and

15  every week as a pleading.

16            And we went through discovery and we're at trial

17  and the evidence, the sworn evidence in the case,

18  plaintiffs' testimony, indicates that they worked more

19  than 40 hours a week during every week during the busy

20  season, and they stated what their hours are and what

21  their lunch breaks are.  So there's a specific amount of

22  hours that they said -- that they testified to -- and I

23  believe Mr. Sanchez also said 14 hours a day, five days a

24  week, he said 70 hours.

25            With regard to the enterprise coverage, Judge,

232

1   where the Court or Mr. Sage's business did earn more than

2   $500,000 during one particular year, and that's all that

3   is necessary to get into federal court.  And then there's

4   a New York State claim that has a six year Statute of

5   Limitations.  So one year of enterprise coverage is the

6   only thing that's necessary to be here and then New York

7   Labor Law claims come into play.

8          THE COURT:  Thank you, gentlemen, for your

9   input.

10         I'll reserve decision on it and we will proceed

11   to the next phase of the case.

12         Consistent with what I just said, I look to

13   Mr. Pearlman at this point.

14         MR. PEARLMAN:  Thank you, your Honor.

15         Defendants call their first witness, Leo

16   Maldonado.

17

18   CLEOTILDE MALDONADO,

19              called as a witness, having been first

20              duly sworn, was examined and testified

21              as follows:

22

23         THE COURT:  Be seated and if you would state

24   your first and last name and spell your last name for the

25   Court Reporter.

Maldonado  -  Direct/Pearlman

233

1          THE WITNESS:  Leotilde Maldonado.  The first

2     name is spelled L-E-O-T-I-L-D-E.  Last name is spelled

3     M-A-L-D-O-N-A-D-O.

4          THE COURT:  Thank you, sir.

5          Also, it's very important that you keep your

6     voice up.  I want to make sure everybody can hear what you

7     have to say.

8

9     DIRECT EXAMINATION

10    BY MR. PEARLMAN:

11    Q.    Would you state your address for the record?

12    A.    21 Lakewood Avenue in Roosevelt.

13    Q.    Okay.

14          Are you acquainted with the defendant Ethan Sage

15    in this case?

16    A.    Yes.

17    Q.    How are you acquainted with the defendant Ethan Sage?

18    A.    I have been working for him for several years.

19    Q.    At the present time, do you have any particular job

20    duty for any of the defendants in this case?

21    A.    Yes, I am the foreman.

22    Q.    And how long have you been the foreman?

23    A.    Forever.

24    Q.    And how long have you worked with the defendant?

25    A.    Almost forever.  I've been out for a while and then

Maldonado  -  Direct/Pearlman

234

1   came back.

2   Q.   But, in total, approximately how many years have you

3   worked with the defendant?

4   A.   15 or 18.

5   Q.   From working with the defendant in this case, are you

6   familiar with the plaintiffs in this case, Jose Sanchez

7   and Antonio Palacio?

8   A.   Yes, of course.

9   Q.   And as foreman, do your duties include -- strike

10  that.

11          As foreman, did your duties include supervision

12  of the plaintiffs in this case during the time they

13  provided any services for the defendant?

14          MR. REILLY:  Objection to form.

15          THE COURT:  Overruled.  I'll permit it.

16  A.   Yes, of everybody.

17  Q.   Does that familiarity extend to the amount of days

18  and the amount of hours generally that the plaintiffs

19  provided any services for the defendants?

20          MR. REILLY:  Objection to form.

21          THE COURT:  Sustained.

22  BY MR. PEARLMAN:

23  Q.   Are you generally familiar with the days in which the

24  plaintiffs provided any services?

25          MR. REILLY:  Objection to form.

Maldonado  -  Direct/Pearlman

235

1    THE COURT:  No, I'll permit it.  It's subject to

2    connection.

3    A.    Yes.

4    Q.    Just so we're clear, on any day in which either of

5    these plaintiffs provided any services for the defendants,

6    were you always on the job?

7              MR. REILLY:  Objection to form.

8              THE COURT:  Overruled.

9    A.    Yes, of course.

10   Q.    And during the time that these plaintiffs provided

11   any services for the defendants in this case, on the

12   average, how many days a week did they show up at any job

13   site of the defendant?

14             MR. REILLY:  Objection to form.

15             THE COURT:  Overruled.

16   A.    Three days, sometimes four.

17   Q.    During the time that the plaintiffs worked providing

18   services for these defendants, was there a set fixed time

19   schedule, or did it vary, or would you describe it in some

20   other way?

21             MR. REILLY:  Objection to form.

22             THE COURT:  Overruled.

23   A.    The problem was that we have to do the work that we

24   had to do that day.  So if we finish early, we finished

25   early.  And normally or usually we finished early every

236

1    day.

2    Q.    And were there different size jobs?

3    A.    Oh, yes, of course.

4    Q.    Some jobs were smaller and some jobs were larger; is

5    that fair?

6    A.    Yes.

7    Q.    And the larger the job, the longer it would take; is

8    that correct?

9    A.    No, because we scheduled the work to be done every

10   day.  So if we finish that part of the job that day, we

11   then have a schedule for the following day to do something

12   else so we could finish at the time that we finish.  That

13   was it.

14   Q.    So you didn't finish at the same time every day; is

15   that correct?

16   A.    No.

17         If we finish at 2:00, we would leave at 2:00.

18   If we finish at three, we leave at three.  And on

19   occasions on the second day we were finished even earlier

20   than that.

21   Q.    And during that time period how were you paid, by the

22   hour, by the day, or in some other fashion?

23   A.    Per the day.

24   Q.    And do you know how these plaintiffs were paid,

25   whether they were paid per day, per hour or some other

Maldonado  -  Direct/Pearlman

237

1   fashion?

2   A.   Are you asking how much they were paid per day?

3   Q.   No.  I'm just asking if he knows if they were paid a

4   daily rate, an hourly rate, or would he describe it in

5   some other way.

6        MR. REILLY:  Objection to form.

7        THE COURT:  Overruled.

8   A.   They were paid by the day.

9   Q.   And was that true of all the workers that provided

10  services for the defendant?

11  A.   Are you asking whether it was by day or by hour?

12  Q.   Yes, for all the workers.

13  A.   It was always by the day, not by the hour.

14  Q.   And on those days in which the plaintiffs worked,

15  provided services for the defendants, did they get the

16  same daily rate whether or not you left at 2:00 or 3:00 or

17  5:00 or any other time?

18       MR. REILLY:  Objection to form.

19       THE COURT:  Overruled.

20  A.   They were always paid for the day.  And if they work

21  a little bit late, they were paid a little less.

22  Q.   Now, did there come a time that you ever observed

23  plaintiff Sanchez show up to any job site with a dump

24  truck that was his.

25  A.   Yes, he had a dump truck.

Maldonado  -  Direct/Pearlman

238

1  Q.   And when he brought his dump truck to the work site,

2  did he ever remove debris from the job site using that

3  vehicle?

4  A.   Yes, he was in charge of taking out the garbage.

5  Q.   And could you tell me approximately what year the

6  defendants allowed Mr. Sanchez to bring his dump truck,

7  when it first allowed Mr. Sanchez to bring his dump truck

8  to any job site?

9        MR. REILLY:  Objection to form.

10        THE COURT:  Overruled.

11  A.   No, I don't remember.

12  Q.   Do you recall if Mr. Sanchez brought his dump truck

13  to any job site in the calendar year 2013?

14        MR. REILLY:  Objection to form.

15        THE COURT:  Overruled.

16  A.   He would bring the dump truck when he was asked to do

17  so.  I don't remember the dates.

18  Q.   And before Mr. Sanchez started to bring his dump

19  truck to any job site; what, if any, measures did the

20  defendants do to remove debris from the work sites?

21  A.   Sometimes we will try to throw the debris from the

22  roof directly on to the truck.  If that was not possible,

23  then we would throw it down to the ground and then we

24  would load it into the truck.

25  Q.   What I'm asking is was there a method used prior to

Maldonado  -  Direct/Pearlman

239

1    any truck where you used a dumpster?

2    A.    Yes.

3    Q.    And after Mr. Sanchez started to bring his dump truck

4    to the work sites, did you continue to use dumpsters?

5    A.    When he started bringing his dump truck, we

6    interrupted the use of dumpsters and after that he brought

7    his own truck.

8    Q.    Just so we're clear as to that, when you say he,

9    you're referring to the defendant Ethan Sage?

10   A.    I didn't understand the question.

11   Q.    After -- strike that.

12            Did there come a point where Mr. Sanchez no

13   longer brought his dump truck to any job site?

14   A.    Yes.

15   Q.    And, at that time, was some other arrangements made?

16   A.    Yes, then he did buy a truck.

17   Q.    Just so we're clear, for the record, when you say he

18   then did buy a truck, are you referring to the defendant

19   Ethan Sage?

20   A.    Yes.

21   Q.    And do you recall when Mr. Sage purchased his truck?

22   A.    No, I don't remember.

23   Q.    Now before the time Mr. Sage purchased his truck,

24   did -- strike that.

25            Did there come a time where Mr. Sanchez started

Maldonado  -  Direct/Pearlman

240

1   to bring a company van on any occasion to any work sites

2   of the defendants?

3   A.   Yes.

4   Q.   And was that after Mr. Sage purchased his dump truck?

5          MR. REILLY:  Objection to form.

6          THE COURT:  It is leading.  I'll sustain it on

7   that basis.

8   BY MR. PEARLMAN:

9   Q.   Did Mr. Sanchez ever drive a company van prior to the

10  time that Mr. Sage bought a dump truck?

11  A.   No.

12          When he bought the truck, he started bringing

13  the van.

14  Q.   When you say he started bringing the van, you mean

15  Mr. Sanchez?

16  A.   Yes.

17  Q.   Okay.

18          And during the 15 to 18 years that you've worked

19  with the defendant Mr. Sage in this case, did you ever

20  start working at five a.m.?

21  A.   No, never, never.

22  Q.   What is the -- in the 15 to 18 years you worked with

23  Mr. Sage, what is the earliest time you ever started

24  working on any given morning?

25  A.   Between seven and 7:30.

Maldonado   -   Direct/Pearlman

241

1   Q.   And during the days that Mr. Sanchez drove the

2   company van, are you aware of whether or not he received

3   any compensation directly related to driving the company

4   van?

5   A.   Yes, he paid him $100 to bring and return the van.

6   Q.   And did he pay him that in cash, by check or some

7   combination of the two?

8   A.   No, cash.

9   Q.   And when did he pay him the cash, was it always the

10  same day or did it differ?

11               MR. REILLY:   Objection to form.

12               THE COURT:   Overruled.

13  A.   The same day that the van was drove, he would pay him

14  in the afternoon for that day.

15  Q.   And how do you know that?

16  A.   Because he would do it in front of all of us.

17  Q.   So you saw it when it occurred?

18  A.   I saw that several times when he was giving him the

19  money.

20  Q.   And at the end of -- strike that.

21               As part of your duties, were you required to

22  hand paychecks or cash payments to any of the workers?

23  A.   No.   He would put the money in an envelope and I will

24  give that to every one of the workers with the name on it.

25  Q.   Just so we're clear, so your duties in that respect

Maldonado   -   Direct/Pearlman

242

1    just involved handing an envelope to the workers; is that

2    correct?

3    A.    Since we all live together, he would send the money

4    or make the money available at my home and then they will

5    come to my house and I will pay them there.

6    Q.    Now, during the time that Mr. Palacio performed

7    services for any of the defendants, were you familiar with

8    where he resided?

9    A.    At the beginning he lived close to my home and then

10   he moved to Hempstead.

11   Q.    And, if you know, how did Mr. Palacio get to the job

12   sites on the days that he provided services for the

13   defendant?

14   A.    Sometimes I call him and told him that we were going

15   to work the following day.  On other occasions he would

16   call me and ask me if there was work on the following day

17   and then I will give him a ride every day.

18   Q.    And so on any of those days that you gave plaintiff

19   Palacio a ride, did you ever arrive at any job site before

20   7:00 a.m.?

21   A.    We always work there at seven, 7:30.

22   Q.    To your knowledge, and what you personally observed,

23   did either of these plaintiffs ever work more than 40

24   hours a week?

25            MR. REILLY:  Objection to form.

Maldonado  -  Direct/Pearlman

243

1    THE COURT:  Overruled.

2    A.   No.

3    Q.   Never?

4    A.   Never.

5    Q.   During the 15 to 18 years that you've worked with the

6    defendants, did you ever work more than 40 hours a week?

7    A.   Never.

8    Q.   And what types of -- strike that.

9         Is it correct that the defendants in this case

10   did work on roofing for houses, is that some of their

11   work?

12        MR. REILLY:  Objection to form.

13        THE COURT:  Overruled.

14   A.   Yes.

15   Q.   And were there any other kinds of jobs that the

16   defendants ever did?

17   A.   Just roofing.

18   Q.   I understand.

19        Were there any other types of roofs other than

20   houses?

21   A.   Are you talking about commercial buildings?

22   Q.   Yes.

23   A.   Yes, on occasion we had commercial buildings.

24   Q.   And who would actually do the work on those jobs?

25   A.   The work was done by a friend of his that is the only

Maldonado  -  Direct/Pearlman

244

1    one who knows how to work the torch.

2    Q.    And when you say a torch, could you explain for the

3    Court how a torch is used on those commercial buildings?

4    A.    What I observed is that the work was done by using

5    fire with a torch.

6    Q.    Did either of these plaintiffs, Mr. Sanchez or

7    Mr. Palacio, ever perform any torch work for the

8    defendants in this case?

9    A.    No, they cannot do that kind of job.

10   Q.    In your role as foreman, did you ever have any

11   conversations with plaintiff Sanchez regarding the manner

12   in which he performed his services?

13   A.    Are you asking what he had to do?

14   Q.    No.

15         I'm asking you, did you ever speak with him

16   concerning the methods or how he was doing his job?

17   A.    I still don't understand the question.

18   Q.    As part of your job as foreman, if I understood your

19   testimony, you had to supervise the workers, including

20   these plaintiffs; is that correct?

21   A.    Yes.

22   Q.    Within that capacity, did you ever have occasion to

23   tell Mr. Sanchez that in some fashion or another you found

24   some service that he provided to be unacceptable?

25   A.    Well, his work was to throwaway the debris and/or to

245

1    bring the materials up.  The installation work was done by

2    me.

3    Q.    Did you ever have occasion to speak with Mr. Sanchez

4    regarding any safety issues?

5    A.    Yes, as far as using the harnessing and the tethers I

6    guess, yes.

7    Q.    Did you ever have any conversations regarding

8    footwear that Mr. Sanchez was employing on the job?

9    A.    We had to tell him every day to tie his shoes because

10   he always -- they were always loose.

11   Q.    Were you the only person that told him that?

12   A.    Every one would tell him that.

13   Q.    To your knowledge, did there come a time where the

14   defendants terminated the services of plaintiff Sanchez?

15   A.    There was a moment that the workload came down and

16   there was not work for everyone, and he was one of the

17   ones that was left out.

18   Q.    Now, also, just during the time that these plaintiffs

19   were working, did every job site have the same number of

20   workers or did it vary?

21   A.    When we had a large job, everybody was there.  But if

22   it was a smaller job, there was less people there.

23   Q.    Were there small jobs in which these plaintiffs were

24   not on the job?  I'll rephrase the question.

25            As foreman, did you know whether or not these

Maldonado  -  Direct/Pearlman

246

1    plaintiffs worked on each and every job that the

2    defendants had?

3    A.    No, not everyone.

4    Q.    So there were job sites that the plaintiffs' services

5    were not required; is that correct?

6    A.    With the small jobs it was very rare that they would

7    be there.

8    Q.    And at any time within the last year, did you have

9    any conversations with plaintiff Sanchez regarding this

10   case?

11   A.    Yes.

12          We met one day at a deli and we had a

13   conversation and he told me that he was not suing for

14   money, what he wanted was his job back.

15   Q.    And was that the only conversation you had with

16   Mr. Sanchez about that subject?

17   A.    Yes, that conversation at the deli was the only

18   conversation on this.

19          MR. PEARLMAN:  I don't have any other questions.

20          THE COURT:  Very good.  Thank you.

21          MR. REILLY:  May I inquire, Judge?

22          THE COURT:  Yes, sir, Mr. Reilly.

23   Cross-examination.

24

25   CROSS-EXAMINATION

Maldonado - Cross/Reilly

247

1   BY MR. REILLY:

2   Q.   Sir, did you come here yesterday to the courthouse?

3   A.   Yes.

4   Q.   And did you stay here for the whole day yesterday?

5   A.   No.

6        Since I wasn't going to be called, I went home.

7   Q.   How did you get here to the courthouse yesterday?

8   A.   The owner gave me a ride.

9   Q.   Okay.

10       And then did the owner's daughter give you a

11  ride home?

12  A.   No, another workman, a black guy took me home.

13  Q.   Nahim, did he take you home?

14  A.   Yes.

15  Q.   And did you spend the entire day here today up until

16  now?

17  A.   Um-hum.  Yes.

18  Q.   And did the owner bring you here this morning?

19  A.   Yes, he gave me a ride.

20  Q.   And is the owner going to bring you home after you're

21  done testifying?

22  A.   Yes, with him, he will take me home.

23  Q.   When you say the owner, you mean Jay; is that

24  correct?

25  A.   Yes.

Maldonado   -   Cross/Reilly

248

1   Q.    And Jay is Jesus Torres; is that correct?

2   A.    That's the name that he had before.

3   Q.    And Jay is your employer; is that correct?

4   A.    Yes.

5   Q.    And for the last three or four years you have worked

6   exclusively for Jay; is that correct?

7   A.    Yes, I did, I worked with him.

8   Q.    And you're Jay's employee, correct?

9   A.    Yes.

10  Q.    And Jay is your employer; is that correct?

11  A.    Yes.

12  Q.    And has Jay promised you your day rate of pay to be

13  here yesterday and today?

14  A.    He hasn't promised anything.

15  Q.    Did you ask Jay to be paid your day rate of pay for

16  being here yesterday and for being here today?

17  A.    No.

18           I'm here to tell the truth and it has nothing to

19  do with whether he pays me or not.

20  Q.    Do you know whether or not Jay is going to pay you

21  for being here yesterday and for being here today?

22  A.    I'm not doing this for money.  I don't know whether

23  he's going to pay me or not.

24  Q.    You've been friends with Jay for 20 years; is that

25  correct?

Maldonado  -  Cross/Reilly

249

1    A.    Yes, more or less 20 years.

2    Q.    And you go out socially with Jay to play pool; is

3    that correct?

4    A.    That was some time ago.  We don't do that anymore.

5    We go out and maybe play pool and/or maybe have a beer

6    together, but that was some time ago.

7    Q.    And am I correct that Jay has loaned you money over

8    the years?

9    A.    Yes.  When I needed money, he would loan it to me.

10   Q.    Excuse me?

11   A.    When I needed money, he would loan it to me.

12   Q.    So over the years, whenever you needed some type of a

13   loan, Jay would always give it to you; is that correct?

14   A.    Yes.

15   Q.    Over the past three to four years where you've been

16   working exclusively for Jay, he's paid you in check and in

17   cash; is that correct?

18   A.    Yes.

19   Q.    And some weeks Jay will pay you in all cash; is that

20   correct?

21   A.    Normally he would pay me by check always.  There is

22   occasions he gives me some cash.

23   Q.    And over the past three or four years there's been a

24   lot of occasions where Jay has given you cash; is that

25   correct?

Maldonado  -  Cross/Reilly

250

1    THE INTERPRETER:  The interpreter didn't

2    understand the answer.

3    MR. REILLY:  You didn't understand the answer?

4    THE INTERPRETER:  No.

5    BY MR. REILLY:

6    Q.   Over the past three to four years, am I correct that

7    Jay has given you cash many times?

8    A.   Yes, but not always.  He normally pays me with a

9    check, but on occasions where there's just one day or two

10   days of work he will pay me in cash.

11   Q.   So let's say in the last two years, if you only

12   worked two days a week, Jay would pay you in cash for

13   those two days; is that correct?

14   A.   Sometimes.  Other times he pays me with a check.

15   Q.   And currently how much do you get paid per day?

16   A.   $400.

17   Q.   And so if you worked two days a week in the year

18   2017, Jay will pay you $800 in cash; is that correct?

19   A.   Yes.

20   Q.   In the year 2016, if you worked two days a week, Jay

21   would pay you in cash; is that correct?

22   A.   Sometimes he pays in check and sometimes he pays in

23   cash.

24   Q.   Am I correct that when you get your 1099 at the end

25   of the year, the 1099 doesn't have any of the cash you

Maldonado  -  Cross/Reilly

251

1    received on it; is that correct?

2    A.    I don't know.

3    Q.    Jay always paid you by the day; is that correct?

4    A.    Yes, by the day.

5    Q.    And Jay's workers that work with you at the job sites

6    are employees of Jay's; is that correct?

7    A.    Yes.

8    Q.    And all Jay's employees always get paid by the day;

9    is that correct?

10   A.    By the day, yes.

11   Q.    Am I correct that Jose Sanchez usually would go to

12   Jay's house or his yard in Oceanside to pick up Jay's

13   truck to bring that truck to the work site?

14   A.    I don't go with him.  I am assuming that he goes to

15   his yard.

16   Q.    Repeat that?

17   A.    I do not go with him, so I am assuming that he would

18   go to that yard.

19   Q.    But did Jose Sanchez usually go to Jay's yard in

20   Oceanside to pick up Jay's truck to bring that truck to

21   the work site?

22   A.    I assume that he goes to pick up the truck at the

23   yard, but I don't know whether he goes to that yard or he

24   goes to his house.

25   Q.    Okay.

Maldonado  -  Cross/Reilly

252

1          But you know that he either goes to his house or

2    he always went to his house or to Jay's yard to pick up

3    the truck to bring the truck to the work site; is that

4    correct?

5    A.    Okay.  When he was driving the van, I imagine that he

6    was going to that yard to pick it up.

7              (Continued on next page.)

Maldonado - Cross/Reilly

253

1  Q    And he would take that van and he would bring that to

2  the work site; am I correct?

3  A    Yes.

4  Q    And at the end of the day when the job was completed

5  he would take the van either back to Jay's yard or back to

6  the house; is that correct?

7  A    Wherever he was going to.

8  Q    Do you recall coming to my office in October where

9  you gave sworn deposition testimony?

10  A    Yes.

11  Q    And you raised your right hand like you did here

12  today and said you were going to tell the whole truth and

13  nothing but the truth; is that correct?

14  A    Yes.

15  Q    And like today, there was an interpreter in my office

16  interpreting the questions from English to Spanish and

17  then your answers from Spanish to English; is that

18  correct?

19  A    Yes.

20  Q    And do you recall on page 45 beginning at line 5, did

21  Jose Sanchez usually go to Jay's house in Oceanside to

22  pick up Jay's truck to bring that truck to the job site,

23  and you answering on line 8:  Yes, he would get paid to

24  take the truck, to take the tools over there so he would

25  pay him for that.

254

1     Do you recall being asked that question and

2   giving that answer?

3     THE INTERPRETER:  May the interpreter have a

4   copy of that deposition, please.

5     MR. REILLY:  You can't question without having

6   the transcript?

7     THE INTERPRETER:  The interpreter requests the

8   pages.  May the interpreter have the page and line.

9     MR. REILLY:  Page 45, beginning at line 5 and

10  ending on line 10.

11  A    I don't remember -- it looks like yes, but I don't

12  recall.

13  Q    You have the transcript in front of you.

14      Does the question at line 5 say did Jose Sanchez

15  usually go to Jay's house in Oceanside to pick up Jay's

16  truck to bring that truck to the job site, and does the

17  answer say or the answer you gave say, yes, he would get

18  paid to take the truck, to take the tools over there, so

19  he would pay him for that?

20  A    Yes.  I don't remember exactly, but, yes, I know that

21  I said something about that he would bring the truck and

22  we would pay him for that.

23  Q    Looking at page 45, line 19 through 21.  Do you

24  recall being asked the question:  At the end of the day

25  does Jose Sanchez then take Jay's truck to bring it back

Maldonado - Cross/Reilly

255

1    to Oceanside.

2            Do you recall giving the answer:  Yes, he takes

3    it back to the yard.

4            Do you recall being asked that question and

5    giving that answer?

6    A     I believe so.

7    Q     Okay.  And on page 47 of your deposition transcript,

8    beginning on line 22, do you recall being asked the

9    question:  When the job is done, or when the workers leave

10   for the day, did Jose Sanchez take the van back to the

11   yard in Oceanside.  And you giving the answer at line 25:

12   Yes.

13           Do you recall being asked that question and

14   giving that answer at your deposition in October?

15   A     Yes.  Though I don't remember it well, but yes, he

16   did bring the truck back.

17   Q     Okay.  Is that the answer that you gave when you were

18   asked that question?

19   A     What I know is that at the end of the day he will

20   bring -- he will take the truck back to the yard.

21   Q     Okay.  Am I correct that when Jay brought the truck

22   to the work site, you don't know -- withdraw that.

23           Am I correct that when Jose Sanchez brought the

24   truck to the work site you don't know what time he went to

25   pick up the truck in the morning; is that correct?

Maldonado - Cross/Reilly

256

1    A    No, because the owner would tell him to pick up the

2    truck.  I don't know what time he was going there.  I

3    would go with the other guys to the job site.

4    Q    Am I correct you don't know how much time each

5    morning that Jose Sanchez spent getting the truck and

6    bringing it to the job site?

7    A    I don't know exactly but most of the jobs were

8    nearby, so it has to be something like 15 to 20 minutes.

9    Q    Am I correct, you were never there with Jose when he

10   went to Jay's yard to pick up the van or the truck in the

11   morning; is that correct?

12   A    No, I was never there.

13   Q    Okay.

14            So you don't know what time Jose arrived at

15   Jay's yard to pick up the van or the truck, correct?

16   A    No, I don't know.

17   Q    And you didn't travel in the van or the truck from

18   Jay's yard to the job site; is that correct?

19   A    No.  No.

20   Q    So you don't know how long it took him to go from

21   Jay's yard with the van to the job site; is that correct?

22   A    You can get a very good idea how long it will take to

23   get into the job site, looking at the location of the job

24   and the construction site.

25   Q    But there were job locations in Queens; am I correct?

Maldonado - Cross/Reilly

257

```
 1   A    Very rarely.

 2   Q    And there were job locations in Suffolk County,

 3   correct?

 4   A    Most of them were in Nassau County, a few in Suffolk.

 5   Q    But there were jobs in Suffolk, right?

 6   A    Yes.

 7   Q    There were also jobs on the North Shore of Nassau

 8   County; is that correct?

 9   A    What do you mean by the North Shore?

10   Q    Okay.  Do you know where the North Shore of Nassau

11   County is?

12   A    Around Long Beach?

13   Q    No, that's the South Shore.

14   A    Like Glen Cove?

15   Q    Yes.  Were there jobs in Glen Cove?

16   A    Yeah, there were some.

17   Q    Were there jobs in Roslyn?

18   A    Yes.

19   Q    Okay.

20         So on days that there were jobs in Glen Cove and

21   Roslyn, am I correct that you don't know when Jose got

22   into the van at Jay's yard and how long it took him to get

23   to Glen Cove from Oceanside; am I correct?

24   A    No.

25   Q    Am I correct that you also don't know how long it
```

258

1    took Jose Sanchez to leave the job site in Glen Cove or

2    Roslyn and travel all the way back to Oceanside to where

3    the yard was located; is that correct?

4    A    No, I didn't.

5    Q    And am I correct that Jose Sanchez would bring Jay's

6    van to the work site and then he would stay at the work

7    site and work all day?

8    A    Yes.

9    Q    And Jay never asked you to keep track of the hours

10   that either Jose or Antonio worked; is that correct?

11   A    No.

12   Q    And am I correct you never kept track of the hours

13   that either Jose or Antonio worked?

14   A    No.

15   Q    And am I correct you never kept track of the days

16   that either Jose or Antonio worked; is that correct?

17   A    The normal thing was for them to work three days.  I

18   was the foreman and I had to finish the roof, so I may

19   work four or five days.

20   Q    Didn't you testify earlier that the normal for them

21   was three to four days a week?

22   A    Yes, three or four days.

23   Q    Okay.  But you never kept track of the actual days

24   they worked; is that correct?

25   A    No, but there were only a few days.  Just a few days.

Maldonado - Cross/Reilly

259

1    Q    There could have been weeks where they worked five

2    days a week, correct?

3    A    No.

4    Q    Well, you just testified that you worked four to

5    five days a week; is that right?

6    A    Being the foreman, I worked more than the others

7    because my work requires me to work more than the others.

8    And there are jobs that there are two or three guys.

9    Q    And being the foreman you worked four to five days a

10   week; is that right?

11   A    Not every week.

12   Q    But there were several weeks --

13   A    Sometimes.

14   Q    The normal for you was to work four to five days in a

15   week; is that correct?

16   A    Four, sometimes five.  And yes, three or four days.

17   Q    And from week to week, am I correct, that you don't

18   know how many hours that Jose Sanchez worked?

19   A    No.

20   Q    And from week to week, am I correct you don't know

21   how many hours that Antonio worked?

22   A    We worked by the day.  We never worked by the hour.

23   Q    Okay.  Am I correct that from week to week you don't

24   know which days of the week Jose worked?

25   A    The days that he had worked for the week, is that the

260

1   question?

2   Q    From week to week, am I correct, you don't know which

3   days of the week Antonio worked?

4   A    Sometimes we would work a Monday, other times it

5   could have been Thursday and Friday.  We never worked the

6   same days.

7   Q    But am I correct because you didn't track the days

8   that Antonio worked, you don't know which days of the week

9   he worked from week to week; is that correct?

10  A    If he worked -- in one week he worked three days, I

11  knew that he had worked three days.

12  Q    Okay.  But as you sit here today, you don't know,

13  let's say for the year 2014, you don't know how many days

14  or which days of the week he worked from week to week; is

15  that correct?

16  A    No, of course not.  I cannot remember.

17  Q    Now, am I correct that you are unaware of any time

18  records that exist to show how many hours a week that the

19  workers worked?

20  A    No.

21  Q    And you are unaware of any worker that has punched in

22  and punched out on a daily basis; is that correct?

23  A    No.

24  Q    And am I correct that you never kept a record of

25  the -- for each job the actual workers that worked on each

**261**

1    day from day-to-day; is that correct?

2    A    No.

3    Q    Okay.  So as you sit here today you don't know what

4    jobs Jose and Antonio worked on and what jobs Antonio and

5    Jose didn't work on?

6    A    I can't remember all of those details.  They worked

7    at some jobs and they didn't work at others.

8    Q    But you testified that Jose was bringing a dump truck

9    to dump materials; is that correct?

10    A    Yes, but when we need the dump truck, he didn't bring

11    it because we didn't need it.

12    Q    So there were times he brought the dump truck and

13    there were times he didn't bring the dump truck; am I

14    correct?

15    A    He would only bring it when the boss would tell him

16    to do so, otherwise he wouldn't bring it.

17    Q    Okay.  And when the boss didn't tell him to do so

18    that's when he went and got the van in the morning and

19    brought the van to the work site; is that correct?

20    A    Yes.

21    Q    Now, Jay goes up on the roofs to supervise the work

22    and see how the job is being done; is that correct?

23    A    At the end of the day when the job is finished, he

24    goes up to inspect it and determine that the work is --

25    has been done properly and complete.

Maldonado - Cross/Reilly

262

1  Q    As the work is actually being done, doesn't Jay

2  sometimes get on the roof to supervise?

3  A    When there was something special to do like removing

4  the electrical fans he would do it.  He would be the one

5  that would be able to do it.

6  Q    Let's turn to page 51 of your deposition transcript

7  beginning at line 2.  Tell me when you get there.

8         Do you recall being asked the question beginning

9  on line 2, in the last 3 to 4 years has Jay ever stayed on

10  the work site where he got on the roofs to help?

11         Answer:  Jay?

12         Question:  Yes?

13         Answer:  Line 7.  Yes, he goes up and supervises

14  the work to see how the job is done.

15         Do you recall being asked those questions and

16  giving those answers?

17  A    Yes.  He supervises the work.  He supervises it.

18  Q    And going down to line 21.  Do you recall being asked

19  the question, while the job is actually in progress, Jay

20  is usually not present, is that correct?

21         Answer:  Line 23.  There are times that he is

22  there present.  He's watching us work, he comes in

23  whenever he has time.  I'll ask him for something that is

24  missing and he comes.

25         Do you recall being asked that question and you

Maldonado - Cross/Reilly

263

1    giving that answer?

2    A    Yes.

3    Q    Now, am I correct that you never kept track of the

4    hours that you worked for Jay in the past 3 to 4 years?

5    A    No.

6    Q    And you've never kept track of the days of the week

7    that you worked for Jay in the past 3 to 4 years, am I

8    correct.

9    A    No, I don't.

10   Q    And you never kept track when you arrived at the job

11   site and when you left the job site; is that correct?

12   A    Normally, depending on the work, but normally we

13   would get there between 7 and 7:30 and normally we leave

14   at around 2 o'clock or sometimes earlier.

15   Q    And sometimes what?

16   A    Earlier.

17   Q    So is it your testimony that your day usually ends at

18   2 o'clock or earlier than 2 o'clock?

19   A    It depends on the job, but normally we finish

20   around -- it could be three it could be even earlier, no

21   later than 3 o'clock.

22   Q    Don't you recall times working at job sites until

23   5 o'clock in the afternoon?

24   A    On a few occasions, not always, there was a small

25   portion of the job that was left to be done.  And instead

264

1    of doing that job the next day, we would stay an hour or

2    maybe a little over an hour and he will then pay us for

3    that.

4    Q    So is it your testimony that whenever you worked past

5    2 o'clock in a day, Jay would pay you extra money?

6    A    Normally we will work until 2 or 2:30.  Maximum

7    3 o'clock.

8          If there was work past 3 o'clock, and we could

9    finish the job instead of coming the following day, he

10   will pay us for that time.

11   Q    And --

12   A    Excuse me.  He will give us some money.  Otherwise we

13   will have to come the following day, work two hours and be

14   paid for a full day.

15   Q    And didn't Jay want the jobs to be completed one day?

16        MR. PEARLMAN:  Objection.  Objection to form.

17        THE COURT:  No, overruled.

18   A    He would schedule what was going to be done every

19   day.

20   Q    And did he also schedule the time it should take to

21   do the job every day?

22   A    The way it worked is that he will tell us what the

23   work was supposed to be, and then we would work as fast as

24   possible so we would leave as early as possible.

25   Q    Did you ever work as early as possible because Jay

Maldonado - Cross/Reilly

265

1    wanted the roof installation to be completed in one day?

2    A    No, we never had that kind of pressure.

3    Q    Well, if 2 o'clock comes along and there are 2 to

4    3 hours left to do, would you get up to leave the job site

5    or would you complete the job?

6    A    When there was a certain job to complete, then we

7    would complete the job, but if it were something like two

8    more hours, we would come the next day because we wanted

9    to get paid for the following day.

10   Q    If it's 2 o'clock on a day and you were not done with

11   the roof, then you leave and come back the next day to

12   work?

13   A    For example, if we had finished ripping away the

14   roof, then we have in case of rain, we have to cover it

15   with a tarp and we will finish the job the next day.

16   Q    Okay.

17        So I'm just trying to get your testimony

18   correct, okay.

19        If 2 o'clock comes along and you are not done

20   with the job, would you then put a tarp on the roof and

21   come back the next day to finish the job?

22   A    No, what we did, everything that had been removed, it

23   had to be finished and recovered, and what we made sure

24   everything was covered and didn't leave any holes open and

25   we would come back the following day to finish the job.

Maldonado - Cross/Reilly

266

1    Q    So you are not directly answering my question.

2         So you are calling yourself a foreman; is that

3    correct?

4    A    Yes.

5    Q    So as the foreman, when 2 o'clock comes each day of

6    week, do you stop work, if you are not done, and finish

7    the job the next day?

8    A    Yes.

9    Q    Okay.  So you would get $400 for working from

10   7:00 a.m. to 2:00 p.m., correct?

11        Correct?

12   A    It's not precisely 2 o'clock.  It's 2, 2:30,

13   3 o'clock.

14   Q    And sometimes is it 4 o'clock?

15   A    Very rarely.

16   Q    Okay.  But sometimes it is 4 o'clock?

17   A    We never went past 4 o'clock.

18   Q    And am I correct that if you stopped the job at

19   2 o'clock and put the tarp on the roof, and then you came

20   back the next day to work for two, three hours, you would

21   get paid $400 for the second day's work; is that correct?

22   A    We were always paid for a full day and we tried to

23   work so that we could leave as early as possible, and then

24   come the next day and finish the job as to the schedule.

25        THE COURT:  We'll break now and resume a quarter

Maldonado - Cross/Reilly

267

1    of four.  We'll see you all at a quarter of four.

2              (Whereupon, a recess was taken.)

3              THE COURT:

4              MR. REILLY:  May I continue?

5              THE COURT:  Mr. Reilly, please.

6    Q    Sir, I just want to be clear for the record.  In the

7    last three to four years if 2 o'clock comes around and you

8    see you have about three hours of work left, would you

9    pack up for the day and put the tarp up on the roof and

10   come back the next day?

11             Is that the usual practice?

12   A    Everything has been planned for what we are supposed

13   to do in the day.  At the end of the day we rarely use the

14   tarp.

15             What I meant was we close the roof -- any part

16   of the roof that has been opened, we close it again and

17   that's what we do.

18   Q    Okay.  My question was different.

19             My question was in the last three to four years,

20   if 2 o'clock comes around and you see there is about three

21   hours of work left, would you stop working for the day and

22   come finish the job the next day?

23   A    No, again, we have a plan that we are going to do

24   during the day.  So we do everything.  At the end of the

25   planned work, we cover up whatever is still open and we

268

1   leave.  We never use a tarp.  We just close up.

2   Q    The last question I asked didn't have anything to do

3   with the tarp, okay.

4        I'm trying to, for the record, I want you to

5   testify as accurately as you can, okay, and I believe you

6   testified that the day usually ends at 2 o'clock; is that

7   correct?  Did you testify to that?

8   A    We finish normally between two and three.

9   Q    And you testified that you never worked past four; is

10  that correct?

11  A    By that time we are home.

12  Q    Okay.  So at 2 o'clock on a workday, if you see that

13  there is two or three hours worth of work that hasn't been

14  done, do you pack up for the day and go home and come back

15  the next day to the same job site?

16  A    What happens is that the work that has been

17  scheduled, is finished by 2 or 3 o'clock.  If there is

18  more work to be done, that work has been planned for the

19  following day.

20  Q    Are there times in the last three or four years that

21  the work for the following day was only for two to

22  three hours?

23  A    Yes, if what has been scheduled is there is a second

24  day where we'll be working there and we have three hours

25  or four hours to work, we go and finish the work and we

269

1    are paid for the full day.

2    Q    So has Jay in the past three to four years scheduled

3    a job from 7:00 a.m. to 2:00 p.m., and then scheduled the

4    same job to be finished the next day from 7:00 a.m. to 10

5    or 11:00 a.m.?

6    A    What we do is that we calculate the work for the day

7    to finish in around 2 or 3 o'clock.  The rest of the work

8    is scheduled for the following day.

9    Q    Are there times that Jay scheduled jobs, a house to

10   be done during the hours of 7:00 a.m. and 2:00 p.m., and

11   then scheduled the job to be finished the next day from

12   7:00 a.m. to 10:00 a.m.?

13   A    No jobs are the same size.  So if there is a job that

14   takes two days to complete, we complete the first day and

15   then we go the second day and finish whatever has to be

16   done the second day.

17   Q    And are there times in the last three to four years

18   that the second day only took two to three hours to finish

19   the job?

20   A    Yes, on occasions.  We just work for a couple of

21   hours.

22   Q    So Jay would pay you $400 to work from 7:00 a.m. to

23   2:00 p.m., correct?

24   A    Yes.

25   Q    And instead of finishing the job by like 5:00 p.m.,

Maldonado - Cross/Reilly

270

1    he would have you come back the next day and he would pay

2    $400 to work the day at the same job site; is that

3    correct?

4    A    That's the way the work is scheduled.  If the job is

5    scheduled to work two days, we work two days.  If there

6    happens to be two hours for the second day, we are paid

7    for the full day.

8    Q    Are there times that jobs were scheduled to be

9    completed in one day?

10   A    If it's a small job it can be finished in one day.

11   Q    And were there times -- withdraw that.

12        Were there times that in the past three to

13   four years, that Jay scheduled the job to be completed in

14   just one day.

15   A    There are jobs, depending on the size of the job that

16   can be done in one day, so, yes.

17   Q    But my question is different because you've been

18   talking about Jay scheduling jobs for one day, two days.

19        My question to you is are there jobs in the past

20   two to three years that Jay has been scheduled to be

21   completed in just one day?

22   A    Yes, there have been several jobs.  Of course, it

23   depends on the size of the house, but there are lots of

24   jobs that I completed in one day.

25   Q    But had there been several jobs in the past three to

271

1   four years that Jay has scheduled to be completed in one

2   day?

3   A    It depends on the size of the work.  How many square

4   feet.  1200 takes less than 2400.

5   Q    See if we can do this with a yes or no answer, okay.

6        Have there been times in the last several years

7   that Jay has scheduled a job to be completed in one day?

8   A    Yes.

9   Q    Okay.  And when Jay schedules a job to be completed

10  in one day, you as the foreman makes sure that the job is

11  completed in that one day; is that correct?

12  A    Yes, because it has been planned that way.

13  Q    So if the job is not completed by 2 o'clock, you

14  continue working until the job is completed; is that

15  correct?

16  A    Okay.  What happens is that always whatever is

17  scheduled is done.

18  Q    Okay.  So if the job that is scheduled for one day is

19  not completed at 2 o'clock, isn't it true that you and the

20  other workers continue working until the job gets

21  completed?

22  A    What I know is whatever is scheduled to be done in

23  one day, we complete in one day.

24  Q    And sometimes it takes you up until 4 o'clock to

25  complete whatever is scheduled in one day; is that

Maldonado - Cross/Reilly

272

1    correct?

2    A    It's not frequently or not often, but if something

3    has happened that makes the job to last longer than

4    anticipated, we'll stay longer and we get paid for that

5    time.

6    Q    And sometimes you are required to stay past 4 o'clock

7    on the workday; is that correct?

8    A    If that happens around 4 o'clock, there was a little

9    bit of work to complete, instead of coming the following

10   day we finish the job that day.

11   Q    Okay.  So there have been times when you and the

12   workers have worked past 4 o'clock; is that correct?

13   A    In very rare occasions.

14   Q    Hasn't there been times in the last several years

15   that you and the workers have worked up until 5 o'clock in

16   the afternoon?

17   A    That doesn't happen that often or that doesn't happen

18   at all.

19   Q    So that has never happened in the 18 or so years that

20   you worked for Jay that the job hasn't been past

21   5 o'clock?

22   A    Those are decisions that are made on the spot that

23   are never scheduled that way.  If there is a little work

24   to be done, we'll finish it.  That's it.

25            (Continued on the following page.)

Maldonado - Cross/Reilly

273

1    BY MR. REILLY:

2    Q.    Okay.  So have there been times that the jobs have

3    taken up until five p.m. to finish?

4    A.    Again that happens very rarely, if we have to finish

5    the job we didn't job, but that's very rare.  We do

6    whatever is scheduled to be done.

7    Q.    And whatever is scheduled to be done sometimes takes

8    you until four o'clock in the afternoon to complete; is

9    that correct?

10   A.    Whatever is planned, normally we finish between two

11   and three.

12   Q.    And sometimes does the scheduling of the job one

13   day -- actually, withdraw that.

14          Isn't it true that sometimes the day's schedule,

15   the workers schedule for the day takes you past

16   four o'clock in the afternoon.

17          THE COURT:  Didn't we just go through that.

18          MR. REILLY:  I'll withdraw that, Judge.

19   Q.    Sir, do you know who Naheem is?

20   A.    Yes.

21   Q.    You just saw Naheem out in the hallway; is that

22   correct?

23   A.    Yes.  He's there.

24   Q.    Okay.  And is Naheem, is he an apprentice?

25   A.    Yes.  He is learning now install roofs.

**Maldonado - Cross/Reilly**

274

1    Q.   So he hasn't installed roofs yet; is that correct?

2    A.   No.  He's an apprentice.

3    Q.   So neither considered a mechanic like you, correct?

4    A.   No.

5            MR. REILLY:  Okay.  I have no further questions,

6    thank you.

7            THE COURT:  Very good.  Thank you, Mr. Reilly.

8            MR. PEARLMAN:  Just have a couple of follow-up.

9            THE COURT:  Yes, sir, Mr. Pearlman.

10           MR. PEARLMAN:  Thank you, your Honor.

11

12   REDIRECT EXAMINATION

13   BY MR. PEARLMAN:

14   Q.   On those days that you don't finish a job and you

15   have to go back on the second day, does the entire crew

16   come back on the second day or does it work in some other

17   fashion?

18   A.   If a job has been programmed for two days, regardless

19   of the amount of work left for the second day we all come.

20           MR. PEARLMAN:  Okay, I have no other questions.

21           THE COURT:  Does that complete the examination

22   of this witness?

23           MR. REILLY:  Yes, Judge.  I have no other

24   questions.

25           THE COURT:  Very good, sir.  You may step down.

Scafe - Direct/Pearlman

275

1        MR. PEARLMAN:  I'll get the other witness from

2   outside.  Your Honor, the defendants call Naheem Scafe.

3        THE COURT:  Very good.

4

5   **NAHEEM SCAFE**,

6               called as a witness, having been first

7               duly sworn, was examined and testified

8               as follows:

9        THE COURT:  If you would please state your first

10  name and your last name and spell each for the court

11  reporter.

12        THE WITNESS:  Naheem Scafe.  First name

13  N-A-H-E-E-M, last name Scafe, S-C-A-F-E.

14        THE COURT:  Very good, thank you, sir.

15

16  DIRECT EXAMINATION

17  BY MR. PEARLMAN:

18  Q.   Would you state your address for record.

19  A.   193 Eastbook Avenue, Wyandanch New York 11798.

20  Q.   Mr. Scafe, are you acquainted with the defendant in

21  this case, Ethan Sage?

22  A.   Yes.

23  Q.   How are you acquainted with him?

24  A.   I work with him.

25  Q.   And when did you start working Mr. Sage?

Scafe - Direct/Pearlman

276

1   A.   In July 2013.

2   Q.   And at that time -- strike that.

3        Are you acquainted with the plaintiffs in this

4   case, Antonio Palacio and Jose Sanchez?

5   A.   Yes.

6   Q.   And how are you acquainted with them?

7   A.   I work with them.

8   Q.   And when you started in July of 2013 were they both

9   coworkers with you?

10  A.   Yes.

11  Q.   Okay.  And in 2013 when you started that work, how

12  many days a week did you work?

13  A.   Like roughly around three, four days a week.  It was

14  never five days.

15  Q.   And did that continue throughout 2013?

16  A.   Yes.

17  Q.   And did you work with the defendants in 2014?

18  A.   Yes.

19  Q.   For the whole year or part of year?

20  A.   I was incarcerated in 2014.  Up until I was

21  incarcerated yes, I worked with them.

22  Q.   So up until what month?

23  A.   Up until July.

24  Q.   Of 2014?

25  A.   Yes.

Scafe - Direct/Pearlman

277

1    Q.    And did there come a time after then that you resumed

2    working with the defendants?

3    A.    Yes, a little bit in 2015.

4    Q.    And starting approximately when in 2015?

5    A.    Around the summertime, around June of 2015.

6    Q.    And during the times that you worked with the

7    defendant through the end of 2015, was the plaintiff Jose

8    Sanchez working with the defendants?

9    A.    Yes.

10   Q.    And did you see him on the job site every day that

11   you were there?

12   A.    Yes.

13   Q.    And so in 2015, how many days a week?

14   A.    About the same.

15   Q.    Three to four?

16   A.    Yes.

17   Q.    And did you have set hours that you had to work or

18   did it vary?

19   A.    It varied.

20   Q.    Did you have a set starting time?

21   A.    More the most part, 7:30.

22   Q.    And was there a set ending time or did it vary?

23   A.    It varies.

24   Q.    And what was the range of ending times that it

25   varied?

Scafe - Direct/Pearlman

278

1   A.   It ranged from 3:30, 4:30.

2   Q.   Some jobs ended earlier than that?

3   A.   Yes.

4   Q.   And were there ever jobs that ended after 4:30?

5   A.   Not really.  No.

6   Q.   And if any job went past 2:30 or three o'clock, did

7   you ever receive any additional compensation?

8   A.   Yes.

9   Q.   And how much was that additional compensation?

10  A.   A hundred dollars extra.

11  Q.   And during any part of the time that you worked with

12  the defendants, did you happen to observe whether or not

13  plaintiff Jose Sanchez brought a dump truck with him to

14  the job sites?

15  A.   From when I started in 2013, up until 2014, yes, he

16  had his dump truck.

17  Q.   And was that every day or some days or did it vary?

18  A.   Every day --

19        MR. REILLY:  Objection to form.

20        THE COURT:  Overruled.

21  A.   Every day that I worked with him, yes, he had it.

22  Q.   And what, if anything, did you observe plaintiff Jose

23  Sanchez do with that dump truck?

24  A.   He dumps all the garbage, all the debris from the

25  job.

279

1   Q.   And when he brought his dump truck and he dumped

2   debris from the job, did he always stay to the end of the

3   workday or did it sometimes vary?

4   A.   No.  He never stayed until after the job.

5   Q.   On the days that he brought his dump truck, what time

6   would he leave?

7        MR. REILLY:  Objection.

8        THE COURT:  No.  Overruled.

9   A.   It depends, it varies.  Each job was different.

10  Q.   What was the range of times that he left?

11  A.   An hour or two before the team.

12  Q.   Before everybody else?

13  A.   Yes.

14  Q.   And did there come a point in time that you observed

15  plaintiff Sanchez bring a van belonging to the defendant's

16  job site?

17  A.   Yes.

18  Q.   And when did that start or when did you first observe

19  that?

20  A.   In 2015 when I came back to work.

21  Q.   Had you ever observed that prior to that time?

22  A.   No.

23  Q.   And do you have any knowledge of whether or not

24  plaintiff Sanchez was paid separately for bringing the van

25  to the job site?

Scafe - Direct/Pearlman

280

1   A.   Yes.

2   Q.   And how do you have that knowledge?

3   A.   We, I drive the defendant sometimes.  He pays me the

4   times, I believe.

5   Q.   I understand, I'm talking about plaintiff and if I

6   misspoke I apologize, I'm talking about plaintiff Sanchez.

7   Did you ever -- did you have any knowledge as to whether

8   or not he was paid separately for bringing the company van

9   to a work site?

10   A.   Yes.

11   Q.   And how do you have such knowledge?

12   A.   Sometimes I seen cash exchanged.

13   Q.   And did you have any knowledge or observe what the

14   amount of the payment was?

15   A.   No.

16   Q.   Okay.  During the time that you have been employed --

17   strike that.

18        During the time that you provided services for

19   the defendants, did you ever work more than 40 hours in

20   any given week.

21   A.   No.

22   Q.   And during that same time period, did you ever

23   observe the plaintiffs in this case work more than 40

24   hours in any given week?

25        MR. REILLY:  Objection to form.

Scafe - Direct/Pearlman

281

1    A.    No.

2          THE COURT:  Well, technically -- no, that's all

3    right.  It will be subject to cross-examination.

4    Overruled.  He hasn't indicated he always had them in his

5    line of vision and so forth.  But he has indicated when he

6    was there and they were there, he never saw them work less

7    than 40.

8          MR. PEARLMAN:  More than 40, more than 40,

9    forgive me.

10   Q.    The Judge brings up a good issue.  When you were on

11   the job site and plaintiff Antonio Palacio was on the job

12   site, how closely physically did you work near plaintiff

13   Palacio?

14   A.    I worked closely with him.

15   Q.    And within how many feet would you say the range was

16   of distance between you and plaintiff Palacio during those

17   times?

18   A.    I can give you a rough measurement, probably around

19   eight to 10 feet.

20   Q.    And did the two of you sometimes to do tasks

21   together?

22   A.    Yes.

23   Q.    Was it a rare occasion or would you describe it some

24   other way?

25   A.    No.  At that time me and him, we were both cleaners.

Scafe - Direct/Pearlman

282

1    Q.    So you worked closely together with him?

2    A.    Yes.

3    Q.    With plaintiff Sanchez, would it be correct that you

4    didn't work as closely with him as you did with plaintiff

5    Palacio?

6    A.    Yes.

7    Q.    But nevertheless, if you were on a job site and

8    plaintiff Sanchez was on the job site, was he within your

9    field of vision?

10   A.    Yes.

11   Q.    So for the most part, you were able to observe what,

12   if anything, he was doing at any given job site, is that

13   fair enough?

14   A.    Yes.

15   Q.    Now, when you came back in 2015 and you observed

16   plaintiff Sanchez bringing the company van to the job

17   site, did you ever see him when he actually arrived, in

18   other words, did you ever arrive before him and then you

19   would see him arrive?

20   A.    Yes.

21   Q.    And how often did that occur?

22   A.    Not too often.

23   Q.    So he was usually there before you?

24   A.    Sometimes.

25   Q.    Okay.  And when he drove the company van, did you

Scafe - Cross/Reilly

283

1    have occasion to observe at what time he left the job

2    site?

3    A.   When he drove the company van he left when we all

4    left.  He left when the team left.

5            MR. PEARLMAN:  I have no you other questions for

6    this witness.

7            THE COURT:  Very good thank you.

8            MR. REILLY:  Judge, may I inquire.

9            THE COURT:  Yes, sir, Mr. Reilly.

10           MR. REILLY:  Thank you.

11

12   CROSS-EXAMINATION

13   BY MR. REILLY:

14   Q.   Now, currently you work for Jay; is that correct?

15   A.   Yes.

16   Q.   And Jay is your boss?

17   A.   If that's what you want to call it.

18   Q.   Well, do you recall coming to my office last month to

19   give sworn deposition testimony?

20   A.   Yes.

21   Q.   Okay.  And did I ask you with questions under oath?

22   A.   Yes.

23   Q.   And did you answer those questions under oath?

24   A.   Yes.

25   Q.   And did you raise your right hand before answering

Scafe - Cross/Reilly

284

1    any questions and agree that you'll tell the truth, the

2    whole truth and nothing but the truth?

3    A.    Yes.

4    Q.    At that time?

5    A.    Yes.

6    Q.    Now, am I correct that you are employed by Jay and

7    his companies?

8    A.    Yes.

9    Q.    And am I correct that you were employed by First

10   Class Roofing?

11   A.    Yes.

12   Q.    And how much are you being paid a day now?

13   A.    300.

14   Q.    And you recently got a raise; is that correct?

15   A.    Yes.

16   Q.    And when did you get the raise?

17   A.    At the beginning of in year.

18   Q.    Okay.  And that raise -- what were you making prior

19   to making $300 a day?

20   A.    I was making 225.

21   Q.    Okay.  So in the beginning of this year you got a

22   raise of $75 a day; is that correct?

23   A.    Yes.

24   Q.    And you've been getting $300 a day from the beginning

25   of this year up until now?

Scafe - Cross/Reilly

285

1   A.   Yes.

2   Q.   And am I correct that Jay is the one that hired you

3   to work for First Class Roofing?

4   A.   Yes.

5   Q.   And am I correct that Jay goes to the job sites to

6   give the workers their instructions for the day?

7   A.   Yes.

8   Q.   And am I correct that Jay sometimes works on the

9   roofs at the job sites?

10  A.   No.

11  Q.   Do you recall on page 206 your deposition transcript

12  beginning at line 7 being asked the question:  Did he go

13  the job sites and also work on the roofs as well, and on

14  line nine answering:  Sometimes.

15       Do you recall being asked that question and

16  giving that answer when you came to my office to testify

17  in October?

18  A.   Yes.

19  Q.   And when Jay worked on the roofs at the job sites he

20  gave direction to the workers; is that correct?

21  A.   Yes.

22  Q.   And he also gave directions to the workers on the

23  ground; is that correct?

24  A.   Yes.

25  Q.   And Ethan Sage is your boss and First Class Roofing

286

1    is your employer; is that correct?

2    A.   Yes.

3    Q.   And you're paid a set daily rate; is that correct?

4    A.   Yes.

5    Q.   And you don't own your own company; is that correct?

6    A.   Kind of.

7    Q.   You've received checks from Jay, correct?

8    A.   I received checks from Jay, yes.

9    Q.   And all the checks are written out directly to you,

10   correct?

11   A.   Yes.

12   Q.   So there's no corporation that the checks are written

13   out to; is that correct?

14   A.   No.  It's written out directly to me.

15   Q.   Every check that Jay has ever written to you for work

16   as an employee has been written correctly in about your

17   name, correct?

18   A.   Yes.

19   Q.   And Jay and his company has always provided you with

20   all the tools that you need to work on the roofs or in the

21   yards; is that right?

22   A.   Yes.

23   Q.   And I correct that you don't purchase your own tools?

24   A.   Yes.

25   Q.   And you don't use any of your own equipment to do

**Scafe - Cross/Reilly**

287

1    work for Jay; is that correct?

2    A.    Yes.

3    Q.    And you don't have any of your own customers that you

4    do work for; is that correct?

5    A.    Yes.

6    Q.    And when you go to a job site you are performing work

7    on the roofs of Jay's customers; is that right?

8    A.    Yes.

9    Q.    And am I correct that you've never maintained your

10   own Workers' Compensation insurance?

11   A.    Yes.  You're right.

12   Q.    And you're under Ethan Sage's Workers' Compensation

13   insurance; is that right?

14   A.    Yes.

15   Q.    Am I correct that it's your understanding if you're

16   hurt on the job that you can apply for Workers'

17   Compensation benefits through Ethan Sage's Workers'

18   Compensation insurance; is that correct?

19   A.    I believe so, yes.

20   Q.    And isn't it your understanding that Ethan Sage, his

21   liability insurance covers any acts of negligence that you

22   may have committed at the job sites; isn't that correct?

23   A.    Yes.

24   Q.    And am I correct that you have never paid for or

25   maintained any policy of insurance covering your work at

**Scafe - Cross/Reilly**

288

1    any of Ethan Sage's job sites?

2    A.    Yes.

3    Q.    And working for Ethan Sage has been the only job that

4    you've had since October of 2013; is that correct?

5    A.    Yes.

6    Q.    Am I correct that you were convicted of criminal sale

7    of heroin in 2014; is that right?

8    A.    Yes.

9    Q.    And you went to jail for one year?

10   A.    Yes.

11   Q.    You began your jail sentence on July 25, 2014; is

12   that correct?

13   A.    Yep.

14   Q.    And you pled guilty to criminal sale of controlled

15   substance; is that correct?

16   A.    Yes.

17   Q.    And you got out of jail on May 28, 2015; is that

18   correct?

19   A.    Yes.

20   Q.    And obviously you didn't work for Jay while you were

21   in jail; is that correct?

22   A.    No.

23   Q.    However, Jay did send you money twice while you were

24   in jail; is that right?

25   A.    Yes.

Scafe - Cross/Reilly

289

1   Q.   And at the time of your arrest in July 2014, both

2   Jose and Antonio offers both work for First Class Roofing;

3   is that correct?

4   A.   Yes, sir.

5   Q.   And you were hired to work for First Class Roofing in

6   October of 2014?

7   A.   Yeah, yes.

8   Q.   And did he tell that you were hired to work for First

9   Class Roofing, Jose and Antonio were already there working

10  for them; is that correct?

11  A.   Yes.

12  Q.   And then you began work for First Class Roofing

13  sometime in the middle of June of 2015 after your release

14  from jail; is that right?

15  A.   Yes.

16  Q.   And am I correct that while you were in jail, Jay

17  promised you that you would have a job when you got out?

18  A.   Yes.

19  Q.   And in the middle of June 2015 when you returned to

20  work, am I correct that both Jose Sanchez and Antonio

21  Palacio were still working at the job sites?

22  A.   Yes.

23  Q.   And Jose and Antonio worked for a period of months in

24  2015 when you returned to work in the middle of June; is

25  that correct?

Scafe - Cross/Reilly

290

1    A.    Yes.

2    Q.    And your recollection is both Jose and Antonio

3    finished the 2015 season; is that correct?

4    A.    For my recollection, yes.

5    Q.    And work began at 7:30 a.m. usually every day; is

6    that correct?

7    A.    Yes.

8    Q.    And the workday usually ended at five p.m. had; is

9    that correct?

10   A.    It varies.

11   Q.    Okay.  On page 51 of your deposition transcript do

12   you recall being asked the question on line 6:  Was there

13   a particular time that your day ended, and giving the

14   answer on line 8:  Yeah, five.

15         And being asked the next question:  Usually at

16   five p.m., and giving the answer yeah?

17         Do you remember being asked those questions and

18   giving those answer?

19   A.    Yes.

20   Q.    So during the time period from October 2013 up until

21   July 2014, your workday was usually from 7:30 a.m. to five

22   p.m.; is that correct?

23   A.    No.

24   Q.    And when you gave your deposition testimony in

25   October, which is only a month ago, am I correct that you

Scafe - Cross/Reilly

291

1    truthfully and accurately answered all of the questions

2    that I asked you?

3    A.    Yes.

4    Q.    Okay.  So I'll ask you again, your workday, usually

5    started at 7:30 and ended at five p.m. from October 2013

6    up until your incarceration in July of 2014?

7    A.    I recall telling you that it varies and I did say yes

8    five and then I gave you another answer after that but

9    these are yes or no answers.

10   Q.    After you got out of jail --

11   A.    Do you recall that?

12   Q.    After you got out of jail.

13   A.    Yes.

14   Q.    Am I correct that your workday usually began at 7:30

15   and ended at five?

16   A.    Yes.

17   Q.    Am I correct that Jose and Antonio were usually at

18   the job sites at 7:30 a.m.?

19   A.    In 2015?  Which one is Jose again.  Jose was there, I

20   saw him 7:30 because he was driving the van.  Antonio was

21   there when the whole place were there.

22   Q.    So Jose and Antonio were there at the job site at

23   7:30 a.m.?

24   A.    In 2015, yes.

25   Q.    And am I correct that from October 2013 to the end of

Scafe - Cross/Reilly

292

1    the season Jose and Antonio were at the job sites?

2    A.    Yes.

3    Q.    And am I correct that Jose Antonio were usually at

4    the job sites from February 2014 until your arrest?

5    A.    Yes.

6    Q.    Am I correct that Jose and Antonio were usually at

7    the job sites from June 2015 to the end of the 2015

8    season?

9    A.    Yes.

10   Q.    Am I correct that you recall weeks that you worked

11   five days?

12   A.    Yes.

13   Q.    Am I correct that there are never anytime records

14   kept showing the hours that you worked each day?

15   A.    Yes.

16   Q.    Am I correct is that there were times that you took a

17   half hour for lunch?

18   A.    Yes.

19   Q.    And there are also times that you took a 45 minute

20   lunch break; it that right?

21   A.    Yes.

22   Q.    And when you started your job in October 2013 you

23   usually saw both Jose and Antonio on the roofs ripping up

24   the shingles; is that correct?

25   A.    Yes.

Scafe - Cross/Reilly

293

1   Q.   And at that time you were only working on the ground;

2   is that correct?

3   A.   Yes.

4   Q.   And you only worked on the ground for a period of

5   many, many months after you began your employment; is that

6   correct?

7   A.   Yes.

8   Q.   So when you testified before that you had Jose in

9   your line of sight on a regular basis, that's not correct;

10  is that correct?

11  A.   If I'm on the ground he's on the roof, I'm looking

12  up, he's in my line of sight.

13  Q.   But you're on the ground picking up garbage and he's

14  on the roof ripping off shingles?

15  A.   If he's on the roof and he's ripping on the roof with

16  him throwing down the shingles also, so you don't never

17  stand under the shingles when you rip it down.  That's

18  what I'm saying.

19  Q.   Am I correct when you first started your job there

20  was a long period of time that you never got on the roofs

21  and you only stayed on the ground; is that correct?

22  A.   Yes.

23  Q.   So when Antonio was on the roofs several months you

24  were on the ground; is that right?

25  A.   Yes.

Scafe - Cross/Reilly

294

1   Q.   So you weren't on the roofs with him watching him on
2   the roofs doing what he did?
3   A.   I was actually told to watch him on the roof.
4   Q.   And Jay told you, did Jay tell you that?
5   A.   Yes.
6   Q.   And do you recall being asked the question on page 63
7   of your deposition transcript beginning at line 7:  Was
8   there a particular time of day that the debris was carted
9   away or was it done after everyone left, and do you recall
10  giving the answer:  At the end of the job, once everything
11  is all thrown in the truck and we were done finishing up
12  everything, when everybody is leaving he's leaving to the
13  dump and everybody else is going their own way.
14       Do you recall being asked that question and
15  giving that answer.
16  A.   Yes.
17  Q.   So Jose didn't leave one or two hours earlier to
18  dump.  He left when the job was done and everyone left for
19  the day; is that correct?
20  A.   Are we talking about one job.  For the most part, he
21  left early.
22  Q.   You saw him leave early on one occasion?
23  A.   No.  He left early on most occasions.
24  Q.   Do you recall being asked that question and giving
25  that answer; is that correct?

Scafe - Cross/Reilly

295

1    A.   Yes, I said yes, I did.

2    Q.   And when you gave that answer you meant something

3    else; is that right?

4              MR. PEARLMAN:  Objection.

5              THE COURT:  Sustained.

6    A.   You asked the question asking if he did it multiple

7    times, you were trying to punch it over all.

8              MR. PEARLMAN:  Your Honor, could you instruct

9    the witness if there's no question --

10             THE COURT:  Yes.  There's no question.  You

11   know, you don't want to volunteer information.  You just

12   answer the question.  Leave it at that.

13   Q.   Am I correct at the end of the job or at the end of

14   the job, that's when the debris was carted away?

15   A.   Yes.

16   Q.   Am I correct that Antonio and other workers would

17   meet up at a deli next to Leo's house and Leo took them to

18   the job sites?

19   A.   That's a question for Leo.

20   Q.   Okay.  Do you recall giving that testimony at your

21   deposition that Antonio and other would meet up at Leo's

22   house, that you recall meeting them up at the deli by

23   Leo's house?

24   A.   Yes.

25   Q.   Do you recall being asked that question?

Scafe - Cross/Reilly

296

1    A.    I don't recall being asked that question, but yes.

2    Q.    On page 67 of your deposition transcript do you

3    recall being asked the question at line 15:  Do you know

4    how Antonio got home from the job sites each day that he

5    worked and -- do you recall being asked the question on

6    line 16:  Do you know how Antonio got home from the job

7    sites each day that he worked and line 18 giving the

8    answer:  They all were meeting up at this deli right next

9    to Leo's house, and they all get into the car with Leo.

10   He gets to work every day with Leo.

11          Do you recall being asked that question and

12   giving that answer?

13   A.    Yes.

14   Q.    And am I correct that you don't know if there were

15   jobs in 2013 from October through the end of the year that

16   Antonio and Jose worked at but you didn't work at?

17   A.    Yeah, I don't know.

18   Q.    And from February 2014 to July 25, 2014, am I correct

19   that you dont' know that there were jobs that Jose and

20   Antonio worked at that you didn't work at?

21   A.    Yes.

22   Q.    And from June 2015 to the end of the season, am I

23   correct that you don't know whether Jose and Antonio

24   worked at the jobs that you didn't work at?

25   A.    Yes.

Scafe - Cross/Reilly

297

1   Q.   So there have been jobs in 2013, 14, and 15 that Jose

2   and Antonio worked at but you did not work at; is that

3   correct?

4   A.   Yes.

5   Q.   Am I correct that you don't know how many days of the

6   week that Antonio and Jose worked from October 2013 to

7   July 25, 2014; is that correct?

8   A.   Yes.

9   Q.   Am I correct that you don't know how many days a week

10  that Jose and Antonio worked in the middle of June 2015 to

11  the end of the season?

12  A.   No.

13  Q.   You've never gotten a pay stub; is that right?

14  A.   No.

15  Q.   And you've never been given a form or a document that

16  stated how you were being paid; is that correct?

17  A.   No.  Yes.  You're correct.

18  Q.   And you never signed a document indicating whether

19  you were being paid by the day, by the hour or something

20  else; is that right?

21  A.   Yeah.

22  Q.   And earlier you testified about a company van, am I

23  correct that Jose Sanchez took the company van to the job

24  sites in the morning?

25  A.   Yes.

**Scafe - Cross/Reilly**

298

1   Q.    And Jose Sanchez took the van to the house at the

2   time the job was over; is that correct?

3   A.    Yes.

4   Q.    Am I correct that you never kept records of how much

5   days you worked in 2013, 2014 and 2015; is that correct?

6   A.    Yes.

7             MR. REILLY:  I have no further questions.

8             THE COURT:  Thank you, Mr. Reilly.

9   Mr. Pearlman.

10            MR. PEARLMAN:  Excuse me one second, your Honor.

11            THE COURT:  Yes, sir.

12            MR. PEARLMAN:  I have no questions, your Honor.

13  Thank you.

14            THE COURT:  Sir, thank you very much.  You may

15  step down, you're excused.

16            MR. PEARLMAN:  The defendants don't have any

17  further witnesses, your Honor.

18            THE COURT:  So both sides have rested.

19            MR. PEARLMAN:  Yes, your Honor.

20            THE COURT:  All right.  What we ought do at this

21  point is set up a briefing schedule.  I'm going to need as

22  I think you received an order posted on ECF, but pursuant

23  to my rules I am going to need proposed findings of fact

24  and conclusions of law, and what's very important in

25  preparing those, most particularly I should say

Scafe - Cross/Reilly

299

1    exclusively with respect to the findings of fact I need

2    pinpoint cites to the record.

3            I think what we ought to do is, I'll get

4    proposals from both sides, and they'll be received on a

5    given date, and then each will have an opportunity to

6    respond to the other's proposed findings of fact and

7    conclusions of law to the extent they feel they're off

8    target.  So now the question is how much time, I'll look

9    first to Mr. Reilly, then I'll look to Mr. Pearlman, how

10   much time do you need to prepare proposed findings of fact

11   and conclusions of law?

12           MR. REILLY:  Normally I can say we can do it in

13   30 days.  But the holiday season is fast approaching.  I

14   think January 1 is a Monday.

15           THE COURT:  Yes.

16           MR. REILLY:  January 8.  I spoke to counsel

17   about that earlier.

18           THE COURT:  I have no problem with that.

19           MR. REILLY:  Okay.  So January 8 is when we'll

20   submit our proposed findings of fact.

21           THE COURT:  Right.

22           MR. REILLY:  With the pinpoint citations and two

23   weeks to submit something further to respond to each

24   other's findings of fact, is that okay, Judge?

25           THE COURT:  That's fine with me.

Scafe - Cross/Reilly

300

1      MR. PEARLMAN:  I'll stipulate to that,

2  your Honor.

3      THE COURT:  All right.  So let's actually look

4  at, January 8 will be for the submissions by both

5  plaintiff and defendants as to their proposed findings of

6  fact and conclusions of law.  And then two weeks after

7  that I will expect to get your response to the others

8  proposal.

9      I don't think there's anything further we have

10  to do today.  But before we call it quits for the day let

11  me check, Mr. Reilly, is there anything further that we

12  should do today.

13      MR. REILLY:  No.

14      MR. PEARLMAN:  I'll say for the record that

15  Mr. Reilly and I spoke yesterday with one of the reporters

16  to make sure that we let them know that we definitely are

17  ordering the transcript and needed it.  I assume it's

18  available.

19      THE COURT:  Have you checked with the reporters?

20  Because they can typically tell you, plus here you have

21  multiple reporters, but usually they can tell you when you

22  can expect transcript.  It's very difficult to do anything

23  on your proposed findings without the transcript.  But

24  have you checked to see if the reporters have given you

25  fully guidance in that regard.

Scafe - Cross/Reilly

301

1          MR. REILLY:  No, Judge.  I thought we had two.

2          THE COURT:  You can check with him right after I

3    get off the bench.  Assuming we're all squared away, I'll

4    expect your initial submission on that January 8th date.

5          So on that happy note we'll call it quits for

6    the day.  Thank you very much for the professional way

7    that the attorneys have handled this.

8

9          (Matter concluded.)

10

11

12

13               **I-N-D-E-X**

14    **W-I-T-N-E-S-S-E-S**

15

16    JOSE SANCHEZ                              165

17    CROSS-EXAMINATION                         165

18    BY MR. PEARLMAN

19    REDIRECT EXAMINATION                      200

20    BY MR. REILLY

21    RECROSS EXAMINATION                       202

22    BY MR. PEARLMAN

23    ANTONIO MEJIA PALACIO                     206

24    DIRECT EXAMINATION                        207

25    BY MR. REILLY

Scafe - Cross/Reilly

302

1    CROSS-EXAMINATION                          214

2    BY MR. PEARLMAN

3    REDIRECT EXAMINATION                       224

4    BY MR. REILLY

5    CLEOTILDE MALDONADO                        232

6    DIRECT EXAMINATION                         233

7    BY MR. PEARLMAN

8    CROSS-EXAMINATION                          246

9    BY MR. REILLY

10   REDIRECT EXAMINATION                       274

11   BY MR. PEARLMAN

12   NAHEEM SCAFE                               275

13   DIRECT EXAMINATION                         275

14   BY MR. PEARLMAN

15   CROSS-EXAMINATION                          283

16   BY MR. REILLY

17

18

19

20

21

22

23

24

25

## $

**$100** [5] - 193:5, 193:7, 193:16, 193:23, 241:5
**$130** [1] - 211:4
**$140** [1] - 211:5
**$180** [3] - 210:22, 211:1, 211:8
**$180.00** [1] - 174:11
**$300** [2] - 284:19, 284:24
**$400** [5] - 250:16, 266:9, 266:21, 269:22, 270:2
**$50** [3] - 193:23, 194:3, 194:5
**$500,000** [3] - 230:23, 231:5, 232:2
**$75** [1] - 284:22
**$800** [1] - 250:18

## 1

**1** [1] - 299:14
**10** [6] - 204:5, 226:15, 226:16, 254:10, 269:4, 281:19
**100** [2] - 164:22, 196:12
**1099** [2] - 250:24, 250:25
**10:00** [1] - 269:12
**11** [3] - 198:21, 201:13, 204:19
**110** [1] - 210:20
**11720** [1] - 164:19
**11722** [1] - 164:14
**11758** [1] - 164:17
**11798** [1] - 275:19
**11:00** [1] - 269:5
**12** [5] - 201:20, 202:4, 221:6, 221:7, 226:15
**120** [1] - 210:21
**1200** [1] - 271:4
**12th** [1] - 221:10
**13** [2] - 177:4, 203:11
**130** [1] - 211:3
**14** [5] - 199:13, 201:22, 202:6, 231:23, 297:1
**140** [1] - 211:3
**15** [20] - 168:8, 168:13, 172:1, 172:7, 172:9, 172:12, 201:22, 203:11, 203:15, 220:1, 220:20, 221:6, 221:7, 234:4, 240:18, 240:22, 243:5, 256:8, 296:3,

297:1
**15th** [1] - 221:11
**16** [2] - 220:20, 296:6
**16-CV-2064** [1] - 164:4
**165** [2] - 301:16, 301:17
**17** [8] - 182:19, 182:23, 182:24, 183:15, 184:13, 185:19
**18** [10] - 185:1, 185:5, 185:18, 234:4, 240:18, 240:22, 243:5, 272:19, 296:7
**180** [4] - 174:8, 210:21, 211:9, 213:10
**19** [3] - 183:2, 183:4, 254:23
**193** [1] - 275:19
**1945** [1] - 228:16

## 2

**2** [27] - 185:5, 197:9, 226:15, 226:16, 262:7, 262:9, 263:14, 263:18, 264:5, 264:6, 265:3, 265:10, 265:19, 266:5, 266:12, 266:19, 267:7, 267:20, 268:6, 268:12, 268:17, 269:7, 271:13, 271:19
**20** [9] - 176:23, 176:25, 187:4, 191:20, 204:5, 248:24, 249:1, 256:8
**200** [1] - 301:19
**2003** [1] - 183:7
**2004** [1] - 183:6
**2006** [3] - 207:17, 207:20, 220:11
**2009** [1] - 197:12
**2010** [3] - 225:25, 226:3, 226:6
**2011** [4] - 222:5, 225:25, 226:3, 226:6
**2012** [9] - 201:2, 211:6, 217:18, 221:8, 222:3, 222:25, 225:16, 225:19, 225:22
**2013** [26] - 210:21, 210:22, 211:6, 217:16, 222:1, 223:2, 225:6, 225:7, 225:9, 229:24,

230:25, 238:13, 276:1, 276:8, 276:11, 276:15, 278:15, 288:4, 290:20, 291:5, 291:25, 292:22, 296:15, 297:1, 297:6, 298:5
**2014** [36] - 207:20, 216:1, 216:6, 217:9, 218:5, 218:9, 219:16, 219:23, 220:3, 220:6, 220:10, 220:13, 220:19, 220:22, 221:1, 221:11, 221:22, 223:5, 224:22, 224:25, 260:13, 276:17, 276:20, 276:24, 278:15, 288:7, 288:11, 289:1, 289:6, 290:21, 291:6, 292:4, 296:18, 297:7, 298:5
**2015** [49] - 171:5, 171:16, 171:21, 177:13, 177:24, 178:15, 178:22, 179:24, 180:7, 180:23, 181:5, 183:7, 183:18, 184:14, 185:10, 185:13, 188:3, 188:14, 189:2, 189:10, 189:24, 190:1, 190:8, 191:15, 197:12, 203:13, 215:19, 215:24, 216:2, 221:8, 277:3, 277:4, 277:5, 277:7, 277:13, 279:20, 282:15, 288:17, 289:13, 289:19, 289:24, 290:3, 291:19, 291:24, 292:7, 296:22, 297:10, 298:5
**2016** [3] - 164:10, 188:7, 250:20
**2017** [1] - 250:18
**202** [1] - 301:21
**206** [2] - 285:11, 301:23
**207** [1] - 301:24
**21** [3] - 233:12, 254:23, 262:18
**214** [1] - 302:1
**22** [1] - 255:8

**224** [1] - 302:3
**225** [1] - 284:20
**23** [5] - 183:4, 183:15, 184:13, 191:22, 262:21
**232** [1] - 302:5
**233** [1] - 302:6
**24** [2] - 191:22, 197:9
**2400** [1] - 271:4
**246** [1] - 302:8
**25** [6] - 183:16, 184:16, 255:11, 288:11, 296:18, 297:7
**274** [1] - 302:10
**275** [2] - 302:12, 302:13
**28** [2] - 164:10, 288:17
**283** [1] - 302:15
**2:00** [7] - 236:17, 237:16, 266:10, 269:3, 269:10, 269:23
**2:30** [3] - 264:6, 266:12, 278:6

## 3

**3** [14] - 192:5, 197:22, 198:6, 200:24, 262:9, 263:4, 263:7, 263:21, 264:7, 264:8, 265:4, 266:13, 268:17, 269:7
**30** [3] - 176:23, 200:22, 299:13
**300** [1] - 284:13
**350** [8] - 174:23, 175:8, 175:12, 175:21, 175:22, 176:16, 176:24, 177:4
**3:00** [1] - 237:16
**3:30** [1] - 278:1

## 4

**4** [10] - 262:9, 263:4, 263:7, 266:14, 266:16, 266:17, 271:24, 272:6, 272:8, 272:12
**40** [29] - 176:23, 176:25, 177:14, 177:25, 178:6, 179:14, 180:2, 180:6, 197:7, 213:12, 215:20, 215:24, 220:23,

**221:3**, 221:24, 227:18, 227:21, 229:4, 230:4, 230:14, 231:14, 231:19, 242:23, 243:6, 280:19, 280:23, 281:7, 281:8
**400,000** [1] - 231:3
**4242** [1] - 164:16
**45** [9] - 201:8, 202:21, 202:25, 203:11, 204:15, 253:20, 254:9, 254:23, 292:19
**47** [1] - 255:7
**4:30** [2] - 278:1, 278:4

## 5

**5** [14] - 201:3, 201:14, 201:23, 202:7, 203:4, 203:24, 203:25, 204:20, 253:20, 254:9, 254:14, 263:23, 272:15, 272:21
**50** [1] - 230:19
**51** [2] - 262:6, 290:11
**54** [1] - 164:19
**55** [1] - 191:19
**57** [1] - 198:1
**5:00** [9] - 167:6, 167:7, 167:20, 167:21, 167:24, 173:11, 203:14, 237:17, 269:25
**5:15** [2] - 172:2, 172:14
**5:30** [5] - 201:14, 203:4, 203:24, 203:25, 204:20

## 6

**6** [9] - 197:24, 198:7, 201:4, 210:6, 225:5, 225:14, 225:23, 226:7, 290:12
**60** [1] - 230:19
**63** [1] - 294:6
**631** [1] - 164:23
**67** [1] - 296:2

## 7

**7** [17] - 185:6, 198:20, 201:2, 201:4, 201:14, 209:11, 209:13, 209:15, 210:1, 210:6,

225:13, 225:23, 226:7, 262:13, 263:13, 285:12, 294:7
**70** [2] - 199:14, 231:24
**712-6101** [1] - 164:23
**726** [1] - 229:23
**7:00** [8] - 203:14, 242:20, 266:10, 269:3, 269:4, 269:10, 269:12, 269:22
**7:30** [23] - 173:4, 173:7, 173:12, 209:13, 209:15, 210:1, 210:6, 225:4, 225:5, 225:14, 225:23, 226:7, 240:25, 242:21, 263:13, 277:21, 290:5, 290:21, 291:5, 291:14, 291:18, 291:20, 291:23

---

## 8

**8** [10] - 201:2, 201:4, 201:10, 202:25, 204:15, 253:23, 290:14, 299:16, 299:19, 300:4
**85** [1] - 229:23
**89** [1] - 197:8
**8:00** [1] - 173:12
**8th** [1] - 301:4

---

## 9

**9** [1] - 197:9
**90** [4] - 197:22, 198:6, 198:20, 229:23
**97** [2] - 201:19, 202:13
**9:30** [1] - 164:11

---

## A

**a.m** [27] - 164:11, 172:2, 172:14, 173:12, 203:14, 210:1, 225:13, 225:14, 225:23, 226:7, 240:20, 242:20, 266:10, 269:3, 269:4, 269:5, 269:10, 269:12, 269:22, 290:5, 290:21, 291:18, 291:23
**a/k/a** [2] - 164:9, 164:9

---

**able** [9] - 175:23, 189:21, 206:15, 207:11, 227:16, 229:15, 230:3, 262:5, 282:11
**accurately** [2] - 268:5, 291:1
**acquainted** [6] - 233:14, 233:17, 275:20, 275:23, 276:3, 276:6
**Act** [1] - 230:20
**acts** [1] - 287:21
**actual** [2] - 258:23, 260:25
**add** [1] - 229:20
**addition** [3] - 174:11, 179:4, 230:22
**additional** [3] - 202:16, 278:7, 278:9
**address** [2] - 233:11, 275:18
**adequate** [1] - 176:13
**adopt** [1] - 179:3
**affiliated** [3] - 201:12, 203:3, 204:17
**afternoon** [6] - 227:3, 241:14, 263:23, 272:16, 273:8, 273:16
**afterwards** [1] - 204:5
**ago** [4] - 217:23, 249:4, 249:6, 290:25
**agree** [2] - 170:11, 284:1
**agreement** [3] - 191:15, 191:23, 192:1
**ahead** [1] - 202:18
**allegation** [1] - 230:17
**allegations** [1] - 187:8
**allege** [3] - 170:23, 230:1, 230:13
**alleged** [2] - 189:6, 189:10
**allowed** [5] - 179:11, 181:12, 184:7, 238:6, 238:7
**almost** [1] - 233:25
**amount** [14] - 173:24, 174:18, 174:20, 174:22, 193:9, 193:16, 211:2, 211:7, 230:2, 231:21, 234:17, 234:18, 274:19, 280:14
**and-a-half** [1] - 198:1
**Ann** [1] - 164:21
**ANSWER** [3] - 183:7,

---

183:20, 185:12
**answer** [81] - 172:16, 177:9, 177:18, 179:17, 180:20, 182:21, 183:17, 183:22, 183:24, 184:5, 184:21, 185:2, 185:3, 185:7, 185:15, 185:17, 186:3, 186:4, 190:3, 192:3, 197:11, 197:15, 197:18, 197:24, 198:5, 198:9, 198:13, 198:14, 198:20, 198:21, 199:3, 201:2, 201:6, 201:13, 201:17, 201:25, 202:6, 202:9, 202:10, 202:23, 203:7, 203:18, 203:19, 203:21, 204:7, 204:13, 205:13, 207:11, 207:12, 216:24, 217:12, 222:1, 222:3, 222:5, 250:2, 250:3, 254:2, 254:17, 255:2, 255:5, 255:11, 255:14, 255:17, 263:1, 271:5, 283:23, 285:16, 290:14, 290:16, 290:18, 291:8, 294:10, 294:15, 294:25, 295:2, 295:12, 296:8, 296:12
**Answer** [9] - 192:1, 197:14, 198:2, 199:1, 203:4, 203:16, 262:11, 262:13, 262:21
**answered** [3] - 178:2, 187:25, 291:1
**answering** [6] - 187:12, 191:22, 253:23, 266:1, 283:25, 285:14
**answers** [12] - 182:10, 182:13, 183:9, 184:8, 185:18, 201:21, 206:14, 221:15, 221:17, 253:17, 262:16, 291:9
**anticipated** [1] - 272:4
**ANTONIO** [3] - 164:3, 206:2, 301:23

---

**Antonio** [36] - 205:23, 206:9, 234:7, 258:10, 258:13, 258:16, 259:21, 260:3, 260:8, 261:4, 276:4, 281:11, 289:2, 289:9, 289:20, 289:23, 290:2, 291:17, 291:20, 291:22, 292:1, 292:3, 292:6, 292:23, 293:23, 295:16, 295:21, 296:4, 296:6, 296:16, 296:20, 296:23, 297:2, 297:6, 297:10
**anytime** [1] - 292:13
**apologize** [1] - 280:6
**APPEARANCES** [1] - 164:15
**application** [4] - 171:12, 183:13, 190:4, 229:19
**apply** [1] - 287:16
**appointed** [1] - 175:6
**appreciate** [3] - 166:3, 206:16, 216:24
**apprentice** [2] - 273:24, 274:2
**approaching** [1] - 299:13
**approximation** [1] - 180:17
**April** [16] - 209:2, 209:6, 209:22, 210:3, 210:5, 210:13, 224:22, 224:24, 225:7, 225:9, 225:17, 225:18, 225:19, 226:1, 228:24, 229:4
**area** [1] - 175:24
**areas** [1] - 200:12
**arrangements** [1] - 239:15
**arrest** [2] - 289:1, 292:4
**arrive** [14] - 201:15, 203:6, 204:3, 204:8, 204:10, 204:21, 205:3, 205:9, 205:13, 205:14, 209:11, 242:19, 282:18, 282:19
**arrived** [7] - 172:18, 209:7, 209:14, 211:16, 256:14, 263:10, 282:17
**artificial** [1] - 166:23

---

**aspect** [1] - 190:12
**ASSOCIATES** [1] - 164:16
**assume** [3] - 181:8, 251:22, 300:17
**assuming** [3] - 251:14, 251:17, 301:3
**attempts** [1] - 227:20
**attorney** [1] - 201:9
**attorneys** [1] - 301:7
**Auerbach** [1] - 164:22
**August** [3] - 189:3, 208:24, 210:4
**available** [3] - 217:25, 242:4, 300:18
**Avenue** [2] - 233:12, 275:19
**average** [1] - 235:12
**aware** [2] - 181:1, 241:2

---

## B

**background** [2] - 183:1, 183:3
**bad** [3] - 170:1, 179:6, 179:9
**based** [2] - 202:15, 229:9
**basis** [6] - 181:8, 181:11, 227:23, 240:7, 260:22, 293:9
**Beach** [1] - 257:12
**became** [2] - 181:1, 186:10
**bed** [2] - 175:17, 175:20
**beer** [1] - 249:5
**BEFORE** [1] - 164:13
**beg** [1] - 169:5
**began** [6] - 209:15, 288:11, 289:12, 290:5, 291:14, 293:5
**begin** [2] - 210:6, 225:3
**beginning** [16] - 200:23, 201:20, 202:4, 220:15, 225:19, 242:9, 253:20, 254:9, 255:8, 262:7, 262:8, 284:17, 284:21, 284:24, 285:12, 294:7
**behalf** [2] - 227:6, 228:18
**belonging** [1] - 279:15
**bench** [1] - 301:3
**BENCH** [1] - 164:13

**bends** [1] - 207:9
**benefits** [1] - 287:17
**best** [1] - 200:24
**better** [1] - 199:15
**between** [18] - 172:2, 172:13, 173:4, 173:7, 173:12, 186:2, 186:3, 209:15, 220:20, 221:6, 221:7, 221:14, 228:3, 240:25, 263:13, 268:8, 273:10, 281:16
**bit** [3] - 237:21, 272:9, 277:3
**black** [1] - 247:12
**Blydenburgh** [1] - 164:19
**book** [1] - 182:23
**boss** [5] - 208:17, 261:15, 261:17, 283:16, 285:25
**bothered** [1] - 198:2
**bought** [2] - 240:10, 240:12
**break** [7] - 184:19, 186:2, 210:14, 211:20, 226:14, 266:25, 292:20
**breaks** [1] - 231:21
**briefing** [1] - 298:21
**bring** [38] - 175:8, 175:10, 175:11, 207:25, 208:8, 213:25, 222:18, 222:24, 223:2, 223:5, 223:10, 223:13, 238:6, 238:7, 238:16, 238:18, 239:3, 240:1, 241:5, 245:1, 247:18, 247:20, 251:13, 251:20, 252:3, 253:1, 253:22, 254:16, 254:21, 254:25, 255:16, 255:20, 258:5, 261:10, 261:13, 261:15, 261:16, 279:15
**bringing** [10] - 214:1, 223:12, 239:5, 240:12, 240:14, 256:6, 261:8, 279:24, 280:8, 282:16
**brings** [1] - 281:10
**broken** [1] - 192:2
**brought** [19] - 166:21,

174:9, 174:13, 181:19, 181:24, 193:6, 223:9, 223:14, 238:1, 238:12, 239:6, 239:13, 255:21, 255:23, 261:12, 261:19, 278:13, 279:1, 279:5
**buildings** [3] - 243:21, 243:23, 244:3
**burden** [4] - 227:14, 228:18, 229:10, 230:15
**busiest** [2] - 208:20, 208:23
**business** [1] - 232:1
**busy** [4] - 209:25, 210:10, 210:12, 214:10, 224:22, 225:6, 225:16, 225:22, 226:1, 226:3, 226:6, 228:24, 231:19
**buy** [2] - 239:16, 239:18
**BY** [42] - 164:17, 165:18, 166:16, 169:19, 171:4, 171:14, 172:5, 173:1, 175:19, 177:12, 177:22, 178:4, 179:23, 180:22, 183:14, 186:1, 200:2, 202:20, 205:1, 207:2, 214:21, 224:21, 233:10, 234:22, 240:8, 247:1, 250:5, 273:1, 274:13, 275:17, 283:13, 301:18, 301:20, 301:22, 301:25, 302:2, 302:4, 302:7, 302:9, 302:11, 302:14, 302:16

---

## C

**calculate** [2] - 199:1, 269:6
**calendar** [16] - 171:5, 171:16, 171:21, 177:13, 177:24, 178:15, 178:22, 180:7, 180:23, 190:8, 201:1, 215:19, 220:22, 221:1, 221:22,

238:13
**calm** [1] - 184:24
**cancelled** [1] - 169:14
**CANDELARIA** [1] - 164:9
**cannot** [5] - 180:11, 180:14, 229:12, 244:9, 260:16
**cans** [2] - 191:14, 192:20
**capacity** [4] - 175:12, 175:15, 177:4, 244:22
**car** [9] - 174:25, 175:3, 176:6, 176:7, 176:12, 201:23, 202:7, 296:9
**car's** [1] - 176:1
**cardboard** [1] - 192:10
**carried** [1] - 167:16
**carry** [2] - 177:2, 177:4
**carrying** [1] - 176:5
**cart** [3] - 176:10, 176:16, 223:15
**carted** [2] - 294:8, 295:14
**case** [36] - 182:6, 182:9, 187:6, 187:8, 187:17, 188:5, 188:11, 194:24, 199:12, 227:13, 227:15, 228:15, 228:16, 228:17, 228:19, 229:9, 229:16, 230:16, 230:17, 231:12, 231:17, 232:11, 233:15, 233:20, 234:5, 234:6, 234:12, 235:11, 240:19, 243:9, 244:8, 246:10, 265:14, 275:21, 276:4, 280:23
**cases** [4] - 229:25, 230:11, 231:11, 231:13
**cash** [25] - 193:25, 194:3, 194:17, 194:19, 211:11, 212:1, 212:10, 212:11, 212:13, 241:6, 241:8, 241:9, 241:22, 249:17, 249:19, 249:22, 249:24, 250:7, 250:10, 250:12, 250:18, 250:21, 250:23, 250:25,

280:12
**Catholic** [1] - 230:12
**cautioned** [1] - 188:15
**Centereach** [1] - 164:19
**Central** [5] - 164:7, 164:23, 200:9, 200:13, 200:19
**Centre** [1] - 168:7
**certain** [1] - 265:6
**chance** [1] - 184:5
**change** [2] - 184:8, 194:16
**changed** [1] - 193:11
**changes** [1] - 218:24
**charge** [1] - 238:4
**check** [14] - 194:3, 194:12, 195:3, 195:4, 211:12, 241:6, 249:16, 249:21, 250:9, 250:14, 250:22, 286:15, 300:11, 301:2
**checked** [2] - 300:19, 300:24
**checking** [1] - 194:17
**checks** [7] - 194:14, 194:19, 194:20, 286:7, 286:8, 286:9, 286:12
**chest** [1] - 188:23
**children** [1] - 192:10
**choose** [2] - 192:20, 193:1
**chose** [2] - 193:2, 205:3
**Circuit** [3] - 228:20, 229:24, 230:12
**circumvent** [1] - 229:15
**citations** [1] - 299:22
**cited** [1] - 227:15
**cites** [1] - 299:2
**claim** [2] - 230:20, 232:4
**claims** [1] - 232:7
**clarify** [2] - 220:13, 230:8
**CLASS** [3] - 164:7, 164:8, 164:8
**Class** [12] - 183:6, 183:19, 184:15, 185:10, 201:1, 284:10, 285:3, 285:25, 289:2, 289:5, 289:9, 289:12
**cleaners** [1] - 281:25
**cleaning** [2] - 208:8, 214:1

**clear** [10] - 173:20, 184:12, 188:2, 188:9, 228:23, 235:4, 239:8, 239:17, 241:25, 267:6
**Clemens** [1] - 228:17
**CLEOTILDE** [2] - 232:18, 302:5
**CLERK** [2] - 165:1, 207:9
**client** [2] - 206:13, 231:2
**clock** [1] - 228:5
**clock-in** [1] - 228:5
**close** [4] - 242:9, 267:15, 267:16, 268:1
**closely** [4] - 281:12, 281:14, 282:1, 282:4
**closest** [2] - 193:3, 193:4
**cold** [2] - 191:11, 219:25
**collect** [4] - 191:5, 191:16, 191:24, 191:25
**collected** [1] - 191:11
**collecting** [2] - 192:7
**combination** [1] - 241:7
**coming** [5] - 228:19, 253:8, 264:9, 272:9, 283:18
**commercial** [3] - 243:21, 243:23, 244:3
**committed** [1] - 287:22
**companies** [3] - 228:4, 228:8, 284:7
**company** [19] - 183:8, 192:15, 201:12, 203:3, 204:17, 208:20, 208:23, 240:1, 240:9, 241:2, 241:3, 280:8, 282:16, 282:25, 283:3, 286:5, 286:19, 297:22, 297:23
**compensated** [1] - 195:6
**Compensation** [4] - 287:10, 287:12, 287:17, 287:18
**compensation** [11] - 169:24, 173:25, 174:6, 189:13, 194:12, 213:11,

213:15, 230:2,
241:3, 278:7, 278:9
**complete** [14] - 180:5,
205:17, 228:12,
261:25, 265:5,
265:6, 265:7,
269:14, 271:23,
271:25, 272:9,
273:8, 274:21
**completed** [16] -
209:19, 253:4,
264:15, 265:1,
270:9, 270:13,
270:21, 270:24,
271:1, 271:7, 271:9,
271:11, 271:13,
271:14, 271:19,
271:21
**computer** [1] - 164:25
**concerning** [2] -
187:8, 244:16
**concluded** [1] - 301:9
**concluding** [1] -
197:24
**conclusions** [4] -
298:24, 299:7,
299:11, 300:6
**conditions** [3] - 168:1,
204:1, 205:14
**confused** [1] - 221:12
**confusion** [5] - 188:1,
193:10, 221:14,
221:16, 221:17
**connection** [1] - 235:2
**considerably** [1] -
170:15
**considered** [2] -
186:22, 274:3
**considering** [1] -
205:14
**consistent** [1] -
232:12
**construction** [2] -
176:13, 256:24
**continue** [7] - 166:24,
229:17, 239:4,
267:4, 271:14,
271:20, 276:15
**Continued** [1] -
195:15
**continued** [5] -
185:24, 204:23,
226:24, 252:7,
272:25
**continuing** [3] -
183:15, 197:22,
198:19
**controlled** [1] - 288:14
**conversation** [4] -
246:13, 246:15,

246:17, 246:18
**conversations** [4] -
187:7, 244:11,
245:7, 246:9
**convicted** [1] - 288:6
**copy** [1] - 254:4
**corporation** [1] -
286:12
**correct** [245] - 165:21,
166:6, 166:12,
166:25, 167:5,
167:9, 167:13,
167:17, 168:9,
168:15, 169:1,
169:15, 169:25,
170:2, 170:16,
170:21, 173:16,
176:11, 177:2,
177:5, 178:8,
179:15, 180:1,
181:6, 181:15,
182:2, 182:13,
182:16, 183:24,
185:20, 186:8,
186:10, 186:17,
186:18, 186:21,
187:6, 187:20,
189:20, 190:13,
190:18, 190:21,
190:24, 191:2,
191:6, 191:12,
193:8, 193:14,
194:1, 194:11,
194:19, 194:21,
196:14, 196:16,
196:17, 196:18,
196:23, 198:10,
199:5, 201:7,
201:18, 203:21,
204:22, 205:4,
214:24, 215:13,
215:16, 216:21,
217:5, 217:12,
218:10, 219:6,
219:12, 222:15,
222:17, 223:16,
236:8, 236:15,
242:2, 243:9,
244:20, 246:5,
247:24, 248:1,
248:3, 248:6, 248:8,
248:10, 248:25,
249:3, 249:7,
249:13, 249:17,
249:20, 249:25,
250:6, 250:13,
250:18, 250:21,
250:24, 251:1,
251:3, 251:6, 251:9,
251:11, 252:4,

253:2, 253:6,
253:13, 253:18,
255:21, 255:23,
255:25, 256:4,
256:9, 256:11,
256:15, 256:18,
256:21, 256:25,
257:3, 257:8,
257:21, 257:23,
257:25, 258:3,
258:5, 258:10,
258:12, 258:15,
258:16, 258:24,
259:2, 259:15,
259:17, 259:20,
259:23, 260:2,
260:7, 260:9,
260:15, 260:17,
260:22, 260:24,
261:1, 261:9,
261:14, 261:19,
261:22, 262:20,
263:3, 263:8,
263:11, 265:18,
266:3, 266:10,
266:11, 266:18,
266:21, 268:7,
268:10, 269:23,
270:3, 271:11,
271:15, 272:1,
272:7, 272:12,
273:9, 273:22,
274:1, 274:3, 282:3,
283:14, 284:6,
284:9, 284:14,
284:22, 285:2,
285:5, 285:8,
285:20, 285:23,
286:1, 286:3, 286:5,
286:7, 286:10,
286:13, 286:17,
286:23, 287:1,
287:4, 287:9,
287:15, 287:18,
287:22, 287:24,
288:4, 288:6,
288:12, 288:15,
288:18, 288:21,
289:3, 289:10,
289:16, 289:20,
289:25, 290:3,
290:6, 290:9,
290:22, 290:25,
291:14, 291:17,
291:25, 292:3,
292:6, 292:10,
292:13, 292:16,
292:24, 293:2,
293:6, 293:9,
293:10, 293:19,
293:21, 294:19,

294:25, 295:13,
295:16, 296:14,
296:18, 296:23,
297:3, 297:5, 297:7,
297:9, 297:16,
297:17, 297:23,
298:2, 298:4, 298:5
**correction** [1] - 220:5
**correctly** [1] - 286:16
**counsel** [4] - 200:23,
207:11, 231:12,
299:16
**country** [2] - 189:20,
189:21
**County** [8] - 200:4,
200:7, 200:16,
200:17, 257:2,
257:4, 257:8, 257:11
**couple** [3] - 224:16,
269:20, 274:8
**course** [10] - 196:5,
215:14, 219:15,
223:12, 231:10,
234:8, 235:9, 236:3,
260:16, 270:22
**court** [3] - 206:8,
232:3, 275:10
**COURT** [113] - 164:1,
165:2, 165:11,
169:10, 169:17,
170:7, 171:3,
171:12, 172:4,
172:22, 175:15,
175:18, 177:7,
177:9, 177:20,
178:3, 178:18,
179:1, 179:17,
180:4, 180:10,
180:19, 181:8,
183:13, 190:4,
191:1, 195:9,
195:12, 196:1,
196:3, 199:22,
199:25, 200:19,
202:14, 202:18,
205:12, 205:17,
205:20, 205:24,
206:6, 206:17,
206:20, 206:24,
207:5, 207:10,
210:24, 213:14,
214:17, 216:11,
217:14, 221:16,
221:20, 222:9,
222:21, 224:15,
224:17, 226:13,
226:22, 227:3,
227:25, 229:19,
231:8, 231:10,
232:8, 232:23,

233:4, 234:15,
234:21, 235:1,
235:8, 235:15,
235:22, 237:7,
237:19, 238:10,
238:15, 240:6,
241:12, 243:1,
243:13, 246:20,
246:22, 264:17,
266:25, 267:3,
267:5, 273:17,
274:7, 274:9,
274:21, 274:25,
275:3, 275:9,
275:14, 278:20,
279:8, 281:2, 283:7,
283:9, 295:5,
295:10, 298:8,
298:11, 298:14,
298:18, 298:20,
299:15, 299:18,
299:21, 299:25,
300:3, 300:19, 301:2
**Court** [11] - 164:21,
199:10, 199:12,
207:3, 207:15,
228:15, 229:17,
231:4, 232:1,
232:25, 244:3
**Court's** [1] - 230:23
**courthouse** [4] -
200:9, 228:20,
247:2, 247:7
**Courthouse** [1] -
164:6
**courtroom** [2] -
208:13, 208:15
**courts** [1] - 231:13
**cousin** [2] - 175:1,
175:11
**Cove** [5] - 257:14,
257:15, 257:20,
257:23, 258:1
**cover** [3] - 221:20,
265:14, 267:25
**coverage** [2] - 231:25,
232:5
**covered** [3] - 186:23,
208:2, 265:24
**covering** [1] - 287:25
**covers** [1] - 287:21
**coworkers** [1] - 276:9
**crew** [1] - 274:15
**cried** [2] - 184:12,
186:19
**criminal** [2] - 288:6,
288:14
**cross** [4] - 165:14,
181:10, 246:23,
281:3

**CROSS** [8] - 165:17, 214:20, 246:25, 283:12, 301:17, 302:1, 302:8, 302:15
**cross-examination** [4] - 165:14, 181:10, 246:23, 281:3
**CROSS-EXAMINATION** [8] - 165:17, 214:20, 246:25, 283:12, 301:17, 302:1, 302:8, 302:15
**crying** [8] - 184:9, 184:11, 184:17, 186:7, 186:10, 186:13, 186:15
**customers** [2] - 287:3, 287:7

# D

**daily** [10] - 168:16, 168:17, 174:3, 174:5, 195:6, 213:8, 237:4, 237:16, 260:22, 286:3
**damage** [1] - 176:14
**damaged** [1] - 188:24
**dark** [4] - 167:3, 167:6, 167:7, 167:19
**date** [5] - 181:16, 189:5, 189:7, 299:5, 301:4
**dates** [13] - 177:24, 189:15, 196:6, 215:23, 220:23, 221:2, 221:5, 221:10, 221:23, 228:16, 230:9, 238:17
**daughter** [1] - 247:10
**day's** [2] - 266:21, 273:14
**day-to-day** [1] - 261:1
**daylight** [2] - 167:11, 167:12
**days** [129] - 168:12, 169:2, 169:3, 169:4, 169:6, 169:7, 169:11, 169:12, 169:20, 169:25, 170:4, 170:18, 171:9, 171:25, 172:6, 172:8, 172:13, 174:10, 174:13, 174:16, 178:15, 178:24, 180:14, 181:19, 181:21, 182:5,

182:7, 183:18, 184:14, 185:9, 189:9, 189:12, 189:15, 193:6, 193:14, 196:11, 196:13, 198:24, 198:25, 209:3, 209:5, 210:9, 215:4, 215:6, 215:15, 217:6, 217:7, 217:9, 218:4, 218:7, 218:8, 219:8, 219:16, 219:22, 219:23, 220:2, 220:3, 220:18, 220:20, 223:9, 223:18, 223:20, 223:25, 224:7, 224:10, 225:1, 225:10, 225:20, 226:4, 228:9, 228:25, 229:3, 231:23, 234:17, 234:23, 235:12, 235:16, 237:14, 241:1, 242:12, 242:18, 250:10, 250:12, 250:13, 250:17, 250:20, 257:20, 258:15, 258:17, 258:19, 258:21, 258:22, 258:23, 258:25, 259:2, 259:5, 259:9, 259:14, 259:16, 259:24, 259:25, 260:3, 260:6, 260:7, 260:8, 260:10, 260:11, 260:13, 260:14, 263:6, 269:14, 270:5, 270:18, 274:14, 274:18, 276:12, 276:13, 276:14, 277:13, 278:17, 279:5, 292:11, 297:5, 297:9, 298:5, 299:13
**debris** [11] - 173:21, 176:8, 223:15, 238:2, 238:20, 238:21, 244:25, 278:24, 279:2, 294:8, 295:14
**December** [9] - 188:3, 190:9, 191:15, 208:25, 209:2, 209:6, 209:22, 218:24, 220:3
**decision** [2] - 229:18, 232:10

**decisions** [1] - 272:22
**defendant** [32] - 180:24, 182:5, 186:11, 187:17, 187:22, 188:11, 189:25, 190:8, 196:6, 199:12, 219:17, 222:19, 223:6, 223:20, 224:2, 224:6, 227:10, 233:14, 233:17, 233:24, 234:3, 234:5, 234:13, 235:13, 237:10, 239:9, 239:18, 240:19, 242:13, 275:20, 277:7, 280:3
**defendant's** [4] - 200:23, 201:9, 224:8, 279:15
**defendants** [54] - 165:23, 170:24, 171:7, 171:17, 171:22, 173:17, 173:22, 175:9, 176:18, 176:22, 180:8, 181:2, 181:16, 181:20, 188:5, 190:16, 190:22, 191:10, 192:13, 194:24, 196:20, 207:10, 218:13, 220:9, 220:14, 220:19, 222:25, 223:3, 223:25, 232:15, 233:20, 234:19, 235:5, 235:11, 235:18, 237:15, 238:6, 238:20, 240:2, 242:7, 243:6, 243:9, 243:16, 244:8, 245:14, 246:2, 275:2, 276:17, 277:2, 277:8, 278:12, 280:19, 298:16, 300:5
**Defendants** [2] - 164:11, 164:18
**defense** [2] - 207:11, 231:12
**definitely** [1] - 300:16
**DeJesus** [1] - 229:22
**deli** [5] - 246:12, 246:17, 295:17, 295:22, 296:8
**demand** [1] - 195:6
**DENIS** [1] - 164:13

**deposition** [30] - 182:9, 182:13, 182:15, 184:2, 184:7, 184:20, 185:1, 186:14, 191:19, 197:8, 197:18, 198:14, 199:16, 200:22, 201:9, 201:19, 202:4, 202:22, 253:9, 254:4, 255:7, 255:14, 262:6, 283:19, 285:11, 290:11, 290:24, 294:7, 295:21, 296:2
**Depot** [2] - 190:23, 224:11
**describe** [4] - 220:16, 235:19, 237:4, 281:23
**designed** [1] - 176:12
**detailed** [1] - 228:5
**details** [1] - 261:6
**determine** [3] - 217:1, 217:24, 261:24
**differ** [2] - 215:3, 241:10
**different** [1] - 176:21, 208:1, 236:2, 267:18, 270:17, 279:9
**difficult** [1] - 300:22
**direct** [1] - 165:11
**DIRECT** [6] - 207:1, 233:9, 275:16, 301:24, 302:6, 302:13
**direction** [1] - 285:20
**directions** [1] - 285:22
**directly** [8] - 185:18, 202:23, 203:10, 238:22, 241:3, 266:1, 286:9, 286:14
**discovery** [1] - 231:16
**discuss** [1] - 222:11
**dismiss** [1] - 231:13
**dismissal** [1] - 227:23
**dismissed** [1] - 227:13
**distance** [1] - 281:16
**District** [1] - 230:17
**DISTRICT** [3] - 164:1, 164:1, 164:14
**doctor** [2] - 199:17, 199:19
**doctor's** [1] - 188:19
**document** [6] - 212:12, 212:15, 212:18, 212:21, 297:15, 297:18

**documents** [1] - 185:8
**dollars** [1] - 278:10
**done** [30] - 171:22, 215:10, 236:9, 243:25, 244:4, 245:1, 247:21, 255:9, 261:22, 261:25, 262:1, 262:14, 263:25, 264:18, 265:10, 265:19, 266:6, 268:14, 268:18, 269:10, 269:16, 270:16, 271:17, 271:22, 272:24, 273:6, 273:7, 294:9, 294:11, 294:18
**dont'** [1] - 296:19
**down** [14] - 166:11, 166:23, 184:24, 195:12, 205:21, 215:7, 226:13, 242:25, 255:15, 262:18, 274:25, 293:16, 293:17, 298:15
**drive** [15] - 167:18, 167:23, 167:25, 168:21, 173:15, 175:4, 181:15, 181:20, 182:1, 200:3, 200:6, 200:12, 200:15, 240:9, 280:3
**driving** [4] - 193:13, 241:3, 252:5, 291:20
**drove** [5] - 193:14, 241:1, 241:13, 282:25, 283:3
**due** [1] - 218:24
**duly** [4] - 165:8, 206:4, 232:20, 275:7
**dump** [51] - 173:18, 173:21, 174:9, 174:13, 174:19, 174:20, 174:24, 181:2, 181:17, 181:19, 181:24, 191:4, 192:6, 192:22, 192:24, 193:1, 193:5, 193:9, 222:18, 222:24, 223:2, 223:5, 223:9, 223:13, 223:14, 237:23, 237:25, 238:1, 238:6, 238:7, 238:12, 238:16, 238:18, 239:3, 239:5, 239:13, 240:4, 240:10,

261:8, 261:9, 261:10, 261:12, 261:13, 278:13, 278:16, 278:23, 279:1, 279:5, 294:13, 294:18
**dumped** [2] - 192:23, 279:1
**dumping** [1] - 193:11
**dumps** [1] - 278:24
**dumpster** [2] - 176:23, 239:1
**dumpsters** [5] - 176:19, 176:22, 176:25, 239:4, 239:6
**during** [58] - 167:10, 167:12, 169:3, 176:2, 186:14, 190:8, 190:15, 191:9, 192:12, 192:17, 194:23, 197:4, 197:25, 198:22, 207:21, 208:22, 209:1, 209:2, 209:21, 209:25, 210:10, 210:12, 213:21, 213:24, 214:9, 219:2, 223:19, 225:3, 225:6, 225:22, 226:3, 226:6, 228:24, 230:17, 231:19, 232:2, 234:12, 235:10, 235:17, 236:21, 240:18, 241:1, 242:6, 243:5, 245:18, 267:24, 269:10, 277:6, 278:11, 280:16, 280:18, 280:22, 281:16, 290:20
**duties** [4] - 234:9, 234:11, 241:21, 241:25
**duty** [1] - 233:20

## E

**earliest** [1] - 240:23
**early** [9] - 235:24, 235:25, 264:24, 264:25, 266:23, 294:21, 294:22, 294:23
**earn** [1] - 232:1
**easiest** [1] - 194:18
**easily** [1] - 207:7
**Eastbook** [1] - 275:19
**Eastern** [1] - 230:17

**EASTERN** [1] - 164:1
**eat** [1] - 191:2
**ECF** [1] - 298:22
**eight** [6] - 172:2, 172:14, 173:4, 173:7, 205:15, 281:19
**either** [13] - 168:22, 181:22, 181:24, 193:25, 194:3, 235:4, 242:23, 244:6, 252:1, 253:5, 258:10, 258:13, 258:16
**electrical** [1] - 262:4
**elsewhere** [3] - 223:21, 224:3, 224:7
**employ** [1] - 229:14
**employed** [3] - 280:16, 284:6, 284:9
**employee** [3] - 229:13, 248:8, 286:16
**employees** [2] - 251:6, 251:8
**employer** [9] - 184:10, 207:21, 212:19, 228:4, 229:12, 230:3, 248:3, 248:10, 286:1
**employer's** [1] - 229:10
**employer/employee** [1] - 228:3
**employing** [1] - 245:8
**employment** [9] - 197:5, 198:23, 209:1, 210:19, 210:23, 213:21, 213:24, 224:24, 293:5
**end** [28] - 174:17, 179:2, 197:12, 210:5, 210:22, 211:23, 213:5, 220:15, 220:17, 225:9, 241:20, 250:24, 253:4, 254:24, 255:19, 261:23, 267:13, 267:24, 277:7, 279:2, 291:25, 292:7, 294:10, 295:13, 296:15, 296:22, 297:11
**ended** [11] - 178:14, 209:23, 216:1, 218:20, 224:24, 278:2, 278:4, 290:8, 290:13, 291:5, 291:15

**ending** [3] - 254:10, 277:22, 277:24
**endorse** [1] - 194:20
**ends** [2] - 263:17, 268:6
**English** [2] - 253:16, 253:17
**entered** [1] - 198:16
**enterprise** [2] - 231:25, 232:5
**entire** [5] - 167:17, 189:24, 218:12, 247:15, 274:15
**envelope** [2] - 241:23, 242:1
**equipment** [2] - 165:23, 286:25
**especially** [1] - 231:12
**ESQ** [2] - 164:17, 164:18
**established** [1] - 229:9
**estimate** [4] - 180:13, 180:17, 180:21, 228:21
**ETHAN** [1] - 164:9
**Ethan** [11] - 233:14, 233:17, 239:9, 239:19, 275:21, 285:25, 287:14, 287:17, 287:20, 288:1, 288:3
**evening** [4] - 166:9, 204:11, 210:7, 211:24
**evidence** [3] - 231:1, 231:17
**exact** [3] - 178:12, 189:5, 189:7
**exactly** [5] - 184:23, 186:18, 218:13, 254:20, 256:7
**examination** [7] - 165:14, 181:10, 202:15, 205:17, 246:23, 274:21, 281:3
**EXAMINATION** [22] - 165:17, 200:1, 202:19, 207:1, 214:20, 224:20, 233:9, 246:25, 274:12, 275:16, 283:12, 301:17, 301:19, 301:21, 301:24, 302:1, 302:3, 302:6, 302:8, 302:10, 302:13, 302:15
**examined** [4] - 165:8,

206:4, 232:20, 275:7
**example** [3] - 168:18, 170:14, 265:13
**exceeded** [1] - 229:4
**exception** [1] - 177:16
**excess** [1] - 230:4
**exchange** [1] - 191:6
**exchanged** [1] - 280:12
**exclusively** [3] - 248:6, 249:16, 299:1
**excuse** [5] - 182:22, 212:23, 249:10, 264:12, 298:10
**excused** [1] - 298:15
**exist** [1] - 260:18
**expect** [3] - 300:7, 300:22, 301:4
**expected** [1] - 230:1
**explain** [1] - 244:2
**extend** [1] - 234:17
**extended** [1] - 189:19
**extends** [1] - 228:17
**extent** [2] - 231:3, 299:7
**extra** [2] - 193:7, 264:5, 278:10

## F

**F.3d** [1] - 229:23
**facie** [1] - 229:9
**fact** [12] - 167:15, 185:1, 185:17, 186:7, 187:16, 298:23, 299:1, 299:6, 299:10, 299:20, 299:24, 300:6
**failed** [1] - 218:23
**failure** [2] - 227:13, 229:10
**Fair** [1] - 230:20
**fair** [8] - 168:3, 178:13, 181:25, 192:8, 200:21, 204:2, 236:5, 282:13
**faith** [2] - 181:8, 181:11
**fall** [2] - 176:2, 196:15
**fallen** [1] - 188:21
**falling** [1] - 189:6
**familiar** [7] - 175:20, 175:22, 176:21, 186:24, 234:6, 234:23, 242:7
**familiarity** [1] - 234:17
**family** [2] - 186:16, 186:20
**fans** [1] - 262:4

**far** [3] - 168:2, 171:24, 245:5
**fashion** [6] - 216:5, 216:9, 236:22, 237:1, 244:23, 274:17
**fast** [2] - 264:23, 299:13
**father** [1] - 186:22
**February** [5] - 189:22, 190:6, 190:9, 292:4, 296:18
**Federal** [3] - 164:22, 228:6, 228:13
**federal** [1] - 232:3
**feet** [3] - 271:4, 281:15, 281:19
**fell** [1] - 188:18
**felt** [1] - 186:19
**few** [8] - 173:23, 199:24, 204:4, 257:4, 258:25, 263:24
**field** [1] - 282:9
**fill** [1] - 185:13
**findings** [8] - 298:23, 299:1, 299:6, 299:10, 299:20, 299:24, 300:5, 300:23
**fine** [3] - 206:25, 210:24, 299:25
**finish** [27] - 235:24, 236:10, 236:12, 236:14, 236:17, 236:18, 258:18, 263:19, 264:9, 265:15, 265:21, 265:25, 266:6, 266:24, 267:22, 268:8, 268:25, 269:7, 269:15, 269:18, 272:10, 272:24, 273:3, 273:4, 273:10, 274:14
**finished** [17] - 165:11, 167:24, 170:20, 201:23, 202:8, 216:1, 235:24, 235:25, 236:19, 261:23, 265:13, 265:23, 268:17, 269:4, 269:11, 270:10, 290:3
**finishing** [2] - 269:25, 294:11
**fire** [1] - 244:5
**First** [12] - 183:6, 183:19, 184:15,

185:10, 201:1,
284:9, 285:3,
285:25, 289:2,
289:5, 289:8, 289:12
**FIRST** [3] - 164:7,
164:8, 164:8
**first** [23] - 183:10,
186:3, 202:2,
203:23, 206:3,
206:7, 206:10,
207:3, 207:15,
207:25, 226:20,
232:15, 232:19,
232:24, 233:1,
238:7, 269:14,
275:6, 275:9,
275:12, 279:18,
293:19, 299:9
**five** [45] - 167:8,
167:18, 169:3,
169:6, 169:11,
171:9, 173:12,
177:16, 178:14,
178:24, 189:12,
189:15, 198:11,
198:17, 209:1,
209:4, 209:5, 210:9,
210:18, 215:16,
224:25, 225:10,
225:20, 226:4,
226:5, 228:25,
231:23, 240:20,
258:19, 259:1,
259:5, 259:9,
259:14, 259:16,
273:3, 276:14,
290:8, 290:14,
290:16, 290:21,
291:5, 291:8,
291:15, 292:11
**fixed** [1] - 235:18
**FLSA** [2] - 228:6,
229:7
**follow** [2] - 203:12,
274:8
**follow-up** [2] - 203:12,
274:8
**following** [25] -
182:20, 182:21,
183:16, 183:17,
185:6, 185:7,
197:10, 197:23,
197:24, 198:21,
204:23, 218:3,
236:11, 242:15,
242:16, 264:9,
264:13, 265:9,
265:25, 268:19,
268:21, 269:8,
272:9, 272:25

**follows** [6] - 165:9,
191:22, 202:23,
206:5, 232:21, 275:8
**footwear** [1] - 245:8
**Ford** [8] - 174:23,
175:8, 175:12,
175:21, 175:22,
176:16, 176:24,
177:4
**foreclosing** [1] -
221:18
**foreman** [15] - 175:6,
187:2, 233:21,
233:22, 234:9,
234:11, 244:10,
244:18, 245:25,
258:18, 259:6,
259:9, 266:2, 266:5,
271:10
**forever** [2] - 233:23,
233:25
**forgive** [1] - 281:9
**form** [30] - 169:9,
169:17, 169:24,
171:1, 172:4, 174:6,
180:3, 213:13,
213:14, 216:10,
217:13, 222:20,
234:14, 234:20,
234:25, 235:7,
235:14, 235:21,
237:6, 237:18,
238:9, 238:14,
240:5, 241:11,
242:25, 243:12,
264:16, 278:19,
280:25, 297:15
**forth** [2] - 206:24,
281:5
**forward** [1] - 169:21
**four** [32] - 169:12,
170:18, 189:12,
189:15, 235:16,
248:5, 249:15,
249:23, 250:6,
258:19, 258:21,
258:22, 259:4,
259:9, 259:14,
259:16, 267:1,
267:7, 267:19,
268:9, 268:20,
268:25, 269:2,
269:17, 270:13,
271:1, 273:8,
273:16, 276:13,
277:15
**free** [2] - 193:1, 223:21
**frequently** [1] - 272:2
**Friday** [5] - 171:9,
177:15, 182:8,

214:13, 260:5
**friend** [1] - 243:25
**friends** [1] - 248:24
**front** [4] - 193:19,
207:6, 241:16,
254:13
**full** [10] - 171:18,
171:20, 171:22,
171:23, 171:24,
174:14, 264:14,
266:22, 269:1, 270:7
**fully** [1] - 300:25

## G

**garbage** [13] - 173:21,
173:24, 174:10,
174:14, 174:18,
174:22, 175:3,
181:23, 193:9,
238:4, 278:24,
293:13
**garden** [1] - 176:2
**generally** [2] - 234:18,
234:23
**gentlemen** [2] - 231:8,
232:8
**gift** [2] - 193:23,
193:25
**gifts** [2] - 194:4, 194:8
**given** [25] - 184:22,
185:13, 201:5,
201:16, 211:12,
211:14, 212:1,
212:15, 212:18,
216:19, 217:2,
217:4, 227:17,
228:2, 228:15,
230:8, 240:24,
249:24, 250:7,
280:20, 280:24,
282:12, 297:15,
299:5, 300:24
**glass** [1] - 184:24
**Glen** [5] - 257:14,
257:15, 257:20,
257:23, 258:1
**God** [1] - 188:20
**goggles** [4] - 166:14,
166:17, 166:18,
166:20
**granted** [3] - 171:13,
183:13, 190:4
**granules** [1] - 196:14
**GREENBERG** [1] -
164:16
**ground** [8] - 238:23,
285:23, 293:1,
293:4, 293:11,
293:13, 293:21,

293:24
**guess** [1] - 245:6
**guidance** [1] - 300:25
**guilty** [2] - 186:19,
288:14
**guy** [1] - 247:12
**guys** [3] - 174:16,
256:3, 259:8

## H

**half** [5] - 168:10,
198:1, 210:15,
211:20, 292:17
**half-an-hour** [1] -
168:10
**hallway** [1] - 273:21
**hand** [4] - 205:25,
241:22, 253:11,
283:25
**handing** [1] - 242:1
**handled** [1] - 301:7
**hang** [1] - 188:13
**happy** [1] - 301:5
**harnessing** [1] - 245:5
**head** [1] - 207:6
**Health** [1] - 230:12
**hear** [5] - 177:9,
206:14, 206:15,
207:11, 233:6
**help** [1] - 262:10
**Hempstead** [2] -
213:3, 242:10
**heroin** [1] - 288:7
**HF** [1] - 229:22
**hired** [3] - 285:2,
289:5, 289:8
**holes** [1] - 265:24
**holiday** [1] - 299:13
**HOME** [1] - 164:7
**home** [16] - 168:19,
211:23, 213:1,
242:4, 242:9, 247:6,
247:11, 247:12,
247:13, 247:20,
247:22, 268:11,
268:14, 296:4, 296:6
**Home** [2] - 190:23,
224:11
**homes** [3] - 215:5,
215:11, 215:12
**Honor** [22] - 165:15,
171:10, 195:11,
196:4, 199:21,
199:24, 202:17,
206:13, 226:17,
227:11, 230:6,
230:22, 231:7,
232:14, 274:10,
275:2, 295:8,

298:10, 298:12,
298:17, 298:19,
300:2
**HONORABLE** [1] -
164:13
**hot** [2] - 196:7, 196:8
**hour** [22] - 168:10,
168:11, 172:18,
173:2, 173:7, 195:1,
199:6, 199:7,
210:15, 211:20,
226:15, 229:14,
236:22, 236:25,
237:11, 237:13,
259:22, 264:1,
264:2, 279:11,
292:17, 297:19
**hourly** [2] - 195:6,
237:4
**hours** [82] - 167:16,
167:20, 167:25,
168:5, 168:20,
172:13, 173:4,
177:14, 177:17,
178:1, 178:6,
178:12, 179:14,
180:2, 180:6, 197:4,
197:7, 197:13,
198:1, 198:24,
199:7, 199:10,
199:14, 200:25,
201:10, 203:1,
203:14, 204:16,
213:12, 215:7,
215:20, 215:22,
215:25, 219:18,
220:24, 221:3,
221:24, 225:13,
225:23, 227:18,
227:21, 228:10,
228:11, 228:21,
229:4, 230:4,
230:14, 230:19,
231:14, 231:19,
231:20, 231:22,
231:23, 231:24,
234:18, 242:24,
243:6, 258:9,
258:12, 259:18,
259:21, 260:18,
263:4, 264:13,
265:4, 265:8,
266:20, 267:8,
267:21, 268:13,
268:22, 268:24,
268:25, 269:10,
269:18, 269:21,
270:6, 277:17,
280:19, 280:24,
292:14, 294:17

**house** [21] - 170:18, 170:20, 188:18, 208:2, 208:8, 214:1, 242:5, 251:12, 251:24, 252:1, 252:2, 253:6, 253:21, 254:15, 269:9, 270:23, 295:17, 295:22, 295:23, 296:9, 298:1
**housecleaning** [1] - 175:1
**houses** [4] - 170:14, 215:9, 243:10, 243:20
**hum** [1] - 247:17
**hundred** [1] - 278:10
**HURLEY** [1] - 164:13
**hurt** [1] - 287:16
**hurting** [1] - 188:25

## I

**idea** [1] - 256:22
**illumination** [1] - 166:24
**imagine** [1] - 252:5
**immediately** [2] - 211:1, 227:5
**important** [2] - 233:5, 298:24
**IMPROVEMENT** [1] - 164:7
**inability** [1] - 227:16
**Inc** [4] - 183:19, 184:15, 185:11, 201:1
**INC** [2] - 164:8, 164:9
**incarcerated** [2] - 276:20, 276:21
**incarceration** [1] - 291:6
**inclemate** [1] - 191:10
**inclement** [6] - 169:25, 178:16, 178:19, 178:23, 179:12, 179:25
**include** [2] - 234:9, 234:11
**included** [1] - 173:18
**including** [1] - 244:19
**income** [2] - 183:10, 190:17
**incorporates** [1] - 175:18
**independent** [1] - 200:19
**INDEX** [1] - 301:13
**indicate** [3] - 179:19, 212:13, 228:9

**indicated** [3] - 227:6, 281:4, 281:5
**indicates** [1] - 231:18
**indicating** [3] - 212:15, 212:18, 297:18
**information** [2] - 185:9, 295:11
**initial** [1] - 301:4
**injury** [1] - 189:11
**input** [1] - 232:9
**inquire** [2] - 246:21, 283:8
**inquiry** [2] - 221:18, 226:17
**insisted** [1] - 195:1
**inspect** [1] - 261:24
**install** [3] - 196:13, 215:8, 273:25
**installation** [2] - 245:1, 265:1
**installed** [1] - 274:1
**instead** [6] - 194:25, 195:6, 263:25, 264:9, 269:25, 272:9
**instruct** [1] - 295:8
**instructions** [2] - 175:7, 285:6
**insufficient** [1] - 230:19
**insurance** [5] - 287:10, 287:13, 287:18, 287:21, 287:25
**insure** [2] - 175:2, 175:3
**insured** [1] - 174:25
**interested** [1] - 199:7
**interpretation** [1] - 221:15
**interpreted** [1] - 207:12
**INTERPRETER** [19] - 166:15, 172:15, 173:6, 177:11, 179:20, 182:22, 199:19, 200:17, 202:1, 206:10, 206:18, 206:22, 212:3, 212:23, 223:22, 250:1, 250:4, 254:3, 254:7
**interpreter** [14] - 172:15, 179:20, 202:1, 206:5, 206:10, 206:18, 206:22, 212:3, 223:22, 250:1, 253:15, 254:3, 254:7, 254:8

**Interpreter** [1] - 173:6
**interpreting** [1] - 253:16
**interrupted** [1] - 239:6
**involved** [2] - 215:9, 242:1
**Island** [1] - 230:13
**Islip** [5] - 164:7, 164:23, 200:10, 200:13, 200:19
**issue** [2] - 229:17, 281:10
**issues** [1] - 245:4
**items** [1] - 194:8

## J

**jail** [9] - 288:9, 288:11, 288:17, 288:21, 288:24, 289:14, 289:16, 291:10, 291:12
**January** [8] - 189:21, 190:6, 190:9, 299:14, 299:16, 299:19, 300:4, 301:4
**Jay** [86] - 175:6, 187:21, 188:3, 188:15, 192:13, 192:18, 192:23, 193:15, 193:24, 194:24, 195:5, 207:4, 207:16, 207:19, 207:22, 207:24, 208:3, 208:7, 208:11, 208:12, 208:13, 208:15, 208:17, 212:21, 213:21, 216:16, 223:7, 247:23, 248:1, 248:3, 248:6, 248:10, 248:12, 248:15, 248:20, 248:24, 249:2, 249:7, 249:13, 249:16, 249:19, 249:24, 250:7, 250:12, 250:18, 250:20, 251:3, 255:21, 258:9, 261:21, 262:1, 262:9, 262:11, 262:19, 263:4, 263:7, 264:5, 264:15, 264:25, 269:2, 269:9, 269:22, 270:13, 270:18, 270:20, 271:1, 271:7, 271:9,

272:20, 283:14, 283:16, 284:6, 285:2, 285:5, 285:8, 285:19, 286:7, 286:8, 286:15, 286:19, 287:1, 288:20, 288:23, 289:16, 294:4
**Jay's** [26] - 200:3, 200:6, 200:12, 200:15, 248:8, 251:5, 251:6, 251:8, 251:12, 251:19, 251:20, 252:2, 253:5, 253:21, 253:22, 254:15, 254:25, 256:10, 256:15, 256:18, 256:21, 257:22, 258:5, 287:7
**Jesus** [1] - 248:1
**JESUS** [2] - 164:9, 164:10
**job** [216] - 165:22, 166:4, 166:10, 166:13, 166:21, 167:20, 167:24, 168:2, 168:12, 168:14, 168:25, 169:4, 169:6, 169:7, 169:14, 170:12, 170:15, 170:20, 170:25, 171:6, 171:7, 171:17, 171:18, 171:21, 171:25, 172:6, 172:9, 173:3, 173:13, 173:19, 173:22, 174:16, 175:4, 175:6, 175:8, 176:22, 181:22, 181:25, 187:4, 187:18, 187:19, 190:13, 192:23, 193:4, 193:7, 193:15, 196:7, 200:13, 200:16, 204:10, 205:9, 208:6, 209:7, 209:11, 209:14, 209:18, 212:24, 213:1, 213:4, 213:6, 213:17, 213:20, 213:23, 214:7, 214:24, 215:8, 215:15, 216:20, 217:21, 217:24, 218:5, 219:2, 219:5, 219:12, 219:13, 219:14, 223:10, 223:11, 224:8,

224:10, 233:19, 235:6, 235:12, 236:7, 236:10, 237:23, 238:2, 238:8, 238:13, 238:19, 239:13, 242:11, 242:19, 244:9, 244:16, 244:18, 245:8, 245:19, 245:21, 245:22, 245:24, 246:1, 246:4, 246:14, 251:5, 253:4, 253:22, 254:16, 255:9, 256:3, 256:6, 256:18, 256:21, 256:23, 256:25, 257:2, 258:1, 260:25, 261:22, 261:23, 262:14, 262:19, 263:10, 263:11, 263:19, 263:22, 263:25, 264:1, 264:9, 264:21, 265:4, 265:5, 265:6, 265:7, 265:15, 265:20, 265:21, 265:20, 266:7, 266:18, 266:24, 267:22, 268:15, 269:3, 269:4, 269:11, 269:13, 269:19, 269:25, 270:2, 270:4, 270:10, 270:13, 270:15, 271:7, 271:9, 271:10, 271:13, 271:14, 271:18, 271:20, 272:3, 272:10, 272:20, 273:5, 273:12, 274:14, 274:18, 277:10, 278:6, 278:14, 278:25, 279:2, 279:4, 279:9, 279:16, 279:25, 281:11, 282:7, 282:8, 282:12, 282:16, 283:1, 285:5, 285:9, 285:13, 285:19, 287:6, 287:16, 287:22, 288:1, 288:3, 289:17, 289:21, 291:18, 291:22, 292:1, 292:4, 292:7, 292:22, 293:19, 294:10, 294:18,

294:20, 295:13, 295:14, 295:18, 296:4, 296:6, 297:23, 298:2
**jobs** [39] - 168:6, 169:21, 170:11, 171:6, 171:16, 236:2, 236:4, 243:15, 243:24, 245:23, 246:6, 256:7, 257:5, 257:7, 257:15, 257:17, 257:20, 259:8, 261:4, 261:7, 264:15, 269:9, 269:13, 270:8, 270:15, 270:18, 270:19, 270:22, 270:24, 270:25, 273:2, 278:2, 278:4, 296:15, 296:19, 296:24, 297:1
**Jose** [52] - 213:17, 213:20, 213:23, 234:6, 251:11, 251:19, 253:21, 254:14, 254:25, 255:10, 255:23, 256:5, 256:9, 256:14, 257:21, 258:1, 258:5, 258:10, 258:13, 258:16, 259:18, 259:24, 261:4, 261:5, 261:8, 276:4, 277:7, 278:13, 278:22, 289:2, 289:9, 289:20, 289:23, 290:2, 291:17, 291:19, 291:22, 292:1, 292:3, 292:6, 292:23, 293:8, 294:17, 296:16, 296:19, 296:23, 297:1, 297:6, 297:10, 297:23, 298:1
**JOSE** [3] - 164:3, 165:6, 301:16
**judge** [2] - 221:13, 283:8
**JUDGE** [1] - 164:14
**Judge** [7] - 231:25, 246:21, 273:18, 274:23, 281:10, 299:24, 301:1
**July** [12] - 189:2, 208:24, 210:3, 276:1, 276:8,

276:23, 288:11, 289:1, 290:21, 291:6, 296:18, 297:7
**June** [10] - 189:2, 208:24, 210:3, 277:5, 289:13, 289:19, 289:24, 292:7, 296:22, 297:10
**jurisdiction** [2] - 230:24, 231:4
**JUSTIN** [1] - 164:17

## K

**keep** [8] - 178:12, 194:6, 198:2, 228:5, 229:11, 229:12, 233:5, 258:9
**keeping** [1] - 228:8
**kept** [9] - 258:12, 258:15, 258:23, 260:24, 263:3, 263:6, 263:10, 292:14, 298:4
**kind** [3] - 244:9, 265:2, 286:6
**kinds** [1] - 243:15
**knee** [2] - 188:24, 188:25
**knowledge** [7] - 242:22, 245:13, 279:23, 280:2, 280:7, 280:11, 280:13
**knows** [2] - 237:3, 244:1

## L

**L-E-O-T-I-L-D-E** [1] - 233:2
**labor** [2] - 190:24, 228:7
**Labor** [2] - 230:20, 232:7
**laborer** [1] - 224:12
**lack** [1] - 228:12
**ladders** [1] - 208:1
**Lakewood** [1] - 233:12
**landscaping** [2] - 176:8
**large** [1] - 245:21
**larger** [4] - 215:5, 215:9, 236:4, 236:7
**last** [39] - 196:19, 196:25, 197:5, 198:23, 201:15, 203:5, 204:8, 204:9,

204:11, 204:21, 205:2, 205:9, 205:12, 206:7, 206:11, 209:1, 210:18, 211:7, 221:15, 232:24, 233:2, 246:8, 248:5, 250:11, 262:9, 267:7, 267:19, 268:2, 268:20, 269:17, 271:6, 272:3, 272:14, 275:10, 275:13, 283:18
**late** [1] - 237:21
**Law** [1] - 232:7
**law** [11] - 227:15, 228:7, 228:14, 228:15, 228:16, 228:19, 229:15, 298:24, 299:7, 299:11, 300:6
**leading** [2] - 183:1, 240:6
**learning** [1] - 273:25
**least** [6] - 178:24, 210:9, 224:25, 225:10, 226:4, 230:3
**leave** [19] - 172:20, 190:1, 201:4, 219:5, 236:17, 236:18, 255:9, 258:1, 263:13, 264:24, 265:4, 265:11, 265:24, 266:23, 268:1, 279:6, 294:17, 294:22, 295:12
**leaves** [3] - 176:1, 176:5, 176:10
**leaving** [1] - 294:12
**LEE** [1] - 164:18
**left** [26] - 167:21, 178:14, 198:11, 198:17, 215:15, 219:12, 220:5, 237:16, 245:17, 263:11, 263:25, 265:4, 267:8, 267:21, 274:19, 279:10, 283:1, 283:3, 283:4, 294:9, 294:18, 294:21, 294:23
**Leo** [25] - 175:4, 175:5, 186:24, 187:7, 187:13, 188:6, 188:9, 212:25, 213:3, 213:5, 214:7,

216:17, 216:18, 216:19, 217:1, 217:4, 217:20, 217:24, 232:15, 295:17, 295:19, 296:9, 296:10
**Leo's** [4] - 295:17, 295:21, 295:23, 296:9
**Leotilde** [1] - 233:1
**less** [15] - 170:20, 171:7, 171:18, 171:23, 177:17, 178:6, 215:10, 215:12, 219:17, 220:1, 237:21, 245:22, 249:1, 271:4, 281:6
**lesser** [1] - 211:2
**liability** [1] - 287:21
**lights** [1] - 167:1
**likewise** [1] - 230:16
**limit** [1] - 176:15
**Limitations** [3] - 229:6, 229:7, 232:5
**line** [60] - 182:19, 182:24, 182:25, 183:2, 183:4, 183:15, 183:16, 184:13, 184:16, 185:5, 191:20, 191:22, 197:9, 197:22, 197:24, 198:20, 198:21, 200:24, 201:2, 201:10, 201:13, 201:20, 202:2, 202:4, 202:6, 202:25, 203:11, 203:15, 204:15, 204:19, 221:18, 253:20, 253:23, 254:8, 254:9, 254:10, 254:14, 254:23, 255:8, 255:11, 262:7, 262:9, 262:13, 262:18, 262:21, 281:5, 285:12, 285:14, 290:12, 290:14, 293:9, 293:12, 294:7, 296:3, 296:6, 296:7
**lines** [2] - 198:6, 201:22
**Lisa** [1] - 207:8
**listened** [1] - 222:14
**live** [2] - 213:3, 242:3
**lived** [1] - 242:9
**LLC** [2] - 164:8,

229:23
**load** [5] - 166:9, 176:1, 176:8, 176:13, 238:24
**loaded** [1] - 166:1
**loading** [1] - 168:10
**loan** [7] - 193:21, 193:25, 194:2, 194:5, 249:9, 249:11, 249:13
**loaned** [2] - 186:12, 249:7
**loaning** [1] - 184:10
**located** [4] - 200:4, 200:7, 200:16, 258:3
**location** [2] - 168:12, 256:23
**locations** [2] - 256:25, 257:2
**look** [6] - 189:8, 229:2, 232:12, 299:8, 299:9, 300:3
**looking** [4] - 191:14, 254:23, 256:23, 293:11
**looks** [1] - 254:11
**loose** [1] - 245:10
**lunch** [7] - 210:14, 211:20, 226:14, 227:5, 231:21, 292:17, 292:20
**luncheon** [1] - 226:23
**Lundy** [2] - 230:12, 231:12

## M

**M-A-L-D-O-N-A-D-O** [1] - 233:3
**main** [1] - 230:12
**maintained** [2] - 287:9, 287:25
**majority** [2] - 215:5, 219:15
**Maldonado** [2] - 232:16, 233:1
**MALDONADO** [2] - 232:18, 302:5
**Maldonato** [5] - 186:24, 187:7, 187:16, 188:9, 188:10
**Management** [1] - 229:23
**manner** [1] - 244:11
**MANUEL** [1] - 164:9
**Mary** [1] - 164:21
**Massapequa** [1] - 164:17
**Matere** [1] - 230:16

**material** [3] - 176:16, 177:2, 192:23
**materials** [9] - 175:23, 176:10, 176:13, 208:1, 208:9, 214:1, 214:2, 245:1, 261:9
**mathematical** [1] - 230:1
**Matter** [1] - 301:9
**maximum** [1] - 264:6
**mean** [5] - 204:9, 218:17, 240:14, 247:23, 257:9
**meaning** [1] - 175:15
**means** [2] - 194:12, 199:14
**meant** [2] - 267:15, 295:2
**measurement** [1] - 281:18
**measures** [1] - 238:19
**mechanic** [1] - 274:3
**mechanical** [1] - 164:25
**meet** [4] - 227:13, 230:15, 295:17, 295:21
**meeting** [2] - 295:22, 296:8
**Mejia** [1] - 206:9
**MEJIA** [4] - 164:4, 206:2, 206:11, 301:23
**melt** [1] - 196:15
**memorandum** [1] - 227:15
**memory** [1] - 199:15
**Merrick** [1] - 164:16
**met** [2] - 230:21, 246:12
**metal** [4] - 191:5, 191:7, 192:7, 192:19
**method** [1] - 238:25
**methods** [1] - 244:16
**microphone** [5] - 206:16, 206:19, 206:21, 206:23, 207:6
**middle** [6] - 219:2, 220:15, 289:13, 289:19, 289:24, 297:10
**minute** [1] - 292:19
**minutes** [10] - 168:8, 168:13, 172:1, 172:7, 172:9, 172:12, 204:4, 226:15, 256:8
**mischaracterizing** [1] - 171:2

**missed** [1] - 189:16
**missing** [1] - 262:24
**misspoke** [1] - 280:6
**misunderstanding** [1] - 220:12
**moment** [3] - 184:11, 205:25, 245:15
**Monday** [5] - 171:9, 177:15, 182:7, 260:4, 299:14
**money** [18] - 184:10, 186:12, 191:6, 193:16, 193:20, 194:7, 241:19, 241:23, 242:3, 242:4, 246:14, 248:22, 249:7, 249:9, 249:11, 264:5, 264:12, 288:23
**month** [19] - 180:12, 180:20, 180:25, 190:7, 217:12, 217:15, 219:19, 219:24, 219:25, 220:4, 220:8, 220:15, 220:16, 220:21, 229:5, 276:22, 283:18, 290:25
**months** [13] - 167:10, 189:24, 190:6, 190:19, 208:22, 209:25, 210:10, 210:12, 219:20, 219:22, 289:23, 293:5, 293:23
**morning** [22] - 165:2, 165:19, 165:20, 173:8, 173:9, 195:10, 205:10, 205:24, 207:3, 209:12, 209:15, 214:22, 214:23, 225:4, 240:24, 247:18, 255:25, 256:5, 256:11, 261:18, 297:24
**most** [14] - 173:14, 201:10, 203:1, 204:15, 217:6, 219:22, 231:4, 256:7, 257:4, 277:21, 282:11, 294:20, 294:23, 298:25
**motion** [2] - 227:12, 231:13
**motions** [1] - 227:7
**Mount** [1] - 228:16

**move** [6] - 171:10, 172:21, 183:11, 190:2, 207:6, 227:8
**moved** [1] - 242:10
**MR** [164] - 165:15, 165:18, 166:16, 169:9, 169:16, 169:18, 169:19, 170:6, 171:1, 171:4, 171:10, 171:14, 172:3, 172:5, 172:21, 172:24, 173:1, 175:14, 175:17, 175:19, 177:6, 177:12, 177:18, 177:22, 178:2, 178:4, 178:17, 178:25, 179:3, 179:16, 179:22, 179:23, 180:3, 180:9, 180:18, 180:22, 181:7, 181:13, 182:24, 183:11, 183:14, 186:1, 188:1, 190:2, 190:5, 190:25, 191:3, 193:10, 195:11, 196:4, 196:23, 198:6, 199:18, 199:20, 199:24, 200:2, 200:21, 202:3, 202:12, 202:17, 202:20, 205:1, 205:11, 205:16, 205:19, 205:23, 206:13, 207:2, 213:13, 214:16, 214:21, 216:10, 217:13, 221:13, 221:19, 222:8, 222:20, 223:23, 224:4, 224:14, 224:16, 224:18, 224:21, 226:10, 226:12, 226:17, 226:19, 226:20, 227:11, 228:2, 229:21, 231:9, 231:11, 232:14, 233:10, 234:14, 234:20, 234:22, 234:25, 235:7, 235:14, 235:21, 237:6, 237:18, 238:9, 238:14, 240:5, 240:8, 241:11, 242:25, 243:12, 246:19, 246:21, 247:1, 250:3, 250:5,

254:5, 254:9, 264:16, 267:4, 273:1, 273:18, 274:5, 274:8, 274:10, 274:13, 274:20, 274:23, 275:1, 275:17, 278:19, 279:7, 280:25, 281:8, 283:5, 283:8, 283:10, 283:13, 295:4, 295:8, 298:7, 298:10, 298:12, 298:16, 298:19, 299:12, 299:16, 299:19, 299:22, 300:1, 300:13, 300:14, 301:1, 301:18, 301:20, 301:22, 301:25, 302:2, 302:4, 302:7, 302:9, 302:11, 302:14, 302:16
**multiple** [5] - 227:19, 227:20, 230:7, 295:6, 300:21

## N

**Naheem** [8] - 214:3, 214:4, 214:5, 273:19, 273:21, 273:24, 275:2, 275:12
**NAHEEM** [4] - 214:3, 275:5, 275:13, 302:12
**Nahim** [1] - 247:13
**name** [23] - 174:25, 177:23, 206:7, 206:8, 206:11, 215:23, 220:22, 221:1, 221:22, 227:20, 230:8, 232:24, 233:2, 241:24, 248:2, 275:10, 275:12, 275:13, 286:17
**named** [1] - 186:24
**Nassau** [3] - 257:4, 257:7, 257:10
**native** [1] - 189:20
**near** [2] - 193:4, 281:12
**nearby** [1] - 256:8
**necessary** [2] - 232:3, 232:6
**need** [11] - 165:24, 182:22, 186:23, 188:12, 261:10,

261:11, 286:20, 298:21, 298:23, 299:1, 299:10
**needed** [6] - 189:13, 191:2, 249:9, 249:11, 249:12, 300:17
**needs** [3] - 202:1, 212:3, 223:22
**negligence** [1] - 287:21
**NEIL** [1] - 164:16
**nervous** [1] - 184:4
**never** [44] - 173:21, 178:6, 187:23, 187:25, 193:19, 198:2, 218:23, 219:11, 240:21, 243:3, 243:4, 243:7, 256:9, 256:12, 258:9, 258:12, 258:15, 258:23, 259:22, 260:5, 260:24, 263:3, 263:6, 263:10, 265:2, 266:17, 268:1, 268:9, 272:19, 272:23, 276:14, 279:4, 281:6, 287:9, 287:24, 292:13, 293:16, 293:20, 297:13, 297:15, 297:18, 298:4
**nevertheless** [1] - 282:7
**NEW** [1] - 164:1
**new** [1] - 215:8
**New** [7] - 164:7, 164:23, 228:7, 229:5, 232:4, 232:6, 275:19
**next** [26] - 168:19, 168:23, 170:12, 185:24, 205:21, 226:24, 227:9, 232:11, 252:7, 264:1, 265:8, 265:11, 265:15, 265:21, 266:7, 266:20, 266:24, 267:10, 267:22, 268:15, 269:4, 269:11, 270:1, 290:15, 295:17, 296:8
**night** [4] - 166:2, 166:14, 166:17, 166:20, 173:5
**nine** [1] - 285:14

**Nissan** [3] - 174:21, 181:22, 181:25
**nobody** [1] - 193:21
**nonresponsive** [1] - 190:3
**normal** [3] - 258:17, 258:20, 259:14
**normally** [11] - 235:25, 249:21, 250:8, 263:12, 263:13, 263:19, 264:6, 268:8, 273:10, 299:12
**North** [3] - 257:7, 257:9, 257:10
**note** [1] - 301:5
**nothing** [6] - 170:10, 176:9, 188:20, 248:18, 253:13, 284:2
**November** [3] - 164:10, 208:25, 219:23
**number** [14] - 170:4, 177:1, 178:12, 197:4, 197:13, 199:7, 199:10, 201:10, 202:2, 203:1, 204:15, 215:22, 245:19
**NY** [2] - 164:17, 164:19

**O**

**o'clock** [40] - 201:23, 202:7, 205:15, 209:24, 215:16, 263:14, 263:18, 263:21, 263:23, 264:5, 264:7, 264:8, 265:3, 265:10, 265:19, 266:5, 266:12, 266:13, 266:14, 266:16, 266:17, 266:19, 267:7, 267:20, 268:6, 268:12, 268:17, 269:7, 271:13, 271:19, 271:24, 272:6, 272:8, 272:12, 272:15, 272:21, 273:8, 273:16, 278:6
**oath** [5] - 182:12, 183:22, 184:1, 283:21, 283:23
**objection** [43] - 169:9, 169:16, 170:6, 171:1, 172:3,

175:14, 177:6, 178:2, 178:17, 178:25, 179:16, 180:3, 180:9, 180:18, 181:7, 181:10, 181:13, 190:25, 205:11, 213:13, 216:10, 217:13, 222:8, 222:20, 234:14, 234:20, 234:25, 235:7, 235:14, 235:21, 237:6, 237:18, 238:9, 238:14, 240:5, 241:11, 242:25, 243:12, 264:16, 278:19, 279:7, 295:4
**Objection** [1] - 280:25
**observe** [8] - 213:23, 278:12, 278:22, 279:18, 280:13, 280:23, 282:11, 283:1
**observed** [7] - 222:17, 237:22, 242:22, 244:4, 279:14, 279:21, 282:15
**obtained** [1] - 190:17
**obvious** [1] - 180:20
**obviously** [2] - 179:9, 288:20
**occasion** [10] - 168:22, 192:6, 223:17, 240:1, 243:23, 244:22, 245:3, 281:23, 283:1, 294:22
**occasions** [24] - 168:18, 168:20, 170:17, 170:19, 173:23, 177:16, 178:20, 188:14, 192:22, 193:23, 203:13, 216:22, 216:25, 219:1, 227:20, 236:19, 242:15, 249:22, 249:24, 250:9, 263:24, 269:20, 272:13, 294:23
**occur** [7] - 189:1, 195:2, 196:7, 196:10, 216:5, 216:8, 282:21
**occurred** [4] - 189:6, 219:5, 230:25, 241:17
**OCEANSIDE** [1] - 164:8

**Oceanside** [11] - 168:7, 200:12, 200:15, 251:12, 251:20, 253:21, 254:15, 255:1, 255:11, 257:23, 258:2
**October** [19] - 208:24, 210:4, 210:5, 210:13, 225:9, 228:24, 229:5, 253:8, 255:14, 285:17, 288:4, 289:6, 290:20, 290:25, 291:5, 291:25, 292:22, 296:15, 297:6
**OF** [2] - 164:1, 164:13
**offer** [1] - 224:11
**offers** [1] - 289:2
**office** [4] - 253:8, 253:15, 283:18, 285:16
**often** [7] - 168:16, 196:10, 196:11, 272:2, 272:17, 282:21, 282:22
**old** [1] - 215:7
**once** [10] - 167:3, 180:25, 217:10, 217:11, 217:12, 219:4, 222:22, 223:1, 294:10
**one** [69] - 170:12, 170:22, 170:23, 170:24, 171:7, 171:18, 174:10, 174:23, 177:16, 180:11, 180:19, 187:7, 192:4, 193:3, 193:22, 201:15, 202:17, 203:5, 203:25, 204:8, 204:11, 204:21, 205:2, 205:9, 205:12, 210:20, 217:15, 224:8, 230:3, 230:12, 230:22, 230:24, 231:4, 232:2, 232:5, 241:24, 244:1, 245:12, 245:16, 246:12, 250:9, 260:10, 262:4, 264:15, 265:1, 270:9, 270:10, 270:14, 270:16, 270:18, 270:21, 270:24, 271:1, 271:7, 271:10,

271:11, 271:18, 271:23, 271:25, 273:12, 285:2, 288:9, 291:19, 294:17, 294:20, 294:22, 298:10, 300:15
**one's** [1] - 230:12
**ones** [3] - 187:9, 187:14, 245:17
**open** [4] - 175:23, 175:24, 265:24, 267:25
**opened** [1] - 267:16
**operator** [1] - 174:20
**opportunity** [3] - 227:10, 230:8, 299:5
**order** [6] - 190:19, 194:19, 199:12, 227:24, 229:18, 298:22
**ordered** [1] - 176:22
**ordering** [1] - 300:17
**otherwise** [4] - 169:12, 175:11, 261:16, 264:12
**ought** [2] - 298:20, 299:3
**outs** [1] - 228:6
**outside** [1] - 275:2
**overload** [1] - 176:14
**overruled** [29] - 169:10, 170:7, 177:7, 178:3, 178:18, 179:1, 179:17, 180:4, 180:10, 191:1, 216:11, 217:14, 222:9, 222:21, 234:15, 235:8, 235:15, 235:22, 237:7, 237:19, 238:10, 238:15, 241:12, 243:1, 243:13, 264:17, 278:20, 279:8, 281:4
**overtime** [5] - 199:11, 213:11, 213:15, 230:2, 230:5
**owed** [1] - 230:2
**Owen** [1] - 164:21
**own** [13] - 166:20, 174:23, 181:2, 223:7, 223:12, 239:7, 286:5, 286:23, 286:25, 287:3, 287:10, 294:13
**owned** [4] - 173:18, 175:13, 176:16,

222:18
**owner** [8] - 166:14, 166:17, 187:11, 247:8, 247:18, 247:20, 247:23, 256:1
**owner's** [4] - 166:13, 176:6, 176:7, 247:10

**P**

**P-A-L-A-C-I-O-S** [1] - 206:12
**p.m** [19] - 167:21, 203:14, 210:1, 210:7, 225:5, 225:14, 225:23, 226:7, 266:10, 269:3, 269:10, 269:23, 269:25, 273:3, 290:8, 290:16, 290:22, 291:5
**pack** [2] - 267:9, 268:14
**page** [38] - 182:19, 182:23, 182:24, 183:15, 184:13, 185:1, 185:5, 185:18, 185:19, 185:24, 191:19, 197:8, 197:9, 197:22, 198:6, 198:20, 200:22, 201:8, 201:19, 202:3, 202:21, 202:25, 203:11, 204:23, 226:24, 229:23, 252:7, 253:20, 254:8, 254:9, 254:23, 255:7, 262:6, 272:25, 285:11, 290:11, 294:6, 296:2
**pages** [1] - 254:8
**paid** [56] - 174:8, 174:19, 178:8, 178:11, 193:15, 194:25, 195:1, 195:3, 199:6, 199:8, 199:11, 208:10, 210:16, 210:19, 210:22, 211:1, 211:2, 211:4, 211:7, 211:10, 212:7, 212:13, 213:8, 213:11, 213:15, 230:5, 236:21, 236:24, 236:25, 237:2, 237:3, 237:8, 237:20, 237:21,

241:5, 248:15, 249:16, 250:15, 251:3, 251:8, 253:23, 254:18, 264:14, 265:9, 266:21, 266:22, 269:1, 270:6, 272:4, 279:24, 280:8, 284:12, 286:3, 287:24, 297:16, 297:19

**pain** [1] - 188:23

**Palacio** [15] - 205:23, 206:9, 214:22, 223:25, 234:7, 242:6, 242:11, 242:19, 244:7, 276:4, 281:11, 281:13, 281:16, 282:5, 289:21

**PALACIO** [3] - 164:4, 206:2, 301:23

**pallets** [8] - 191:12, 191:13, 191:17, 191:25, 192:2, 192:4, 192:7, 192:19

**paper** [4] - 183:10, 185:13, 189:8, 208:9

**pardon** [1] - 169:5

**part** [12] - 180:13, 180:17, 220:8, 236:10, 241:21, 244:18, 267:15, 276:19, 277:21, 278:11, 282:11, 294:20

**particular** [8] - 208:19, 209:7, 209:21, 212:6, 232:2, 233:19, 290:13, 294:8

**particularly** [1] - 298:25

**past** [20] - 167:6, 167:8, 249:15, 249:23, 250:6, 263:4, 263:7, 264:4, 264:8, 266:17, 268:9, 269:2, 270:12, 270:19, 270:25, 272:6, 272:12, 272:20, 273:15, 278:6

**pay** [33] - 174:4, 174:5, 188:19, 191:16, 193:5, 199:12, 211:14, 212:9, 212:16, 213:9, 241:6, 241:9, 241:13, 242:5,

248:12, 248:15, 248:20, 248:23, 249:19, 249:21, 250:10, 250:12, 250:18, 250:21, 253:25, 254:19, 254:22, 264:2, 264:5, 264:10, 269:22, 270:1, 297:13

**paychecks** [1] - 241:22

**paying** [3] - 210:20, 210:21

**payment** [1] - 280:14

**payments** [2] - 208:14, 241:22

**pays** [7] - 191:24, 248:19, 250:8, 250:14, 250:22, 280:3

**PEARLMAN** [82] - 164:18, 165:15, 165:18, 166:16, 169:18, 169:19, 171:4, 171:10, 171:14, 172:5, 172:21, 172:24, 173:1, 175:17, 175:19, 177:12, 177:18, 177:22, 178:4, 179:3, 179:22, 179:23, 180:22, 182:24, 183:11, 183:14, 186:1, 188:1, 190:2, 190:5, 191:3, 193:10, 195:11, 196:4, 196:23, 198:6, 199:18, 199:20, 202:17, 202:20, 205:1, 205:16, 206:13, 213:13, 214:21, 221:19, 223:23, 224:4, 224:14, 226:12, 226:17, 226:20, 227:11, 229:21, 232:14, 233:10, 234:22, 240:8, 246:19, 264:16, 274:8, 274:10, 274:13, 274:20, 275:1, 275:17, 281:8, 283:5, 295:4, 295:8, 298:10, 298:12, 298:16, 298:19, 300:1, 300:14, 301:18, 301:22,

302:2, 302:7, 302:11, 302:14

**Pearlman** [11] - 165:13, 196:3, 199:22, 214:18, 224:15, 225:17, 229:19, 232:13, 274:9, 298:9, 299:9

**people** [3] - 176:2, 229:14, 245:22

**per** [15] - 174:8, 180:12, 180:25, 193:16, 199:14, 210:19, 211:7, 215:22, 219:19, 230:19, 236:23, 236:25, 237:2, 250:15

**perform** [5] - 165:24, 180:2, 180:8, 180:24, 244:7

**performed** [2] - 242:6, 244:12

**performing** [2] - 192:14, 287:6

**period** [18] - 167:12, 173:16, 192:12, 192:17, 198:22, 207:18, 209:2, 222:23, 223:19, 229:6, 229:7, 229:14, 236:21, 280:22, 289:23, 290:20, 293:4, 293:20

**periods** [1] - 190:15

**permit** [4] - 172:22, 190:16, 234:15, 235:1

**permitted** [2] - 224:3, 224:7

**Perry** [1] - 164:22

**person** [3] - 187:1, 204:9, 245:11

**personally** [1] - 242:22

**phase** [3] - 227:9, 229:17, 232:11

**phone** [1] - 187:25

**physically** [1] - 281:12

**pick** [23] - 174:17, 175:3, 181:4, 191:8, 192:2, 192:9, 201:14, 201:22, 202:7, 203:4, 203:24, 204:20, 251:12, 251:20, 251:22, 252:2, 252:6, 253:22, 254:15, 255:25,

256:1, 256:10, 256:15

**picked** [5] - 172:1, 172:7, 172:9, 173:10, 173:11

**picking** [3] - 191:13, 192:19, 293:13

**pickup** [1] - 204:3

**piece** [2] - 185:13, 191:7

**pinpoint** [2] - 299:2, 299:22

**place** [4] - 168:23, 194:17, 217:22, 291:21

**plaintiff** [22] - 230:14, 230:18, 237:23, 242:18, 244:11, 245:14, 246:9, 277:7, 278:13, 278:22, 279:15, 279:24, 280:5, 280:6, 281:11, 281:12, 281:16, 282:3, 282:4, 282:8, 282:16, 300:5

**Plaintiff** [1] - 164:5

**plaintiff's** [2] - 205:21, 230:17

**Plaintiffs** [1] - 164:16

**plaintiffs** [33] - 226:18, 227:6, 227:16, 227:19, 228:4, 228:10, 228:11, 228:12, 228:18, 228:19, 228:21, 228:23, 229:8, 229:25, 230:6, 234:6, 234:12, 234:18, 234:24, 235:5, 235:10, 235:17, 236:24, 237:14, 242:23, 244:6, 244:20, 245:18, 245:23, 246:1, 276:3, 280:23

**plaintiffs'** [4] - 227:13, 227:14, 231:18, 246:4

**plan** [1] - 267:23

**planned** [5] - 267:12, 267:25, 268:18, 271:12, 273:10

**plastic** [1] - 208:1

**play** [3] - 232:7, 249:2, 249:5

**Plaza** [1] - 164:22

**plead** [1] - 230:20

**pleading** [1] - 231:15

**pled** [1] - 288:14

**plus** [1] - 300:20

**point** [14] - 165:13, 174:23, 176:18, 195:9, 205:12, 207:5, 207:10, 226:23, 229:18, 230:22, 232:13, 239:12, 279:14, 298:21

**policy** [1] - 287:25

**pool** [2] - 249:2, 249:5

**portion** [1] - 263:25

**possible** [5] - 238:22, 264:24, 264:25, 266:23

**posted** [1] - 298:22

**pounds** [1] - 176:15

**practical** [1] - 216:12

**practice** [1] - 267:11

**preceding** [1] - 185:19

**precisely** [1] - 180:14, 266:12

**precision** [1] - 230:2

**prepare** [1] - 299:10

**preparing** [1] - 298:25

**present** [3] - 233:19, 262:20, 262:22

**pressure** [1] - 265:2

**pretrial** [1] - 227:15

**prevented** [1] - 176:9

**previous** [4] - 166:1, 176:6, 200:18

**previously** [2] - 165:7, 175:3

**prima** [1] - 229:9

**primary** [1] - 194:11

**problem** [2] - 235:23, 299:18

**proceed** [1] - 232:10

**proceeding** [1] - 227:9

**Proceedings** [1] - 164:25

**produced** [1] - 164:25

**professional** [1] - 301:6

**programmed** [1] - 274:18

**progress** [1] - 262:19

**prohibited** [2] - 192:14, 192:18

**promised** [3] - 248:12, 248:14, 289:17

**proof** [1] - 227:14

**properly** [2] - 184:5, 261:25

**property** [1] - 173:19

**proposal** [1] - 300:8

**proposals** [1] - 299:4

**proposed** [6] - 298:23, 299:6, 299:10,

299:20, 300:5, 300:23
**protected** [1] - 208:2
**provide** [9] - 166:14, 166:17, 183:5, 183:19, 184:15, 185:9, 189:25, 190:7, 200:25
**provided** [32] - 165:23, 166:4, 166:11, 173:17, 175:9, 182:5, 184:22, 185:10, 192:12, 194:23, 196:5, 196:21, 201:11, 203:2, 204:16, 208:10, 218:12, 219:17, 219:20, 223:19, 223:24, 234:13, 234:19, 234:24, 235:5, 235:10, 237:9, 237:15, 242:12, 244:24, 280:18, 286:19
**providing** [6] - 165:22, 190:22, 193:16, 220:9, 227:9, 235:17
**punch** [5] - 211:16, 211:19, 211:22, 211:23, 295:7
**punched** [2] - 260:21, 260:22
**purchase** [1] - 286:23
**purchased** [5] - 181:2, 181:16, 239:21, 239:23, 240:4
**purposes** [1] - 216:12
**pursuant** [1] - 298:22
**pursue** [1] - 172:23
**put** [5] - 175:23, 241:23, 265:20, 266:19, 267:9

## Q

**quarter** [4] - 195:10, 195:13, 266:25, 267:1
**Queens** [2] - 200:4, 256:25
**Quest** [3] - 174:21, 181:23, 181:25
**QUESTION** [4] - 183:5, 183:18, 184:14, 185:8
**questions** [34] - 182:10, 183:1, 183:4, 183:9, 185:19, 199:20,

202:12, 202:16, 202:21, 202:22, 203:23, 205:16, 214:16, 221:15, 221:17, 224:14, 226:10, 226:12, 230:7, 231:2, 246:19, 253:16, 262:15, 274:5, 274:20, 274:24, 283:5, 283:21, 283:23, 284:1, 290:17, 291:1, 298:7, 298:12
**quits** [2] - 300:10, 301:5
**quote** [3] - 204:7, 229:22, 229:25
**quote/unquote** [1] - 219:18

## R

**rain** [6] - 214:12, 218:2, 218:7, 218:9, 219:2, 265:14
**rained** [6] - 169:13, 170:9, 179:7, 214:9, 214:13, 217:8
**raining** [1] - 219:7
**rainy** [1] - 169:11
**raise** [6] - 205:25, 283:25, 284:14, 284:16, 284:18, 284:22
**raised** [1] - 253:11
**range** [3] - 277:24, 277:10, 281:15
**ranged** [1] - 278:1
**rare** [4] - 246:6, 272:13, 273:5, 281:23
**rarely** [4] - 257:1, 266:15, 267:13, 273:4
**rate** [12] - 174:3, 174:5, 195:6, 195:7, 212:16, 213:8, 237:4, 237:16, 248:12, 248:15, 286:3
**re** [1] - 207:13
**re-ask** [1] - 207:13
**read** [9] - 177:18, 177:21, 182:25, 183:3, 185:2, 198:14, 202:21, 204:12, 229:22
**really** [5] - 178:11, 184:4, 196:18,

219:11, 278:5
**rearrange** [2] - 206:18, 206:22
**receipt** [1] - 212:1
**receive** [6] - 173:25, 174:5, 174:11, 212:10, 212:12, 278:7
**received** [11] - 194:11, 194:14, 212:1, 212:5, 212:9, 241:2, 251:1, 286:7, 286:8, 298:22, 299:4
**receiving** [4] - 174:3, 189:13
**recently** [1] - 284:14
**recess** [5] - 195:10, 195:14, 226:23, 267:2
**recollection** [3] - 200:25, 290:2, 290:4
**record** [13] - 177:21, 220:13, 221:14, 227:12, 229:13, 233:11, 239:17, 260:24, 267:6, 268:4, 275:18, 299:2, 300:14
**recorded** [1] - 164:25
**recordkeeping** [1] - 228:13
**records** [9] - 185:9, 228:5, 228:6, 228:9, 229:11, 260:18, 292:13, 298:4
**recovered** [2] - 179:10, 265:23
**RECROSS** [2] - 202:19, 301:21
**redirect** [3] - 199:23, 199:25, 224:16
**REDIRECT** [6] - 200:1, 224:20, 274:12, 301:19, 302:3, 302:10
**reduced** [2] - 228:18, 229:9
**refer** [2] - 182:22, 194:8
**referring** [2] - 239:9, 239:18
**reframe** [1] - 175:18
**refusing** [2] - 194:25, 195:5
**regard** [4] - 229:15, 231:11, 231:25, 300:25
**regarding** [5] - 227:15, 244:11, 245:4, 245:7, 246:9

**regardless** [1] - 274:18
**regular** [4] - 219:9, 219:11, 219:18, 293:9
**REILLY** [84] - 164:17, 169:9, 169:16, 170:6, 171:1, 172:3, 175:14, 177:6, 178:2, 178:17, 178:25, 179:16, 180:3, 180:9, 180:18, 181:7, 181:13, 190:25, 199:24, 200:2, 200:21, 202:3, 202:12, 205:11, 205:19, 205:23, 207:2, 214:16, 216:10, 217:13, 221:13, 222:8, 222:20, 224:16, 224:18, 224:21, 226:10, 226:19, 228:2, 231:9, 231:11, 234:14, 234:20, 234:25, 235:7, 235:14, 235:21, 237:6, 237:18, 238:9, 238:14, 240:5, 241:11, 242:25, 243:12, 246:21, 247:1, 250:3, 250:5, 254:5, 254:9, 267:4, 273:1, 273:18, 274:5, 274:23, 278:19, 279:7, 280:25, 283:8, 283:10, 283:13, 298:7, 299:12, 299:16, 299:22, 300:13, 301:1, 301:20, 301:25, 302:4, 302:9, 302:16
**Reilly** [21] - 165:12, 199:23, 199:25, 202:14, 202:15, 202:21, 202:24, 205:21, 206:25, 207:13, 214:17, 227:5, 228:1, 246:22, 267:5, 274:7, 283:9, 298:8, 299:9, 300:11, 300:15
**related** [1] - 241:3
**relationship** [1] - 228:3

**release** [1] - 289:13
**relevant** [1] - 230:18
**remain** [1] - 205:24
**remember** [29] - 171:24, 177:25, 179:5, 180:14, 182:4, 183:20, 184:16, 185:14, 186:14, 189:7, 196:18, 196:24, 197:23, 198:9, 203:7, 203:12, 203:17, 203:19, 217:10, 220:20, 238:11, 238:17, 239:22, 254:11, 254:20, 255:15, 260:16, 261:6, 290:17
**remove** [4] - 173:21, 173:23, 238:2, 238:20
**removed** [3] - 174:10, 174:14, 265:22
**removing** [1] - 262:3
**rendition** [1] - 172:17
**repair** [1] - 171:19
**repay** [1] - 194:6
**repeat** [4] - 166:15, 173:6, 220:25, 251:16
**repetition** [2] - 212:3, 223:22
**rephrase** [3] - 223:23, 224:4, 245:24
**replied** [1] - 184:16
**report** [5] - 171:17, 171:22, 173:2, 173:13, 224:10
**reported** [3] - 171:25, 172:6, 172:8
**reporter** [2] - 206:8, 275:11
**Reporter** [2] - 164:21, 232:25
**reporters** [4] - 300:15, 300:19, 300:21, 300:24
**request** [1] - 187:12
**requests** [1] - 254:7
**required** [5] - 180:5, 184:2, 241:21, 246:5, 272:6
**requires** [1] - 259:7
**reserve** [1] - 232:10
**resided** [1] - 242:8
**respect** [2] - 241:25, 299:1
**respectfully** [1] - 229:16

**respond** [3] - 231:9, 299:6, 299:23
**response** [1] - 300:7
**responsive** [4] - 171:11, 171:12, 172:21, 183:12
**rest** [1] - 269:7
**rested** [2] - 227:6, 298:18
**restricted** [1] - 176:4
**resume** [2] - 226:14, 266:25
**resumed** [1] - 277:1
**resumes** [1] - 196:2
**retake** [1] - 165:4
**return** [2] - 187:15, 241:5
**returned** [2] - 289:19, 289:24
**returning** [1] - 204:11
**returns** [1] - 231:1
**ride** [6] - 212:25, 242:17, 242:19, 247:8, 247:11, 247:19
**rip** [1] - 293:17
**ripped** [1] - 166:11
**ripping** [4] - 265:13, 292:23, 293:14, 293:15
**rise** [1] - 165:1
**Riverhead** [3] - 168:4, 200:7, 200:20
**Road** [2] - 164:16, 164:19
**Rockville** [1] - 168:7
**role** [1] - 244:10
**roof** [22] - 170:15, 171:22, 174:15, 188:22, 189:6, 196:13, 238:22, 258:18, 262:2, 265:1, 265:11, 265:14, 265:20, 266:19, 267:9, 267:15, 267:16, 293:11, 293:14, 293:15, 294:3
**Roofing** [12] - 183:6, 183:19, 184:15, 185:10, 201:1, 284:10, 285:3, 285:25, 289:2, 289:5, 289:9, 289:12
**roofing** [5] - 196:14, 208:20, 208:22, 243:10, 243:17
**ROOFING** [2] - 164:8, 164:8
**roofs** [21] - 166:25,

167:4, 188:16, 215:6, 215:7, 215:8, 243:19, 261:21, 262:10, 273:25, 274:1, 285:9, 285:13, 285:19, 286:20, 287:7, 292:23, 293:20, 293:23, 294:1, 294:2
**rooms** [1] - 215:2
**Roosevelt** [4] - 213:3, 213:6, 213:7, 233:12
**Roslyn** [3] - 257:17, 257:21, 258:2
**rough** [1] - 281:18
**roughly** [1] - 276:13
**rules** [1] - 298:23
**Russo** [1] - 230:16

# S

**S-C-A-F-E** [1] - 275:13
**safety** [1] - 245:4
**Sage** [30] - 186:11, 186:16, 187:21, 188:4, 188:15, 192:13, 192:17, 192:24, 193:15, 193:24, 201:11, 203:2, 204:17, 228:3, 228:8, 233:14, 233:17, 239:9, 239:19, 239:21, 239:23, 240:4, 240:10, 240:19, 240:23, 275:21, 275:25, 285:25, 287:20, 288:3
**SAGE** [1] - 164:9
**Sage's** [4] - 232:1, 287:12, 287:17, 288:1
**sale** [2] - 288:6, 288:14
**Sanchez** [60] - 165:4, 165:12, 165:19, 188:14, 200:3, 205:20, 213:17, 213:20, 222:11, 222:17, 222:24, 223:2, 223:5, 223:9, 223:14, 231:23, 234:6, 237:23, 238:6, 238:7, 238:12, 238:18, 239:3, 239:12, 239:25, 240:9, 240:15, 241:1, 244:6, 244:11,

244:23, 245:3, 245:8, 245:14, 246:9, 246:16, 251:11, 251:19, 253:21, 254:14, 254:25, 255:10, 255:23, 256:5, 258:1, 258:5, 259:18, 276:4, 277:8, 278:13, 278:23, 279:15, 279:24, 280:6, 282:3, 282:8, 282:16, 289:20, 297:23, 298:1
**SANCHEZ** [3] - 164:3, 165:6, 301:16
**Sanchez's** [1] - 222:14
**sat** [2] - 167:20, 222:14
**Saturday** [3] - 214:10, 214:12, 214:14
**Saturdays** [10] - 178:20, 179:10, 180:7, 180:11, 180:20, 182:8, 196:20, 197:1, 212:8, 212:9
**save** [1] - 190:19
**savings** [2] - 167:11, 167:12
**saw** [7] - 241:17, 241:18, 273:21, 281:6, 291:20, 292:23, 294:22
**Scafe** [4] - 275:2, 275:12, 275:13, 275:20
**SCAFE** [2] - 275:5, 302:12
**schedule** [11] - 167:15, 170:3, 218:13, 235:19, 236:11, 264:18, 264:20, 266:24, 273:14, 273:15, 298:21
**scheduled** [24] - 169:14, 169:22, 236:9, 268:17, 268:23, 269:2, 269:3, 269:8, 269:9, 269:11, 270:4, 270:5, 270:8, 270:13, 270:20, 271:1, 271:7, 271:17, 271:18, 271:22, 271:25, 272:23, 273:6, 273:7
**schedules** [5] -

218:16, 229:1, 229:2, 271:9
**scheduling** [2] - 270:18, 273:12
**scrap** [2] - 192:7, 192:19
**season** [19] - 188:7, 191:11, 214:10, 224:22, 225:6, 225:7, 225:16, 225:22, 226:1, 226:3, 226:6, 228:24, 231:20, 290:3, 292:1, 292:8, 296:22, 297:11, 299:13
**seasonal** [1] - 190:12
**seated** [5] - 165:3, 196:1, 206:6, 227:4, 232:23
**second** [14] - 186:3, 206:11, 229:17, 236:19, 266:21, 268:23, 269:15, 269:16, 269:18, 270:6, 274:15, 274:16, 274:19, 298:10
**Second** [3] - 228:20, 229:24, 230:11
**see** [15] - 195:12, 208:13, 213:20, 226:16, 261:22, 262:14, 267:1, 267:8, 267:20, 268:12, 271:5, 277:10, 282:17, 285:14, 298:12, 300:24
**sell** [3] - 191:8, 191:12, 191:14
**send** [2] - 242:3, 288:23
**sent** [1] - 173:22
**sentence** [1] - 288:11
**separate** [2] - 173:25, 193:16
**separately** [2] - 279:24, 280:8
**separation** [2] - 216:5, 216:8
**September** [16] - 207:17, 207:20, 208:24, 210:3, 210:4, 220:5, 220:10, 220:11, 220:13, 220:17, 220:18, 221:10, 221:11, 224:25
**service** [2] - 193:17, 244:24

**services** [52] - 165:22, 165:24, 166:4, 166:11, 173:17, 173:18, 175:9, 180:2, 180:8, 180:24, 182:5, 183:5, 183:19, 184:15, 185:10, 188:4, 188:10, 189:25, 190:7, 190:22, 192:12, 192:14, 194:23, 196:6, 196:21, 201:1, 201:11, 203:2, 204:16, 208:10, 216:1, 218:12, 219:17, 219:21, 220:9, 223:19, 223:24, 224:12, 234:13, 234:19, 234:24, 235:5, 235:11, 235:18, 237:10, 237:15, 242:7, 242:12, 244:12, 245:14, 246:4, 280:18
**Services** [1] - 229:23
**set** [13] - 167:15, 170:3, 172:18, 173:2, 173:4, 173:7, 206:16, 235:18, 277:17, 277:20, 277:22, 286:3, 298:21
**seven** [16] - 167:18, 167:21, 177:16, 178:14, 198:12, 198:17, 203:5, 204:21, 209:10, 215:21, 219:15, 222:6, 225:4, 225:5, 240:25, 242:21
**several** [9] - 221:15, 233:18, 241:18, 259:12, 270:22, 270:25, 271:6, 272:14, 293:23
**shift** [1] - 225:3
**shingles** [7] - 166:11, 196:15, 208:9, 292:24, 293:14, 293:16, 293:17
**shoelaces** [1] - 188:16
**shoes** [2] - 188:17, 245:9
**Shore** [4] - 257:7, 257:9, 257:10, 257:13
**show** [8] - 217:5,

217:9, 218:4, 218:8, 223:21, 235:12, 237:23, 260:18
**showing** [1] - 292:14
**shown** [1] - 228:2
**sides** [2] - 298:18, 299:4
**sight** [2] - 293:9, 293:12
**sign** [5] - 176:23, 194:20, 211:16, 211:19, 212:21
**signed** [1] - 297:18
**single** [1] - 229:4
**sit** [7] - 177:25, 182:4, 189:9, 197:3, 215:18, 260:12, 261:3
**site** [97] - 165:22, 166:5, 166:10, 166:21, 167:20, 167:24, 168:2, 168:14, 168:25, 169:4, 169:6, 169:8, 171:7, 171:17, 171:25, 172:9, 173:3, 173:13, 173:22, 174:19, 174:20, 175:9, 176:13, 181:20, 181:25, 192:23, 192:24, 193:1, 193:4, 193:5, 193:15, 204:3, 204:10, 211:17, 212:24, 213:1, 213:4, 216:20, 218:5, 219:2, 219:6, 219:12, 219:13, 222:25, 223:3, 223:11, 223:21, 224:1, 224:11, 235:13, 237:23, 238:1, 238:2, 238:8, 238:13, 238:19, 239:13, 242:19, 245:19, 251:13, 251:21, 252:3, 253:2, 253:22, 254:16, 255:22, 255:24, 256:3, 256:6, 256:18, 256:21, 256:23, 256:24, 258:1, 258:6, 258:7, 261:19, 262:10, 263:11, 265:4, 268:15, 270:2, 277:10, 279:16, 279:25, 280:9,

281:11, 281:12, 282:7, 282:8, 282:12, 282:17, 283:2, 287:6, 291:22
**sites** [53] - 168:7, 170:12, 170:16, 171:21, 172:6, 175:4, 176:19, 176:22, 200:4, 200:6, 200:13, 200:16, 205:9, 208:6, 209:7, 209:11, 209:14, 213:17, 213:20, 213:23, 214:7, 214:24, 215:8, 215:15, 222:18, 223:6, 223:10, 223:15, 223:16, 224:8, 238:20, 239:4, 240:1, 242:12, 246:4, 251:5, 263:22, 278:14, 285:5, 285:9, 285:13, 285:19, 287:22, 288:1, 289:21, 291:18, 292:1, 292:4, 292:7, 295:18, 296:4, 296:7, 297:24
**sitting** [1] - 208:15
**six** [19] - 196:19, 196:25, 197:5, 198:23, 198:24, 209:4, 209:5, 209:10, 209:24, 210:1, 210:8, 215:21, 219:13, 219:15, 222:6, 226:5, 228:25, 229:5, 232:4
**size** [13] - 170:11, 170:15, 175:15, 175:17, 214:25, 215:2, 236:2, 269:13, 270:15, 270:23, 271:3
**sizes** [1] - 176:21
**small** [11] - 170:19, 170:24, 173:23, 174:18, 174:22, 181:22, 192:9, 245:23, 246:6, 263:24, 270:10
**smaller** [7] - 170:15, 215:4, 215:6, 215:11, 215:12, 236:4, 245:22
**snow** [2] - 190:10,

190:11
**snowed** [1] - 169:13
**socially** [1] - 249:2
**soda** [1] - 191:14
**solicit** [1] - 190:24
**someone** [2] - 186:20, 186:24
**sometime** [2] - 219:8, 289:13
**sometimes** [39] - 171:19, 182:8, 196:15, 201:4, 209:4, 209:5, 219:4, 222:22, 223:4, 223:17, 224:11, 224:13, 228:25, 235:16, 238:21, 242:14, 250:14, 250:22, 259:13, 259:16, 260:4, 262:2, 263:14, 263:15, 266:14, 266:16, 271:24, 272:6, 273:7, 273:12, 273:14, 279:3, 280:3, 280:12, 281:20, 282:24, 285:8, 285:14
**sorry** [3] - 173:10, 185:22, 199:18
**source** [1] - 221:17
**South** [1] - 257:13
**Spanish** [2] - 253:16, 253:17
**special** [1] - 262:3
**specific** [13] - 169:21, 170:4, 177:14, 177:24, 215:19, 215:23, 215:24, 220:23, 221:2, 221:23, 227:17, 227:21, 231:21
**specifically** [1] - 227:14
**specify** [2] - 230:3, 230:10
**specifying** [1] - 221:23
**spell** [3] - 206:7, 232:24, 275:10
**spelled** [2] - 233:2
**spelling** [1] - 206:10
**spend** [1] - 247:15
**spent** [1] - 256:5
**spot** [1] - 272:22
**square** [1] - 271:3
**squared** [1] - 301:3
**St** [1] - 228:16
**stand** [4] - 165:4,

172:22, 190:23, 293:17
**Standards** [1] - 230:20
**standing** [1] - 205:25
**start** [16] - 172:19, 183:3, 188:8, 188:17, 201:21, 202:5, 205:15, 219:1, 219:2, 224:22, 225:7, 225:16, 225:20, 240:20, 275:25, 279:18
**started** [25] - 181:15, 186:13, 186:15, 187:6, 207:4, 207:15, 210:20, 210:21, 218:17, 226:1, 238:18, 239:3, 239:5, 239:25, 240:12, 240:14, 240:23, 276:8, 276:11, 278:15, 291:5, 292:22, 293:19
**starting** [11] - 182:19, 182:24, 182:25, 183:2, 183:4, 183:15, 191:19, 197:8, 203:11, 277:4, 277:20
**state** [7] - 206:7, 221:13, 227:16, 232:23, 233:11, 275:9, 275:18
**State** [2] - 228:14, 232:4
**STATES** [2] - 164:1, 164:14
**states** [1] - 228:20
**States** [1] - 164:6
**Statute** [3] - 229:6, 229:7, 232:4
**stay** [6] - 247:4, 258:6, 264:1, 272:4, 272:6, 279:2
**stayed** [3] - 262:9, 279:4, 293:21
**Steiger** [1] - 164:21
**stenography** [1] - 164:25
**step** [5] - 195:12, 205:21, 226:13, 274:25, 298:15
**stickers** [1] - 176:7
**still** [3] - 244:17, 267:25, 289:21
**stipulate** [1] - 300:1
**stone** [1] - 170:3
**stop** [4] - 167:11,

220:9, 266:6, 267:21
**stopped** [3] - 219:8, 220:14, 266:18
**strictly** [1] - 218:5
**strike** [19] - 169:2, 171:10, 172:21, 174:4, 176:24, 182:25, 183:2, 183:11, 189:4, 190:2, 222:23, 223:18, 234:9, 239:11, 239:24, 241:20, 243:8, 276:2, 280:17
**stub** [4] - 195:4, 211:14, 297:13
**subject** [6] - 170:5, 193:12, 193:13, 235:1, 246:16, 281:3
**submission** [1] - 301:4
**submissions** [1] - 300:4
**submit** [3] - 229:16, 299:20, 299:23
**substance** [1] - 288:15
**sue** [2] - 187:9, 187:14
**sued** [1] - 188:21
**sufficient** [1] - 230:15
**Suffolk** [6] - 200:7, 200:16, 200:17, 257:2, 257:4, 257:5
**suggesting** [1] - 227:8
**suing** [3] - 186:20, 187:17, 246:13
**summer** [1] - 196:6
**summertime** [1] - 277:5
**sun** [1] - 166:23
**Sunday** [2] - 214:11, 214:12
**Sundays** [5] - 178:21, 179:11, 180:23, 196:20, 197:1
**supervise** [3] - 244:19, 261:21, 262:2
**supervises** [3] - 262:13, 262:17
**supervision** [1] - 234:11
**support** [1] - 192:11
**supposed** [3] - 228:5, 264:23, 267:12
**Supreme** [1] - 228:15
**survive** [1] - 190:19
**sustain** [3] - 169:17, 180:19, 240:6
**sustained** [5] - 171:3,

172:4, 213:14,
234:21, 295:5
**swing** [1] - 206:24
**swings** [1] - 207:7
**sworn** [7] - 165:8,
206:4, 231:17,
232:20, 253:9,
275:7, 283:19
**Systems** [1] - 230:13

# T

**talks** [1] - 230:13
**target** [1] - 299:8
**tarp** [7] - 265:15,
265:20, 266:19,
267:9, 267:14,
268:1, 268:3
**tasks** [1] - 281:20
**tax** [2] - 183:10, 231:1
**taxes** [1] - 185:14
**team** [2] - 279:11,
283:4
**technically** [1] - 281:2
**temperature** [1] -
196:8
**ten** [1] - 219:21
**term** [1] - 175:20
**terminated** [4] -
188:17, 216:4,
216:7, 245:14
**terms** [1] - 192:19
**territory** [1] - 221:20
**testified** [15] - 165:8,
186:15, 187:1,
206:4, 210:13,
222:12, 231:22,
232:20, 259:4,
261:8, 268:6, 268:9,
275:7, 293:8, 297:22
**testify** [5] - 217:23,
258:20, 268:5,
268:7, 285:16
**testifying** [1] - 247:21
**testimony** [24] -
165:21, 167:19,
167:22, 169:13,
169:20, 171:2,
173:20, 184:12,
193:24, 218:4,
218:19, 219:9,
222:11, 222:15,
230:24, 231:18,
244:19, 253:9,
263:17, 264:4,
265:17, 283:19,
290:24, 295:20
**tethers** [1] - 245:5
**thanking** [1] - 188:20
**THE** [137] - 164:13,

165:1, 165:2,
165:11, 166:15,
169:10, 169:17,
170:7, 171:3,
171:12, 172:4,
172:15, 172:22,
173:6, 175:15,
175:18, 177:7,
177:9, 177:11,
177:20, 178:3,
178:18, 179:1,
179:17, 179:20,
180:4, 180:10,
180:19, 181:8,
182:22, 183:13,
190:4, 191:1, 195:9,
195:12, 196:1,
196:3, 199:19,
199:22, 199:25,
200:17, 200:19,
202:1, 202:14,
202:18, 205:12,
205:17, 205:20,
205:24, 206:6,
206:9, 206:10,
206:17, 206:18,
206:20, 206:22,
206:24, 207:5,
207:9, 207:10,
210:24, 212:3,
212:23, 213:14,
214:17, 216:11,
217:14, 221:16,
221:20, 222:9,
222:21, 223:22,
224:15, 224:17,
226:13, 226:22,
227:3, 227:25,
229:19, 231:8,
231:10, 232:8,
232:23, 233:1,
233:4, 234:15,
234:21, 235:1,
235:8, 235:15,
235:22, 237:7,
237:19, 238:10,
238:15, 240:6,
241:12, 243:1,
243:13, 246:20,
246:22, 250:1,
250:4, 254:3, 254:7,
264:17, 266:25,
267:3, 267:5,
273:17, 274:7,
274:9, 274:21,
274:25, 275:3,
275:9, 275:12,
275:14, 278:20,
279:8, 281:2, 283:7,
283:9, 295:5,
295:10, 298:8,

298:11, 298:14,
298:18, 298:20,
299:15, 299:18,
299:21, 299:25,
300:3, 300:19, 301:2
**thereafter** [1] - 229:18
**therefore** [3] - 170:2,
179:8, 182:15
**they"** [1] - 187:10
**three** [41] - 168:4,
169:12, 174:16,
176:17, 219:19,
229:6, 235:16,
236:18, 248:5,
249:15, 249:23,
250:6, 258:17,
258:21, 258:22,
259:8, 259:16,
260:10, 260:11,
263:20, 266:20,
267:7, 267:8,
267:19, 267:20,
268:8, 268:13,
268:20, 268:22,
268:24, 269:2,
269:17, 269:18,
270:12, 270:20,
270:25, 273:11,
276:13, 277:15,
278:6
**threshold** [2] - 230:23,
231:5
**throughout** [4] -
167:16, 196:5,
218:12, 276:15
**throw** [2] - 238:21,
238:23
**throwaway** [1] -
244:25
**throwing** [1] - 293:16
**thrown** [1] - 294:11
**Thursday** [1] - 260:5
**tie** [1] - 245:9
**timeframe** [1] - 197:25
**today** [17] - 182:4,
199:15, 208:13,
208:15, 215:18,
222:12, 228:17,
247:15, 248:13,
248:16, 248:21,
253:12, 253:15,
260:12, 261:3,
300:10, 300:12
**together** [4] - 242:3,
249:6, 281:21, 282:1
**tons** [1] - 176:17
**took** [19] - 171:7,
171:18, 171:23,
171:24, 191:4,
192:22, 193:9,

211:20, 215:12,
247:12, 256:20,
257:22, 258:1,
269:18, 292:16,
292:19, 295:17,
297:23, 298:1
**tools** [12] - 166:1,
166:5, 166:8,
166:12, 166:13,
168:10, 208:1,
253:24, 254:18,
286:20, 286:23
**torch** [5] - 244:1,
244:2, 244:3, 244:5,
244:7
**TORRES** [2] - 164:9,
164:10
**Torres** [1] - 248:1
**total** [3] - 171:18,
215:22, 234:2
**Toyota** [1] - 175:3
**track** [10] - 178:12,
198:2, 258:9,
258:12, 258:15,
258:23, 260:7,
263:3, 263:6, 263:10
**traffic** [3] - 168:1,
204:1, 205:14
**transcript** [15] -
164:25, 201:9,
201:19, 202:4,
254:6, 254:13,
255:7, 262:6,
285:11, 290:11,
294:7, 296:2,
300:17, 300:22,
300:23
**TRANSCRIPT** [1] -
164:13
**travel** [2] - 256:17,
258:2
**treated** [2] - 186:16,
186:20
**trial** [1] - 231:16
**TRIAL** [1] - 164:13
**tried** [3] - 196:13,
230:7, 266:22
**trips** [2] - 173:14
**truck** [91] - 166:5,
172:2, 172:8,
172:10, 173:10,
173:18, 173:21,
174:9, 174:13,
174:21, 174:24,
175:10, 175:12,
175:20, 176:4,
181:2, 181:17,
181:19, 181:24,
191:5, 191:25,
192:6, 192:22,

222:18, 222:24,
223:2, 223:6, 223:8,
223:9, 223:10,
223:13, 223:14,
223:15, 237:24,
237:25, 238:1,
238:6, 238:7,
238:12, 238:16,
238:19, 238:22,
238:24, 239:1,
239:3, 239:5, 239:7,
239:13, 239:16,
239:18, 239:21,
239:23, 240:4,
240:10, 240:12,
251:13, 251:20,
251:22, 252:3,
253:22, 253:24,
254:16, 254:18,
254:21, 254:25,
255:16, 255:20,
255:21, 255:24,
255:25, 256:2,
256:5, 256:10,
256:15, 256:17,
261:8, 261:10,
261:12, 261:13,
278:13, 278:16,
278:23, 279:1,
279:5, 294:11
**true** [9] - 183:24,
185:3, 189:18,
192:4, 197:19,
219:21, 237:9,
271:19, 273:14
**truth** [15] - 182:16,
183:25, 184:2,
184:5, 198:9,
198:14, 199:5,
203:21, 205:6,
248:18, 253:12,
253:13, 284:1, 284:2
**truthfully** [1] - 291:1
**try** [9] - 171:15,
190:24, 191:5,
191:7, 191:8,
207:13, 220:12,
227:20, 238:21
**trying** [3] - 265:17,
268:4, 295:7
**turn** [2] - 191:6, 262:6
**twice** [6] - 217:10,
217:11, 217:12,
219:4, 288:23
**two** [42] - 167:20,
167:25, 168:20,
177:16, 177:17,
180:12, 180:19,
186:2, 192:4,
202:17, 219:19,

221:6, 228:4, 241:7, 250:9, 250:11, 250:12, 250:13, 250:17, 250:20, 259:8, 264:13, 265:7, 266:20, 268:8, 268:13, 268:21, 269:14, 269:18, 270:5, 270:6, 270:18, 270:20, 273:10, 274:18, 279:11, 281:20, 294:17, 299:22, 300:6, 301:1
**tying** [1] - 188:17
**type** [5] - 207:24, 208:3, 212:12, 229:25, 249:12
**types** [2] - 243:8, 243:19
**typically** [2] - 170:9, 300:20

## U

**Um-hum** [1] - 247:17
**unable** [2] - 206:14, 227:22
**unacceptable** [1] - 244:24
**unaware** [2] - 260:17, 260:21
**under** [11] - 174:25, 182:12, 183:22, 184:1, 228:6, 228:7, 231:3, 283:21, 283:23, 287:12, 293:17
**understood** [2] - 190:12, 244:18
**UNITED** [2] - 164:1, 164:14
**United** [1] - 164:6
**unload** [1] - 166:8
**unloaded** [1] - 166:2
**untied** [1] - 188:16
**up** [83] - 168:1, 168:2, 172:1, 172:8, 172:9, 173:10, 173:11, 174:17, 175:3, 179:13, 179:25, 181:4, 183:1, 188:2, 188:13, 191:8, 191:13, 192:2, 192:9, 192:19, 201:14, 201:22, 202:7, 203:4, 203:12, 203:24, 204:1, 204:20, 209:2, 209:22,

210:1, 214:10, 217:5, 217:9, 218:5, 218:9, 223:21, 233:6, 235:12, 237:23, 245:1, 247:15, 251:12, 251:20, 251:22, 252:2, 252:6, 253:22, 254:15, 255:25, 256:1, 256:10, 256:15, 261:21, 261:24, 262:13, 265:4, 267:9, 267:25, 268:1, 268:14, 271:24, 272:15, 273:3, 274:8, 276:20, 276:22, 276:23, 278:15, 281:10, 284:25, 290:20, 291:6, 292:23, 293:12, 293:13, 294:11, 295:17, 295:21, 295:22, 296:8, 298:21
**upset** [1] - 186:10
**usual** [1] - 267:11

## V

**vacations** [1] - 189:19
**van** [56] - 166:1, 166:9, 167:21, 168:22, 168:24, 169:4, 169:7, 173:11, 181:16, 181:20, 181:23, 182:1, 192:9, 193:6, 193:13, 193:14, 200:3, 200:6, 200:12, 200:15, 201:14, 203:4, 203:24, 204:11, 204:20, 213:25, 240:1, 240:9, 240:13, 240:14, 241:2, 241:4, 241:5, 241:13, 252:5, 253:1, 253:5, 255:10, 256:10, 256:15, 256:17, 256:21, 257:22, 258:6, 261:18, 261:19, 279:15, 279:24, 280:8, 282:16, 282:25, 283:3, 291:20, 297:22, 297:23, 298:1
**varied** [4] - 170:12,

214:24, 277:19, 277:25
**varies** [4] - 277:23, 279:9, 290:10, 291:7
**various** [1] - 170:11
**vary** [6] - 235:19, 245:20, 277:18, 277:22, 278:17, 279:3
**vehicle** [3] - 175:16, 176:10, 238:3
**violation** [1] - 228:13
**vision** [4] - 166:18, 166:20, 281:5, 282:9
**visit** [1] - 188:19
**voice** [1] - 233:6
**volunteer** [1] - 295:11
**vs** [3] - 229:22, 230:12, 230:16

## W

**wages** [2] - 228:5, 230:5
**watch** [1] - 294:3
**watching** [2] - 262:22, 294:1
**water** [1] - 184:25
**weather** [19] - 169:22, 169:25, 170:1, 178:16, 178:19, 178:23, 179:6, 179:9, 179:11, 179:12, 179:25, 189:22, 190:15, 190:23, 191:10, 218:6, 218:24, 218:25, 220:1
**week** [94] - 167:16, 169:3, 169:6, 170:3, 177:14, 177:15, 177:24, 179:12, 188:19, 189:9, 197:4, 197:13, 198:1, 199:14, 204:18, 209:3, 209:6, 210:9, 212:6, 213:12, 214:9, 215:1, 215:19, 215:22, 215:23, 215:24, 217:12, 218:14, 220:23, 221:2, 221:23, 225:1, 225:10, 225:11, 225:20, 226:4, 227:17, 227:21, 228:10, 228:11, 228:22, 228:25, 229:3, 229:4, 229:13,

230:4, 230:9, 230:19, 231:14, 231:15, 231:19, 231:24, 235:12, 242:24, 243:6, 250:12, 250:17, 250:20, 258:21, 259:2, 259:5, 259:10, 259:11, 259:15, 259:17, 259:20, 259:23, 259:24, 259:25, 260:2, 260:3, 260:8, 260:9, 260:10, 260:14, 260:18, 263:6, 266:6, 276:12, 276:13, 277:13, 280:20, 280:24, 297:6, 297:9
**weekend** [2] - 179:13, 180:1
**weeks** [15] - 178:23, 179:14, 179:24, 180:1, 198:24, 221:6, 230:9, 230:14, 249:19, 259:1, 259:12, 292:10, 299:23, 300:6
**weight** [1] - 176:15
**where/when** [1] - 205:13
**whole** [6] - 217:11, 247:4, 253:12, 276:19, 284:2, 291:21
**Wicker** [1] - 164:21
**withdraw** [7] - 181:13, 211:22, 212:5, 255:22, 270:11, 273:13, 273:18
**WITNESS** [3] - 206:9, 233:1, 275:12
**witness** [15] - 165:7, 196:2, 204:13, 205:18, 205:21, 206:3, 207:7, 226:20, 232:15, 232:19, 274:22, 275:1, 275:6, 283:6, 295:9
**witness'** [2] - 206:14, 207:12
**WITNESSES** [1] - 301:14
**witnesses** [3] - 226:18, 226:19, 298:17
**wooden** [5] - 191:11, 191:17, 191:24,

192:2, 192:7
**words** [5] - 205:2, 205:3, 205:6, 218:8, 282:18
**workday** [9] - 201:12, 203:3, 268:12, 272:7, 279:3, 290:8, 290:21, 291:4, 291:14
**worker** [1] - 260:21
**workers** [22] - 166:24, 187:13, 193:19, 237:9, 237:12, 241:22, 241:24, 242:1, 244:19, 245:20, 251:5, 255:9, 260:19, 260:25, 271:20, 272:12, 272:15, 273:15, 285:6, 285:20, 285:22, 295:16
**Workers'** [4] - 287:10, 287:12, 287:16, 287:17
**workload** [1] - 245:15
**workman** [1] - 247:12
**works** [1] - 285:8
**worth** [1] - 268:13
**writing** [1] - 170:10
**written** [5] - 286:9, 286:12, 286:14, 286:15, 286:16
**Wyandanch** [1] - 275:19

## Y

**yard** [27] - 167:23, 167:25, 168:3, 168:8, 168:13, 168:21, 172:1, 172:7, 251:12, 251:15, 251:18, 251:19, 251:23, 252:2, 252:6, 253:5, 255:3, 255:11, 255:20, 256:10, 256:15, 256:18, 256:21, 257:22, 258:3
**yards** [3] - 177:1, 177:4, 286:21
**year** [49] - 167:17, 171:5, 171:6, 171:16, 171:21, 177:13, 177:24, 178:15, 178:22, 180:7, 180:23, 189:1, 190:8, 201:2,

208:19, 208:22,
209:6, 209:22,
209:25, 210:10,
210:12, 210:20,
211:4, 215:19,
217:11, 220:22,
221:1, 221:22,
229:5, 229:6,
230:24, 231:5,
232:2, 232:4, 232:5,
238:5, 238:13,
246:8, 250:17,
250:20, 250:25,
260:13, 276:19,
284:17, 284:21,
284:25, 288:9,
296:15

**years** [40] - 170:23,
187:4, 196:19,
196:25, 197:5,
198:23, 209:1,
210:18, 218:21,
229:15, 231:1,
231:6, 233:18,
234:2, 240:18,
240:22, 243:5,
248:5, 248:24,
249:1, 249:8,
249:12, 249:15,
249:23, 250:6,
250:11, 262:9,
263:4, 263:7, 267:7,
267:19, 268:20,
269:2, 269:17,
270:13, 270:20,
271:1, 271:6,
272:14, 272:19

**yesterday** [8] -
165:11, 247:2,
247:4, 247:7,
248:13, 248:16,
248:21, 300:15

**YORK** [1] - 164:1

**York** [7] - 164:7,
164:23, 228:7,
229:5, 232:4, 232:6,
275:19

**yourself** [3] - 190:17,
192:19, 266:2