UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
JOSE SANCHEZ AND ANTONIO
MEJIA PALACIO,

                                  <u>MEMORANDUM AND ORDER</u>

           Plaintiffs,       16-CV-2064(DRH)(ARL)

       -against-

FIRST CLASS HOME IMPROVEMENT,
LLC, FIRST CLASS ROOFING, INC.,
OCEANSIDE FIRST CLASS ROOFING,
INC., and ETHAN SAGE (a/k/a JESUS
MANUEL TORRES CANDELARIA, a/k/a
JESUS TORRES),

           Defendants.
------------------------------X
A P P E A R A N C E S:

For the Plaintiffs:
    Neil H. Greenberg & Associates, P.C.
    4242 Merrick Road
    Massapequa, New York 11758
      By: Justin M. Reilly, Esq.

For Defendants:
    Lee R. Pearlman, Esq.
    54 Blydenburgh Road
    Centereach, New York 11720

HURLEY, Senior District Judge

       Plaintiffs Jose Sanchez ("Sanchez") and Antonio Mejia

Palacio ("Palacio") (collectively "plaintiffs") commenced this

action against First Class Home Improvement, LLC, First Class

Roofing, Inc.[1], Oceanside First Class Roofing, Inc. and Ethan

---

[1]Although First Class Roofing, Inc. is named as defendant,
no claims against it were pursued at trial. Moreover, as found
<u>infra</u>, plaintiffs' claims are for periods when they worked for
the corporate entities First Class Home Improvement, LLC and its
successor, Oceanside First Class Roofing, Inc.  Accordingly, the
claims against First Class Roofing, Inc. are dismissed.

Sage ("Sage") (collectively "defendants"), pursuant to the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 <u>et seq.</u>, and New York Labor Law ("NYLL"), N.Y. Lab. Law § 190 <u>et seq.</u>, alleging they were "not paid time and a half their regular rate or rates of pay when they worked more than 40 hours each week." Joint Pretrial Order (Doc. # 21) at 2. Additionally plaintiffs assert two NYLL claims premised on defendants' purported failure to provide them with (1) "wage notices pursuant to NYLL § 195(1)" detailing such items as "the dates of their hiring, their rates of pay and [the] basis thereof" and (2) "wage statements pursuant to NYLL § 195(3)," listing, <u>inter alia</u>, the "dates of work covered" by the compensation paid, together with the "name . . . address and phone number of the employer . . . ." <u>Id.</u> at 3.

A bench trial was held before the undersigned on November 26, 27, and 28, 2017 to determine the merits of the plaintiffs' contentions.

The purpose of this decision is to provide my Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure ("FRCP") 52.

<u>Format of Decision</u>

By way of format, a brief overview of the positions advanced by the parties and the relief sought by plaintiffs will be provided, followed by a discussion of the applicable law as to the causes of action asserted. Against that backdrop, findings

of fact and concomitant conclusions of law will be furnished.

Part I - Parties' Positions as to Overtime
Claims Asserted in Counts I and II

A threshold issue underlying the present overtime dispute is whether Sanchez and Palacio were, as plaintiffs urge, employed by defendants and thus subject to the FLSA and NYLL[2], or independent contractors as defendants maintain to which neither statute applies.

As detailed in the Prayer for Relief portion of the Amended Complaint, plaintiffs seek judgment against defendants, jointly and severally, for overtime wages earned but not paid, for NYLL statutory penalties attributable to wage notices and statements not furnished together with interest, costs, and attorneys' fees as well as liquidated damages. See Amended Complaint (Doc. # 8) at page 8-9.

Part II - Parties' Positions as to NYLL
Failure to Provide Wage Notices (Count III)
and as to NYLL Failure to Provide Wage
Statements (Count IV)

Defendants acknowledge that they did not furnish

---

[2] The statutory scheme for overtime purposes of the FLSA and the NYLL are essentially the same. See Nakahata v. New York-Presbyterian Healthcare System, Inc., 723 F.3d 192, 200 (2d Cir. 2013) ("The FLSA mandates that an employee engaged in interstate commerce be compensated at a rate of no less than one and one-half times the regular rate of pay for any hours worked in excess of forty per week, 29 U.S.C. § 207(a)(2006); the NYLL adopts this same standard, N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.2 (2011(incorporating the FLSA definition of overtime into the NYLL).")(footnote omitted).

plaintiffs with either of the captioned documents based on their avowed belief that Sanchez and Palacio were independent contractors.  Since that belief is erroneous as explained _infra_, plaintiffs are entitled to statutory damages to the extent set forth _infra_.

### Part III - Applicable Law as to Overtime Claims

#### (a) The FLSA Statute

Title 29 U.S.C. § 207 provides in pertinent part:

> [N]o employer shall employ any of his
> employees who in any workweek is engaged in
> commerce or in the production of goods for
> commerce, or is employed in an enterprise
> engaged in commerce or in the production of
> goods for commerce, for a workweek longer
> than forty hours unless such employee
> receives compensation for his employment in
> excess of the hours above specified at a rate
> not less than one and one-half times the
> regular rate at which he is employed.

#### (b) Elements of Cause of Action

Under the Fair Labor Standards Act, the plaintiff has the burden of proving each of the following elements by a preponderance of the evidence:

> First, that plaintiff was an employee of the
> defendant during the [relevant] time period .
> . . . Second, that plaintiff was an employee
> engaged in commerce or the production of
> goods for commerce (or employed by an
> enterprise engaged in commerce or in the
> production of goods for commerce); and
> Third, that the defendant failed to pay the
> plaintiff . . . overtime as required by law.

4 Modern Federal Jury Instructions - Civil Instruction 85-3.

c) <u>Employer-Employee Relationship</u>

As explained by the Second Circuit in <u>Brock v. Superior Care, Inc.</u>:

> Several factors are relevant in determining
> whether individuals are "employees" or
> independent contractors for purposes of FLSA.
> These factors, derived from <u>United States v.
> Silk</u>, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed.
> 1757 . . ., and known as the "economic
> reality test," include: (1) the degree of
> control exercised by the employer over the
> workers, (2) the workers' opportunity for
> profit or loss and their investment in the
> business, (3) the degree of skill and
> independent initiative required to perform
> the work, (4) the permanence or duration of
> the working relationship, and (5) the extent
> to which the work is an integral part of the
> employer's business.  No one of these factors
> is dispositive; rather, the test is based on
> a totality of the circumstances.  The
> ultimate concern is whether, as a matter of
> economic reality, the workers depend upon
> someone else's business for the opportunity
> to render service or are in business for
> themselves.

840 F.2d 1054, 1058-59 (2nd Cir. 1988)(internal citations omitted except for <u>United States v. Silk</u>.)

d) Statute of Limitations and Meaning of the
   Word "Willful"

Section 255 of Title 29 U.S.C. provides that an action based on purported violations of the FLSA must be commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after such time.

New York's limitation period is six years.  <u>Fermin v.</u>

_Las Delicias Peruanas Restaurant, Inc._, 93 F. Supp. 3d 19, 38
(E.D.N.Y. 2015)(citing, inter alia, Sections 198(3) and 663(3) of
the New York Labor Law).  "Therefore [p]laintiffs may recover
under the NYLL for claims outside of the FLSA's . . . limitations
period" if they establish the elements of their causes of action.
_Id._

          As to the meaning of "willful" within the statutory
scheme, the following excerpt from _Young v. Cooper Cameron Corp._
is instructive:

>          An employer willfully violates the FLSA
> when it "either knew or showed reckless
> disregard for the matter of whether its
> conduct was prohibited by" the Act.
> _McLaughlin v. Richland Shoe Co._, 486 U.S.
> 128, 133, 108 S. Ct. 1677, 100 L. Ed. 2d 115
> (1988); _see also_ _Herman v. RSR Sec. Svcs._
> _Ltd._, 172 F.3d 132, 141 (2d Cir. 1999).  Mere
> negligence is insufficient.  _McLaughlin_, 486
> U.S. at 133, 108 S. Ct. 1677.  The effect of
> a willfulness finding is to extend the
> statute of limitations period from two to
> three years.  _See_ 29 U.S.C. § 255(a).  The
> burden is on the employee to show
> willfulness.  _Herman_, 172 F.3d at 141.

586 F.3d 201, 207 (2d Cir. 2009).

          Part IV - Findings of Fact as to Plaintiffs' Overtime
          Claims Coupled With Court's Conclusions as to Certain
          Disputed Factual Issues

          1.  Defendant First Class Home Improvement, LLC,
("First Class") and Defendant Oceanside First Class Roofing, Inc.
("Oceanside"), (Defendants First Class and Oceanside collectively
"First Class Roofing"), have operated a roofing business with its

principal place of business located at Defendant Ethan Sage's ("Sage") home at 3072 Brower Avenue, Oceanside, New York. Trial Transcript ("Tr.") at 14:22-15:3, 15:12-25, 16:5-10,16:22-24, 18:6-9, 18:24-19:1.

2. Defendant First Class was a New York limited liability company from 1977 until 2015, and changed its name when Defendant Sage incorporated his roofing business, creating Defendant Oceanside. Tr. at 16:14-16, 15:20-25. The entity change did not interrupt defendants' roofing business. Tr. at 18:21-23. First Class Roofing provides roofing services to residential and commercial properties, including removing, installing, and repairing roofs. Tr. at 17:3-8, 19:2-20.

3. Defendant Sage was the sole member and owner of Defendant First Class for nearly twenty years, and is the current owner, sole shareholder, and president of Defendant Oceanside. Tr. at 16:1-4, 16:11-13, 17:23-18:5. Defendant Sage has run the day-to day operations of First Class Roofing for its entire existence. Tr. at 16:25-17:2, 18:6-9.

4. Plaintiff Sanchez was hired by Defendant Sage and worked for defendants from 2003 until December 2015. Tr. at 40:19-22, 151:6-21, 290:2-4. Plaintiff Sanchez's duties included removing old shingles from roofs, bringing materials from the ground up to the roofs, collecting and discarding debris from around the houses and picking up garbage. Tr. at 25:15-22, 26:6-

9, 43:14-17, 81:18-23, 127:7-11, 151:25-152:-3, 244:22-245:1, 292:22-25. By "sometime in 2012," or thereabouts, Sage testified, Sanchez was being paid $200 a day for his roofing activities alone. Tr. at 44:20-45:3.

5. During the time Sanchez was working for defendants he did not work for any other company although, when his services were not required by defendants, he would sometimes go to Home Depot in an effort to find day labor. Tr. at 151:22-24, 190:21-191:2. Sanchez never owned his own company nor had a personal customer. Tr. at 161:9-12.

6. According to Sage when he was examined by plaintiffs' attorney, "there [were] times when . . . Sanchez went to [defendants'] yard [in Oceanside] to pick up the [company] van," – containing the tools and materials needed for the day's activities — and drove the van to the relevant job site. Tr. at 37:5-9. Those times were said to occur during the years 2012 through 2015. Id. At the end of the work day, he would return the van to the yard. Id. at 37:13-16.

7. How many times Sanchez drove the company van to the job sites is disputed. Sanchez maintains it was virtually everyday causing his work days to supposedly begin at 5:00 a.m. and extend to 7:00 p.m. E.g., Tr. at 152:4-154:7 (Sanchez testified that from April to October during the last five years of his employment by defendants, he worked "[f]ive or six" days a

week beginning at "5:00 a.m." when he picked up the van in Oceanside and ending when he returned the van to the same location at 7:00 p.m. in the evening.)

During Sage's direct examination by plaintiffs' counsel, he, although disputing both the 5:00 a.m. pick-up time provided by Sanchez and the frequency of Sanchez' round trips to the yard in Oceanside, confirmed that "there [were] times" when Sanchez made such trips, and that those efforts extended from 2012 through to Sanchez's discharge in December 2015. Tr. at 37:5-16,37:20-22. But during the examination by his own attorney, Sage suddenly claimed that Sanchez only began "bringing the van to and from work" as of "May of 2015" when he, Sage, purchased his own dump truck, not beginning in 2012. Id. at 134:10-17. Indeed he, answered "[n]o, sir" to the question whether Sanchez "[h]ad . . . taken your van before that [i.e. before May of 2015]?" at Id. 134:18-19.

8. In support of Sage's inexplicable change in testimony, his counsel underscores the obvious, viz. that Sanchez couldn't operate both the company van and his personal dump truck[3] simultaneously. Defs.' Reply to Pls.' Concl. of Fact and Law at 4-5. However Sage, as earlier noted, indicated that "there [were] times when . . . Sanchez" provided debris removal

---

[3] Sanchez's use of his dump truck to remove debris from job sites is discussed infra.

services, suggesting that the service was not furnished "regularly" or on a constant basis. Defendants' records evidence only eleven such instances although there may have been more. Tr. at 81:18-23. In any event, there were abundant other available workdays – i.e. when Sanchez was not driving his dump truck – to allow Sanchez to drive the van consistent with the general tenure of his testimony.

In sum, the testimony as to who drove the van and when falls far short of being a model of clarity. Yet, on balance, I conclude that it is more likely than not that Sanchez typically picked-up the company van on the days he worked before the activities at the job site began, and returned it to Oceanside after the day's roofing activities were concluded. However, the Court, as explained _infra_, rejects his testimony that he arrived at the yard at 5:00 a.m., regardless of the location of the job for the day, as an intentional falsehood.

9. With respect to defendants having Sanchez using his personal dump truck to remove debris from job sites, supposedly, in defendants' view, as an independent contractor, Sanchez acknowledges that "on a few occasions" he removed "a very small amount of garbage at defendants' request. Tr. at 173:20-24. However it appears that he did this during the normal workday at the site. Thus co-worker Scafe explained that Sanchez "never stayed until after the job" when he used his dump truck to

dispose of debris, instead leaving "an hour or two before the team." Tr. at 279:1-11.

Defendants argue that Sanchez acted as an independent contractor as to this task thus warranting a downward adjustment in his hours for overtime calculation purposes. Defs.' Proposed Conclusions of Law at 8 ("Sanchez acted as an independent contractor in providing dumping services."). Such an adjustment is not feasible, however, because the time associated that task – whether performed in whole or in part by Sanchez as an employee, or as an independent contractor – is nondecipherable from a review of the transcript. Accordingly, his debris removal services will not be factored into the calculation of his weekly hours.

10. Having discussed Sanchez's work relationship with defendants, attention will now be directed to Palacio's. He was hired in 2006, tr. 207:15-17, and performed essentially the same functions at the job sites as Sanchez. Id. at 25:15-26:9. Defendants were his sole employer from 2006 until his termination in September 2014. Id. at 207:15-23,220:3-6. His starting pay was $110 per day which increased to $180 daily by 2012 or 2013. Tr. at 210:20-211:9. He was paid in cash, never by check. Id. at 211:10-13.

11. Each plaintiff was an employee, not an independent contractor. The evidence leading to that conclusion is

overwhelming and includes:

a) Plaintiffs and their co-workers considered Sage to be their boss and First Class Roofing to be their employer. Tr. at 151:9-10, 248:3-11, 251:5-7, 285:25-286:2.

b) During their employment with defendants, plaintiffs did not work for any other company, never owned their own business nor had any customers of their own. Tr. at 151:22-24, 161:9-12, 207:21-23.

c) Defendants provided essentially all the tools and other necessary materials for plaintiffs to perform their jobs. Tr. at 61:14-62:22, 152:17-25, 166:4-13, 286:19-287:8.

d) Defendants furnished liability and worker's compensation insurance for plaintiffs. Tr. at 33:3-23.

e) Sage supervised, directed, and controlled plaintiffs' work when he was at the job site, including correcting them if he concluded that they were improperly performing a task. Tr. at 30:12-15, 32:7-9, 57:11-14, 262:8-17, 285:5-24.

f) Defendants hire and fire employees, including plaintiffs, and determine their daily rates of pay and methods of payment. Tr. at 38:6-7, 44:10-19, 45:12-20, 53:18-21, 95:23-96:2, 151:20-21,156:16-157:9, 158:3-5, 208:10-12, 210:16-17, 212:9-11, 285:2-4. Absent from the record is anything to suggest that the aforementioned items, such as rates of pay, are

traceable to a price quote from plaintiffs or to negotiations between plaintiffs and the defendants and

g) Defendants represented to potential customers that they do not utilize the services of independent contractors in performing their roofing services but instead relied on their highly trained internal work force.  Tr. at 75:4-8; 75:24-76:9.

In sum, plaintiffs have established their status as employees.

12.  This case ultimately turns on whether either Sanchez or Palacio, or both, has established by a fair preponderance of the credible evidence that he worked over forty hours in any given week or weeks absent receiving overtime.  With respect to that burden, plaintiffs are aided at the outset in two respects.  Firstly it is agreed that neither claimant ever received overtime, defendants say, because, neither is an employee and, even if the case were otherwise, neither worked sufficient hours to trigger such payments.  And secondly, defendants have no records, either contemporaneously prepared or otherwise, reflecting plaintiffs' days worked, start or concluding times on the job, or the total hours worked in any given day or week (hereinafter "time records").  Not surprisingly since employees have no legal duty to maintain such records, plaintiffs similarly lack documentation of their hours worked.

To provide context to the next Finding of Fact, brief

comment of the legal significance of defendants' lack of time records is required.  As explained in the seminal case of Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 687-88 (1946):

> [A] complaining employee . . . carrie[s] out
> his burden [of proof] if he proves that he
> has in fact performed work for which he was
> improperly compensated and if he produces
> sufficient evidence to show the amount and
> extent of that work as a matter of just and
> reasonable inference.  The burden then shifts
> to the employer to come forward with evidence
> of the precise amount of work performed or
> with evidence to negative the reasonableness
> of the inference to be drawn from the
> employee's evidence.  If the employer fails
> to produce such evidence, the court may then
> award damages to the employee, even though
> the result be only approximate.

In essence, Anderson and like cases do not initially shift the burden but rather assists an employee in satisfying his burden of proof to the extent the defendant employer has no time records.  For that assistance to come into play, however, the employee must first "produce[] sufficient evidence to show the amount of that work as a matter of just and reasonable inference."  Anderson at 688.  For the reasons provided infra, I find that each plaintiff has failed to make that preliminary showing via the presentation of credible evidence.

13. As accurately synopsized by plaintiffs' counsel:

> Plaintiff Sanchez testified that he began
> work at 5:00 a.m. each work day when he
> picked up the company van, and that his shift
> usually ended around 7:00 p.m. after he
> dropped the van off at the end of the day.
> Tr. at 152:7-16, 178:14, 198:11-17, 201:1-

202:11.  Plaintiff Palacio likewise testified
that his shift began every day at about 7:30
a.m., when he arrived with Witness Maldonado
and all of the other workers at the job site,
and ended at about 6:00 p.m. when all of the
workers left for the day.[4]  Tr. at 209:5-
24, 210:5-11, 224:24-226:9; see also 240:22-
25, 242:21, 263:12-13, 277:20-21, 290:5-7,
291:14-24.  They worked these hours a minimum
of five days per week during the busy season
every year.[5]  Tr. at 154:3-7, 199:13-14,
210:5-11, 224:24-226:9.  They were their
regular and typical hours worked on a daily
basis. . . .  Plaintiff Sanchez testified, in
no uncertain terms, that he "never worked
less than 40 hours.  I always worked more,"
and Plaintiff Palacio testified that he
always worked from about 7:00 a.m. until 6:00
p.m.  Tr. at 177:13-178:7, 221:22-222:6.
Every week throughout the busy season,
Plaintiff Sanchez worked seventy (70) hours
per week, and Plaintiff Palacio worked fifty-
two and one-half (52.5 hours per week, less
their daily thirty-minute lunch breaks).  Tr.
at 154:3-7, 199:13-14.

Pls.' Response at 12-13.

14.  Plaintiffs' testimony as to hours worked is at

odds with that of their co-workers, as well as, incidentally,

that of defendant Sage.

15.  Sage testified that Sanchez never went to Oil

_____

    [4]  In plaintiffs' COMPLAINT, their daily working hours are
alleged to extend form "6:00 a.m. until 6:00 p.m."  See Doc. # 1,
¶ 14 as to Sanchez and ¶ 22 as to Palacio.  In their FIRST
AMENDED COMPLAINT, the same twelve hour span is identified for
each (see Doc. # 18, ¶s 20 and 30 respectively), rather than the
different hours each testified about at trial.  Note particularly
Sanchez's starting time being moved back an hour to 5:00 a.m. in
the interim between the pleading and trial stages.

    [5]  The "busy season" was identified by Sanchez as extending
"from April to October."  Tr. at 152:4-6.

City[6] where the company van was parked at 5:00 a.m., although he obviously did arrive at that location sometime before the actual roofing activities for the day started.  Tr. at 41:16-19, 42:1-4. Sage's practice was to send text messages to Sanchez beforehand providing the address for the next day's job, if any. (id. at 39:3-7; see also Pls.'s Ex 15 (sample text messages sent in the "P.M.").  The advanced notice provided by Sage allowed Sanchez to estimate the probable drive-time separating Oil City and the van's destination for the day.  We know from the testimony of Cleotilde Maldonado ("Maldonado"), defendants' "foreman,"[7] that most of the jobs were in the relatively compact County of Nassau with only "a few" in its easterly neighbor of Suffolk and fewer still in Queens County.  Tr. at 256:25-257:6; see also Pls.' Ex. 15 (listing job locations).  As a result, Maldonado credibly opined that "[the corresponding travel time typically] ha[d] to be something like 15 to 20 minutes."  Tr. at 256:4-8.  Yet Sanchez insisted that "most of the trips were long trips" and, accordingly, the time between 5:00 a.m. and the time the other members of the crew arrived at the job sites was supposedly spent driving to job sites.  That statement is irreconcilable with the

---

[6]  Although defendants ran the business out of Sage's home, the company van was parked during off-hours at a place in Oceanside, Nassau County called Oil City.  Tr. at 36:8-37:4.

[7]  When Sage was present at the job site, he, Sage, served as "foreman" directing the activities of the men, including plaintiffs.  Tr. at 31:8-20, 144:20-25.

15 to 20 minute time frame provided by Maldonado.  Moreover, the proposition that Sanchez allowed the same amount of travel time whether the customer resided in the same community as Oil City or, for example, in the far reaches of Suffolk County, strains credibility and is rejected.

Simply put, Sanchez has not produced, in the words of Anderson, credible evidence to permit the conclusion that his work days started at 5:00 a.m. "as a matter of just and reasonable inference."  Anderson, 328 U.S. at 687.  As a result the Anderson aid does not come into play as to when he started his workday.  Which is to say, Sanchez's testimony concerning how he usually spent the first couple hours of his day in defendants' employ is rejected as unworthy of belief.

16.  Sanchez also testified that during the busy season from April to October he worked five or six days a week from 5:00 a.m. to 7:00 p.m. and did so for the five years prior to his termination in mid-December 2015.  Tr. at 152:4-16.  His co-plaintiff Palacio testified that from "April up until December" he worked "[f]ive . . . sometimes six days a week and was at the job site from "7" or "7:30" a.m.[8] until 6:00 p.m.  Id. at 209:1-24.

17. Sanchez's claimed starting time of 5:00 a.m. has

_____

[8]  Unlike Sanchez, Palacio's workday began when he reported to the job site.

just been discussed.  In this Finding of Fact, plaintiffs'
purported concluding time at the job sites – which both set at
6:00 p.m. – will be addressed.

Here again, as was true of Sanchez's claimed starting
time of 5:00 a.m., the 6:00 p.m. figure is rejected as, inter
alia,  contrary to all the other trial evidence on point.   And,
here again, neither plaintiff benefits from the Anderson rule
because I believe their shared testimony on this point is
concocted.  While Maldonado's testimony dovetails with that of
plaintiffs as to the "normal[]" starting time at the job site of
between "7 and 7:30 [a.m.]", he identifies the concluding time as
"around 2 o'clock or sometimes earlier [and in any event] . . .
"no later than 3 o'clock."  Tr. at 263:10-264:10.

Naheem Scafe ("Scafe") was a co-worker of plaintiffs
since "July 2013."  Tr. at 276:3-10.  From that time through to
the end of 2015 – except for a stint in jail from July 25, 2014
to May 28, 2015, id. at 288:11-19 – he worked with both
plaintiffs.  Id. at 276:3 to 277:12.  He, like foreman Maldonado
and plaintiffs, set the starting time at the job sites at around
7:30 a.m. and, like Maldonado, recalled the workday ending long
before the 6:00 p.m. time claimed by plaintiffs.  Id. 277:20-
278:5.

Specifically the normal ending time, Scafe explained,
"ranged from 3:30 [to] 4:30" p.m. at the latest.  Tr. at 278:1.

To the extent a "job went past 2:30 or three o'clock" additional compensation of a hundred dollars was added to the employee's daily wage. Id. at 278:6-10.

On cross examination by plaintiffs' counsel, Scafe, when confronted with prior inconsistent deposition testimony, at first reaffirmed his direct testimony, tr. at 290:20-23, but later wavered by stating that the "workday usually began at 7:30 and ended at five," id. at 291:4-16. From the sum total of the above, and having observed his demeanor while testifying, I believe Scafe's testimony on direct more closely adheres to his recollection of the times involved.

18. To partially reiterate, I find Sanchez's and Palacio's testimony as to the ending times of their work day to be unworthy of belief. When either was pressed by defendants' counsel on the subject, each summarily invoked a common and unconvincing mantra, to wit: "All I know is that I worked from seven to six" – or from 5:00 a.m. until 7:00 p.m. for Sanchez – or some variation of that theme. Tr. at 222:6 (response by Palacio on cross examination to an inquiry as to whether he could name a specific week in which he worked over forty hours); see also id. at 198:11-12 (Sanchez on cross examination responding to the question of whether he worked the same number of hours every week: "All I know is that I got in at five and left a seven.").

At one point while on cross examination, Palacio went

off-message and spoke of "smaller jobs" where he finished before

5:00 p.m.  However he quickly returned to the 7:00 a.m. to 6:00

p.m. mantra as evidenced by following exchange:

> Q.  On the homes that were small, they took
> less time, correct?  Yes or no.
>
> A.  Of course.  Yes.
>
> Q.  And on those days, you left the job sites
> earlier than five o'clock; isn't that
> correct?
>
> A.  Yes, But not every day.
>
> Q.  As you sit here today, can you tell me in
> the calendar year 2015 a specific week in
> which you worked more than 40 hours.
>
> A.  I always worked from seven to six.

Tr. at 215:12-21.

The number of hours in each plaintiff's typical workday

at the job site is problematic.  The lack of clarity and

precision in plaintiffs' proof, however, is not primarily

traceable to defendants' lack of record keeping as ordinarily one

might expect to be the case.  Instead the inadequacy is rooted in

the unbelievable character of much of evidence presented by

plaintiffs concerning Sanchez's starting and ending times and

Palacio's proof as to the latter.

Surely, an employee's proof, when confronted with an

employer's inadequate or nonexistent payroll records, will not be

deemed sufficient to create a "just and reasonable inference" of

entitlement when such proof is believed to be bogus.  Anderson,

328 U.S. at 687.  Scafe, who worked side by side with plaintiffs, initially and credibly testified , as noted earlier, that the workday typically ended between 3:30 and 4:30 p.m.  Averaging those two times, I suspect that average workday probably was over sometime around 4:00 p.m.  In any event, plaintiffs' proffer as to hours worked per day is rejected for the reasons indicated.

19. At this juncture, having discussed plaintiffs' hours worked per day, attention will be focused on the days per week worked by Sanchez and Palacio.

Sanchez contends that from April to October he worked "[f]ive or six" days a week.[9]  Tr. at 152:7-10.  Palacio similarly spoke of working during the busy season "five[,] sometimes six" days every week.  Id. at 209:1-4.  Here again, Sanchez's and Palacio's testimony is at odds with that of the other trial witnesses, including plaintiffs' co-worker Scafe's whose low-level position in the company essentially paralleled theirs.

20. Before discussing the testimony given by Sanchez, Palacio, and Scafe as to the days worked per week, however, some

---

[9]  When deposed on June 8, 2017, Sanchez lacked the certitude he had at trial, at least as the number of days worked in 2015.  At that time when asked for the number of days he replied "I don't remember."  June 8, 2017 Dep. at 17:23-25; see also Sanchez's less-than-illuminating explanation given at trial for the inconsistency, tr. at 183:18-184:18 (Sanchez explained that he was "nervous" and "crying" when the relevant questions were posed.).  Id.

preliminary observations are in order.  Defendants had "five to seven individuals that performed services for their company" during the relevant time period.  Tr. at 26:15-18.  "Typically," but not always, "five guys work[ed] on a roof installation."  Id. at 26:22-25.  For roof repairs, it is unclear whether the same or different number of employees were usually called into service.  But that all hands did not work on all jobs has been acknowledged by, among others, plaintiff Sanchez when he volunteered about jobs with "three guys working there."  Id. at 174:13-20.

Maldonado, notwithstanding his longtime and strong association with Sage, tr. at 248:10-249:14, I found to be a generally credible witness.  He explained that when "we had a large job, everybody was there.  But if it was a smaller job, there were less people there. . . . With the small jobs it was very rare that [plaintiffs] would be there."  Id. at 245:21-246:7.  That makes sense and I accept it as accurate.  Maldonado also testified that although he as the foreman "may work four or five days" a week, plaintiffs each typically worked "three or four days" and never "five days."  Id. at 258:12-259:3.

Plaintiffs' co-worker Scafe – who, again, I found to be a credible witness — testified the same as Maldonado to the number of days worked per week.  Scafe explained that he worked with Sanchez and Palacio and he, Scafe, worked "around three, four days a week . . . never five days," tr. at 276:11-16

(referring to the year 2013); that same number of days per week
continued for Scafe's employment during 2014 and 2015, _id_. at
276:17-277:16.[10]

Based on the testimony of Maldonado and Scafe, I find
that each plaintiff worked, on average 3 1/2 days a week.

Palacio therefore worked considerably less than forty
hours a week throughout the relevant period (7:00 a.m. to 4:00
p.m. x 3 1/2 days = 31.5 hrs. a week). The corresponding hours
per week for Sanchez — even if it is assumed, contrary to the
fact, that his day started at 5:00 a.m. — falls short of 40 hours
(5:00 a.m. to 4: p.m., x 3 1/2 days = 38.5 hrs. per week).

To partially reiterate, I find that Sanchez's and
Palacio's testimony as to the extended hours each claimed to have
worked per day and the days claimed to have been worked per week
are the product of a calculated decision to provide materially
false information to the Court in an effort to establish their
claims to overtime. As such, neither plaintiff has proffered
sufficient information to give rise to a "just and reasonable
inference" of entitlement to overtime compensation thereby not
benefitting from the burden shifting mechanism set forth in
Anderson, 328 U.S. at 688. It is one thing for a worker to

---

[10] Scafe also testified, as did Maldonado, that he never
worked over 40 hours a week and does not believe that either
plaintiff did either. Tr. at 280:18-281:1 (as to Scafe's
testimony), _id_. at 242:22-243:7(as to Maldonado's).

provide his or her honestly held estimate of hours worked even though perhaps imprecise or possibly significantly inaccurate with the lack of precision being due to the employer's failure to maintain required time records, and deliberating proffering false information in an effort to bogusly create or inflate an overtime claim.  In my judgment, each plaintiffs' testimony falls into the latter category.

As the fact finder, my task was complicated not only by the flawed character of plaintiffs' testimony but also by the fact that Sage's testimony was often not a model of consistency vis-a-vis what he said at disposition.  Moreover, some of Sage's explanations were convoluted to say the least.  But the burden of proof rests with plaintiffs.  Unaided by the <u>Anderson</u> rule, neither Sanchez nor Palacio proved able to meet that burden.

Part V - Findings of Fact and Discussion as
to NYLL Wage Notice and Statement Claims

The NYLL claims will be discussed seriatim.

(a) <u>Sanchez's and Palacio's § 195 (1) Notice Claims</u>

21. Since April 9, 2011, NYLL § 195(1) has required employers, at the time of hiring and annually thereafter through December 28, 2014 to notify employees of, inter alia, their "rate or rates of pay and basis thereof [and] whether paid by hour, shift, day, week, salary, piece, commission or other."  NYLL § 195(1).

It is undisputed that defendants never served with plaintiffs with such wage notices at times of hiring or thereafter.  As a result, Sanchez and Palacio seek the associated statutory penalties set forth in NYLL § 198(1-b).

Section 198(1-b) provides in pertinent part that: "If any employee is not provided within ten business days of his or her first day of employment a notice as required by subdivision one of section one hundred ninety-five of this article he or she may recover in a civil action damages of fifty dollars for each work week that the violations occurred or continue to occur, but not to exceed a total of two thousand five hundred dollars, together with costs and reasonable attorney's fees."  Had plaintiffs been hired after the NYLL provided a private damages cause of action for § 195(1) violations, viz. April 9, 2011, they would have had a viable claim.  But such is not the case for each joined defendants years before that date.

"Employees who began working before the [Wage Theft Prevention Act] took effect on April 9, 2011 . . . are not entitled to bring a claim for an employer's failure to provide notice as required under NYLL § 195(1)."  <u>Franco v. Jubilee First Avenue Corp.</u>, 2016 WL 4487788 *13 (Aug. 25, 2016 S.D.N.Y.)(citing cases); <u>see also</u> <u>Demirovic v. Ortega</u>, 2018 WL 1935981, *6 (Apr. 24, 2018 E.D.N.Y.) and <u>Gamero v. Koodo Suchi Corp.</u>, 272 F. Supp. 3d 481, 509-11 (S.D.N.Y. 2017); <u>cf.</u> <u>Gold v. New York Life Ins.</u>

<u>Co.</u>, 730 F.3d 137, 143-44 (2d Cir. 2013).

In sum, both plaintiffs started working for defendants before April 9, 2011 and, accordingly, may not benefit from § 198(1-b)'s penalty provisions.

The reference in the text of § 195(1) which was effect from April 9, 2011 to December 28, 2014 about reissuing a wage notice annually does not alter that result. That is evident from § 198(1-b)'s language which speaks of its penalty provisions being activated solely if a wage notice "is not provided within ten business days of his or her first day of employment," absent any reference to annual renewals. <u>Guan Ming Lin v. Benihana New York Corp.</u>, 2012 WL 7620734 at *8 (Oct. 23, 2012 S.D.N.Y.)("The plain language of the statute confers a private right of action upon those who do not receive their notice at the time of hiring, but not upon those who do not receive it on or before February first of any subsequent year. NYLL § 198(1-b). In contrast, the provision giving the Commissioner of Labor the power to bring an action does not contain any limitations. Therefore, the proper interpretation of NYLL § 198(1-b) is that only employees who did not receive a proper wage and hour notice at the time of hiring can sue for a penalty pursuant to § 198(1-b).").

(b) Sanchez's and Palacio's § 195(3) Statement

Claims

(i) Plaintiffs' Starting Dates do not Bar

Recovery.

22. Unlike the situation with respect to § 195(1) in which plaintiffs' dates of hiring precluded recovery, the benefits under § 195(3) are available to Sanchez and Palacio. As explained in Demirovic:

> Section 195(3) requires that every employer provide to his or her employees "a statement with every payment of wages," listing various information including the dates of work covered by the payment, information identifying the employer and employee, details regarding the rate of pay and the overtime rate of pay, and the number of hours worked. N.Y. Lab. Law § 195(3). . . . The statutory duty, and thus the attendant statutory damages, applies each time the employer pays wages, and an employee's hiring date therefore does not affect entitlement to damages for wage statement violations after the statute's effective date.

2018 WL 1935981 at *7 (E.D.N.Y.). "Prejudgment interest is nto avaiable for violations of the wage statement . . . provision[]." Salustio v. Columbia Deli Corp., 264 F. Supp. 3d 540, 557 (S.D.N.Y. 2017).

(ii) NYLL Statute of Limitations and Periods

Worked by Plaintiffs

23. As noted earlier, Sanchez worked for defendants from 2003 until December 2015, while Palacio's period of

employment extended from 2006 to "September [of] 2014." Tr. at 220:3-6. The present action was commenced on April 26, 2016. Deducting the six year NYLL statute of limitations from that April date provides the launch point, viz. April of 2010, for evaluating plaintiffs' quest for statutory damages attributable to defendants' failure to provide wage statements.

Again as noted earlier, each plaintiff worked an average of three and a half days during the busy season, i.e. from April to October according to Sanchez. That time period translates into approximately 7 months or, alternatively, 28 weeks per year.

On the days plaintiffs were not working during the busy season, each was essentially "on call." Accordingly, defendants' delinquencies vis-a-vis furnishing wage statements are appropriately measured via the weeks involved. The wage statements should have been provided to plaintiffs on payday, i.e. each Saturday.

For the period from April 2010 until April 8, 2011, NYLL § 198 is silent as to the imposition of a weekly penalty. Beginning April 9, 2011 through February 26, 2015, Section 198 speaks of "damages of one hundred dollars for each work week that the statement violations occurred or continue[d] to occur, . . . not to exceed a total of two thousand five hundred dollars." NYLL § 198(1-d) (eff. April 9, 2011). As of February 27, 2015,

subsection 1-d was amended to increase the penalty to two hundred fifty dollars per work day, instead of work week, with a total cap now of five thousand dollars.

(iii) <u>Even Though Plaintiffs Only Worked an Average of Three and a Half Days a Week From April to October of Each Year, the Total Penalties Exceed the Relevant Statutory Maximums and Thus the Statutory Maximum Controls.</u>

24. The legitimacy of the proposition set forth in the caption of this section of the opinion becomes evident by multiplying the penalty amounts per week for violations of § 195(3) – or per "each work day" after February 26, 2015 for Sanchez — times the related periods during which the employees were not furnished the required statements.

Consider Palacio's entitlement under Section 195(3). He worked roughly seven months of each year for the period from April 2011 to April 2014 and for five months thereafter until his termination in September 2014. Multiplying the number of weekly statements he should have, but didn't receive, i.e. 104, times $100 for each non-furnished statement totals $10,400. The statutory cap for that period is $2500 and Palacio is therefore awarded that sum.

Similar computations for defendants' violations of § 195(3) vis-a-vis Sanchez produces a like, although more pronounced result, particularly when the post-February 26, 2015

penalty of $250 per work day figure is factored into the
analysis.

Finally, plaintiffs ask in their post-trial submissions
that the pre-February 27, 2015 statutory cap of $2,500 and the
amended cap of $5,000 be combined for a total award of $7,500.
This application, based on termination dates, pertains solely to
Sanchez.  In any event, a fair reading of § 195(3) and its
penalty provision, however, indicates that the change in § 198(1-
d) under discussion is simply a legislative amendment not an
invitation to double count the cash amounts by combining  the
pre-amendment cap with the replacement cap.  Which is to say, the
most plaintiff Sanchez may recover from defendants under § 198(1-
d) is $5,000.  See Jindan Wu v. National Tofu Restaurant Corp.,
2018 WL 1009274, at *8 (Feb. 20, 2018 E.D.N.Y.)("They are each
entitled to the statutory maximum of $5,000.  Each worked for
over twenty-five weeks without receiving a wage statement before
February 27, 2015, entitling them to $2,500.  And each worked for
another ten days without receiving a wage statement between
February 27, 2015, and the end of their employment with
defendants, entitling them to the remaining $2,500 of the
statutory maximum.").

Part VI - Sage and the Corporate Defendants
are Jointly and Severally Liable to Plaintiffs

25. Sage, acting serially through the defendant
corporations, was the plaintiffs' employer for NYLL purposes.  He

-30-

is, and has been since the mid-1970s, the sole operator of the enterprise and, for all relevant times, its lone shareholder and president. Simply put, he has had total operational control of its activities and is answerable for its violations of NYLL § 195(3) along with the involved corporations. See Khurana v. JMP USA, Inc., 2017 WL 1251102 at *9-10 (Apr. 5, 2017 E.D.N.Y.) and cases cited therein; see also Demirovic, 2018 WL 1935981 at *2.

<u>Part VII - Conclusions of Law</u>

1. Plaintiffs have not established their FLSA or NYLL overtime claims as alleged in Counts I and II.[11] However that failure does not effect the Court's subject matter jurisdiction. See Aquino v. El Gran Valle II Corp., 2017 WL 5195238, n.3 (Nov. 9, 2017 S.D.N.Y.) and cases cited therein. Since I have the authority to adjudicate the FLSA causes of action as framed by the pleading, it was appropriate for me, in the exercise of my discretion, to address the state-based wage notice and statement claims set forth in Counts III and IV under the doctrine of supplemental jurisdiction. See Kroshnyi v. U.S. Pack Courier Serv., Inc., 771 F.3d 93, 101-02 (2d Cir. 2014) and Air China, Ltd. v. Kopf, 473 F. App'x 45, 48 (2d Cir. 2012.)

2. Although plaintiffs' proof fell short as to Counts

---

[11] Parenthetically, whether the FLSA's two year statute of limitations is extended to three years due to defendants' conduct allegedly being willful is irrelevant given that plaintiffs have not proven an FLSA overtime violation.

I and II, they have established that they were employees, not independent contractors.  As such, the protections afforded to workers under the NYLL are germane.  As to defendants' admitted failure to furnish wage notices under § 195(1), their employment prior to the effective date of its penalty provisions precludes recovery as explained _supra_.  Their claims under § 195(3), however, as explained _supra_, are viable.  Sanchez is entitled to the statutory maximum of $5000 for its breach given that his employment by defendants spanned both the statute's original, as well as its amended, and higher penalty provisions.  Palacio is awarded $2500 since the defendants' § 195(3) violations occurred solely under the unamended statute with its $2500 maximum award provision.

   3.  Defendants, including defendant Sage, are jointly and severally liable to Sanchez for $5000 and to Palacio for $2500.  As explained in Part V, _supra_, as to those sums, no prejudgment interest may be awarded.  Salustio v. 106 Columbia Deli Corp., 264 F. Supp. 3d 540, 557 (S.D.N.Y. 2017).

   The above constitutes the Court's factual find and conclusions of law.

   In accordance with the foregoing, the Clerk of Court is directed to enter judgment as follows:

   1.  In favor of Plaintiff Jose Sanchez and against defendants First Class Home Improvement, LLC, Oceanside

First Class Roofing, Inc. and Ethan Sage, jointly and
severally, in the amount of $5,000.00, plus post-
judgment interest pursuant to 28 U.S.C. § 1961, on his
NYLL wage statement claim;

2.    In favor of plaintiff Antonio Mejia Palacio and
against defendants First Class Home Improvement, LLC,
Oceanside First Class Roofing, Inc. and Ethan Sage,
jointly and severally, in the amount of $2,500.00, plus
post-judgment interest pursuant to 28 U.S.C. § 1961, on
his NYLL wage statement claim; and

3.    In favor of defendants against plaintiffs dismissing
all other claims.[12]

SO ORDERED.

Dated: August 28, 2018
       Central Islip, New York


_____
DENIS R. HURLEY, U.S.D.J.

---

[12] To the extent plaintiffs wish to pursue their request for
attorneys' fees and costs they should file an appropriate motion
pursuant to Fed. R. Civ. P. 54(d).